**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IVAN ANTONYUK, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, and GUN OWNERS OF AMERICA NEW YORK, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. <u>1:22-cv-734 (GTS/CFH)</u> |
| KEVIN P. BRUEN, in his Official Capacity as Superintendent of the New York State Police, | ) ) ) ) | |
| Defendant. | ) ) ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

COME NOW Plaintiffs, Ivan Antonyuk, Gun Owners of America, Inc., Gun Owners Foundation, and Gun Owners of America New York, Inc. ("Plaintiffs"), by and through undersigned counsel, and allege as follows:

**I.      PARTIES**

1.      Plaintiff Ivan Antonyuk is a natural person, a citizen of the United States and of the State of New York, resides in Schenectady County, New York, and is a member of Gun Owners of America, Inc.  He is a law-abiding person, who currently possesses and has maintained an unrestricted New York carry permit since 2009, and who is eligible to possess and carry firearms in the State of New York.  Plaintiff Antonyuk is the kind of person discussed by the United States Supreme Court in its recent opinion in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___ (2022)

– that is, he is a typical, law-abiding citizen with ordinary self-defense needs, who cannot be dispossessed of his right to bear arms in public for self-defense.

2.      Plaintiff Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business at 8001 Forbes Place, Springfield, VA 22151.  GOA is organized and operated as a non-profit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code.  GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners.  GOA has more than 2 million members and supporters across the country, including residents of the Northern District of New York, and throughout the state of New York.  Many of these gun owners, like the individual plaintiff, will be irreparably harmed by New York's sweeping and unconstitutional changes to its concealed carry law recently passed in the Extraordinary Session and signed into law by New York Governor Hochul, and colloquially called the Concealed Carry Improvement Act ("CCIA"), which is scheduled to take effect on September 1, 2022.

3.      Gun Owners Foundation ("GOF") is a Virginia non-stock corporation with its principal place of business at 8001 Forbes Place, Springfield, VA 22151.  GOF was formed in 1983, and is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code. GOF is supported by gun owners across the country and within this district who, like the individual plaintiff, will be irreparably harmed by implementation of the CCIA.

4.      Plaintiff Gun Owners of America New York, Inc. ("GOA-NY") is a New York corporation registered with the State of New York. GOA-NY is organized and operated as a non-profit organization that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code.  GOA-NY was formed in 2017 to preserve and defend the Second

Amendment rights of gun owners.  GOA-NY has more than four hundred supporters in New York, some of whom reside in this district.  Many of these gun owners, like the individual plaintiff, will be irreparably harmed by the CCIA.

5.     Many of the irreparable harms to GOA, GOF, and GOA-NY's members and supporters, which will be caused by implementation of the CCIA, are alleged herein by GOA, GOF, and GOA-NY in a representational capacity on behalf of the interests of their members and supporters.  Each of these persons would have standing to challenge the CCIA in their own right.  Protection of these persons' rights and interests is germane to GOA, GOF, and GOA-NY's mission, which is to preserve and protect the Second Amendment and the rights of Americans to keep and bear arms, including against overreach by anti-gun politicians.  Litigation of the challenges raised herein does not require participation of each of GOA, GOF, and GOA-NY's individual members and supporters, and GOA, GOF, and GOA-NY are capable of fully and faithfully representing the interests of their members and supporters without participation by each of these individuals and entities.  Indeed, GOA and GOF routinely litigate cases throughout the country on behalf of their members and supporters.  *See e.g., Gun Owners of America, Inc., et al. v. Merrick B. Garland*, U.S. Supreme Court, No. 21-1215 (petition for certiorari pending).

6.     The members and supporters of GOA, GOF, and GOA-NY represent a diverse group of individuals across New York, including those who currently possess unrestricted New York state permits to carry firearms, those who possess restricted permits, and those individuals who, previously unable to demonstrate "proper cause" beyond ordinary self-defense needs, have not yet applied to receive permits since the Supreme Court's recent decision in *Bruen*.  That case bears the name of the same Defendant, and found that the state's prior requirement that a person

demonstrate "proper cause" as a condition of being issued a permit to carry a firearm to be blatantly unconstitutional.

7.     Defendant Kevin P. Bruen is sued in his official capacity as the Superintendent of the New York State Police.  As Superintendent, he exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public, including prescribing the form for Handgun Carry License applications. Defendant Bruen may be served at the New York State Police, Building 22, 1220 Washington Avenue, Albany, NY, 12226.

## II.     JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1651, 2201, 2202 and 42 U.S.C. §§ 1983 and 1988.

9.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## III.     STATEMENT OF FACTS

### a.  The Second Amendment.

10.     The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

11.     In its landmark 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly-uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an organized militia.  *Heller*, 554 U.S. at 581.  Setting the record straight, the *Heller* Court explained that the Second Amendment recognizes, enumerates, and guarantees to

*individuals* the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation.  *Id.* at 592.

12.     Then, in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment.  *Id*. at 791.

13.     In *Caetano v. Massachusetts,* 577 U.S. 411 (2016), the Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding ..." and that this "Second Amendment right is fully applicable to the States[.]"  *Id.* at 411, 416.

14.     As the Supreme Court has now explained in *Bruen*, the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home," free from infringement by either federal or state governments. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___ (2022) Slip Op. at 1.

15.     Importantly, in addition to clearly recognizing the right of "'law-abiding, responsible citizens' ... to public carry" (Slip Op. at 29, fn 9), *Bruen* also rejected outright the methodology used within this Circuit and other circuits to judge Second Amendment challenges.

16.     Prior to *Bruen*, the Second Circuit had adopted a two-part test for analyzing Second Amendment cases: "First, we 'determine whether the challenged legislation impinges upon conduct protected by the Second Amendment,' and second, if we 'conclude[] that the statute[] impinge[s] upon Second Amendment rights, we must next determine and apply the appropriate level of scrutiny.'" *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 883 F.3d 45, 55 (2d Cir. 2018). *See also Bruen*, Slip Op. at 10 fn. 4 (collecting cases using two-part test).  Other circuit courts also

5

had adopted and used a substantially similar formula, which invariably utilized the very same "judge-empowering 'interest-balancing inquiry'" that *Heller* had rejected.  *See Heller* at 634; *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017), *aff'd* 742 Fed. Appx. 218 (9th Cir. 2018) ("the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit.").

17.     Rejecting this widespread atextual, "judge empowering" (*Bruen*, Slip Op. at 13) interest-balancing approach, *Bruen* directed (again) the federal courts back to first principles, to assess the text of the Second Amendment, informed by the historical tradition.  *Bruen*, Slip Op. at 10.

