**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

IVAN ANTONYUK, GUN OWNERS OF   )
AMERICA, INC., GUN OWNERS      )
FOUNDATION, and GUN OWNERS OF  )
AMERICA NEW YORK, INC.,        )
                               )
Plaintiffs,                    )
                               )   Civil Action No. 1:22-cv-00734-GTS-CFH
v.                             )
                               )
KEVIN P. BRUEN, in his Official )
Capacity as Superintendent of the New )
York State Police,             )
                               )
                               )
Defendant.                     )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY AND/OR PERMANENT INJUNCTION**

# TABLE OF CONTENTS

I.      Introduction……………………………………………………………………1

II.     Plaintiffs Have Standing………………………………………………….........1

III.    Plaintiffs Are Entitled to a Preliminary Injunction…………………………....5

        A. Plaintiffs Are Likely to Succeed on the Merits…………………………....5

            i.   The CCIA is repugnant to a plain reading of the Second Amendment, and contrary to the Supreme Court's clear teachings in *Bruen*……………..…..6

            ii.  The CCIA is a legislative repudiation of *Bruen*………………………………6

            iii. "Good Moral Character"……………………………………………………8

            iv.  In Person Meetings, Social Media, and "Character References"…………......9

            v.   The CCIA declares nearly all of New York to be a "sensitive place"……….17

            vi.  The CCIA demands almost five-times the amount of training previously required……………………………………………………………………....19

            vii. Under *Bruen's* "historical tradition" standard of review, New York cannot come close to justifying the CCIA's provisions……………………………..…20

        B.  Plaintiffs Are Likely to Suffer Irreparable Harm Absent Preliminary Relief…....23

        C.  The Balance of Equities Tips Overwhelmingly in Plaintiffs' Favor……...............24

        D.  An Injunction Is in the Public Interest………………………………….…………..24

IV.     Conclusion………………………...……………………………………………....25

## I.     Introduction.

New York continues its history of infringing the Second Amendment right to bear arms, treating most law-abiding people as unworthy of the natural right to self-defense. In response to the U.S. Supreme Court's recent vindication of the People's rights to keep and bear arms in public in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 2022 U.S. LEXIS 3055 (2022), New York has enacted new restrictions in explicit contravention not only of the Court's holdings, but also the text of the First, Second, and Fourteenth Amendments. Compl. ¶¶ 46–50. New Yorkers now face the impending reinstitution of discretionary licensing standards, imposition of draconian carry restrictions in a cornucopia of nonsensitive public places, invasion of protected First Amendment conduct, a four-and-a-half-times expanded training requirement and accompanying exorbitant costs, and conversion of private property into de facto "gun free zones" that "would eviscerate the general right to publicly carry arms for self-defense," *Bruen*, at *38. Plaintiffs request that this Court enter a preliminary injunction before the law goes into effect to prevent the irreparable harm that will befall Plaintiffs absent emergency relief.

## II.    Plaintiffs Have Standing.

To show standing, an individual plaintiff must suffer a concrete and particularized invasion of a legally protected interest that is either actual or imminent. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). This injury must be fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision. *Id.* at 560–61. For pre-enforcement challenges, "[a] party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. FEC*, 554 U.S. 724, 734 (2008). "[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).   Finally, an organizational plaintiff has standing to sue as the

representative of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Due to the incontrovertible constitutional violations at issue here, Plaintiffs easily satisfy these requirements.

Plaintiff Antonyuk currently holds an unrestricted New York carry license, which has enabled him to carry a handgun for self-defense in public places that will now be off limits under New York's so-called Concealed Carry "Improvement" Act (CCIA), scheduled to take effect on September 1, 2022. *See* Compl. ¶¶ 106–07, 112–14. *See also* Dec. of Antonyuk, Compl. Ex. "6", ¶ 3. Mr. Antonyuk wishes to "continue to lawfully carry [his] handgun in public, which [he] has done since 2009." *Id*. at ¶ 12. However, Mr. Antonyuk will be prohibited from carrying a firearm in any of the numerous categories of "sensitive locations" and "restricted locations" as now defined in the CCIA, including all private property, such as private businesses that do not take affirmative steps to post signage that gun owners are allowed on the premises. *Id*. at ¶ 14. If Mr. Antonyuk needs to visit (for instance, to obtain necessities such as food or gas) any one of those businesses that does not take the steps to expressly opt-out of the state's disarmament scheme, he will be forced first to disarm himself in public, unload his firearm and then store it in a "safe storage box" – but not in his "glovebox," all without arousing suspicion from passers-by, and hopefully avoiding potential confrontational police responses to "man-with-a-gun" calls. *Id*. at ¶ 15.

Of course, if a parking lot appurtenant to a business is also "private property" without required signage allowing the carrying of firearms, then Mr. Antonyuk will not even be able to disarm lawfully as the CCIA requires. Should Mr. Antonyuk wish to visit his family or friends – people he has known for years or even to whom he is related, including those who are well aware

that he is a gun owner who possesses a license to carry – he nevertheless will first be required to obtain such persons' *express consent* to his lawful bearing of arms in each and every location he visits.  Since the CCIA places the burden on the gun owner to establish the legality for each place he carries, Mr. Antonyuk would be well-advised to obtain such consent in writing, imposing a ridiculous recordkeeping obligation on gun owners who merely wish to go about their daily lives.