18.     First, the Supreme Court "decline[d] to adopt that two-part approach" used in this and other circuits, and reiterated that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, Slip Op. at 8.

19.     Second, the Supreme Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, Slip Op. at 8. (citation omitted).

20.     Third, in reviewing the historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment (but noted that "post-ratification" interpretations "cannot overcome or alter that text," and "we

have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."). *See Bruen*, Slip Op. at 30-51 (discussing the lack of relevant historical prohibitions on concealed carry in public).

21.     In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" a protected "arm," then the ability to do so "shall not be infringed."  Period.  There are no "ifs, ands or buts," and it does not matter (even a little bit) how important, significant, compelling, or overriding the government's justification for or interest in infringing the right.  It does not matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment.  There are no relevant statistical studies to be consulted.  There are no sociological arguments to be considered.  The ubiquitous problems of crime or the density of population do not affect the equation.  The only appropriate inquiry then, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791, and perhaps during ratification of the Fourteenth Amendment in 1868. *Bruen*, Slip Op. at 29.

22.     Lest there be any doubt, the Supreme Court has also instructed as to the scope of the protected persons, arms, and activities covered by the Second Amendment.

23.     First, *Heller* explained that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset."  *Heller*, at 580.  *Heller* cited to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which held that "'[T]he people' … refers to a class of persons who are

part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*.

24.     Second, *Heller* then turned to the "substance of the right: 'to keep and bear Arms.'" *Id*. at 581.  The Court explained that "'[k]eep arms'" was simply a common way of referring to possessing arms, for militiamen *and everyone else*." *Id*. at 583.  Next, the Court instructed that the "natural meaning" of "bear arms" was "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id*. at 584. And "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id*.  *Bruen,* in fact, was more explicit, explaining that the "definition of 'bear' naturally encompasses public carry." *Bruen*, Slip Op. at 23.

25.     Third, with respect to the term "arms," the Court explained that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller* at 582.  Indeed, the "arms" protected by the Second Amendment include "weapons of offence, or armour of defence… Arms are any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, at 581 (punctuation omitted).

26.     Finally, it is worth nothing that, in addition to clearly establishing the framework by which lower courts are to analyze Second Amendment challenges, *Bruen* also provided several additional guideposts which are relevant to New York's CCIA challenged here.

27.     First, the Court rejected the statutory schemes of "may issue" states such as New York, whereby "authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria," such as when "the applicant has not demonstrated … suitability for the relevant license." *Bruen,* Slip Op. at 5.  Rather, the Court pointed to "'shall

issue' jurisdictions" wherein licenses are issued "whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Bruen,* Slip Op. at 4.

28.     Second, the Court explained that states have extremely narrow latitude to limit the places where firearms may be carried in public, mentioning only "sensitive places such as schools and government buildings." *Bruen,* Slip Op. at 21.  Although the Court acknowledged that other "new and analogous sensitive places" may exist, such potential locations would be highly limited, and certainly cannot be defined so broadly as to "include all 'places where people typically congregate'" or for New York to "effectively declare the island of Manhattan a 'sensitive place'" by claiming nearly every category of place to be a sensitive one.  *Bruen,* Slip Op. at 22.

29.     Third, the *Bruen* court acknowledged the inherent risk in *all* permitting schemes, "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen,* Slip Op. at 30 n.9.

30.     But in spite of the Supreme Court's clear pronouncements in *Bruen*, New York apparently did not 'get the memo.'  On the contrary, rather than representing a good-faith attempt to bring New York law into compliance with the Second Amendment and the *Bruen* decision, the CCIA instead doubles down, flouting the people's right to keep and bear arms, and in fact creating a far more onerous and restrictive concealed carry scheme even than that which existed prior to the *Bruen* decision (if such thing is possible).

31.     This Court's intervention is therefore necessary, to again make it clear to New York that it is not free to thumb its nose at the text of the Second Amendment and the opinions of the

Supreme Court, and that the Second Amendment is neither a "constitutional orphan" or a "second-class right." *See Silvester v. Becerra*, 138 S. Ct. 945 (2018) (Thomas, J., dissenting from denial of certiorari); *McDonald*, at 780; *Bruen*, Slip Op. at 62.

### b. New York's Gun Control Regime.

32.    New York represents an extreme outlier among the states, imposing all manner of severe infringements on the constitutional right to keep and bear arms.

33.    For example, New York requires a permit simply to purchase and possess any handgun.  Every handgun is thus registered with the state, and the serial number is affixed to the permit. *See* N.Y. Penal Law § 400.00(3).

34.    This requirement creates a de facto waiting period, due to the significant delay in issuance of such a permit, which New York estimates applicants "should expect [] to take a minimum of four months from the time of application until a license is either granted or denied."[1]

35.    Next, the 2013 New York "Safe Act" banned newly acquired so-called "assault weapons," while requiring registration of existing firearms for those individuals who had them.[2]

36.    So-called 'large capacity' magazines (which are really standard capacity magazines commonly sold in almost every other state) are generally banned in New York, subject to some exemptions.  *See* NY Pen. Law § 265.00(23); NY Pen. Law § 265.02(8).

37.    New York Requires background check for every firearm transfer,[3,4] including private sales, and requires a non-licensee to first notify the state that they are disposing (*i.e.*, selling) a firearm (N.Y. Penal Law § 265.10(7)).

---

[1] *See* https://www.ny.gov/services/how-obtain-firearms-license
[2] *See* https://safeact.ny.gov/resources-gun-owners.
[3] Transfers between immediate family members are exempt. *See* https://safeact.ny.gov/resources-gun-dealers.
[4] *See* https://safeact.ny.gov/resources-gun-dealers.

38.     In order to simply possess a handgun, a person must obtain a premise permit, which permits one only to possess a handgun within the home or place of business, but does not permit the person to take the handgun outside of the home, subject to few exceptions, such as traveling to a shooting range, shooting competition, or another dwelling where the licensee is authorized to take the firearm. *See* N.Y. Penal Law § 400.00(6).

39.     In order to carry a firearm outside the home, a person must obtain a carry permit, which could be "restricted" to allow carry only in certain places specifically identified on the license itself. *Id.* Indeed, a New York state carry license does not apply in New York City, which has its own permitting scheme. *See* N.Y. Penal Law § 400.00(6) (discussing New York City's application process).[5]

40.     Moreover, refusing to participate in the "reciprocity" agreements that are common between states across the country, New York does not honor the concealed permits of any other state.