The definition of "sensitive locations" in the CCIA includes all manner of obviously nonsensitive locations including public parks, public transportation, theaters, and public gatherings, while the definition of "restricted locations" includes all private property, including the homes of friends and family,[1] and businesses without affirmative signage. *See* Compl. at ¶¶ 69, 73–74. Should Plaintiff Antonyuk attempt to exercise his Second Amendment right, consistent with *Bruen*, to public carry in any of these locations, he risks felony prosecution.  *See id.* at ¶¶ 71, 75.  In other words, on September 1, 2022, Mr. Antonyuk will be forbidden to carry in most places he lawfully carries now.  *Id.* at ¶¶ 18, 20.  Based on the language of the CCIA, it appears that even venturing off the public streets might mean unwittingly committing a felony.  *See Bruen*, at *38 ("[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly.")

Additionally, when Mr. Antonyuk must recertify his carry permit in January 2023, he will be subjected to the CCIA's onerous new training requirement (even though he has already met the training requirement in existing law), consisting of payment of hundreds of dollars, potentially taking of multiple days off of work, and a considerable investment of time.  *Id.* at ¶ 13.

---

[1] *See* statement of Gov. Hochul's office ("private property owners must expressly allow a person to possess a firearm, rifle, or shotgun on their property"), https://on.ny.gov/3zi9BKz.

Further, as a result of the CCIA, Mr. Antonyuk now faces having his protected First Amendment rights chilled, as subsequent recertification of his carry license hinges on an amorphous and entirely discretionary finding by public officials that he has "good moral character," in part predicated upon his providing his social media history to government agents to scrutinize. *See* Compl. ¶¶ 59, 109. *See* also Dec. of Antonyuk, at ¶ 19. Additionally, he must provide a list of his family and associates to the government so that they can be interrogated by government agents, in violation of the rights of association and anonymity. Consequently, he faces imminent curtailment of constitutionally protected conduct. In short, Mr. Antonyuk will be required to trade his First Amendment rights for his Second Amendment rights when he recertifies his permit come January 2023. These are undoubtedly injuries that "affect the plaintiff in a personal and individual way." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992). And these injuries are fairly traceable to Defendant Bruen, who is tasked with enforcing these impending restrictions. *See* Compl. at ¶ 7. An injunction from this Court would prevent Mr. Antonyuk from suffering those harms by preserving the *status quo*.

Plaintiffs Gun Owners of America (GOA), Gun Owners Foundation (GOF), and Gun Owners of America New York (GOA-NY) have members and supporters in New York who will face the same harms and similar harms as Plaintiff Antonyuk, due to the impending implementation of CCIA. These GOA/GOF/GOA-NY associated persons would otherwise have standing to sue in their own right. *See id.* at ¶¶ 2–5. The interests Plaintiffs GOA, GOF, and GOA-NY seek to protect in this suit—preservation of New Yorker's Second Amendment rights to bear arms in public for self-defense—are germane to their purposes as Second Amendment advocacy organizations. *See id.* Finally, individual participation of each of their members and supporters is

wholly unnecessary to vindicate those members' rights and interests.  *See* Declaration of Erich Pratt, Compl. Ex. "4"; Declaration of William Robinson, Compl. Ex. "5."

### III.     Plaintiffs Are Entitled to a Preliminary Injunction.

The standard for a preliminary injunction requires Plaintiffs to "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm.  Likelihood of success on the merits is therefore 'the dominant, if not the dispositive, factor.'"  *A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021).  Because Plaintiffs seek a preservation of the *status quo* via a prohibitory injunction of a statute yet to go into effect (*see* Compl. at ¶ 2), they need not "demonstrate a 'substantial' likelihood of success on the merits," *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)), or "make a 'strong showing' of irreparable harm.'" *A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (quoting *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020)).

Due to the CCIA's blatant and imminent repudiation of the Second and Fourteenth Amendments' guarantees as affirmed by *Bruen*, as well as the significant, structural First Amendment violations the CCIA enacts into law, Plaintiffs nonetheless are able to demonstrate a substantial likelihood of success and make a strong showing of irreparable harm.  Plaintiffs also easily demonstrate that the balance of equities tips in their favor and that, pursuant to the unambiguous guidance from *Bruen*, injunctive relief undoubtedly would be in the public interest.

### A.  <u>Plaintiffs Are Likely to Succeed on the Merits.</u>

i.    <u>The CCIA is repugnant to a plain reading of the Second Amendment, and contrary to the Supreme Court's clear teachings in *Bruen*.</u>

The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const. amend. II.  As the Supreme Court has now reiterated in *Bruen*, the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home," free from infringement by either federal or state governments. *Bruen*, at *13.  In *Bruen*, the Supreme Court first "decline[d] to adopt that two-part approach" used in this and other circuits, and reiterated that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Bruen*, at 8. Second, the Supreme Court held that:

> [t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' [*Bruen*, at *21 (citation omitted).]

Third, in reviewing the historical evidence, because "not all history is created equal," the *Bruen* Court cabined review of relevant history to a narrow time period, focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment (but noted that "post-ratification" interpretations "cannot overcome or alter that text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."). *See Bruen*, at * 46 (discussing the lack of relevant historical prohibitions on concealed carry in public).

Under the *Bruen* test, then, it does not matter whether a government restriction "minimally" or "severely" burdens (infringes) the Second Amendment. There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered. The ubiquitous problems of crime or the density of population do not affect the equation. The only appropriate inquiry, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791, and perhaps during ratification of the Fourteenth Amendment in 1868. *Bruen*, at *47.

In striking down New York's discretionary "proper cause" requirement, the Supreme Court found no Founding-era historical tradition that permits a state to condition the right to carry arms in public on subjective requirements within the discretion of licensing officials. *See id.* at *47–48. In doing so, the Court pointed to the entirely different "shall-issue" licensing schemes that a supermajority[2] of states have implemented, so long as they "contain only 'narrow, objective, and definite standards' guiding licensing officials, rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion.'" *Id.* at *48 n.9 (citation omitted).

ii.      The CCIA is a legislative repudiation of *Bruen*.