41.     The difference between "restricted" and "unrestricted" permits was created not by the legislature, but rather by the judiciary, with judges adding various restrictions to licenses to carry. *See O'Brien v Keegan*, 87 N.Y.2d 436, 639 N.Y.S.2d 1004, 663 N.E.2d 316, 1996 N.Y. LEXIS 69 (N.Y. 1996) ("It was not unreasonable for licensing officer to restrict petitioner's unrestricted carry concealed license to hunting and target shooting in view of petitioner's inability to show need for unrestricted license, which would permit him to carry several concealed firearms.").

---

[5] *See also* https://www1.nyc.gov/site/nypd/services/law-enforcement/permits-licenses-firearms.page, and https://licensing.nypdonline.org/new-app-instruction/.

42.     "Open carry," meaning the unconcealed carry of a firearm, although legal in most states even without a permit, is entirely illegal in New York, as a carry license (authorizing only concealed carry) is the only way to carry a firearm outside the home.

43.     Finally, Prior to *Bruen*, New York law required that a person demonstrate a "proper cause" as a condition necessary to obtain a license to carry a firearm in public.  Proper cause has been interpreted to mean "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." *Kaplan v. Bratton*, 249 A.D.2d 199, 201, 673 N.Y.S.2d 66, 68 (App. Div. 1st Dept. 1998).

44.     In practice, then, ordinary persons with typical self-defense needs were found not to have "proper cause," and few New York residents were able to obtain a permit.  *See Kaplan, supra*; *see also Klenosky v. N.Y.C. Police Dep't*, 53 N.Y.2d 685 (1981); *see also Matter of Agro v. Shea*, 2022 NY Slip Op 30816(U) (Sup. Ct.).  The end result was a statutory scheme that wholly deprived ordinary citizens of the ability to armed self-defense outside the home.

45.     Yet although this nation's highest court recently rejected the New York statutory scheme, the recently enacted CCIA largely ignores the Court's decision, acting as if it is business as usual in the state.

### c.   New York's Most Recent Attempt at Gun Control – the CCIA.

46.     After the Supreme Court's complete rejection of New York's restrictive "may issue" carry scheme, the state legislature immediately went to work to craft new and improved ways to infringe on New Yorker's Second Amendment rights, seemingly to impose retribution on New York gun owners for successfully challenging its prior statute.

47.     Unhappy with the Supreme Court's opinion, and searching for ways to continue to restrict the ordinary New Yorker's ability to armed self-defense outside the home, the new

Governor of New York, Kathy Hochul, who took the place of Governor Andrew Cuomo, called an extraordinary session of the New York State Legislature for the purpose of enacting a new statutory scheme (the CCIA), designed to give the appearance of compliance with *Bruen*, but in reality thwarting and bypassing the Supreme Court's decision.

48.     The Governor herself issued several statements critical and disrespectful of the Supreme Court's ruling: "[t]he Supreme Court's reckless and reprehensible decision to strike down New York's century-old concealed carry law puts lives at risk here in New York,"[6] and "[a] week ago, the Supreme Court issued a reckless decision removing century-old limitations on who is allowed to carry concealed weapons in our state — senselessly sending us backward and putting the safety of our residents in jeopardy[.]"[7]  In other words, the Governor appears to have no desire to comply with the Supreme Court's *Bruen* decision, and every intention to thwart and undermine it through signing the CCIA into law, as a sort of guerrilla warfare against the Supreme Court, the rule of law, and the Second Amendment.

49.     This new bill, rushed through the extraordinary session and passed without the required public posting, comment and debate, has now introduced a slew of new, unprecedented, and blatantly unconstitutional impediments to New Yorkers in their attempt to exercise their constitutional right to armed self-defense outside the home.

50.     The bill, ironically called the Concealed Carry *Improvement* Act, is instead New York's attempt to flout the Supreme Court's holding in *Bruen*.  Instead of complying with that decision, the Assembly and Senate, with the Governor's glowing approval, have promulgated

---

[6] https://www.governor.ny.gov/news/governor-hochul-announces-extraordinary-session-new-york-state-legislature-begin-june-30.

[7] https://www.governor.ny.gov/news/governor-hochul-signs-landmark-legislation-strengthen-gun-laws-and-bolster-restrictions.

several blatantly unconstitutional new infringements of the enumerated right to keep and bear arms.

51.     A true and correct copy of the Bill is attached as Exhibit "1" to the Complaint.  A true and correct copy of the "Gun Control Bill Memo," summarizing the provisions of SB51001, is attached hereto as Exhibit "2."  For ease of viewing the changes in the Bill, a "redlined" version of the Bill is attached as Exhibit "3" to the Complaint.

### i.  Good Moral Character.

52.     To be sure, the CCIA removes the now-unconstitutional "proper cause" requirement from the prior statute.  In its place, the CCIA defines the malleable term "good moral character" to now mean "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others…."  Exhibit "1" at 2.

53.     However, the Second Amendment does not leave it up to the state of New York to decide whether to "entrust[]" its citizens with arms.  Rather, the right of all "the people" (not just the government's chosen favorites) "shall not be infringed."

54.     The concept of "good moral character" is a standardless notion, inevitably open to subjective interpretations by licensing individuals across the state who, based on history, may wish to continue to deny the law-abiding citizens of New York the ability to defend themselves in public.  A "I'll know it when I see it" standard for bestowing the privilege of licensure is a concept entirely foreign to the Second Amendment.

55.      As recently interpreted by a New York federal district court, "[g]ood moral character is more than having an unblemished criminal record. A person of good moral character behaves in an ethical manner and provides the Court, and ultimately society, reassurance that he

14

can be trusted to make good decisions." *Sibley v. Watches*, 501 F. Supp. 3d 210, 219 (W.D.N.Y. 2020)

56.     Yet, as noted above, the *Bruen* Court expressly rejected such a statutory scheme, which "grant[s] licensing officials discretion to deny licenses based on a perceived lack of need *or suitability*." *Bruen*, Slip Op. at 4-5 (emphasis added).  If a decision whether a person has "good moral character" is not a judgment about his "suitability" to carry firearms, it is hard to see what would be.

57.     Likewise, writing in concurrence in *Bruen*, Justice Kavanaugh rejected a "feature[] of New York's regime — the unchanneled discretion for licensing officials … in effect deny the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens.'" (Kavanaugh, J., concurring, Slip Op. at 2).