After *Bruen* was handed down, the Governor of New York called an extraordinary session of the state legislature for the purpose of enacting a new statutory scheme (the CCIA), designed to give some appearance of compliance with *Bruen*, while in reality thwarting the Supreme Court's decision. Indeed, during the process, Governor Kathy Hochul issued several statements critical and disrespectful of the Supreme Court's ruling:

---

[2] In fact, more than half of the states do not require any sort of government issued-permit in order for a law-abiding person to carry a firearm in public, known as "constitutional carry" or "permitless carry." Many more are "shall issue" states where licensing officials must issue permits if an applicant meets certain basic criteria. Altogether, a reported 41 states operate under one or the other of these permissive regimes. *See* https://bit.ly/3OjmyYE.

[t]he Supreme Court's reckless and reprehensible decision to strike down New York's century-old concealed carry law puts lives at risk here in New York,[3] [and] [a] week ago, the Supreme Court issued a reckless decision removing century-old limitations on who is allowed to carry concealed weapons in our state — senselessly sending us backward and putting the safety of our residents in jeopardy[.][4]

On the contrary, it is the Governor's signing of the CCIA which was the "reckless," "reprehensible," "senseless[]" and "backward" act, which unconstitutionally puts the safety of New Yorkers in jeopardy by ensuring their continued disarmament in public.

    iii.    <u>"Good Moral Character."</u>

The CCIA made one "improvement" to New York's licensing scheme, removing from the statute the repudiated "proper cause" requirement held unconstitutional by *Bruen.* However, the CCIA replaced the tyranny of "proper cause" with an entirely new tyranny, redefining the phrase "good moral character" with an utterly subjective and amorphous standard. *See* Compl. Ex. "1" at p 2 ("[G]ood moral character . . . for the purposes of this article, shall mean having the essential character, temperament and judgement [sic] necessary to be entrusted with a weapon . . . ."). This "entrust[ment]" contemplated by the CCIA is a perversion of the Second Amendment's unqualified guarantee of a right of all "the people," not just those lucky few who government officials choose to "entrust" with a firearm. Indeed, those disqualified from licensure for allegedly not having "good moral character" will be those who otherwise would have qualified for a permit – those who the *Bruen* Court describes as "ordinary, law-abiding citizens" (*Bruen*, at *102) – but who nevertheless are disfavored by a licensing official applying a vague standard.

On the contrary, the Second Amendment's plain text protects the right of the people to bear arms in public without having to demonstrate *anything* to the government or obtain *anything* from

---

[3] https://on.ny.gov/3aLXqwc.
[4] https://on.ny.gov/3zglMY3.

the government (such as approval, or a license).  No other constitutional right works in that way.  *See Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002).  Indeed, more than half of states within this country now properly recognize the right to bear arms in its purest form without the government "permitting" its citizens to exercise their natural rights).  Moreover, as *Bruen* notes, even when it comes to states that require a permit, the supermajority are "shall issue" states which freely issue permits to those who meet clear, attainable, objective licensing requirements, such as the passing of a background check or receipt of a training certification, entirely immune from government officials' assessments of suitability, character or purpose. *See Bruen*, at *48 n.9. Indeed, the *Bruen* Court explicitly rejected such a statutory scheme as New York has enacted, which "grant[s] licensing officials discretion to deny licenses based on a perceived lack of need *or suitability*." *Bruen*, at *17 (emphasis added).[5]

iv.    In Person Meetings, Social Media, and "Character References."

After requiring an applicant to meet the amorphous standard of having "good moral character" before being permitted to exercise Second Amendment rights, the CCIA imposes a litany of unconstitutional prerequisites on those applying for, or recertifying, a carry license.  *See* Compl. Ex. "1", at 4-5.  First, the CCIA's requirement of an in-person interview with a "licensing officer" (Ex. "1" at 5) violates numerous constitutional protections.  A right that can only be exercised after an in-person interview with a "licensing officer" is no right at all. This interview has no bounds, to discuss whatever the officer wishes to discuss, for however long or to whatever satisfaction the licensing officer sees fit.  This is an affront to applicants' First and Second

---

[5] The Second Amendment unequivocally protects a law-abiding citizen's exercise of the right to "bear arms," because "[t]he Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Id.* at *31 (quoting *Heller*, 554 U.S. 570, 635 (2008)).

Amendment rights, and, depending on the questions, also their Fifth Amendment right to *remain silent*.[6]   Additionally, the CCIA requires that the applicant provide "names and contact information" for the applicant's "spouse or domestic partner," other adults in the home, adult children in the home, and whether minors reside "full time or part time" in the home.[7]   *Id*.  This allows New York to contact and interrogate those persons however desired on any topic bearing on suitability without regard to existing protections, such as the spousal privilege (*Obergefell v. Hodges*, 576 U.S. 644, 670, 135 S. Ct. 2584, 2601 (2015)) that "protects private and confidential communications between spouses from disclosure." *Shih v. Petal Card, Inc.*, 565 F. Supp. 3d 557, 572 (S.D.N.Y. 2021) (citations omitted).  This violates both the applicant's right of association, as well as the anonymity rights of those who do not want to be contacted by government officials, or have their personal information entered into a government database.