58.     Yet that is precisely what the CCIA permits, allowing licensing officials unbridled discretion to decide whether to "entrust[]" a person with constitutional rights, and to "require … such other information … that is reasonably necessary" to making that determination, another open-ended grant of authority, thus opening the door to a host of abuses, unequal enforcement, arbitrary and capricious, actions and the further erosion of the Second Amendment through the exercise of unbridled power and "unchanneled discretion."

### ii.  In Person Meetings, Social Media, and "Character References"

59.     In addition to requiring an applicant to demonstrate "good moral character," the CCIA imposes a litany of demands on those seeking a New York carry permit, including a requirement that the applicant "shall meet in person with the licensing officer for an interview and shall, in addition to any other information or forms required by the license application submit to the licensing officer the following information:

i.      names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home;

ii.     names and contact information of no less than four character references who can attest to the applicant's good moral character and that such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others;

iii.    certification of completion of the training required in subdivision nineteen of this section;

iv.     a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicants [sic] character and conduct as required in subparagraph (ii) of this paragraph; and

v.      such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application."

*See* Exhibit "1" at 4-5.

60.    In addition to constituting blatant infringements of the Second Amendment right to keep and bear arms, several of these demands (conditions of qualifying for a carry license) also represent gross infringements of applicants' First Amendment rights.

61.    For example, demanding the names and contact information (presumably for interrogation by licensing authorities) of relatives and co-habitants violates the First Amendment

16

right of association, along with anonymity rights of those who do not want to be contacted by government officials, or have their information entered into a government database.

62.     Demanding a list of and potentially access to some vague class of "social media accounts of the applicant" in order to issue a permit to carry a concealed weapon requires disclosure of protected First Amendment speech and press as a condition of exercising another protected constitutional right.

63.     Next, applicants must provide four character references to the government as a condition of exercising Second Amendment rights.  Unsurprisingly, other constitutional rights are not predicated upon what others think about you, or conditioned on having friends who will agree to stand up to government interrogation and scrutiny (or retaliation) in order to help another person obtain a carry license.  Notwithstanding that, those who do not have four "character references" presumably will be unable to exercise their Second Amendment rights.  Exhibit "1" at 5.

64.     Making matters worse, the CCIA demands that "character references" attest that the applicant "has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others." *Id*. at 5.  Of course, how someone would be in the omniscient position to attest that another person has not engaged in "*any act*" or made "*any statements*" of a certain nature seems a tall order indeed.

65.     Next, the requirement that nothing "suggest [an applicant is] likely to engage in conduct that would result in harm [justified or not] to themselves or others" is an open-ended and vague standard, as one hundred percent of those applying for a permit to carry a handgun in public, by definition, could be said to be "likely" to "harm" a carjacker through the morally legitimate and entirely lawful act of self-defense.

66.     It is axiomatic that the exercise of one constitutional right cannot be conditioned on the forfeiture or violation of another.  *See, e.g., Simmons v. United States*, 390 U.S. 377 (1968) (rejecting a situation where a defendant was forced to forfeit his Fifth Amendment right to keep silent in order to assert his Fourth Amendment right, calling that a "condition of a kind to which this Court has always been peculiarly sensitive," and concluding it to be "intolerable that one constitutional right should have to be surrendered in order to assert another.")  *Id*. at 393-94.  *See also Perry v. Sindermann*, 408 U.S. 593 (1972) (the government may not deny a person a benefit "on a basis that infringes his constitutionally protected interests ... For if the government could deny a benefit to a person because of his constitutionally protected [rights], his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly ... Such interference with constitutional rights is impermissible.")  *Id*. at 597. (punctuation omitted).

### iii.    Sensitive Locations.

67.     The CCIA next creates a new Section 265.01-e entitled "Criminal Possession of a firearm, rifle or shotgun in a sensitive location."  Exhibit "1" at 16.

68.     The list of "sensitive locations" contained in this section is extensive, and serves to bar the carry of firearms in most public places.

69.     "Sensitive location" is defined as:

(a) any place owned or under the control of federal, state or local *government*, for the purpose of government administration, including courts;

(b) any location providing *health*, behavioral health, or chemical dependance *care* or services;

(c) any place of *worship* or religious observation;

18

(d) libraries, public *playgrounds*, public *parks*, and *zoos*;

(e) the location of any program licensed, regulated, certified, funded, or approved by the office of *children and family services* that provides services to children, youth, or young adults, any legally exempt *childcare provider*; a childcare program for which a permit to operate such program has been issued by the department of health and mental hygiene pursuant to the health code of the city of New York;

(f) nursery *schools*, *preschools*, and summer *camps*;

(g) the location of any program licensed, regulated, certified, operated, or funded by the office for people with *developmental disabilities*;

(h)  the location of any program licensed, regulated, certified, operated, or funded by office of *addiction* services and supports;

(i) the location of any program licensed, regulated, certified, operated, or funded by the office of *mental health*;

(j)  the location of any program licensed, regulated, certified, operated, or funded by the office of temporary and *disability* assistance;

(k) homeless shelters, runaway homeless youth *shelters*, family shelters, shelters for adults, domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence;

(l) *residential settings* licensed, certified, regulated, funded, or operated by the department of health;

(m) in or upon any building or grounds, owned or leased, of any *educational institutions*, *colleges and universities*, licensed private career *schools*, school districts, public schools, private schools licensed under article one hundred

one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools;

(n) any place, conveyance, or vehicle used for *public transportation* or public transit, subway cars, train cars, buses, ferries, railroad, omnibus, marine or aviation transportation; or any facility used for or in connection with service in the transportation of passengers, airports, train stations, subway and rail stations, and bus terminals;

(o) any establishment issued a license for on-premise *consumption* pursuant to article four, four-A, five, or six of the *alcoholic beverage* control law where alcohol is consumed and any establishment licensed under article four of the cannabis law for on-premise consumption;

(p) any place used for the *performance, art* entertainment, gaming, or sporting events such as theaters, stadiums, racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission;

(q) any location being used as a *polling place*;

(r) any *public sidewalk* or other public area *restricted from general public access* for a limited time or special event that has been issued a permit for such time or event by a governmental entity, or subject to specific, heightened law enforcement

protection, or has otherwise had such access restricted by a governmental entity, provided such location is identified as such by clear and conspicuous signage;

(s) ***any gathering of individuals to collectively express their constitutional rights to protest or assemble***;

(t)  the area commonly known as *Times Square*, as such area is determined and identified by the city of New York; provided such area shall be clearly and conspicuously identified with signage.

*See* Exhibit "1" at pp. 16-18.

70.     The CCIA has certain exemptions, including for police, certain government employees engaged in the course of their duties, persons engaged in hunting, and persons operating a program in a "sensitive location out of their residence."