Second, the CCIA mandates that the applicant provide "such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application." *Id*. at 5.  This is an invitation to a fishing expedition using a casting net rather than a rod and reel.  Could the "officer" decide to require a report of a blood or urine sample to check whether the applicant has any medications or drugs in his system?  Could the "officer" require a

---

[6] Indeed, the Second Circuit held that "… compelled speech presents a unique affront to personal dignity. The decision to withhold speech depends on views and calculations known only to the individual..." and "[a]s the Supreme Court has explained, between compelled silence and compelled speech, compelled speech is the more serious incursion on the First Amendment. . ." *Burns v. Martuscello*, 890 F.3d 77, 85 (2d Cir. 2018).

[7] The requirement that a normal citizen must turn over his closest contacts to the government for who-knows-what is reminiscent of the former Soviet Union. Mr. Antonyuk, when he lived in Ukraine in the 1990's, no doubt would not have wished to provide government officials with a list of his closest associations and relations, social media accounts, or be interviewed in person by a licensing "officer" to discuss his private activities.  That reluctance did not change when Mr. Antonyuk moved to the United States, and there is nothing amiss with a law-abiding person not desiring to be interrogated by state actors as a precondition to exercise an enumerated right.

report from a hair or fingernail sample to test for ethyl glucuronide (EtG) to determine if the applicant abuses alcohol?[8] While the "interview" is ostensibly limited to only those things "reasonably necessary and related to the review of the licensing application," the CCIA's invitation for a licensing official to probe "any other information" invites abuse.  It is hardly speculative to predict that some licensing officer will conduct a deep dive into an applicant's activities and lifestyle simply because he is able to.

Third, the CCIA requires "names and contact information" of four character references who must attest to the applicant's "good moral character[.]"[9] *Id*. at 5.  No other constitutional right is predicated upon what others think about you, or conditioned on having friends who will agree to stand up to government interrogation and scrutiny (or retaliation) in order to help you obtain a carry license.  Those who do not have four qualifying "character references" presumably will be unable to exercise their Second Amendment rights.  Making matters worse, the CCIA demands that "character references" attest that the applicant "has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others." *Id*.  Of course, how someone would be in the omniscient position to attest that another person has never engaged in "*any act*" or made "*any statements*" of a certain nature seems a tall order indeed.  The requirement that nothing "suggest [an applicant is] likely to engage in conduct that would result in harm [justified or not] to themselves or others" would deny a carry permit to those who would defend their own life in a lawful act of self-defense.

---

[8] *See* https://bit.ly/3PyMMHy ("Ethyl glucuronide, especially in fingernails, may have potential as a quantitative indicator of alcohol use.").

[9] Current state law does not require "character references," however the permit application has a section requiring "four character references *who by their signature* attest to your good moral character." *See* https://on.ny.gov/3PGQorf.  Unlike the CCIA, the application requires nothing more than a signature from the reference.

Fourth, the CCIA's requirement to list "former and social media accounts … for the past three years" is a staggering overreach into protected First Amendment activity, requiring citizens to disclose protected information to the government so that an unnamed "licensing officer" can rummage through their personal affairs, as a condition precedent to engaging in protected Second Amendment activity.  As a preliminary matter, it is entirely unclear what is meant by the CCIA's use of the term "social media accounts," which is left undefined. Thus, it is a certainty that different licensing officials across New York state will interpret the phrase differently, some applying it far more broadly and to numerous more platforms and interfaces than others. As the dictionary definition of "social media" is all "forms of electronic communication (such as websites for social networking and microblogging) through which users create online communities to share information, ideas, personal messages, and other content (such as videos),"[10] a broad understanding of the phrase "social media" is hardly unreasonable.[11]

Many social media platforms permit entirely anonymous speech and profiles, such as Reddit, *etc*., and the CCIA would *breach that anonymity*, forcing a person to specifically identify his anonymous speech.  The First Amendment clearly protects even anonymous speech, and the CCIA's demand that anonymous individuals unmask themselves violates those protections.  *See Doe v. 2TheMart.com, Inc.*, 140 F. Supp. 2d 1088, 1092-93 (W.D. Wash. 2001) (noting that the

---

[10] https://www.merriam-webster.com/dictionary/social%20media.

[11] Indeed, the Supreme Court in *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017) used the terms "social media" and "social networking" interchangeably, likely because it is next to impossible to draw any sort of meaningful distinction between the two.  The very same websites, apps, and other platforms that permit a person to post information publicly also permit quasi-public postings, private communications and anonymous postings.  For example, a Facebook profile can be set to "Public," or to be viewable only to "Friends (+ friends of anyone tagged)," to "Only Me," or even to "Custom" which allows a user to "selectively share something with specific people, or hide it from specific people."  https://bit.ly/3PExm4N.  LinkedIn allows for both public postings and private communications, with some information available only in relation to how many degrees of connection a user is with another user.  *See* https://bit.ly/3B41fHO.

exchange of ideas on the internet is 'driven in large part by the ability of Internet users to communicate anonymously')"). *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342, 115 S. Ct. 1511, 1516 (1995) ("The freedom to publish anonymously extends beyond the literary realm."). The CCIA's demand for social media accounts is analogous to the government demanding to see what books a person is buying and reading: "The right to engage in expressive activities anonymously, without government intrusion *or observation*, is critical to the protection of the First Amendment rights of book buyers and sellers, precisely because of the chilling effects of such disclosures." *Tattered Cover v. City of Thornton*, 44 P.3d 1044, 1053 (Colo. 2002).

What is more, even the *existence of* a particular social media account, username, or screen name can serve to divulge highly personal information to the government.  Like a phone number or seemingly innocuous cell-site location information, such information can paint a "precise, comprehensive record of a person's public [life] that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations [including] 'trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on.'"  *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring); *see also Carpenter v. United States*, 138 S. Ct. 2206 (2018).  For example, an applicant's reporting his "Grindr" screen name could divulge his sexual orientation, an AR15.com, Armslist, or Gunbroker profile reveals a fairly-serious Second Amendment advocate, a "Gatalog" account reveals a likely hobbyist engaged in 3-D printing homemade firearms, and a Truth Social, Parler, or Gab profile indicates someone with probable alt-right and pro-Trump political views.