71.     Unlawful carry in any of these 20 categories of "sensitive locations" is a Class E Felony, conviction of which leads to the loss of Second Amendment rights.

72.     Although some of these "sensitive locations" must be marked conspicuously with signage, many are not required to be so marked, leaving carry license holders in peril of unintentionally violating the statute in a place they have no idea constitutes a "sensitive location" in the massive list above.

73.     Rather than concocting this extensive list of so-called "sensitive locations," it would probably have been easier for the legislature to list the places that New York, in its grace, *does allow* ordinary law-abiding citizens to exercise their rights.

74.     In addition to these numerous "sensitive locations," the CCIA also bans the carry of firearms in what it calls "a restricted location," defined in "§ 265.01-d Criminal possession of a weapon in a restricted location":

A person is guilty of criminal possession of a weapon in a restricted location when such person possesses a firearm, rifle, or shotgun and enters into or remains on or in private property where such person knows or reasonably should know that the owner or lessee of such property *has not permitted such possession by clear and conspicuous signage* indicating that the carrying of firearms, rifles, or shotguns on their property is permitted *or has otherwise given express consent*. [Exhibit 1, p19 (emphasis added).]

75.     Violation of this prohibition, like the prohibition on "sensitive locations," is a "class E felony" conviction of which leads to the loss of Second Amendment rights for life.  Exhibit 1 at 20.[8]

76.     In other words, the CCIA makes all private property in New York state a "restricted location" by default, with a property owner (such as a storekeeper) required to "conspicuously" post signage indicating that concealed carry is allowed.

77.     *Bruen* has expressly foreclosed the ability of New York to paint with such broad strokes, labeling vast swaths of the state to be "sensitive places" (or "sensitive locations" or "restricted locations"), explaining that:

> expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below…. Put simply, there is no historical basis for New York to effectively declare the island of

---

[8]     Not content with banning licensed carriers from carrying in most of New York, the CCIA now mandates that individuals who are otherwise licensed to carry, but who are entering a "no carry" zone, must remove the ammunition from their firearm and secure the firearm in an "appropriate safe storage depository out of sight from outside of the vehicle."  Exhibit "1" at 25. Mandating the removal of magazines and unloading firearms will unnecessarily introduce the possibility for accidental discharges. Mandating that individuals unload their lawfully carried firearms each time they leave their vehicle to enter a no carry zone will do nothing to ensure the safety of the firearm, will provide opportunities for the vehicle to be vandalized and the firearm stolen (by definition, by someone who is *not* law-abiding and, most likely by someone who is *not* a carry license holder), and can potentially cause injuries or, at a minimum, "man with a gun" calls to police when passers by witness a gun owner unloading, storing, or reloading his firearm. Indeed, New York affirmatively stated that a glove box or glove compartment "shall not be considered an appropriate safe storage depository," meaning something less discrete will be required.  *Id*. at 25.

Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.  [*Bruen*, Slip Op. at 22.]

78.    Disregarding the Court's warning not to turn the entire state into a "sensitive place," New York has essentially told the Court "challenge accepted," with the CCIA effecting virtually that result.

79.    With "sensitive locations" covering most public locations and locations that have some tie to or involvement with state government, and "restricted location" covering all private property by default, it is hard to imagine how a carry license holder could so much as leave home without running afoul of the CCIA.  That is precisely the result that *Bruen* warned against.

80.    New York's new "sensitive locations" and "restricted locations" provisions are unconstitutional on their face, serve only to "eviscerate the general right to publicly carry arms for self-defense," and create a situation that is even more onerous and restrictive than that which existed prior to the *Bruen* decision.

81.    Additionally, by listing as a "sensitive location" any location where individuals exercise their First Amendment rights to association and protest (subsection s), the CCIA takes away Second Amendment rights for those who exercise their First Amendment rights.

### iv. New York's Second Amendment Tax.

82.    The CCIA's licensing scheme adds a slew of new requirements to the demands placed on a carry license applicant, which will disproportionately affect individuals who cannot devote the new "minimum of sixteen hours of in-person live curriculum" that New York demands all permittees acquire. *Id*. at 39.  This course also requires two hours of live-fire training, apparently resulting in a total training demand of 18 hours.  *Id*.

83.     Prior to this new law, only a four-hour course was required, with many trainers offering the course for approximately $75.00[9,10] and some offering it for $50.00.[11]

84.     The new 16-hour course, with an additional two hours live-fire, is estimated to run in approximately the $400 dollar range, plus the cost of ammunition for "live fire" (perhaps $50 or more), not to mention the significant time investment required for individuals to take off potentially three days of work to complete a training requirement that is now four and half times what was previously required.

85.     Adding further draconian layers to the application process, those who already possess a valid carry license will be required to complete this 18-hour training process upon renewal of their license, meaning such persons now have a total training requirement of 22 hours (versus 18 hours for new applicants). *Id.* at 40.  In other words, those who have already possessed licenses without incident are put to a higher standard than are new applicants, essentially creating two classes of license holders within the state.

86.     The CCIA's new training requirement and associated costs, which is obviously designed with the intent to increase the cost associated with exercising an enumerated right, ignores *Bruen*'s footnote 9 which stated that "we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."  Slip Op. at 30.

87.     Prior to losing *Bruen*, New York did not require such an extensive and expensive training requirement.  Rather, for many years, New York has deemed four hours sufficient to train

---

[9] https://ftwny.com/coursedetails/.
[10] https://theindoorgunrange.com/basic-pistol-safety-1.
[11] https://www.donssecurityservices.com/product/nys-pistol-permit-safety-course/.

individuals to carry firearms in public.  The mere fact that Bruen now requires the state to recognize the rights of its citizens does not justify a 4.5-fold increase in training.

### d.  The CCIA Has Been Condemned by the State's Law Enforcement Officials.

88.     Though it was only recently enacted, the CCIA has received significant, well-deserved criticism, including from the New York State Sheriff's Association ("NYSSA"), which represents the chief law enforcement officers across the state whose duty it is to decide whether the CCIA can be constitutionally enforced, or whether their oath to the Constitution demands otherwise.