13

The list of "social media" apps, websites, and platforms that would be covered under the CCIA is nearly endless,[12] and a given carry applicant is likely to have numerous such profiles and accounts, the existence of each of which would need to be turned over to the state in order to qualify for a carry license (good luck remembering them all, since the application is signed upon penalty of fines and imprisonment[13]).  Like the ubiquitous cellular phone, a person's social media history paints "a digital record of nearly every aspect of their lives."  *Riley v. California*, 573 U.S. 373, 375 (2014).  New York cannot demand that "digital record" as a condition of a person being permitted to exercise enumerated Second Amendment rights.

Finally, the CCIA is entirely unclear *to what end* a licensing official will be reviewing a person's social media history.  An invitation to a licensing official to consider a person's morality – aside from their law-abiding record – invites inconsistency, corruption, abuse, discriminatory, prejudicial, arbitrary and capricious behavior.   For example, the vague nature of the CCIA's standard begs the question whether someone who attends a BLM "parade" or "rally" that turns violent could be denied a permit.  Does a teacher who regrets her appearance on "OnlyFans" have "good moral character?"[14]  How about those who believe that the 2020 election was "stolen," or who publicly advocate against Covid-19 vaccination?  Does a person lack "good moral character" if he has multiple speeding tickets within school zones?  How about those who have engaged in quintessentially political speech that happens to be critical of the Governor, the local sheriff, a judge, or even the licensing official considering the application? Indeed, numerous past publications by federal and state governments have warned of potential domestic extremist tendencies by those who stockpile firearms and ammunition, receive tactical training, or even who

---

[12] Google, YouTube, Discord, Snapchat, Pinterest, Twitch, Instagram, and on and on.
[13] *See* https://troopers.ny.gov/system/files/documents/2020/12/ppb-3.pdf.
[14] *See* https://bit.ly/3v2vStn.

vigorously advocate for constitutional rights.[15] The constitutional problems are evident when government licensing officials are equipped with unbridled discretion to engage in not only content-based discrimination, but viewpoint discrimination.[16] *See Rosenberger v. Rectors and Visitors of the University of Virginia*, 515 U.S. 819 (1995) ("When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. … The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.).  The CCIA's creation of a "pre-crime"[17] style prohibition on the exercise of an enumerated right is expressly foreclosed by the Supreme Court's admonition in *Bruen* that states enact licensing schemes "without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability.")  Ex. "1" at 4.

Finally, the CCIA's social media requirement will undoubtedly chill protected speech, as individuals seeking to exercise their Second Amendment rights will stop using social media, delete their accounts, or self-censor what they are saying prior to applying for or renewing a carry license. *See FEC v. Wis. Right to Life, Inc*., 551 U.S. 449, 457 (2007) ("the First Amendment requires us to err on the side of protecting political speech rather than suppressing it[]").

It is axiomatic that the exercise of one constitutional right cannot be conditioned on the forfeiture or violation of another.  *See, e.g., Simmons v. United States*, 390 U.S. 377, 393-394 (1968) (rejecting a situation where a defendant was forced to forfeit his Fifth Amendment right to

---

[15] *See, e.g.*, "Crisis Controlled, Assessing Potential Threats of Violence," Virginia State Police, https://bit.ly/3yU7Th2.
[16] *See Lamont v. Postmaster Gen*., 381 U.S. 301, 307, 85 S. Ct. 1493, 1496-97 (1965) (holding unconstitutional a requirement that an individual wanting to receive "communist propaganda" write the post office and inform it of his intent to receive that mailer. . . ).
[17] *See* "Minority Report," 20th Century Fox (2002).

keep silent in order to assert his Fourth Amendment right, calling that a "condition of a kind to which this Court has always been peculiarly sensitive," and concluding it to be "intolerable that one constitutional right should have to be surrendered in order to assert another."); s*ee also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (the government may not deny a person a benefit "on a basis that infringes his constitutionally protected interests").

Notwithstanding the CCIA's blatant First Amendment overreach, its draconian licensing provisions also fail under the simple standard articulated most recently in *Bruen*, because there is no historical analog requiring an individual seeking to bear arms in public to provide his newspaper clippings, private letters, or handbills before he is deemed "suitable" to carry a firearm.  Quite to the contrary, the Fourth Amendment was designed specifically to protect against such a "general warrant" by the government, and this nation's Founders often used *anonymous* political speech to discuss the importance of protecting the right to keep and bear arms.  For example, in Federalist No. 46, James Madison (under the pseudonym "Publius") wrote of "the advantage of being armed, which the Americans possess over the people of almost every other nation," which "forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form," in contrast with "the several kingdoms of Europe, which … are afraid to trust the people with arms."   It is ludicrous to imagine that this nation's founding generation would have countenanced a New York statute which required Madison to seek permission to bear arms from his government in the first place[18] (something not required in New York until the Sullivan Act was enacted in 1911, a period in history that the Supreme Court has explained is most definitely not

---

[18] *See Bruen*, at *57 ("there is little evidence of an early American practice of regulating public carry by the general public")

part of this nation's "historical tradition" (*Bruen*, at *46-47)), much less to unmask his true identity in the Federalist Papers to a licensing official, as a condition of "being armed."

       v.       <u>The CCIA declares nearly all of New York to be a "sensitive place."</u>