89.     In fact, the NYSSA issued a public statement on July 6, 2022, critical not only of the CCIA, but also the way it was enacted.   Specifically, the NYSSA stated, "Once again the New York State Legislature has seen fit to pass sweeping new criminal justice laws that affect the rights of millions of New York citizens, and which impose burdensome new duties on local government officials, without any consultation with the people who will be responsible for carrying out the provisions of those new laws."[12]

90.     The NYSSA went on to state, "The new firearms law language first saw the light of day on a Friday morning and was signed into law Friday afternoon.  A parliamentary ruse was used to circumvent the requirement in our State Constitution that Legislators — and the public — must have three days to study and discuss proposed legislation before it can be taken up for a vote. The Legislature's leadership claimed, and the Governor agreed, that it was a 'necessity' to pass the Bill immediately, without waiting the Constitutionally required three days, even though the law would not take effect for two full months.  Consequently, law enforcement agencies and the courts, which bear most of the responsibility for implementing the new licensing laws, were

---

[12] https://nysheriffs.org/statement-concerning-new-yorks-new-firearms-licensing-laws/

deprived of any opportunity to point out to Legislators the burdensome, costly, and unworkable nature of many of the new laws' provisions.  And, of course, our citizens, whose rights are once again being circumscribed, probably again in unconstitutional ways, had no opportunity to communicate their concerns to their legislative representatives."

91.     Finally, the NYSSA disclaimed support for "punitive licensing requirements that aim only to restrain and punish law-abiding citizens who with to exercise their Second Amendment rights."

92.     Peter Kehoe, the executive director of the New York State Sheriff's Association, "which represents all 58 sheriffs across New York state," was interviewed by CBS 6 (WRGB), and claimed that this new law infringes on the Second Amendment by "creating a rule [citizens] can't abide by."[13]

93.     Indeed, the Sheriffs and their deputies will be responsible for enforcing the draconian new restrictions in the CCIA, and also responding to the inevitable "man with a gun" calls about citizens who are complying with CCIA by removing their firearms from their person, separating the magazine and ammunition from the handgun, and then storing the firearm in an approved container, all in public view.

e.     **Plaintiff Ivan Antonyuk**

94.     Plaintiff Ivan Antonyuk is an adult male citizen of the State of New York, residing in Schenectady County within this district, and is a citizen of the United States.  He is a law-abiding person, and has no disqualification under state or federal law which would prohibit him from possessing a firearm.  *See* Declaration of Ivan Antonyuk, Exhibit "6."

---

[13] https://cbs6albany.com/news/local/nys-sheriffs-new-gun-laws-unconstitutional-by-creating-rules-impossible-to-follow.

95.     In addition to the fact that the CCIA on its face violates Mr. Antonyuk's First and Second Amendment rights, there is another, more personal reason that Mr. Antonyuk is unwilling to submit to New York's new and unconstitutional demands.

96.     Plaintiff Antonyuk is originally from Ukraine.  *See* Exhibit "6" at ¶ 4.

97.     In early 1990's Ukraine, crime was rampant. The country was run by mafia and criminals, while ordinary citizens were not allowed to own firearms to protect themselves.  Indeed, only the government and their chosen protectors had access to arms.  *Id*. at ¶ 4

98.     This left the Ukrainian people with no means to defend themselves from crime, whether committed by petty criminals or the government itself.  The police were often hours away when called, if they came at all, and the Ukrainian people had no right to free speech and no right to protest. *Id*. at ¶ 6.

99.     During his childhood, Plaintiff Antonyuk witnessed attacks on the citizens of Ukraine by the government for the simple act of protesting.  Indeed, he was a victim of government violence during a protest in which he was not involved, but nevertheless was beaten by the police for simply being in the general vicinity of the protest. *Id*. at ¶ 7.

100.     In 1994, Mr. Antonyuk fled Ukraine in favor of the United States and its promise of freedom, moving to New York, where he became a citizen of the United States in 1999.  He has lived in New York ever since. *Id*. at ¶ 9.

101.     In coming to the United States, and New York in particular, Mr. Antonyuk was not seeking to exchange one totalitarian regime for another.

102.     For example, Mr. Antonyuk does not wish the government to have access to his social media accounts, as that infringes and chills his right to speak without government

interference and without the government looking over his shoulder to see (and either approve or disapprove of) what he is saying. *Id*. at ¶ 19.

103.    Starting in approximately 2014, Ukraine *ostensibly* liberalized its firearms ownership laws, and the Ukrainian people could possess certain firearms, but *only if – like in New York – they were deemed fit to own them by the government*.  Nevertheless, in the presence of more armed civilians, crime started to decrease immediately.

104.    When Russia invaded Ukraine in 2022, the Ukrainian government began to arm its civilians so they could fight against the Russians.[14]  And the Ukraine parliament passed a law allowing citizens to carry firearms in public.[15]

105.    In other words, Mr. Antonyuk has firsthand experience with the dangers that inevitably occur when the government prohibits its citizens from keeping and bearing arms, and has first-hand knowledge of the results that occur when a population is disarmed.  Whether from criminals, one's own government, or foreign invaders, Mr. Antonyuk has experienced it all, and is particularly sensitive to the CCIA's attempts to institute a whole host of new infringements of his Second Amendment rights.

106.    Mr. Antonyuk is not prohibited from owning, possessing or transporting firearms in New York and, indeed, lawfully owns firearms and currently possesses an unrestricted New York carry license, which was issued in March of 2009.  Mr. Antonyuk has continuously held a carry license since then and it has never been revoked or suspended.  *Id*. at ¶¶ 3, 11.

107.    Mr. Antonyuk wishes to continue to lawfully carry his handgun in public which, as *Heller* and *Bruen* have explained, are the "the quintessential self-defense weapon." *Bruen*, Slip Op. at 39; *see also id*. at 23 ("weapons 'in common use' today for self-defense").  *Id*. at ¶ 12.

---

[14] https://www.washingtonpost.com/world/2022/02/26/ukraine-russia-militias/.
[15] https://www.businessinsider.com/ukraine-parliament-passes-law-allowing-citizens-to-carry-firearms-2022-2.

108.    Because New York carry licenses must be recertified after five years (*see* NY CLS Penal § 400.00(10), Plaintiff Antonyuk will be required to renew or recertify his permit in January 2023, shortly after the CCIA takes effect in September 2022. *Id.* at ¶ 13.

109.    However, Mr. Antonyuk does not wish to provide his protected First Amendment communications to the government of New York for scrutiny, and does not want to provide a list of his friends and their whereabouts to the government for interrogation, as conditions precedent to his being permitted to continue to exercise his Second Amendment right to carry a firearm in public.  It is axiomatic that the government may not condition the exercise of one right on the forfeiture of another.[16] *Id.* at ¶ 19.

110.    These demands in the CCIA are far too reminiscent of the regime that Mr. Antonyuk fled decades ago, and violate this country's promises of a free society that Mr. Antonyuk was seeking, as enshrined in our founding documents and guaranteed by the Bill of Rights.