The CCIA's laundry list of "sensitive places" includes places which are sensitive in name only, sweeping up all manner of entirely ordinary venues that the New Yorkers visit on a daily basis for a whole host of activities that are entirely unrelated to the administration of government. In fact, the CCIA's grossly overexpansive nature of "sensitive places," makes analysis for purposes of injunctive relief clear cut.  As the *Bruen* Court explained, a "sensitive place" under Second Amendment jurisprudence is not just any "place[] where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id.* at *38. Rather, the Court explained that states have extremely narrow latitude to limit the places where firearms may be carried in public, mentioning only a limited number of "sensitive places such as schools and government buildings." *Bruen,* at *38.  Although the Court acknowledged that other "new and analogous sensitive places" may exist, it cautioned that such potential locations would be highly limited, and certainly could not be defined so broadly as to "include all 'places where people typically congregate'" or for New York to "effectively declare the island of Manhattan a 'sensitive place'" by claiming nearly every category of place to be a sensitive one. *Bruen,* at *38.

The concept of a "sensitive place" as used by the Court in *Bruen* and *Heller* refers to the government's control as proprietor of facilities designated for certain specific and limited government purposes. The term relates to the government's relationship with the facility and the facility's designated use — not the number of people who might attend an event there. In a "sensitive place," such as a courthouse designated for official judicial business, the government as proprietor enjoys the power of exclusion just as would any other private property owner would

17

possess.  On the other hand, the government's relationship with places like public parks and transit

is entirely different.  Instead of the location being used for a designated and specific governmental

purpose, the government merely manages the property on behalf of the public, and the location is

designated for public use and is widely available to all comers to use for any of a variety of lawful

purposes.  The government is not thereafter free to single out for discriminatory treatment a

subclass of citizens attempting to use or frequent those venues, who merely happen to be exercising

a constitutionally-protected right while otherwise lawfully making use of the space.

> In addition to the large number of designated "sensitive locations," the CCIA also bans the

carry of firearms in what it calls "a restricted location," when a person:

> enters into or remains on or in private property where such person knows or reasonably
> should know that the owner or lessee of such property *has not permitted such possession
> by clear and conspicuous signage* indicating that the carrying of [firearms] on their
> property is permitted *or has otherwise given express consent*. [Compl. Ex. "1" at 19
> (emphasis added).]

Violation of this prohibition, like the prohibition on "sensitive locations," is a "class E felony,"

conviction of which leads to the loss of Second Amendment rights for life.  Ex. "1" at 20.[19]  This

provision, declaring much of the state to be a "restricted location," usurps the right of land owners

and makes all private property in the entire state of New York a "restricted location" by default,

requiring the business owner to "opt out" of the regime by placing a "conspicuous" sign to allow

the carry of a firearm in that location.  In doing so, New York has again violated one constitutional

right in order to violate another, taking private property without compensation, and putting it to

public use in order to enact the legislature's anti-gun political agenda and deprive New Yorkers of

---

[19]  Not content with banning licensed carriers from carrying in most of New York, the CCIA would
require individuals who are otherwise licensed to carry, but who are entering a "no carry" zone,
remove the ammunition from their firearm and secure the firearm in an "appropriate safe storage
depository out of sight from outside of the vehicle."  Ex. "1" at 25.

their constitutional right to bear arms – requiring all property owners to engage in compelled speech in order to get around the state's anti-gun agenda.  The CCIA's designation of "restricted locations" makes New York the extreme outlier among the states, where the general rule leaves it to property owners to decide whether to allow or prohibit firearms, such as through the posting of a "no guns" sign.  Even then, in some states, "no guns" signs do not carry the force of law unless they mirror specific language.[20]  This is based on the notion that it is up to a property owner – not the legislature – to decide what sorts of persons and activities are permitted on the property. Together, the CCIA's "sensitive locations" and "restricted locations" provisions convert most of New York into a gun free zone.  In enacting these provisions, New York has thumbed its nose at the Supreme Court, which in *Bruen* disapproved of that very situation.

      vi.    <u>The CCIA demands almost five-times the amount of training previously required.</u>

For years, New York implemented different training requirements in different counties and left some counties to come up with their own standards.  *See* N.Y. PL § 400(1) (discussing Westchester County requirement for a "firearms safety course and test").  Schenectady County requires an approved "handgun safety course"[21] which lasts four hours.[22] But after *Bruen*, New York now believes that 16 hours of classroom training, plus an additional 2 hours of live-fire, is necessary. This new training requirement adds a significant monetary cost to the price of obtaining the license necessary to "bear arms" in New York state.  For example, the cost to obtain such training could run in the neighborhood of $400.  Compl. ¶84.  In addition, the handgun ammunition expended during two hours of live-fire could conservatively be 100-200 rounds or more, at an

---

[20] *See* https://bit.ly/3aTd3Sn ("… if the private property owner chooses to post a notice, it must comply with the 1-inch block-letter, contrasting color, and other requirements specified in Sections 30.06 and 30.07.").

[21] *See* https://bit.ly/3aS4YgQ.

[22] *See* https://northeastfirearmstraining.net/classes/category/ny-pistol-permit-class/.

additional cost of at least $40.  In addition to that, whereas under the existing regime, an applicant may be able to meet the 4-hour training requirement by attending a class in an evening or on a weekend, that is doubtful given the CCIA's 18-hour mandate.  If a license applicant were required to take even a single day off work to obtain the necessary training, that could run another $300 or more, on average.[23]  And, of course, an applicant would still be required to pay the up to $10 fee for the license application,[24] which is routinely circumvented by localities through charging additional exorbitant fees for other services.[25]  In other words, all told, the cost of obtaining a carry license under the CCIA will run into the many hundreds of dollars, before an ordinary law-abiding person is permitted to exercise his constitutional right to bear arms in public.  For those who cannot afford such costs, their right to bear arms is extinguished, evidencing the CCIA's clear attempt to deprive the lower earning classes of society their constitutional rights.