111.    As a current carry license holder, Plaintiff Antonyuk has already met all existing statutory requirements in order to obtain and maintain an unrestricted permit to carry.  *See* N.Y. Penal Law § 400.00.  Mr. Antonyuk does not wish to complete an additional 16-hour course, plus a two-hour live fire course (at the cost of hundreds of dollars), as now mandated by the CCIA (Exhibit "1" at p. 39), simply to continue exercising the same right to carry that he has exercised, without incident, since 2009.  *See* Exhibit "6."

---

[16] *See State v. Irving*, 114 N.J. 427, 456-57, 555 A.2d 575, 590-91 (1989) (Handler, J., dissenting) "The right to an alibi defense and the right to remain silent are two separate constitutional rights. Exercise of one should not be conditioned on waiver of the other. Just as in *Simmons v. United States, supra*, 390 *U.S.* at 377, 88 *S.Ct.* at 967, 19 *L.Ed.*2d at 1247, where exercise of the fourth amendment cannot be conditioned on waiver of the fifth; *Lefkowitz v. Cunningham, supra,* 431 *U.S.* at 801, 97 *S.Ct.* at 2132, 53 *L.Ed.*2d at 1, where the first amendment right to hold political office cannot be conditioned on waiver of the fifth; and *Brooks v. Tennessee, supra*, 406 *U.S.* at 605, 92 *S.Ct.* at 1891, 32 *L.Ed.*2d at 358, where waiver of the privilege cannot be conditioned on giving up the right to have the prosecutor bear the burden of proof first, we should not allow such a choice between constitutional rights."

112.   Mr. Antonyuk will also now be barred from lawfully carrying his firearm in places where he previously has been permitted to carry.  For instance, when Plaintiff is lawfully carrying his firearm, now he will have to store it in his vehicle if he were to go into a gas station that has not affirmatively announced that it permits concealed carry within the premises.  *See* Exhibit "1" at p. 19.

113.   This CCIA's prohibition on carry in "restricted locations" infringes on Plaintiff Antonyuk's right to bear arms in public, because it commandeers all private property in New York state, declares it to be a gun-free zone, and then allows a limited right for property owners to opt out of the state's no gun scheme, but only after they engage in compelled speech (the placement of a clear statement that guns are permitted on the premises).

114.   If Plaintiff Antonyuk visits a store that is not posted to permit him to carry, he will be required to disarm himself, remove the ammunition and magazine from the firearm, and store the firearm separately from the ammunition, an inherently risky activity when done inside a vehicle while in public view.  *Id*. at ¶¶14-17.

115.   Plaintiff Antonyuk believes that these requirements increase the risk that law abiding gun owners could experience an accidental discharge, because they will be forced to unnecessarily remove their firearm, empty the round from the chamber, and then separate the ammunition.  Conversely, when they return to their vehicle, they will be doing this process in reverse, again increasing the risk of an accidental discharge for no reason.

116.   Plaintiff Antonyuk's Second Amendment rights are unconstitutionally infringed by the State of New York and the CCIA's new licensing scheme, which leaves him with less of a constitutional right to bear arms in public than he had before the law was passed and even before the Supreme Court's opinion in *Bruen* was handed down.

      **f.   Plaintiffs Gun Owners of America, Inc., Gun Owners Foundation, and Gun Owners of America New York, Inc.**

117.   Plaintiffs GOA, GOF, and GOA-NY together have tens of thousands of members and supporters within the state of New York, many of whom, like Plaintiff Antonyuk, reside within this district, and will be irreparably harmed by implementation of the CCIA.  *See* Declaration of Erich Pratt, Exhibit "4;" Declaration of William Robinson, Exhibit "5."

118.   GOA, GOF, and GOA-NY's members and supporters within New York represent a wide variety of those who will be detrimentally affected (and irreparably harmed) by the CCIA.

119.   GOA, GOF, and GOA-NY's members and supporters include those individuals with unrestricted carry permits will no longer be allowed to carry in New York in the same manner and to the same extent as they have been before this new law went into effect, because of the CCIA's ban on carry in what it defines as "sensitive places" and "restricted locations."

120.   GOA, GOF, and GOA-NY's members and supporters include those who currently possess valid permits, but will be required to recertify or renew their permits after the CCIA takes effect, thereby subjecting themselves to invasive First Amendment audits by the government as a condition to being "permitted" to exercise their Second Amendment right to carry a firearm in public.  Additionally, GOA, GOF, and GOA-NY's members and supporters will also have to expend significant sums of money and devote substantial time to complete a new, yet to be defined, training course.

121.   GOA, GOF, and GOA-NY's members and supporters include those who will seek to apply for new carry licenses after the effective date of CCIA, and will be irreparably harmed by this new law because they will be subjected to invasive First Amendment audits, expend significant sums of money to take training classes, *still* will not be able to carry in a majority of places due to

New York's "sensitive places" and "restricted location" definitions, and will be required to disarm themselves when entering any private property that is not marked with signage allowing carry.

122.    GOA, GOF, and GOA-NY's members and supporters include those individuals without permits who are ordinary law-abiding people with typical self-defense needs (as discussed in *Bruen*, Slip Op. at 63), but who will not be able to acquire carry licenses because they will not be able to meet the "good character" showing, as it is vague and ambiguous and leaves it entirely open to the unchanneled discretion of licensing officials.

123.    Moreover, for those without a wide social network or who are recent transplants to the state, and who are unable to provide "no less[17] [sic] than four character references," such persons will not be able to meet the new requirements of the CCIA, and will be unable to exercise their Second Amendment right to bear arms.

124.    The CCIA is the Governor's and the Legislature's attempt at evade binding Supreme Court precedent, making it more difficult for the average New Yorker to exercise Second Amendment rights than before *Bruen*.

125.    GOA, GOF, and GOA-NY's members and supporters, including those who have not yet applied for a carry permit, will be irreparably harmed by the CCIA, which exists only to continue the state's infringements on New York's citizens' rights.

**COUNT I**

**U.S. CONST., AMEND. II**

126.    The foregoing allegations are repeated and realleged as if fully set forth herein.

127.    The CCIA infringes Plaintiffs' Second Amendment rights that "shall not be infringed."

---

[17] Apparently the legislature doesn't know the distinction between less and fewer.

128.    First, Plaintiff Antonyuk (not to mention the thousands of members and supporters of the organizational plaintiffs) is a member of "the people" who desire to "bear" a quintessential protected "arm" (a handgun) in public.

129.    Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, Slip Op. at 8.