Yet this is precisely what the Supreme Court in *Bruen* warned against, noting that the Court would "not rule out constitutional challenges to … regimes where, for example, lengthy wait times in processing license applications *or exorbitant fees deny ordinary citizens their right to public carry*."  *Bruen*, at fn 9.  New York would have no authority to demand that a person attend journalism school before being allowed to publish an article, and it similarly has no authority to demand 18 hours of training and the payment of many hundreds of dollars of costs prior to the exercise of an enumerated Second Amendment right.

---

[23] *See* https://on.ny.gov/3IQ4og4 (estimating New York state's average hourly earnings to be about $36/hr in May of 2022).

[24] *See* NY Penal Law § 400.00 ("Elsewhere in the state, the licensing officer shall collect and pay into the county treasury the following fees: for each license to carry or possess a pistol or revolver, not less than three dollars nor more than ten dollars as may be determined by the legislative body of the county….).

[25] For example, Schenectady County, where Mr. Antonyuk resides, charges $10 for the license application, and $116.50 for *fingerprinting*.  *See* https://bit.ly/3B62Psu at p.3.

vii.   Under *Bruen*'s "historical tradition" standard of review, New York cannot come close to justifying the CCIA's provisions.

Under *Heller* and *Bruen*, the standard for assessing Second Amendment challenges requires Plaintiffs to show that their conduct falls under the Second Amendment's plain text. *Id.* at \*20.  Plaintiffs have clearly made this showing.  Compl. ¶¶ 21-25, 128-29.  Under "text, history, and tradition," the initial analysis of the Second Amendment's plain text requires an examination of whether 1) Plaintiffs are part of "the People" protected by the amendment, 2) the weapons in question are in fact "arms" protected by the amendment, and 3) the regulated conduct falls under the phrase "keep and bear." *See id.* at \*39–41. Courts have acknowledged that handguns are "arms" without further analysis, because they are "typically possessed by law-abiding citizens for lawful purposes," "in common use," and the "quintessential self-defense weapon[]". *Heller*, 554 U.S. at 625–27, 629; *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010); *Bruen*, at \*39. And, of course, the Court in *Bruen* has explicitly found that ordinary, law-abiding persons such as Plaintiffs carrying handguns in public is clearly within the bearing of arms protected by the amendment.

Thus, as Plaintiffs have shown that the conduct regulated by the CCIA falls under the Second Amendment's plain text, New York must rebut the strong resulting presumption of Second Amendment protection:

> [T]he government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." [*Bruen* at \*20–21 (quoting Konigsberg v. State Bar of Cal., 366 U.S. 36, 50 n.10 (1961)).]

Defendant thus bears the burden of justifying the regulation by "affirmatively prov[ing] that [the] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, at \*23.  Defendant cannot even come close.

The Second Amendment analysis "requires courts to assess whether modern firearms regulations are consistent with" the Second Amendment's "text and historical understanding," *id.* at \*31–32, meaning courts must examine the *original public understanding* of the right when it was adopted. *See id.* at \*42 (quoting *Heller*, 554 U.S. at 634–35) ("[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'"). Courts must consider whether the challenged regulation finds constitutional support from directly related or analogous historical regulation from the Founding era, which evidences adoption-era acceptance of the regulation as not infringing on the pre-existing right to keep and bear arms. *See id.* at \*32–39. In assessing the existence of historical analogues, if any, *Heller* and *McDonald* guide courts with "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at \*36.

Suffice it to say there are no founding-era analogues in accord with the CCIA's demands. In 1776, it would have been preposterous to have required William Floyd (an original signatory to the Declaration of Independence from New York)[26] to sit down with a British licensing official to receive a permit to carry a firearm. Perhaps one of those interview questions would be, "Why do you need to carry a firearm, Mr. Floyd?" And perhaps the answer would have been, "Well governor, we intend to sign a Declaration of Independence, and withdraw our consent to be governed." It is doubtful the Crown's licensing official would have given Mr. Floyd a license. Would Alexander Hamilton have been approved to carry a firearm if the government learned that he wrote Federalist No. 33: "If the federal government should overpass the just bounds of its authority and make a tyrannical use of its powers, the people, whose creature it is, must appeal to

---

[26] https://www.archives.gov/founding-docs/declaration-transcript.

the standard they have formed, and take such measures to redress the injury done to the Constitution as the exigency may suggest and prudence justify"?  Likely no British "licensing officer" would have found any of this nation's Founders to have "good moral character" defined as "the essential character, temperament and judgement [sic] necessary to be entrusted with a weapon."  And because licensing for concealed firearms did not start until the 1890s, long after ratification, none of these absurd and imaginary analogues could have occurred in the first place.

### B.  Plaintiffs Are Likely to Suffer Irreparable Harm Absent Preliminary Relief.

"Irreparable harm is 'injury for which a monetary award cannot be adequate compensation.'" *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) (citation omitted). Further, "[i]n cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm." *French*, 985 F.3d at 176. Even an ephemeral constitutional violation causes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *French*, 985 F.3d at 184 (quoting *Int'l Dairy Foods Ass'n*, 92 F.3d at 71) ("The denial of a constitutional right ordinarily warrants a finding of irreparable harm, even when the violation persists for 'minimal periods'….").