130.    Thus, the burden is on the government to justify the CCIA based on the historical tradition of the activity that it is now attempting to regulate and ban.

131.    However, there is no historical analogue for any of the new and onerous requirements in the CCIA. The exorbitant fees, slew of non-sensitive "sensitive locations" and "restricted locations" which include very public places (like parks and sidewalks), and incredulous demands for carry license applicants, all are entirely without historical example, and thus violate the Second Amendment.   Indeed, the Defendant must historically justify *each* of its "sensitive locations" defined in the CCIA.  *See* Exhibit "1", pp. 16-18.

132.    Thus, CCIA violates the Second Amendment.

133.    Not to mention failing the *Bruen* framework, the CCIA expressly violates the Supreme Court's explicit instructions (and binding holdings) in *Bruen*.

134.    First, *Bruen* disapproved of discretion during the permitting process, instead making clear that governments may rely only rigid statutory criteria.  *Bruen*, Slip Op. at 4-5.  The CCIA, however, includes a malleable "good moral character," which is inherently a judgment call and invites discretion and the abuses that stem from unbridled discretion.

135.    Second, New York has abused the narrow exception for "sensitive places" to include innumerable places that clearly do not fall under that doctrine, doing precisely what the Supreme Court found unavailing in *Bruen*: "effectively declare the island of Manhattan a 'sensitive place'…." *Bruen*, Slip Op. at 22.

136.    Indeed, the CCIA has wandered far afield, coopting and declaring all private property to be a "restricted location," and requiring that property owners affirmatively allow firearms on the premises.

## COUNT II

### U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST DEFENDANT

137.    The foregoing allegations are repeated and realleged as if fully set forth herein.

138.    As such, Defendant's laws, customs, practices, and policies, reducing the Second Amendment's protection of the right to "bear arms" in public to an inkblot, damages Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

139.    By infringing the Second Amendment right to bear arms in public in these ways, the New York laws and regulations discussed in the foregoing allegations violate the Second Amendment, which applies to Defendant by operation of the Fourteenth Amendment, both facially and as applied to Plaintiff Antonyuk and members and supporters of GOA, GOF, and Gun Owners of America New York, and they are therefore invalid.

## COUNT III

### U.S. CONST., AMEND. I

140.    The foregoing allegations are repeated and realleged as if fully set forth herein.

141.    The CCIA unlawfully requires the Plaintiffs to provide "social media" accounts to the government, along with a list of names and contact information of their family and friends. This blatantly unconstitutional demand to exercise a constitutionally protected right cannot stand.

142.    The CCIA will chill the protected speech of Plaintiffs, including members and supporters of GOA, GOF and GOA-NY, will not know what they can and cannot say in their private lives and in their private social media, and whether their exercise of protected speech and press rights may one day give a licensing officer pause in issuing a license to exercise an entirely different constitutionally protected right.

143.    As such, Plaintiffs, including members and supporters of GOA, GOF and GOA-NY, will self-censor, knowing that government agents will have access to and be required to scrutinize Plaintiffs' social media in the future.

144.    Entirely legitimate First Amendment speech can theoretically form the basis for denial of good moral character, such as (for example) from sovereign citizens who do not recognize and reject government authority, those who engage in antigovernment rhetoric, or those who exaggerate and use hyperbole in their social media posts.

145.    Justice Thomas, in a dissent to denial of certiorari in a previous Second Amendment challenge, listed various cases where the First Amendment has been held to protect speech that would likely run afoul of New York's social media censors, leading to a denial on the basis that the applicant is not of "good moral character:" *see Silvester v. Becerra*, 138 S. Ct. 945, 951 (2018) (Thomas, J., dissenting from denial of certiorari) "*Forsyth County v. Nationalist Movement*, 505 U. S. 123 (1992) (holding that the First Amendment forbids a county from charging even a small permitting fee to offset the costs of providing security for a white-nationalist rally); *Virginia v. Black*, 538 U. S. 343 (2003) (holding that the First Amendment protects the burning of a 25-foot

cross at a Ku Klux Klan rally); *Brandenburg v. Ohio*, 395 U. S. 444, 446, n. 1 (1969) (per curiam) (holding that the First Amendment protects a film featuring Klan members wielding firearms, burning a cross, and chanting "'Bury the n*****s'")."

146.     If the above is protected speech under the First Amendment, then New York may not use protected First Amendment activity to deny the exercise of another right simply based upon content or opinions of which the State of New York does not approve.

**COUNT IV**

**U.S. CONST., AMEND. I, 42 U.S.C. § 1983 AGAINST DEFENDANT**

147.     The foregoing allegations are repeated and realleged as if fully set forth herein.

148.     The New York laws and regulations discussed in the foregoing allegations violate the First Amendment, which applies to Defendant by operation of the Fourteenth Amendment, both facially and as applied to Plaintiff Antonyuk and members and supporters of GOA, GOF, and Gun Owners of America New York and they are therefore invalid.

149.     Because Defendant's laws, customs, practices, and policies, reducing the First Amendment's guarantee of freedom of speech to New York approved speech, it damages Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

150.     By infringing the First Amendment's protections in these ways, the New York laws and regulations discussed in the foregoing allegations violate the First Amendment, which applies to Defendant by operation of the Fourteenth Amendment, both facially and as applied to Plaintiff Antonyuk and members and supporters of GOA, GOF, and Gun Owners of America New York, and they are therefore invalid.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendant as follows:

1. An order preliminarily and permanently enjoining Defendant, its officers, agents, servants, employees, and all persons in active concert or participation with him who receive actual notice of the injunction, from enforcing the challenged sections of SB51001;

2. An order declaring that the challenged sections of SB51001 are unconstitutional and violate the First, Second, and Fourteenth Amendments to the United States Constitution;

3. An order declaring the challenged sections of SB51001 unenforceable;

4. Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988;

5. Such other Declaratory relief consistent with the injunction as appropriate; and

6. Such other further relief as the Court deems just and appropriate.

Dated:  July 11, 2022.

Respectfully submitted,


*/s/ Stephen D. Stamboulieh*          Robert J. Olson (VA # 82488)
Stephen D. Stamboulieh              William J. Olson, PC
Stamboulieh Law, PLLC               370 Maple Ave. West, Suite 4
P.O. Box 428                        Vienna, VA 22180-5615
Olive Branch, MS  38654             703-356-5070 (T)
(601) 852-3440                      703-356-5085 (F)
stephen@sdslaw.us                   wjo@mindspring.com
NDNY Bar Roll# 520383               *Pro Hac Vice paperwork forthcoming*