The CCIA declares a large portion of New York's public places to be "sensitive locations," with all private property labeled "restricted locations," increases the training requirement to almost five-times as much as previously required thereby unnecessarily raising the cost to exercise a right, and mandates waiver of numerous First Amendment rights in exchange for the state's permission to exercise Second Amendment rights.  Each of these constitutes an impending irreparable injury which an injunction can prevent.[27]

---

[27] Moreover, Plaintiffs' First Amendment concerns bear a striking similarity to those of the dairy-manufacturer plaintiffs who won a preliminary injunction on appeal in *International Dairy Foods*

### C. The Balance of Equities Tips Overwhelmingly in Plaintiffs' Favor.

In assessing this injunction factor, courts "must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Yang*, 960 F.3d at 135 (quoting *Winter*, 555 U.S. at 24). This prong is closely tied to whether the injunction is in the public interest and, to satisfy it, this Court need look no further than the extensive explanation of the right to bear arms outside of the home in *Bruen*. In its zeal to engage in guerrilla warfare with the Supreme Court, New York's legislature has tripped over the Constitution in its rush to limit the rights of the people to bear arms outside the home. Rather than learning from *Bruen* that the right to keep and bear arms is no longer a "second-class right," New York turned the Second Amendment's protections into the equivalent of constitutional "steerage," unilaterally reversing the Supreme Court by trampling clearly enumerated rights. *Bruen*, at *12. Further, as explained above, the impact of the CCIA is not only to enumerated Second Amendment rights, but also to well established First Amendment rights.

### D. An Injunction Is in the Public Interest.

"[T]he public consequences in employing the extraordinary remedy of injunction" are not just the vindication of constitutional rights but also the prevention of their egregious curtailment.

---

*Ass'n v. Amestoy*, 92 F.3d 67 (2d. Cir. 1996). In that case, Dairy manufacturers challenged a statute compelling speech, requiring labeling when a certain growth hormone had been used. *Id.* at 69–70. The Second Circuit found that "[b]ecause the statute at issue requires appellants to make an involuntary statement whenever they offer their products for sale . . . the statute causes the dairy manufacturers irreparable harm," regardless of whether or not the compelled speech was merely commercial in nature. *Id.* at 71–72. "The wrong done" by a statute to the "constitutional right *not* to speak is a serious one," and it must be "given proper weight by [a] district court." *Id.* at 71. Here, private property and business owners must engage in compelled speech by posting "clear and conspicuous signage" to derestrict their own properties from the CCIA's mandates. *See* Compl. ¶ 74. Compelled speech through submitting to an "interview" by government licensing officials or to indicate a property owner's public support for constitutionally guaranteed rights is anathema to the First Amendment.

*Yang*, 960 F.3d at 135–36 (quoting *Winter*, 555 U.S. at 24).  Here, such egregious curtailment is exactly the types of limitations that the Supreme Court warned would be unconstitutional in *Bruen*.  Furthermore, although public interest is a necessary prong for injunctive relief, under *Bruen,* New York can no longer rely on the typical public safety talisman as an automatic justification for public interest.  As Justice Thomas explained, "the Second Amendment does not permit—let alone require—'judges to assess the costs and benefits of firearms restrictions' under means-end scrutiny." *Bruen*, at *27. Therefore, in assessing whether injunctive relief would be in the public interest, this Court must assess whether the CCIA infringes upon the Second Amendment in a manner foreclosed by *Bruen*.  Because Plaintiffs are "the people" and the CCIA infringes upon their right to "bear arms," New York carries the burden of justifying, via historical analog, how the CCIA is constitutionally permissible.  New York cannot shoulder this burden, because the CCIA consists of unprecedented restrictions on constitutional rights that have no historical analog.  Without historical support, the public interest requirement clearly weighs in favor of the Plaintiffs, as it is always in the public interest to enjoin an unconstitutional law. *See, e.g., Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).[28]

## IV.    Conclusion.

For the foregoing reasons, the Court should preliminarily and permanently enjoin the challenged provisions of New York's Concealed Carry Improvement Act.

---

[28] Although Fed. R. Civ. P. 65(c) requires that a bond or other security be provided as a condition of issuing preliminary injunctions, this requirement may be dispensed with when there is no risk of financial harm. *Federal Prescription Serv. v. American Pharmaceutical Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980); *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). Even courts that view Rule 65(c) as mandatory are open to the idea of the bond being set at zero. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp*., 174 F.3d 411, 421 n.3 (4th Cir. 1999). Given the nature of this case, the Court should dispense with the bond requirement.

Respectfully submitted, this the <u>20th</u> of July 2022.

| | |
|---|---|
| <u>*/s/ Stephen D. Stamboulieh*</u> | Robert J. Olson (VA # 82488) |
| Stephen D. Stamboulieh | William J. Olson, PC |
| Stamboulieh Law, PLLC | 370 Maple Ave. West, Suite 4 |
| P.O. Box 428 | Vienna, VA 22180-5615 |
| Olive Branch, MS  38654 | 703-356-5070 (T) |
| (601) 852-3440 | 703-356-5085 (F) |
| stephen@sdslaw.us | wjo@mindspring.com |
| NDNY Bar Roll# 520383 | *Pro Hac Vice* paperwork forthcoming |

## CERTIFICATE OF SERVICE

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing document or pleading to be electronically mailed to the following non-ECF participants, and certify that I have spoken with Counsel listed below, and advised that a Motion for Preliminary Injunction would be filed, and was advised I could send to him by electronic mail:

Michael G. McCartin
Assistant Attorney General | Special Counsel
Litigation Bureau
N.Y.S. Attorney General's Office
The Capitol
Michael.McCartin@ag.ny.gov

Dated: July 20, 2022.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

27