UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

IVAN ANTONYUK, GUN OWNERS OF AMERICA,
INC., GUN OWNERS FOUNDATION, and GUN
OWNERS OF AMERICA NEW YORK, INC.,

                                  Plaintiffs,

               -against-                               Case No. 22 Civ. 734 (GTS) (CFH)

KEVIN P. BRUEN, in his official capacity as
Superintendent of the New York State Police,

                                  Defendant.
------------------------------------------------------------------X

## DEFENDANT SUPERINTENDENT BRUEN'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION  FOR A PRELIMINARY INJUNCTION

                                LETITIA JAMES
                                Attorney General
                                State of New York
                                The Capitol
                                Albany, New York 12224-0341
                                <u>Attorney for Superintendent Bruen</u>

James M. Thompson, Bar Roll No. 703513
  Special Counsel
Michael G. McCartin, Bar Roll No. 511158
  Special Counsel

August 15, 2022

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 6

STANDARD OF REVIEW ..................................................................................... 8

ARGUMENT ............................................................................................................ 10

I.  PLAINTIFFS LACK STANDING TO SUE ............................................... 10

   A.  Under Controlling Second Circuit Precedent, The Organizational Plaintiffs Lack Standing .................................................................................. 11

   B.  Superintendent Bruen Is Not A Proper Defendant Due To Lack of Traceability And The Eleventh Amendment Barring Suit ............................... 12

     1.  Any Alleged Injury From The Licensing Laws Is Not Fairly Traceable To Superintendent Bruen ....................................................... 12

     2.  The Eleventh Amendment Separately Bars Suit Against Superintendent Bruen ....................................................................... 14

   C.  Plaintiff Antonyuk Has Not Alleged An Injury-in-fact .................................... 15

     1.  Because Plaintiff Antonyuk's License Does Not Expire, He Will Never Be Subject To The Interview, Social Media Disclosure, or Training Requirements He Is Challenging ............................... 15

     2.  Plaintiff Antonyuk Lacks Standing To Challenge The Licensing Provisions of the CCIA Because He Has Not Yet Filed For a License .... 16

     3.  Plaintiff's Generalized and Conclusory Allegations Do Not Properly Allege A Sufficient Injury-In-Fact for a Pre-Enforcement Challenge ...... 18

II. PLAINTIFFS HAVE NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS ................................................................................. 20

   A.  Plaintiffs Can Only Bring a Disfavored Facial Challenge ................................. 20

   B.  New York's Good Moral Character Requirement Is Constitutional And Patterned After Laws Endorsed By The *Bruen* Majority ................................... 21

     1.  New York's Revised Good Moral Character Requirement Is In Line With State Laws Deemed Constitutional In *Bruen* ................................... 22

2.    New York's Good Moral Character Requirement Is Relevantly Similar To A Long Tradition Of Anglo-American History And Doctrine ........... 25

C.    New York's Licensing Procedures Are Constitutional ...................................... 33

1.    New York's Interview and Reference Requirements Are Constitutional, Both Under *Heller* and *Bruen* and as Part of the Longstanding Tradition Requiring In-Person Inspections of Those Carrying Firearms ................ 33

2.    The Requirement to Share Social Media in Connection With a Gun License Application Is Constitutional ......................................................... 37

a.    The Disclosure Requirement Does Not Violate the Second Amendment ...................................................................................... 37

b.    The Disclosure Requirement Does Not Violate the First Amendment ...................................................................................... 43

D.    New York's Protections For Sensitive Places Are Constitutional .................... 47

E.    New York's Law Preventing Armed Persons From Entering Other People's Property Without Consent Is Constitutional And Deeply Rooted In Anglo-American Property Law And Tradition .............................................................. 51

F.    New York's Training Requirements Are Constitutional. ................................... 56

1.    In-person Firearms Training Requirements Are Provided For In the Constitution Itself And Are Deeply Rooted In American Tradition ......... 56

2.    Plaintiffs' Allegations About Training Costs Are Entirely Hypothetical, While American History And Tradition Support Gun Owners Bearing The Reasonable Cost Of Firearms Training ............................................ 60

III.    PLAINTIFFS HAVE FAILED TO SHOW IRREPARABLE HARM ...................... 62

IV.    THE EQUITIES AND THE PUBLIC INTEREST FAVOR ALLOWING THE CCIA TO PROTECT THE PUBLIC FROM GUN VIOLENCE .............................. 63

CONCLUSION ................................................................................................................... 65

## **TABLE OF AUTHORITIES**

**Cases**

Abekassis v. New York City, 477 F. Supp. 3d 139 (S.D.N.Y. 2020)............................................. 22

Able v. United States, 44 F.3d 128 (2d Cir. 1995) ......................................................................... 9

Adam v. Barr, 792 F. App'x 20 (2d Cir. 2019) ..................................................................... 18, 19

Aguayo v. Richardson, 473 F.2d 1090 (2d Cir. 1973)................................................................... 11

Amidon v. Student Ass'n of SUNY at Albany, 508 F.3d 94 (2d Cir. 2007) ................................. 44

Anderson v. United States, No. 05-CR-418, 2022 WL 1912937 (E.D.N.Y. June 3, 2022) ......... 43

Aron v. Becker, 48 F. Supp. 3d 347 (N.D.N.Y. 2014) ........................................................... 13, 22

Ass'n of Home Appliance Mfgrs. v. City of N.Y., 36 F. Supp. 3d 366 (S.D.N.Y. 2014)............ 21

Bach v. Pataki, 408 F.3d 75 (2d Cir. 2005) .................................................................................. 14

Baur v. Veneman, 352 F.3d 625 (2d Cir. 2003) ............................................................................ 20

Beal v. Stern, 184 F.3d 117 (2d Cir. 1999)..................................................................................... 9

Bill & Ted's Riviera, Inc. v. Cuomo, 494 F. Supp. 3d 238 (N.D.N.Y. 2020) ................................ 9

Binderup v. Attorney General, 836 F.3d 336 (3d Cir. 2016)........................................................ 26

Butler v. Obama, 814 F. Supp. 2d 230 (E.D.N.Y. 2011).............................................................. 19

Cedar Point Nursery v. Hassid, 141 S.Ct. 2063 (2021) ......................................................... 52, 55

Chrysafis v. James, 534 F. Supp. 3d 272 (E.D.N.Y. 2021) .......................................................... 14

Citizens Union of the City of N.Y. v. Attorney General of N.Y., No. 16 Civ. 9592,
    2017 WL 2984167 (S.D.N.Y. June 23, 2017) ......................................................................... 15

Corbett v. City of N.Y., No. 18 Civ. 7022, 2019 WL 2502056 (S.D.N.Y. June 16, 2019).......... 34

Cranley v. Nat'l Life Ins. Co. of Vt., 318 F.3d 105 (2d Cir. 2003) ............................................. 21

D.C. v. Heller, 554 U.S. 570 (2008) ...................................................................................... passim

Diaz v. Pataki, 368 F. Supp. 2d 265 (S.D.N.Y. 2005) ................................................................. 21

Dickerson v. Napolitano, 604 F.3d 732 (2d Cir. 2010) ................................................................ 20

Doe v. N.Y.U., 666 F.2d 761 (2d Cir. 1981) ................................................ 9

Doe v. Shurtleff, 628 F.3d 1217 (10th Cir. 2010) .......................... 44, 46, 47

Dukakis v. Dep't of Defense, 686 F. Supp. 30 (D. Mass. 1988) ................... 62

Dwyer v. Farrell, 193 Conn. 7 (1984) .......................................................... 7

Erznoznik v. Jacksonville, 422 U.S. 205 (1975) ......................................... 21

Faisal Nabin Kashem v. Barr, 941 F.3d 358 (9th Cir. 2019) ....................... 43

Frey v. Bruen, No. 21 CV 5334, 2022 WL 522478 (S.D.N.Y. Feb. 22, 2022) ............... 18, 19, 63

GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244 (11th Cir. 2012) ................... 54, 55

HealthNow N.Y., Inc. v. New York, 739 F. Supp. 2d 286 (W.D.N.Y. 2010) ............... 14

In re Lonique M., 93 A.D.3d 203 (1st Dep't 2012) ..................................... 52

Jackson-Bey v. Hanslmaier, 115 F. 3d 1091 (2d Cir. 1997) ......................... 17

Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth
    Departments, 852 F.3d 178 (2d Cir. 2017) ................................... 20, 51

Joglo Realties, Inc. v. Seggos, No. 16-CV-1666, 2016 WL 4491409
    (E.D.N.Y. Aug. 24, 2016) ................................................................ 63

Jurek v. Texas, 428 U.S. 262 (1976) ......................................................... 43

Kaiser Aetna v. U.S., 444 U.S. 164 (1979) ........................................... 53, 55

Kanter v. Barr, 919 F.3d 437 (7th Cir. 2019) ............................................ 39

Kelly v. N.Y. State Civil Service Com'n, No. 14 Civ. 716, 2015 WL 861744
    (S.D.N.Y. Jan. 26, 2015) ................................................................. 15

Kwong v. Bloomberg, 723 F.3d 160 (2d Cir. 2013) .................................... 61

L&M Bus Corp. v. Bd. of Educ. of City Sch. Dist. of City of N.Y., No. 18 Civ. 1902,
    2018 WL 2390125 (E.D.N.Y. May 25, 2018) ...................................... 9

Libertarian Party of Erie Cty. v. Cuomo, 970 F.3d 106 (2d Cir. 2020) ................. passim

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ............................ 10, 18

Mann v. N.Y. State Ct. of Appeals, No. 21-CV-49, 2021 WL 5040236
    (N.D.N.Y. Oct. 29, 2021) .............................................................. 14

Marino v. Twn. of Branford, No. 17-cv-1828, 2018 WL 691715 (D. Conn. Feb. 2, 2018)......... 14

Maryland v. King, 569 U.S. 435 (2013) ...................................... 42

Mental Hygiene Legal Serv. v. Cuomo, 13 F. Supp. 3d 289 (S.D.N.Y. 2014) ........................... 19

Mullins v. City of N.Y., 626 F.3d 47 (2d Cir. 2010) ................................... 26

N.Y. State Citizens' Coal. for Child. v. Poole, 922 F.3d 69 (2d Cir. 2019) ............................. 11

N.Y. State Club Ass'n, Inc. v. City of New York, 487 U.S. 1 (1988)......................................... 43

Nat'l Endowment of the Arts v. Finley, 524 U.S. 569 (1998)..................................................... 43

Nat'l Shooting Sports Found., Inc. v. James, ___ F. Supp. 3d ___, 2022 WL 1659192
   (N.D.N.Y. May 25, 2022)........................................................................... 40

Nicosia v. Amazon.com, Inc. 834 F.3d 220 (2d Cir. 2016)......................................... 10

Nken v. Holder, 556 U.S. 418 (2009) ...................................................... 9

Nnebe v. Daus, 644 F.3d 147 (2d Cir. 2011).............................................. 11

NRA of Am. v. ATF, 700 F.3d 185 (5th Cir. 2012) .......................................... 39

NRA of Am. v. Hochul, No. 20-3187-cv, 2021 WL 5313713 (2d Cir. Nov. 16, 2021)......... 11, 12

NYSRPA v. Bruen, 142 S. Ct. 2111 (2022) ....................................................... passim

NYSRPA v. Cuomo, 804 F.3d 242 (2d Cir. 2015) ............................................... passim

Oneida Indian Nation v. U.S. Dep't of the Interior, 336 F. Supp. 3d 37 (N.D.N.Y. 2018).... 10, 11

Osterweil v. Bartlett, No. 09-cv-825, 2010 WL 1146268 (N.D.N.Y. Feb. 24, 2010) .................. 13

Paulk v. Kearns, 2022 WL 954405 (W.D.N.Y. Mar. 30, 2022) .................................... 22

Pena-Rodriguez v. Colorado, 137 S.Ct. 855 (2017) ............................................. 27

People ex. rel. Schneiderman v. Actavis PLLC, 787 F.3d 638 (2d Cir. 2015)......................... 9, 63

People v. Graves, 76 N.Y.2d 16 (1990)........................................................ 52

Picard v. Magliano, ___ F.4th ___, 2022 WL 2962548 (2d Cir. July 27, 2022)......................... 47

Reed v. Town of Gilbert, Ariz., 576 U.S. 155 (2015) .................................. 44

Restaurant Law Ctr. v. City of N.Y., 360 F. Supp. 3d 192 (S.D.N.Y. 2019) .............................. 20

SAM Party v. Kosinski, 483 F. Supp. 3d 245 (S.D.N.Y. 2020) ............................................ 37, 38

Scarbrough v. Evans, No. 09 Civ. 850, 2010 WL 1608950 (N.D.N.Y. Apr. 20, 2010) ............... 60

Schall v. Martin, 467 U.S. 253 (1984) ....................................................................... 45

Shipping Fin. Servs. Corp. v. Drakos, 14 F.3d 129 (2d Cir. 1998) ................................... 11

Sibley v. Watches, 501 F. Supp. 3d 210 (W.D.N.Y. 2020) ...................................... 13, 19, 22, 34

Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26 (1976) ........................................... 12

Spokeo, Inc. v. Robins, 578 U.S. 330 (2016) ............................................................ 10

Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725 (1997) ................................... 21

Time Warner Cable Inc. v. F.C.C., 729 F.3d 137 (2d Cir. 2013) .................................... 44

Time Warner Cable v. Bloomberg L.P., 118 F.3d 917 (2d Cir. 1997) ............................... 63

Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645 (2017) .................................. 10

Turley v. Giuliani, 86 F. Supp. 2d 291 (S.D.N.Y. 2000) ............................................. 63

Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180 (1997) .......................................... 44, 45

United Food & Commercial Workers Union, Local 919 v. Centermark Props. Meriden Square,
    30 F.3d 298 (2d Cir. 1994) .......................................................................... 11

United States v. Carpio-Leon, 701 F.3d 974 (4th Cir. 2012) ..................................... 28, 29

United States v. Decastro, 682 F. 3d 160 (2d Cir. 2012) ...................................... 16, 17, 21

United States v. Jimenez, 895 F.3d 228 (2d Cir. 2018) ............................................. 39

United States v. Miller, 307 U.S. 174 (1939) ......................................................... 59

United States v. Salerno, 481 U.S. 739 (1987) ............................................ 21, 37, 40, 42

United States v. Williams, 553 U.S. 285 (2008) ...................................................... 44

United States v. Yancey, 621 F.3d 681 (7th Cir. 2010) .............................................. 39

Ward v. Rock Against Racism, 491 U.S. 781 (1989) ................................................. 44

Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442 (2008) ....................... 21

Waskul v. Washtenaw Cnty. Community Mental Health, 900 F.3d 250 (6th Cir. 2018) ............. 10

Whitmore v. Arkansas, 495 U.S. 149 (1990) ............................................................ 19

Winter v. Natural Res. Defense Council, Inc., 555 U.S. 7 (2008) ........................ 8, 9, 64

## **Statutes**

11 Del. Code § 1441 .......................................................................................... 8, 34

11 Del. Code Ann. § 1441 ...................................................................................... 56

2022 N.Y. Laws ch. 371 .................................................................................... passim

21 Okla. Stat. Ann. § 1290.12 ................................................................................. 56

25 Maine Stat. § 2003 ............................................................................................. 56

430 Ill. Comp. Stat. Ann. § 66/10 ........................................................................... 24

430 Ill. Comp. Stat. Ann. § 66/75 ........................................................................... 57

430 Ill. Comp. Stat. Ann. § 66/25 ........................................................................... 56

Alaska Stat. § 18.65.705 ........................................................................................ 56

Ariz. Stat. § 13-3112 .............................................................................................. 56

Ark. Code Ann. § 5-39-203 ..................................................................................... 54

Ark. Code Ann. § 5-73-309 ..................................................................................... 56

Cal. Penal Code § 26165 ........................................................................................ 57

Colo. Rev. Stat. § 18-12-203 .............................................................................. 24, 56

Conn. Gen. Stat. § 29-28 ................................................................................... 23, 56

Fla. Stat. § 190.06 .................................................................................................. 56

Fla. Stat. § 810.08 .................................................................................................. 54

Ga. Code Ann. § 16-11-127 ..................................................................................... 54

Haw Rev. Stat. § 708-813 ....................................................................................... 54

Idaho Stat. § 18-3302K ........................................................................................... 56

Iowa Stat. § 724.9 .................................................................................................... 56

Kan. Stat. 75-7c04 ................................................................................................... 56

Ky. Stat. § 237.110 .................................................................................................. 56

La. Rev. Stat. § 1379.3 ............................................................................................. 56

Mich. Stat. § 28.425j ............................................................................................... 56

Minn. Stat. § 624.714 .............................................................................................. 56

Mo. Stat. § 571.101 ................................................................................................. 56

Mont. Stat. § 45-8-321 ............................................................................................ 56

N.C. Stat. § 14-415.12 ............................................................................................. 56

N.M. Stat. Ann. § 29-19-4 ....................................................................................... 56

N.M. Stat. Ann. § 29-19-7 ....................................................................................... 57

N.Y. CPLR § 7803 ................................................................................................... 46

N.Y. Penal Law § 140.00 ......................................................................................... 52

N.Y. Penal Law § 140.17 ......................................................................................... 52

N.Y. Penal Law § 265.00 .................................................................................... 13, 15

N.Y. Penal Law § 265.01 ......................................................................................... 51

N.Y. Penal Law § 400.00 .................................................................................. passim

N.Y. Penal Law § 400.01 ......................................................................................... 15

Ohio Rev. Code § 2923.125 ..................................................................................... 56

Or. Rev. Stat § 164.265 ............................................................................................ 54

Or. Rev. Stat. Ann. § 166.291 .............................................................................. 35, 56

Pa. Cons. Stat. § 6109 .......................................................................................... 8, 24

R.I. Gen. Laws § 11-47-11 ....................................................................................... 24

R.I. Gen. Laws § 11-47-16 ....................................................................................... 56

viii

S.C. Code § 23-31-215 ............................................................................... 56

Tenn. Code Ann. § 39-17-1366 .................................................................. 56

Tex. Penal Code Ann. § 30.06 ................................................................... 54

Va. Code § 18.2-308.02 .............................................................................. 56

Va. Code. § 18.2-308.09 ............................................................................. 24

W.Va. Code § 61-7-4 .................................................................................. 56

Wis. Stat. Ann. § 175.60 ............................................................................ 56

Wyo. Stat. Ann. § 6-8-104 ......................................................................... 56

### Historical Statutes and Authorities

1 Records of Mass. 1628-1641, at 211-12 (Nathaniel B. Shurtleff, ed. 1853) ...................... 27, 35

1 William Hawkins, A Treatise of the Pleas of the Crown ........................................ 31

1 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of
   Virginia From the First Session of the Legislature, in the Year 1619, at 255 (1823) .............. 26

1715 Md. Laws 90 ....................................................................................... 53

1741 N.J. Laws 101 ..................................................................................... 53

1771 N.J. Laws 344 ..................................................................................... 53

1776-1777 Pa. Laws ch. XXI ........................................................................ 29

1779 N.Y. Laws 237 ........................................................................... 56, 59, 62

1786 Va. Laws 35 ....................................................................................... 48

1806 N.J. Laws 563 ..................................................................................... 36

1822 Pa. Laws 340 ...................................................................................... 31

1869-70 Tenn. Pub. Acts 23-24 .................................................................... 50

1870 Ga. Laws 421 ..................................................................................... 50

1870 Tex. Gen. Laws 63 ........................................................................ 49, 51

1871 Tex. Gen. Laws 25-26 .............................................................................. 49

1873 Pa. Laws 735-36 ...................................................................................... 50

1876 Wyo. Comp. Laws ch. 52 .......................................................................... 32

1879 Tenn. Pub. Acts ch. 186 ........................................................................... 32

1881 Ordinances of the Mayor, Aldermen and Commonality of the City of New York
   (rev. Elliott F. Shepard & Ebenezer B. Shafer, 1881) ............................... 32, 36, 38, 42

1883 Mo. Laws 76 ............................................................................................ 50

1893 Or. Laws 79 ............................................................................................. 54

2 W. Blackstone, Commentaries on the Laws of England 2 (1766) .................... 52

Act for Establising and Conducting the Military Force of New-Jersey, 1806 N.J. Laws 536 ..... 31

Act of April 14, 1778, §§ 13-15, 1778 N.J. Laws 42, 46 ...................................... 30, 36

Act of March 14, 1776, in 1775-1776 Mass. Acts & Laws 31 .............................. 28, 41

An Act for Disarming Papists, and Reputed Papisits, Refusing to Take the Oaths to the
   Government (1756), in 7 William W. Hening, The Statutes at Large, Being a Collection
   of all the Laws of Virginia 35-36 (Richmond: Franklin Press, 1809) ..................... 28

An Act for Forming and Regulating the Militia Within the Colony, in 1775-1776 Mass.
   Acts & Laws 15, 21 ...................................................................................... 30

An Act for Regulating the Indian Trade and Making It Safe to the Publick, No. 269, § 4
   (1707), in 2 The Statutes at Large of South Carolina 309, 310 (Thomas Cooper ed. 1837) .... 27

An Act for Regulating the Militia of the State of New York (1780), 1779 N.Y. Laws, ch. 55 .... 30

An Act for Regulation of the Militia of this Commonwealth, 1822 Pa. Laws 316 ..................... 31

An Act for the Better Securing the Government by Disarming Papists and Reputed Papists,
   1 William & Mary, c. 15 (1688) ...................................................................... 28

An Act for the Better Security of the Government, 1777 Md. Laws Ch. XX .............................. 29

An Act to Amend An Act for Declaring What Crimes and Practices Against the State Shall
   Be Treason, . . . and for Preventing the Dangers Which May Arise From Persons
   Disaffected to the State, 1777 N.C. Laws 228 ............................................... 29

An Act to Amend and Reduce Into One Act, the Several Laws for Regulating and Disciplining
   the Militia, and Guarding Against Invasions and Insurrections (1785), in 12 William Waller

Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature (1785) ........................................................................ 30

An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurances of Allegiance to the Same (1777), in 9 William W. Hening, The Statutes at Large, Being a Collection of all the Laws of Virginia 281, 281-82 (1821)............................ 29

An Act to Prohibit the Selling of Guns, Gunpowder or Other Warlike Stores to the Indians (1763), in 6 The Statutes at Large of Pennsylvania From 1682 to 1801, at 319-20 (WM Stanley Ray 1899)..................................................................................................... 26

An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes § 2, Public Law 52-159, 27 Stat. 116, 116-17 (1892).... 32

An Act to Regulate the Militia (1782), 1781 N.Y. Laws, ch. 27 ........................................... 31, 59

An Act to Regulate the Militia (1786), in Thomas Greenleaf, Laws of the State of New York, Comprising the Constitution, and the Acts of the Legislature, since the Revolution, from the First to the Fifteenth Session, Inclusive 230 (1792) ................................................... 30, 61

Ark. Act of Apr. 1, 1881 ................................................................................................ 32

Del. Const. Art. 28 (1776) ............................................................................................ 48

Discourses on Davila, in 6 Works of John Adams 280 (C. Adams ed. 1851).............................. 52

Fourth Annual Report of the Board of Commissioners of the Central Park (Jan. 1861)............. 49

Friedrich von Steuben, Regulations for the Order and Discipline of the Troops of the United States (Styner & Cist ed. 1779)................................................................... 58, 59

George Paschal, ed., 4 Digest of the Laws of Texas Containing the Laws in Force, and the Repealed Laws on Which Rights Rest, from 1754 to 1875 .................................................... 54

James T. Mitchell et al., Statutes at Large of Pennsylvania from 1682 to 1801 vol III (Clarence M. Busch, Printer, 1896) ....................................................................... 53

John Carpenter, Liber Albus: The White Book of the City of London 335 (Henry Thomas Riley ed., London, 1861) ....................................................................................... 31

Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New York, 1775-1776-1777 (1842)..................................... 29

Militia Act of 1662, 13 & 14 Car. 2, c. 3 § 13 (1662) ................................................... 27

Order of Mass. General Court of 1648, reprinted in The Laws and Liberties of Massachusetts 28 (Harvard Univ. Press 1929) ................................................................................ 26

Public Law 2-33, 1 Stat. 271 .......................................................................... passim

Revised Statutes of 1880, Section 6995, 76 Ohio Laws 191 ....................................... 32

Tex. Act of Apr. 12, 1871 ....................................................................................... 32

Univ. of Va. Bd. of Visitors Minutes (Oct. 4-5, 1824) .................................................. 49

Va. Declaration of Rights § 13 (1776), in 7 Thorpe 3812, 3814 ................................... 57

**Rules**

Federal Rule of Evidence 801 ........................................................................... 26

**Regulations**

Alaska Admin. Code § 30.070 ............................................................................ 56

Md. Code Regs. 29.03.02.03 .............................................................................. 35

N.J. Admin. Code § 13:54-2.3 ............................................................................ 35

**Other Authorities**

Application for a Pennsylvania License to Carry Firearms ........................................ 35

David C. Williams, Civic Republicanism and the Citizen Militia: The Terrifying Second
   Amendment, 101 Yale L.J. 551 (Dec. 1991) .................................................... 62

Don B. Kates & Clayton E. Cramer, Second Amendment Limitations and Criminological
   Considerations, 60 Hastings L.J. 1339, 1360 & nn.121-23 (2009) ......................... 26

Florida Department of Law Enforcement, Unreported Information Showing [Shooter]'s
   Troubling Behavior ................................................................................... 41

Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right
   (1994) ................................................................................................... 28

Kevin Roose, On Gab, an Extremist-Friendly Site, Pittsburgh Shooting Suspect Aired His
   Hatred in Full, N.Y. Times, Oct. 28, 2018 ...................................................... 41

Patrick J. Charles, <u>Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry</u> (2018) .......................................................................... 32

Patrick J. Charles, <u>The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review</u>, 60 Cleveland St. L. Rev. 1 (2012). .................................... 31

Peter H. Lindert and Jeffrey G. Williamson, <u>American Incomes Before and After the Revolution</u>, 73 J. of Econ. Hist. No. 3 (Sept. 2013) ................................ 59

PPB-3 Pistol License Application form (Feb. 2007) .................................... 17

Robert H. Churchill, <u>Gun Regulation, The Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment</u>, 25 Law & Hist. Rev. 139 (2007) .......................................................................... 30

S51001 State Senate Sponsor Memo ............................................................ 7

Texas House of Representatives Investigative Committee on the Robb Elementary Shooting, Interim Report 2022 .......................................................... 40

Travis Caldwell, et al., <u>Online posts reveal suspected gunman spent months planning racist attack at a Buffalo supermarket</u>, CNN.com .................................... 41

Defendant Kevin P. Bruen, in his official capacity as Superintendent of the New York State Police ("Superintendent Bruen" or the "Defendant"), respectfully submits this memorandum of law, with the accompanying Declaration of James M. Thompson and the exhibits thereto, in opposition to the motion for a preliminary injunction, ECF No. 9, filed by Plaintiffs Ivan Antonyuk, Gun Owners of America, Inc. ("GOA"), Gun Owners Foundation ("GOF"), and Gun Owners of America New York, Inc. ("GOA-NY") (collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

The recent mass shootings at a grocery store in Buffalo, an elementary school in Uvalde, Texas, and a parade in Highland Park, Illinois demonstrate that gun violence continues to plague New York and our nation.  To address the ongoing crisis and to comply with the dictates of the Supreme Court's decision in <u>NYSRPA v. Bruen</u>, 142 S. Ct. 2111 (2022), the State of New York enacted the Concealed Carry Improvement Act ("CCIA"), which amended New York's existing laws related to concealed carry permits, firmly grounding each provision in centuries of law and tradition. Despite this, Plaintiffs—special interest organizations and an individual—challenge multiple key sections of the CCIA, including the requirement of "good moral character" for licensing; the requirement of in-person interviews for licensing; the requirement that a person list their social media accounts; the requirement that a person submit character references; all restrictions on "sensitive locations"; application fees and training requirements; and the provision banning carrying of guns on private property absent permission from the property owner.

Plaintiffs seek this injunction based on speculative hypotheticals and sweeping assertions that each statutory provision is unconstitutional *on its face*, without asserting any facts to plausibly suggest that any provision is likely to be applied in an unconstitutional manner, let alone that it is likely to be applied unconstitutionally to Plaintiff Antonyuk.  But the Supreme Court made clear

1

in <u>Bruen</u> that Second Amendment cases should involve careful historical analysis to determine whether a challenged statute is "consistent with this Nation's historical tradition of firearms regulation." <u>Id.</u> at 2135.  A careful historical analysis shows the challenged provisions are firmly grounded in centuries of Anglo-American law and tradition.

As a threshold matter, a lack of standing should derail Plaintiffs' challenge before the analysis ever reaches the merits.  Second Circuit precedent prevents organizational plaintiffs from filing suit on behalf of their members, meaning that if any party is to have Article III standing, it must be Plaintiff Antonyuk himself—and he has fatal standing deficiencies of his own.  He has no injury fairly traceable to Superintendent Bruen, and the Eleventh Amendment bars any such lawsuit.  As a Schenectady County permit holder, Plaintiff Antonyuk will never have to renew his license, so he will never be subject to the interview, reference, social media disclosure, or training requirements.  Even if he were, he has not applied for a license under the CCIA yet, which is a prerequisite to standing, and he has not shown any injury-in-fact, which requires both concrete allegations of an intent to violate the law and a credible threat of prosecution.  There is a clear disconnect between the scope of the advisory opinion Plaintiff Antonyuk wants the Court to issue and the negligible allegations as to how the challenged statutes would ever be applied to him.  The CCIA is a statute of extraordinary importance to public safety, and its constitutionality deserves to be adjudicated in the context of genuine challenges brought by parties with a real stake in its specific application, not simply a generalized desire to see it struck down.

Plaintiffs are also unlikely to succeed on the merits because the historical record provided thus far by the parties establishes that the challenged provisions are facially constitutional.  The "good moral character" requirement Plaintiff Antonyuk challenges has already been upheld by the Second Circuit on the first part of the analysis from <u>D.C. v. Heller</u>, 554 U.S. 570 (2008), and in

2

fact the CCIA further clarifies the statutory definition in order to mirror a Connecticut statute specifically endorsed by the majority in <u>Bruen</u>.   Requirements for in-person interviews and character references are common elements of the "shall-issue" licensing laws approved of by the <u>Bruen</u> majority, and they fall comfortably into a long line of Anglo-American precedents allowing for assessments designed to ensure that a person is, in fact a "law-abiding, responsible citizen" entitled to keep and bear arms – and permitting the disarmament of dangerous persons in the interest of public safety.   New York's requirement that a licensing officer consider an applicant's social media posting is a sensible modern analogue to those established precedents, satisfying both the <u>Bruen</u> test under the Second Amendment and traditional First Amendment intermediate scrutiny.

Likewise, New York's protection of sensitive locations such as schools, libraries, churches, and daycare centers is constitutional under the explicit language of <u>Heller</u> and <u>Bruen</u>, and under a centuries-long tradition of barring the carrying of guns in places where the public is especially vulnerable.   New York's law preventing the carrying of guns on private property without the owner's consent is also well-grounded in history going back deep into the Eighteenth Century, as well as settled law establishing that a property holder's dominion over his land is just as fundamental – and just as constitutionally protected – as the right to bear arms.   Lastly, the training requirements that Plaintiffs object to are contemplated in the text of the constitution itself (and in the text of <u>Heller</u> and <u>Bruen</u>) and pale in comparison to the training done as part of militia service at the time of the Founding.   Each of these arguments is documented with direct citations to historical sources and to case law interpreting historical traditions; in contrast, Plaintiffs have decided to forego conducting any historical analysis of their own.

Although Plaintiffs want to extend <u>Bruen</u> and to have the Court find by implication

3

holdings that are not present in <u>Bruen</u>'s text, the Supreme Court was clear on what the <u>Bruen</u> case does and does not mean.  The <u>Bruen</u> Court held that laws protecting the public from gun violence are justified if "historical precedent from before, during, and even after the founding [and the enactment of the Fourteenth Amendment in the late Nineteenth Century] evinces a comparable tradition of regulation."  <u>See</u> <u>id.</u> at 2131-32.  The Court was clear that a law should be upheld if it is "relevantly similar" to a historical tradition, <u>id.</u> at 2132, explaining that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  <u>Id.</u> at 2133 (emphasis in the original).  Applying the new test, the Court compared and contrasted the licensing rules in 43 "shall-issue" states, "under which a general desire for self-defense is sufficient to obtain a permit," against the remaining states, which "require applicants to show an atypical need for self-defense."  <u>Id.</u> at 2138 n.9.

The Supreme Court was equally clear on what <u>Bruen</u> does *not* mean.  The Court emphasized that "[t]o be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality" of the 43 states' laws, even though they had provisions "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" <u>id.</u> (quoting <u>Heller</u>, 554 U.S. at 613 (2008)), and even though the Court acknowledged that several of them "have discretionary criteria," such as precluding the issuing of gun licenses to persons "whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon."  <u>Id.</u> at 2123 n.1.  In concurrence, Justice Alito emphasized the limited scope of what <u>Bruen</u> actually decided, and cautioned against those – like Plaintiffs in this case – who would read into <u>Bruen</u> wholesale changes to the substantive law of the Second Amendment.

4

See id. at 2157 (Alito, J., concurring) ("[T]oday's decision therefore holds that a State may not enforce a law, like New York's Sullivan Law, that effectively prevents its law-abiding residents from carrying a gun for [self-defense]. That is all we decide. Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said . . . about restrictions that may be imposed on the possession or carrying of guns."). Justice Kavanaugh, joined by Chief Justice Roberts, likewise emphasized that "the right secured by the Second Amendment is not unlimited," re-emphasizing that "[n]othing in our opinion should be taken to cast doubt on" a host of categories of laws protecting public safety, including "laws forbidding the carrying of firearms in sensitive places" and "laws imposing conditions and qualifications" to buy a gun. Id. at 2162 (Kavanaugh, J., concurring). Justice Kavanaugh reiterated that such statutes are "presumptively lawful" before saying that only "with those additional comments, I join the opinion of the Court." Id.

Bruen lays out a new test to be fairly applied, where laws protecting the public from gun violence are evaluated not according to intermediate scrutiny, but whether they are "consistent with this Nation's historical tradition of firearm regulation," that is, whether they are "relevantly similar" to laws and traditions in place at the time of the enactment of the Second and Fourteenth Amendments. Id. at 2132, 2135. New York has carried this burden, demonstrating that each of the provisions at issue is firmly grounded in Anglo-American history and doctrine. Accordingly, the CCIA should be upheld.

## STATEMENT OF FACTS

On July 1, 2022, the CCIA was passed by the New York State Legislature in special session, then promptly signed into law by Governor Kathy Hochul.  At the bill signing in Times Square, Governor Hochul stated, "After a close review of the NYSRPA vs. Bruen decision, . . . I am proud to sign this landmark legislative package that will strengthen our gun laws and bolster restrictions on concealed carry weapons."   See Press Release, July 1, 2022, available at https://on.ny.gov/3BM6Hz7.  The bill was specifically designed "to align with the Supreme Court's recent decision in []Bruen"  Id.

In Bruen, the Supreme Court found that a single provision of New York's gun licensing regime was unconstitutional: the provision that required an applicant to demonstrate "proper cause" to obtain a license to carry a concealed weapon.  The Court held that requiring such a heightened, individualized need for self-defense to obtain a license violated the Second Amendment.  See id. at 2123 n.1; see also id. at 2157 (Alito, J., concurring) ("[T]oday's decision therefore holds that a State may not enforce a law, like New York's Sullivan Law, that effectively prevents its law-abiding residents from carrying a gun for this [self-defense].  That is all we decide.").  The Court did not address any other provision of New York's gun licensing or related statutes, and in fact held that "nothing in our analysis should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes, under which "a general desire for self-defense is sufficient to obtain a permit."  Id. at 2138 n.9 (cleaned up).  Justice Thomas' majority opinion noted that these licensing laws "often require applicants to undergo a background check or pass a firearms safety course," but that such measures are constitutional because they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  Id. (quoting Heller, 554 U.S. at 635).  The Court also noted that some of

these constitutional licensing laws "have discretionary criteria," but that such criteria are permissible where they are aimed at excluding "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." Id. at 2123 n.1 (quoting Dwyer v. Farrell, 193 Conn. 7, 12 (1984)).

The Sponsor's Memo of the CCIA bill makes it clear that the Legislature was set on complying with Bruen and securing the fundamental Second Amendment rights of all New Yorkers, while at the same time enacting measures to "prevent[] death and injury by firearms":

> The proposed legislation creates a new licensing procedure that satisfies the requirements set forth by the United States Supreme Court decision in New York State Rifle & Pistol Association, Inc., v. Bruen, et al.  Notably, this replaces the "proper cause" requirements of New York's current conceal carry law, with a new set of requirements that protects individuals' Second Amendment rights as determined by the Supreme Court.  Under this bill, applicants who successfully meet New York's conceal carry license applications requirements will receive their license.

See S51001 State Senate Sponsor Memo, Declaration of James M. Thompson (the "Thompson Dec." or "TD"), Ex. 1 at 4.  Although many of New York's lawmakers vehemently disagreed with Bruen, New York respected and complied with the opinion of the high court, revising its laws to stand side by side with the 43 "shall-issue" states whose laws were endorsed by the Bruen majority.  See id. at 1 (discussing the purpose of the statute, explaining that "[a]s a result of this decision, the State must amend the State's laws on concealed carry permits . . . . The proposed legislation changes the concealed carry permitting process and adds specific eligibility requirements.").

For instance, New York adjusted its requirement that concealed carry licensees must have "good moral character," which had previously been upheld by the Second Circuit on the first prong of the Heller analysis, see Libertarian Party of Erie Cty. v. Cuomo, 970 F.3d 106, 126-27 (2d Cir. 2020), abrogated in part on other grounds, Bruen, 142 S.Ct. 2111, in order to provide additional

7

clarity.  To that end, the Legislature explained that the term "shall mean having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others."  Cf. Bruen, 142 S. Ct. at 2124 n.1 (endorsing the constitutionality of Connecticut's statute denying licenses to "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon.").  Similar standards exist in several of the "shall-issue" licensing laws specifically endorsed by the Supreme Court in Bruen.  See, e.g., Pa. Cons. Stat. § 6109(d)(3) (requiring an investigating sheriff to determine "whether the applicant's character and reputation are such that the applicant will not be likely to act in a manner dangerous to public safety."); 11 Del. Code. § 1441 ("A person of full age and good moral character desiring to be licensed to carry a concealed deadly weapon for personal protection . . .").

In order to make that determination, the new law provided for specific elements in every application, including an in-person interview, character references, and review of an applicant's social media postings.  Cf. Bruen, 142 S.Ct. at 2162 (Kavanaugh, J., concurring) (explaining that permissible state laws "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and  . . . other possible requirements.").  And New York enumerated the vulnerable locations where guns do not belong, in keeping with "longstanding . . . laws forbidding the carrying of firearms in sensitive places," which are "presumptively lawful." Id. at 2162 (Kavanaugh, J., concurring) (quoting Heller, 554 U.S. at 626-27).  In sum, New York's CCIA is the vehicle by which the State complies with Bruen.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right."  Winter v. NRDC, Inc., 555 U.S. 7, 24 (2008).  The burden is on Plaintiffs to establish (1) that they are

8

likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.  Id. at 20.  The final two factors – the balance of the equities and the public interest – "merge when the Government is the opposing party."  L&M Bus Corp. v. Bd. of Educ. of City Sch. Dist. of City of N.Y., No. 18 Civ. 1902, 2018 WL 2390125, at *13 (E.D.N.Y. May 25, 2018) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).

In addition, the Second Circuit has "held the movant to a heightened standard" where, as here: (i) an injunction is "mandatory" (i.e., altering the status quo rather than maintaining it) or (ii) the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits."  People ex. rel. Schneiderman v. Actavis PLLC, 787 F.3d 638, 650 (2d Cir. 2015).  In cases such as this one where a plaintiff asks the Court to enjoin a law passed by the Legislature and signed by the Governor, "[r]equiring such a heightened showing is consistent with the principle that 'governmental policies implemented through legislation . . . are entitled to a higher degree of deference and should not be enjoined lightly.'"  Bill & Ted's Riviera, Inc. v. Cuomo, 494 F. Supp. 3d 238, 244 (N.D.N.Y. 2020) (quoting Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995)).  Plaintiffs must therefore show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest.  Actavis, 787 F.3d at 650 (quoting Beal v. Stern, 184 F.3d 117, 123 (2d Cir. 1999) and Doe v. N.Y.U., 666 F.2d 761, 773 (2d Cir. 1981)).[1]  Plaintiffs cannot meet this standard.

---

[1] Plaintiffs have provided this Court with the wrong standard for the preliminary injunction analysis.  They point to N.Y. Progress and Protection PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013), and A.H. ex rel. Hester v. French, 985 F.3d 165, 176 (2d Cir. 2021), for the proposition that

**ARGUMENT**

I.   **PLAINTIFFS LACK STANDING TO SUE**

This Court need not reach the merits of Plaintiffs' preliminary injunction motion because a "party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." Waskul v. Washtenaw Cnty. Community Mental Health, 900 F.3d 250, 256 n.4 (6th Cir. 2018); accord Nicosia v. Amazon.com, Inc. 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a real or immediate threat of injury."). "To establish Article III standing, a plaintiff bears the burden of establishing three 'irreducible constitutional minimum' elements." Oneida Indian Nation v. U.S. Dep't of the Interior, 336 F. Supp. 3d 37, 44 (N.D.N.Y. 2018) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016)). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1651 (2017). "[W]hen there are multiple plaintiffs," as there are in this case, then at least "one plaintiff must have standing to seek each form of relief requested in the complaint." Id.

The burden must be carried by the plaintiff without the Court filling in the blanks on its behalf, because "jurisdiction must be shown affirmatively, and that showing is not made by

---

"they need not demonstrate a substantial likelihood of success on the merits." See Pls' Prelim. Inj. Mem. at 5. But neither case supports the proposition they cite it for, and in fact the Second Circuit confirmed in both cases that the heightened standard applied. See Walsh, 733 F.3d at 486 (plaintiff "must demonstrate a substantial likelihood of success on the merits"); A.H., 985 F.3d at 177 ("[T]he district court correctly applied the higher legal standard for a mandatory injunction.")

drawing from the pleadings inferences favorable to the party asserting it." Oneida, 336 F. Supp. 3d at 44 (quoting Shipping Fin. Servs. Corp. v. Drakos, 14 F.3d 129, 131 (2d Cir. 1998)). And "[w]here jurisdiction is lacking" because of a lack of standing, then "dismissal is mandatory." United Food & Commercial Workers Union, Local 919 v. Centermark Props. Meriden Square, 30 F.3d 298, 301 (2d Cir. 1994). For the reasons explained below, and in greater detail in Superintendent Bruen's accompanying motion to dismiss, separately filed on this date, none of the named Plaintiffs have standing to sue here.

A.   Under Controlling Second Circuit Precedent, The Organizational Plaintiffs Lack Standing

As an initial matter, under controlling Second Circuit precedent none of the three organizational plaintiffs has alleged facts sufficient to support standing to sue in its own right. The Second Circuit has held that "organizations suing under Section 1983 must, *without relying on their members' injuries*, assert that their own injuries are sufficient to satisfy Article III's standing requirements." NRA of Am. v. Hochul, No. 20-3187-cv, 2021 WL 5313713, at *2 (2d Cir. Nov. 16, 2021) (summary order) (emphasis added) (quoting N.Y. State Citizens' Coal. for Child. v. Poole, 922 F.3d 69, 74-75 (2d Cir. 2019)). The rule that "an organization does not have standing to assert the rights of its members" stems from the Circuit's longstanding doctrine "interpret[ing] the rights § 1983 secures to be personal to those purportedly injured." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011). This doctrine has been the law of the Second Circuit for nearly half a century, see Aguayo v. Richardson, 473 F.2d 1090, 1099 (2d Cir. 1973), and remains controlling precedent today. See NRA, 2021 WL 5313713 at *2.

11

Regarding the organizational Plaintiffs, the Complaint in this action only alleges injuries to the "members and supporters" of Plaintiffs GOA, GOF, and GOA-NY.[2]  See Compl., ¶¶ 117-125.  Plaintiffs' moving brief similarly argues only that these organizational Plaintiffs "have members and supporters in New York who will face the same harms and similar harms as Plaintiff Antonyuk."  Pls' Prelim. Inj. Mem. at 4.  Under settled law, these vague, conclusory "harms" to members cannot provide standing for the organizational plaintiffs.  "Because [each organizational plaintiff] failed to allege its own injuries separate and apart from injuries to its members, it lacks standing in this § 1983 action," and dismissal is required.  NRA, 2021 WL 5313713 at *2.

B.    Superintendent Bruen Is Not A Proper Defendant Due To Lack of Traceability And The Eleventh Amendment Barring Suit

1.    Any Alleged Injury From The Licensing Laws Is Not Fairly Traceable To Superintendent Bruen

Plaintiff Antonyuk has sued the wrong defendant.  He pleads absolutely no information about how the licensing laws (or any other part of the statute) will be concretely and particularly applied to him in any type of unconstitutional manner by Superintendent Bruen.  This is crucial because "the 'case or controversy' limitation of Article III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court."  Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 42 (1976).  In the context of a challenge to the gun licensing laws, both the Second Circuit and New York District Courts have held that the only proper

---

[2] Two of the organizational plaintiffs do not even purport to bring suit on behalf of their members, instead claiming only to have "supporters" in this District.  See Compl. ¶ 3 ("GOF is supported by gun owners across the country and within this district"); id. ¶ 4 ("GOA-NY has more than four hundred supporters in New York, some of whom reside in this district.").  If Second Circuit precedent does not permit an organization to sue based on "injuries to its members," NRA, 2021 WL 5313713 at *2, it certainly does not permit suit on behalf of non-member "supporters."

12

defendant is a licensing officer, and not state officials who simply bear law enforcement responsibilities by virtue of their position.  See Libertarian Party, 970 F.3d at 122 (affirming dismissal of State Police Superintendent and finding "no error in the district court's determination that . . . the only defendants to whom [plaintiffs'] alleged injuries were fairly traceable were the judges who denied their respective applications.").  Numerous district court decisions have similarly dismissed state officials with law enforcement responsibilities as improper parties to a challenge to a gun licensing law, both on standing grounds and under the Eleventh Amendment. See, e.g., Sibley v. Watches, 501 F. Supp. 3d 210, 234 (W.D.N.Y. 2020) (Governor, State Police Superintendent, and county District Attorney); Aron v. Becker, 48 F. Supp. 3d 347, 368-69 (N.D.N.Y. 2014) (Governor); Osterweil v. Bartlett, No. 09-cv-825, 2010 WL 1146268, at *2 (N.D.N.Y. Feb. 24, 2010) (Governor and Attorney General).  Superintendent Bruen was one of the defendants in the recent U.S. Supreme Court case ruling on New York's prior "proper cause" licensing standard, but the standing issue was not similarly present there because the plaintiffs in that matter also sued "a New York Supreme Court justice, who oversees the process of licensing applications in Rensselaer County," and who had in fact ruled on the license applications submitted by the plaintiffs in that case.  Bruen, 142 S.Ct. at 2125.

Here, Plaintiff Antonyuk has named Superintendent Bruen as the sole defendant in this action, but he has failed to plausibly allege that there exists any direct causal connection between Superintendent Bruen's conduct and the actual measures that he is challenging.  Under New York law, Superintendent Bruen is only the "licensing officer" for retired members of the Division of State Police.  N.Y. Penal Law § 265.00(10) ("'Licensing officer' means . . . for the purposes of section 400.01 of this chapter [for retired members of the Division of State Police] the superintendent of state police; and elsewhere in the state a judge or justice of a court of record

13

having his office in the county of issuance."). A "licensing officer" in Schenectady County would be a County Court Judge or Supreme Court Justice of that county. It would not be Superintendent Bruen. See Bach v. Pataki, 408 F.3d 75, 79 (2d Cir. 2005) ("Local licensing officers [are] often local judges . . . ."). In short, Plaintiff Antonyuk has not sued a proper defendant, and the lack of any injury "fairly traceable" to Superintendent Bruen is fatal to his claim. See Marino v. Twn. of Branford, No. 17-cv-1828, 2018 WL 691715, at *2 (D. Conn. Feb. 2, 2018) ("As an initial matter, the plaintiff appears to have sued the wrong defendants . . . . [a]s a result, the court cannot grant him the relief he seeks with respect to his license.").

   2.   The Eleventh Amendment Separately Bars Suit Against Superintendent Bruen

   Plaintiffs' action against Superintendent Bruen is also barred by the Eleventh Amendment, for reasons that largely mirror the traceability analysis discussed above. "Since New York has not consented to be sued, and because Section 1983 did not abrogate New York's Eleventh Amendment immunity, Plaintiff[s'] claims can only proceed if the Ex parte Young exception applies." Mann v. N.Y. State Ct. of Appeals, No. 21-CV-49, 2021 WL 5040236, at *4 (N.D.N.Y. Oct. 29, 2021). "To fall within the Ex parte Young exception, however, the defendant state officer 'must have some connection with the enforcement of the act, or else [the plaintiff] is merely making him a party as a representative of the state, and thereby attempting to make the state a party." HealthNow N.Y., Inc. v. New York, 739 F. Supp. 2d 286, 294 (W.D.N.Y. 2010), aff'd on other grounds, 448 F. App'x 79 (2d Cir. 2011) (summary order); accord Chrysafis v. James, 534 F. Supp. 3d 272, 288-89 (E.D.N.Y. 2021). "For a state officer to be a proper party, both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty are

needed." <u>Kelly v. N.Y. State Civil Service Com'n</u>, No. 14 Civ. 716, 2015 WL 861744, at *3 (S.D.N.Y. Jan. 26, 2015) (citing <u>HealthNow</u>, 739 F. Supp. 2d at 294).

Here, as discussed more fully in Section I(B)(1), above, Superintendent Bruen is only directly involved in the licensing process for retired State Police members, and the Plaintiff is not one. <u>See</u> N.Y. Penal Law §§ 265.00(10), 400.01(1). To be sure, Superintendent Bruen is the chief executive of a statewide law enforcement agency, but a general ability or obligation to enforce state laws is not sufficient to pierce Eleventh Amendment immunity; instead, "it has been held that 'a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute.'" <u>Citizens Union of the City of N.Y. v. Attorney General of N.Y.</u>, No. 16 Civ. 9592, 2017 WL 2984167, at *4 (S.D.N.Y. June 23, 2017) (collecting cases). Rather, a state official must have a "particular duty" to enforce a law in order to be a proper defendant under <u>Ex Parte Young</u>. <u>Id.</u> at *5 n.6 (quoting <u>Kelly</u>, 201 WL 861744, at *3). That "particular duty" is absent here, with respect to either the licensing laws or the other challenged provisions of the CCIA. Superintendent Bruen simply is not a proper defendant for Plaintiffs' challenge, both on standing grounds and under the Eleventh Amendment.

C.   <u>Plaintiff Antonyuk Has Not Alleged An Injury-in-fact</u>

1.   Because Plaintiff Antonyuk's License Does Not Expire, He Will Never Be Subject To The Interview, Social Media Disclosure, or Training Requirements He Is Challenging

Plaintiff Antonyuk cannot demonstrate an injury-in-fact from the CCIA's key revisions to New York's licensing laws, including the interview, social media disclosure, and training provisions, because these provisions will never be applied to him. These provisions are part of N.Y. Penal Law § 400.00(1), which applies whenever a license is "issued or renewed." <u>See</u> 2022 N.Y. Laws ch. 371 § 1.

But as a current holder of a Schenectady County unrestricted carry permit, <u>see</u> Compl. ¶ 1, Plaintiff Antonyuk will not be required to have his license re-issued or renewed, and therefore will never be subject to any of these application requirements.  Renewal of a license is governed by N.Y. Penal Law § 400.00(10), under which the renewal period is every three years for licenses issued in New York City, and every five years for licenses from Nassau, Suffolk, or Westchester Counties.  <u>See</u> N.Y. Penal Law § 400.00(10).  But "elsewhere than in the city of New York and the counties of Nassau, Suffolk and Westchester, any license to carry or possess a pistol or revolver, issued at any time pursuant to this section . . . and not previously revoked or cancelled, shall be in force and effect until revoked."  <u>Id.</u>  Plaintiff Antonyuk avers that his license "has never been revoked or suspended."  Compl. ¶ 106.  Accordingly, he will never need to renew his license, never need to have an interview, never need to disclose his social media, and never need to go through the training required for new applicants or renewals.[3]

2.      Plaintiff Antonyuk Lacks Standing To Challenge The Licensing Provisions of the CCIA Because He Has Not Yet Filed For a License

Even if Plaintiff Antonyuk would potentially be subject to the requirements for new and renewal licenses, he has not yet filed for a permit under the CCIA, and his challenge would not be ripe until he did.  <u>See United States v. Decastro</u>, 682 F. 3d 160, 164 (2d Cir. 2012) (holding that plaintiff who failed to apply for a New York gun license lacked standing to challenge the state's licensing laws), <u>cert. denied</u>, 568 U.S. 1092 (2013).  The threshold requirement that a plaintiff

---

[3] Plaintiff Antonyuk alleges that he will be required to "renew or recertify his permit in January 2023" because "New York carry licenses must be recertified after five years."  Compl. ¶ 108.  But renewal and recertification are different – Mr. Antonyuk will only need to recertify under Penal Law § 400.00(10)(b), which merely requires updating one's contact information and firearms owned, and certifying "that such license holder is not prohibited from possessing firearms."  The interview, social media, and training requirements do not apply to this recertification process.  <u>See</u> N.Y. Penal Law § 400.00(1) (requirements apply only when a license is "issued or renewed").

must first apply for a license before bringing suit may be excused, but only "if he made a 'substantial showing' that submitting an application 'would have been futile.'" Id. (quoting Jackson-Bey v. Hanslmaier, 115 F. 3d 1091, 1096 (2d Cir. 1997)).  Here, Plaintiff Antonyuk does not allege that seeking a license would be futile, much less make a "substantial showing" of futility.

For instance, one of the central aspects of this case is Plaintiffs' challenge to the CCIA's language regarding the "good moral character" necessary for a license applicant, see Compl. ¶¶ 52-58, 134, 144-45; Dkt. No. 9-1 at 4, 8-11, but there is no basis to assume that Plaintiff Antonyuk would be denied a license for lack of good moral character.  This is particularly the case where Plaintiff Antonyuk states that he "currently possesses an unrestricted New York carry license, which was issued in March of 2009," presumably after satisfying the longstanding good moral character requirement, Compl. ¶ 106, and "has continuously held a carry license since then and it has never been revoked or suspended." Id.  Similarly, Plaintifff Antonyuk has almost certainly satisfied the character reference requirement in the past, since four character references were required in pistol permit applications long before the Bruen decision or the passage of the CCIA. See PPB-3 Pistol License Application form (Feb. 2007), TD Ex. 2 at 1 (requiring "four references who by their signature attest to your good moral character").

The Complaint therefore provides no reason to believe that the CCIA's licensing requirements would actually stop Plaintiff Antonyuk from keeping and bearing arms.  Under Decastro, unless and until he seeks a license and is rejected, the law has not impacted his Second Amendment rights and he lacks standing to challenge it. See 682 F.3d at 164 ("The premise of Decastro's argument is that New York's licensing scheme is itself constitutionally defective; his argument is therefore tantamount to a challenge to that scheme.  However, because Decastro failed

17

to apply for a gun license in New York, he lacks standing to challenge the licensing laws of the state.").

> 3.    Plaintiff's Generalized and Conclusory Allegations Do Not Properly Allege A Sufficient Injury-In-Fact for a Pre-Enforcement Challenge

Where, as here, a plaintiff is trying to challenge a statute that has never been enforced against him, "pre-enforcement review is available where the 'circumstances render the threatened enforcement sufficiently imminent,' which can be established 'by plausible allegations that a plaintiff intends to engage in conduct proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" Frey v. Bruen, No. 21 CV 5334, 2022 WL 522478, at *4 (S.D.N.Y. Feb. 22, 2022) (cleaned up) (quoting Adam v. Barr, 792 F. App'x 20, 21-22 (2d Cir. 2019) (summary order)).  Plaintiff Antonyuk has not alleged either a concrete plan to violate the CCIA or a credible threat of prosecution by Superintendent Bruen.

Take Plaintiff Antonyuk's challenge to New York's protection of sensitive locations.  The Plaintiff is challenging the entire applicable section of the CCIA, see Compl. ¶ 69, but he fails to plead sufficient facts about any "sensitive place" into which he intends to take a gun.  He merely pleads – in overly generalized and entirely conclusory fashion – that he "wants to continue to lawfully carry [his] handgun in public, which [he has] done since 2009."  See Antonyuk Dec. ¶ 12, ECF No. 1-6.  But "such 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury that is required."  Frey, 2022 WL 522478 at *5 (emphasis in the original) (quoting Lujan, 504 U.S. at 564).  There is no credible allegation that Plaintiff Antonyuk intends to take a gun into a homeless shelter, a bar, a church, a preschool, a university, a polling place, Times Square, or any other specific location – but he wants the Court to adjudicate the

constitutionality of his carrying a gun into each of them.  Cf. Butler v. Obama, 814 F. Supp. 2d

230, 240 (E.D.N.Y. 2011) ("speculation is insufficient to confer Article III standing").   Similarly,

there is no "real and immediate" likelihood that Plaintiff Antonyuk would be harmed by the private

property protection, particularly when he pleads no facts about any concrete plan to violate it.

Plaintiff Antonyuk similarly fails to allege an injury-in-fact because he has not pled facts

that indicate a credible threat of prosecution.   "Although courts generally presume that the

government will enforce its laws, 'the mere existence of a law prohibiting intended conduct does

not automatically confer Article III standing.'"   Sibley, 501 F. Supp. 3d at 222 (quoting Adam,

792 F. App'x at 22).  Like the plaintiffs in Adam, Sibley, and Frey, Plaintiff Antonyuk "does not

allege that the [CCIA] has been enforced against him in the past or that anyone threatened him

with prosecution." Id.  Instead, he "infers that because the Penal Laws exist, he will be prosecuted

once he carries his firearms outside the confines of his license."  Frey, 2022 WL 522478 at *5

(changed to the singular).  This provides no basis for a credible threat of prosecution, as a matter

of law, much less a basis for a credible threat of prosecution from Superintendent Bruen.[4]

"When a litigant fails to plead sufficient facts to establish standing, then the [C]ourt is

'powerless to create its own jurisdiction by embellishing otherwise deficient allegations of

standing.'" Mental Hygiene Legal Serv. v. Cuomo, 13 F. Supp. 3d 289, 298-99 (S.D.N.Y. 2014)

(quoting Whitmore v. Arkansas, 495 U.S. 149, 155-56 (1990)), aff'd, 609 F. App'x 693 (2d Cir.

2015) (summary order).  And that is the primary problem with Plaintiffs' deficient Complaint: they

want the broadest possible advisory opinion, but they have not sued the correct defendant(s), and

---

[4] "[T]he Superintendent is not required to make [a] disavowal" of an intent to enforce the law, "as
he has not previously threatened or charged Plaintiff[] under the relevant statutes" or their
predecessors.  Frey, 2022 WL 522478 at *5.

they have not made sufficient factual allegations to constitute an injury-in-fact.  See Baur v. Veneman, 352 F.3d 625, 637 (2d Cir. 2003) ("[A] plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing."). Because Plaintiff Antonyuk has not made a clear or substantial showing of standing to pursue his claims, his motion for a preliminary injunction likewise fails.

## II.   PLAINTIFFS HAVE NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   Plaintiffs Can Only Bring a Disfavored Facial Challenge

Plaintiffs attempt to bring both a facial and an as-applied challenge to the provisions of the CCIA, see Compl. ¶¶ 139, 148, 150, but they cannot bring an as-applied challenge to a statute that has never been applied to them.  A long line of precedent within the Second Circuit establishes that any "pre-enforcement" challenge to a state law, defined as one brought "before [any plaintiffs] have been charged with any violation of law," can only be brought as a facial challenge.  Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Departments, 852 F.3d 178, 184 (2d Cir. 2017) (citing N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 265 (2d Cir. 2015)); see Restaurant Law Ctr. v. City of N.Y., 360 F. Supp. 3d 192, 208 (S.D.N.Y. 2019) ("Plaintiffs bring their challenge to the [] Law before it has been enforced.  As such, their challenge is a facial challenge.").  Plaintiffs fail to allege that any governmental actor has ever charged them (or will ever charge them) with violating the CCIA.

That leaves Plaintiffs' facial challenge remaining.  Not only are "[f]acial challenges … generally disfavored" by courts, Dickerson v. Napolitano, 604 F.3d 732, 741 (2d Cir. 2010), but a facial challenge to the provisions of a statute can succeed only if Plaintiffs "show that 'no set of circumstances exists under which the [statute] would be valid, i.e., that the law is unconstitutional in all of its applications,' or at least that it lacks a 'plainly legitimate sweep.'"  Decastro, 682 F.3d

20

at 168 (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008));

see also United States v. Salerno, 481 U.S. 739 (1987)).   Moreover, it is black-letter law that the

New York State courts must be given the opportunity to narrow the provisions of the CCIA, if

necessary, during the course of specific enforcement activities or judicial proceedings.   See

Erznoznik v. Jacksonville, 422 U.S. 205, 216 (1975) ("a state statute should not be deemed facially

invalid unless it is not readily subject to a narrowing construction by the state courts").   Because

of this, "[a] plaintiff making a facial claim faces an uphill battle because it is difficult to

demonstrate that the mere enactment of a piece of legislation violated the plaintiff's constitutional

rights." Cranley v. Nat'l Life Ins. Co. of Vt., 318 F.3d 105, 110 (2d Cir. 2003) (quoting Suitum

v. Tahoe Regional Planning Agency, 520 U.S. 725, 736 n.10 (1997)) (internal quotation marks

omitted); see also Diaz v. Pataki, 368 F. Supp. 2d 265, 274 (S.D.N.Y. 2005) (same).[5]

B.      New York's Good Moral Character Requirement Is Constitutional And Patterned
         After Laws Endorsed By The Bruen Majority

The Second Amendment right to bear arms is a right that belongs to "law-abiding,

responsible citizens." Heller, 554 U.S. at 635; accord Bruen, 142 S.Ct. at 2131.   And the Bruen

majority recognized the importance of state licensing requirements "designed to ensure [] that

those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"   Bruen, 142

S.Ct. at 2138 n.9.   In New York, this work is done in part through a statutory requirement that a

license applicant be "of good moral character."   N.Y. Penal Law § 400.00(1)(b).   The Second

---

[5] Additionally, even if the Court were to enjoin one part of the CCIA, "the remainder of the Law continues to be valid and enforceable," both because of the strong preference for severability under New York State law and because of "the presence of a broad severability clause" in the statute. Ass'n of Home Appliance Mfgrs. v. City of N.Y., 36 F. Supp. 3d 366, 377 (S.D.N.Y. 2014); see Ch. 371, 2022 N.Y. Laws § 25 ("If any clause, sentence, paragraph or section of this act shall be adjudged by any court of competent jurisdiction to be invalid, the judgment shall not affect, impair, or invalidate the remainder thereof . . . .").

Circuit previously upheld the constitutionality of this provision at "the first step of the [Heller] analysis," finding that the requirement is "easily understandable," that examples of its proper application "are not beyond an ordinary person's comprehension; nor are they rare," and that "the statute does not burden the ability of *law-abiding, responsible* citizens to use arms."  Libertarian Party, 970 F.3d at 126, 127 (emphasis in the original).[6]  The statute's constitutionality should only be more solid now, as the CCIA clarifies the definition of "good moral character" using language derived directly from the Bruen opinion.

> 1.    New York's Revised Good Moral Character Requirement Is In Line With State Laws Deemed Constitutional In Bruen

The Bruen majority specifically endorsed "shall-issue" licensing regimes that included an evaluation of an applicant's responsibility and fitness to carry a gun, explaining that "shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice."  Id. at 2162 (Kavanaugh, J., concurring).  This is the case even where licensing systems "have discretionary criteria," so long as those criteria are geared toward evaluating a person's "character of temperament" or "suitability," and so long as "demonstration of a proper showing of need" is not "a component of that requirement."  Id. at 2123 n.1 (majority op.).  Although New York's "good moral character" standard previously stood alone and included no definition to guide the discretion of a licensing officer, the CCIA provides one, explaining that good moral character "shall mean having the

---

[6] Other district courts in this Circuit have done likewise.  See, e.g., Sibley, 501 F. Supp. 3d at 225-31 (rejecting facial and as-applied vagueness and overbreadth challenges to good moral character requirement); Paulk v. Kearns, 2022 WL 954405, at *5 (W.D.N.Y. Mar. 30, 2022) (discussing the "good moral character" aspect of a New York firearms statute and noting that the Second Amendment only applies of to "law-abiding, responsible citizens"); Abekassis v. New York City, 477 F. Supp. 3d 139, 157 (S.D.N.Y. 2020) (same); Aron v. Becker, 48 F. Supp. 3d 347, 374 (N.D.N.Y. 2014) (same).

essential character, temperament and judgment necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others."[7]  Ch. 371, 2022 N.Y. Laws § 1(b). This language wasn't pulled out of thin air – it came from a Connecticut statute quoted in the Bruen opinion and declared constitutional.

The Bruen Court separated the acceptable "shall-issue" regimes from the unacceptable "may issue" regimes in Footnote One of the majority opinion, and in doing so made clear that Bruen does not forbid "discretionary criteria" so long as those criteria are focused on an applicant's fitness to own a deadly weapon, not on whether he or she has a special need for one.  Bruen, 142 S.Ct. at 2123 n.1.  Justice Thomas noted that "[a]lthough Connecticut officials have discretion to deny a concealed carry permit to anyone who is not a 'suitable person,' the 'suitable person' standard precludes permits only to those 'individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon.'"  Id. (quoting Conn. Gen. Stat. § 29-28(b) (citation omitted)).  New York's revised good moral character standard, which requires that an applicant "hav[e] the essential character, temperament and judgment necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others," mirrors the Connecticut standard Justice Thomas deemed constitutional.  Bruen similarly blessed Rhode Island's licensing system, including its "suitability requirement," because "demonstration of a proper showing of need" was not "a component of that

---

[7] The changes to the "good moral character" requirement further underscore the standing problems discussed in Section I, above.  With Plaintiff Antonyuk having already obtained a carry permit under the prior standard, see Compl. ¶ 1, there is no reason to imagine that he would suffer an injury-in-fact under the more defined standard enacted by the CCIA.  Cf. Compl. ¶ 1 (Mr. Antonyuk "is a law-abiding person, who currently possesses and has maintained an unrestricted New York carry permit since 2009, and who is eligible to possess and carry firearms in the State of New York.").

23

requirement." <u>Bruen</u>, 142 S.Ct. at 2123 n.1.  The language of that statute required only that a permit be issued to an applicant "if it appears . . . that he or she is a suitable person to be so licensed." R.I. Gen. Laws § 11-47-11.

Many other states that the <u>Bruen</u> majority endorsed similarly require licensing officials to judge an applicant's character and whether or not he is a threat to himself or others.  Pennsylvania, for instance, requires an investigating sheriff to determine "whether the applicant's character and reputation are such that the applicant will not be likely to act in a manner dangerous to public safety." Pa. Cons. Stat. § 6109(d)(3).  Virginia allows a judge to reject a licensing request if "the court finds, by a preponderance of the evidence" that the applicant "is likely to use a weapon unlawfully or negligently to endanger others." Va. Code. § 18.2-308.09(13).  Colorado allows a sheriff to reject a permit application "if the sheriff has a reasonable belief that documented previous behavior by the applicant makes it likely the applicant will present a danger to self or others." Colo. Rev. Stat. § 18-12-203(2).  And Illinois only allows permits for an applicant who "does not pose a danger to himself, herself, or others, or a threat to public safety as determined by the Concealed Carry Licensing Review Board." 430 Ill. Comp. Stat. Ann. 66/10(a)(4).  Each of these state laws was specifically cited by the <u>Bruen</u> majority, <u>see</u> 142 S.Ct. at 2123 n.1, and each is equivalent to the new standard provided for in the CCIA.

Conversely, the <u>Bruen</u> majority made clear that it was not discretion alone, but rather discretion combined with a "proper cause" requirement that offended the Second Amendment. Writing for the majority, Justice Thomas noted that some of the "shall-issue" states had licensing systems including "discretionary criteria," <u>id.</u>, but nonetheless announced that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of their licensing regimes, since they "are designed to ensure [] that those bearing arms in the jurisdiction are, in fact, 'law abiding,

24

responsible citizens,'" and the systems "do not require applicants to show an atypical need for armed self-defense." Id. at 2138 n.9. Justice Kavanaugh, joined by Justice Roberts, similarly explained that it was the *combination* of discretion and a proper cause requirement that caused the pre-CCIA version of New York's law to run afoul of the Second Amendment. See id. at 2161 (Kavanaugh, J. concurring) (finding the previous law "constitutionally problematic because it grants open-ended discretion to licensing officials *and* authorizes licenses only for those applicants who can show some special need apart from self-defense" (emphasis added)).

The CCIA fixes this problem, removing the proper cause requirement struck down in Bruen and cabining the discretion of licensing officials in a manner equivalent to a host of other states whose criteria the Bruen majority specifically endorsed. Although the Plaintiffs insinuate that there will be "a host of abuses, unequal enforcement, arbitrary and capricious[] actions," Compl. ¶ 58, they offer no actual evidence that New York licensing officials will operate in bad faith. Meanwhile, the Second Circuit previously found that the prior, broader standard's "repeated use for decades, without evidence of mischief or misunderstanding" was strong evidence of its constitutionality. Libertarian Party, 970 F.3d at 126-27. If such hypothetical "abuses" were in fact to take place, they would be a proper subject for an as-applied challenge to rectify the misapplication of the law, see Bruen, 142 S.Ct. at 2162 (Kavanaugh, J., concurring), not a facial challenge such as this one seeking to strike it entirely.

2.   New York's Good Moral Character Requirement Is Relevantly Similar To A Long Tradition Of Anglo-American History And Doctrine

New York's good moral character requirement is consistent with the long history in both England and America of disarming those whose associations, reputation, or conduct suggested they posed a danger to others or to the public order. "Constitutional rights are enshrined with the

25

scope they were understood to have when the people adopted them." Heller, 554 U.S. at 634-35. "[F]rom time immemorial, various jurisdictions recognizing a right to arms have nevertheless taken the step of forbidding suspect groups from having arms."  Don B. Kates & Clayton E. Cramer, Second Amendment Limitations and Criminological Considerations, 60 Hastings L.J. 1339, 1360 & nn.121-23 (2009); see also id. ("American legislators at the time of the Bill of Rights seem to have been aware of this tradition of excluding . . . suspect persons from the right to arms.").[8]  In the period between the establishment of colonies in America and the Revolutionary War, both the colonial governments and the monarchy from which their legal traditions originated did not hesitate to disarm persons based on a finding that they were potentially dangerous.[9]

From the early days of English settlement in America, the colonies sought to prevent Native American tribes from acquiring firearms, passing laws forbidding the sale and trading of arms to Indigenous people.  See Order of Mass. General Court of 1648, *reprinted in* The Laws and Liberties of Massachusetts 28 (Harvard Univ. Press 1929), TD Ex. 3; An Act to Prohibit the Selling of Guns, Gunpowder or Other Warlike Stores to the Indians (1763), *in* 6 The Statutes at Large of Pennsylvania From 1682 to 1801, at 319-20 (WM Stanley Ray 1899), TD Ex. 4; Act XXIII (1642), 1 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia From the First Session of the Legislature, in the Year 1619, at 255 (1823), TD Ex. 5; An Act for

---

[8] To the extent that any of the reports or scholarly articles cited in this memorandum may be considered hearsay under Federal Rule of Evidence 801, "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction."  Mullins v. City of N.Y., 626 F.3d 47, 52 (2d Cir. 2010).

[9] See Binderup v. Attorney General, 836 F.3d 336, 368 (3d Cir. 2016) (Hardiman, J., concurring in part) ("Debates from the Pennsylvania, Massachusetts and New Hampshire ratifying conventions, which were considered 'highly influential' by the Supreme Court in Heller ... confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses.")

Regulating the Indian Trade and Making It Safe to the Publick, No. 269, § 4 (1707), *in* 2 The Statutes at Large of South Carolina 309, 310 (Thomas Cooper ed. 1837), TD Ex. 6.   Colonial governments also directly regulated gun ownership of individuals believed to be unfit.   The Massachusetts Bay Colony, for instance, issued an order in 1637 disarming the followers of a dissident preacher named John Wheelwright because there was "just cause of suspition that they . . . may, upon some revelation, make some suddaine irruption upon those that differ from them in judgment."  1 Records of Mass. 1628-1641, at 211-12 (Nathaniel B. Shurtleff, ed. 1853), TD Ex. 7.   Likewise, King Charles II of England passed the Militia Act of 1662, which authorized royal officials, called Lord Lieutenants, to "search for and seize all arms in the custody or possession of any person or persons whom the said Lieutenant or two or more of their deputies shall judge dangerous to the peace of the Kingdom."  Militia Act of 1662, 13 & 14 Car. 2, c. 3 § 13 (1662), TD Ex. 8.[10]  Based only on a person's reputation for supposed dangerousness, as known to one English official or two of his deputies, the person could be disarmed to protect public safety.

And even after the English Bill of Rights established a right of the people to arm themselves, the right was only given to Protestants, based on a continued belief that Catholics were likely to engage in conduct that would harm themselves or others and upset the peace. [11]  See An

---

[10] Although the Supreme Court cautioned in Bruen that "English common law 'is not to be taken in all respects to be that of America,'" 142 S. Ct. at 2138 (quoting Van Ness v. Pacard, 2 Pet. 137, 144, 27 U.S. 137 (1829)), the Court also stated that it considers English history "between the Stuart Restoration in 1660 and the Glorious Revolution in 1688 to be particularly instructive" of the founders' views on the Second Amendment, id. at 2140 (cleaned up) (quoting Heller, 554 U.S. at 592).

[11] Although these laws reflect the broad pre- and post-Founding understanding that gun possession could be restricted in cases where a person was dangerous or unfit, they (and others in the historical analysis discussed in this section) are based on racial or religious animus that is repugnant to a modern understanding of the Constitution.  Cf. Pena-Rodriguez v. Colorado, 137 S.Ct. 855, 867 (2017) ("It must become the heritage of our Nation to rise above the racial classifications that are

Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 William & Mary, c. 15 (1688), TD Ex. 9.  Virginia followed this example, passing an act in 1756 that ordered the disarmament of all Catholics or "reputed Papists" who refused to take an oath of loyalty to the colonial government.  An Act for Disarming Papists, and Reputed Papisits, Refusing to Take the Oaths to the Government (1756), in 7 William W. Hening, <u>The Statutes at Large, Being a Collection of all the Laws of Virginia</u> 35-36 (Richmond: Franklin Press, 1809), TD Ex. 10.[12]  It was thus commonly understood at the time of the Second Amendment's ratification that if authorities believed an individual threatened the public by virtue of that person's associations or reputation, authorities could strip that person of his right to bear arms.  <u>See</u> <u>United States v. Carpio-Leon</u>, 701 F.3d 974, 980 (4th Cir. 2012) ("Colonial governments often barred 'potential subversives' from owning firearms." (citing Joyce Lee Malcolm, <u>To Keep and Bear Arms: The Origins of an Anglo-American Right</u> 140-41 (1994)).

In the Revolutionary era, colonies frequently disarmed individuals based on their reputation for being disloyal or hostile to the new American nation.  Massachusetts, for instance, had a law "disarming such person as are notoriously disaffected to the cause of America." Act of March 14, 1776, in 1775-1776 Mass. Acts & Laws 31, TD Ex. 11.  Once an individual had been deemed disaffected to the cause of America, he could often only regain his right to bear arms by appearing in person before an official to swear an oath of loyalty.  In a Pennsylvania law passed

---

so inconsistent with our commitment to the equal dignity of all persons.").  A clear-eyed look at American history and doctrine will necessarily reveal episodes that are shameful but nonetheless relevant, as the <u>Bruen</u> opinion teaches us.  <u>See</u> 142 S.Ct. at 2150-51.  Of course, if a modern instance were to arise where gun licensing requirements were applied in a discriminatory manner, it could, should, and would be struck down as unconstitutional.

[12] As with its English analogues, Virginia's Act deemed someone a "reputed Papist" if two or more justices of the peace knew or suspected that person was Catholic.  <u>Id.</u> at 36.

28

in 1776, all white male inhabitants were required to appear "before some one of the justices of the peace of the city or county where they shall respectively inhabit" to take a prescribed oath of allegiance, and if they failed to do so, they were "disarmed by the lieutenant or sublieutenants of the city or counties respectively."  1776-1777 Pa. Laws ch. XXI, §§ 1, 4, at 61-63, TD. Ex. 12. Other colonies adopted similar provisions. See An Act for the Better Security of the Government, 1777 Md. Laws Ch. XX, TD Ex. 13; An Act to Amend An Act for Declaring What Crimes and Practices Against the State Shall Be Treason, . . . and for Preventing the Dangers Which May Arise From Persons Disaffected to the State, 1777 N.C. Laws 228, TD Ex. 14; An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurances of Allegiance to the Same (1777), in 9 William W. Hening, The Statutes at Large, Being a Collection of all the Laws of Virginia 281, 281-82 (1821), TD Ex. 15.  In New York, if an individual refused to sign a loyalty oath, his arms were taken and redistributed to the colony's militia. Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New York, 1775-1776-1777, at 389 (1842), TD Ex. 16; see also Carpio-Leon, 701 F.3d at 980 (noting that Massachusetts required participants in Shays' Rebellion to obtain a pardon, to swear allegiance to the state, and to give up their firearms for three years).

Character judgments also played a role in Founding-era statutes governing the militia, which provided for the disarmament and punishment of those who showed up to muster and demonstrated their unfitness to bear arms.  During the Eighteenth and Nineteenth Centuries, every American colony also required male citizens to appear in person and demonstrate the fitness of themselves and their weapons as part of their enrollment in the local militia.  Virtually all able-bodied men were legally required to enroll in a militia.  See Public Law 2-33, 1 Stat. 271, TD Ex. 17.  As part of this requirement, men were required to be "mustered," that is, to present themselves

29

and their arms for inspection, at regular intervals.  See An Act for Forming and Regulating the Militia Within the Colony, in 1775-1776 Mass. Acts & Laws 15, 21, TD Ex. 18 (requiring militia members to appear once every six months with their arms to be expected and train); Act of April 14, 1778, §§ 13-15, 1778 N.J. Laws 42, 46, TD Ex. 19 (requiring men to appear with their arms for exercise twice a year and further inspections of weapons every four months); An Act to Amend and Reduce Into One Act, the Several Laws for Regulating and Disciplining the Militia, and Guarding Against Invasions and Insurrections (1785), in 12 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature (1785), TD Ex. 20; see also Robert H. Churchill, Gun Regulation, The Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 Law & Hist. Rev. 139, 161 & n.54 (2007) (collecting other examples).  In New York, every brigade was required to have an inspector to "inspect [militia members'] arms, ammunition, accoutrements and clothing; superintend their exercises and maneuvers, and introduce a proper system of military discipline throughout his brigade, agreeable to such orders as he may, from time to time, receive from the adjutant-general."  An Act to Regulate the Militia (1786), in Thomas Greenleaf, Laws of the State of New York, Comprising the Constitution, and the Acts of the Legislature, since the Revolution, from the First to the Fifteenth Session, Inclusive 230 (1792), TD Ex. 21.

While one significant purpose of mustering was to inspect the physical weapons of individuals, the laws also contemplated that some individuals would be found personally unfit to bear arms and authorized officers to take action in these cases.  See, e.g., An Act for Regulating the Militia of the State of New York (1780), 1779 N.Y. Laws, ch. 55, TD Ex. 22 ("That if any dispute shall arise with respect to the age or ability to bear arms of any person, it shall be determined by the colonel or commanding officer of the regiment whose determination in the case

30

shall be final."); An Act to Regulate the Militia (1782), 1781 N.Y. Laws, ch. 27, TD Ex. 23 (same).

New Jersey law provided that if a member of the militia appeared drunk, disobeyed orders, used

abusive language, quarreled, or instigated argument among other militiamen, "he shall be disarmed

and put under guard, by order of the commanding officer present, until the company is dismissed,

and shall be fined at the discretion of a regimental court martial." Act for Establising and

Conducting the Military Force of New-Jersey, 1806 N.J. Laws 536, 563, TD Ex. 24. Pennsylvania

enacted a nearly identical provision in 1822.   An Act for Regulation of the Militia of this

Commonwealth, 1822 Pa. Laws 316, 340, TD Ex. 25 (authorizing disarmament of any non-

commissioned officer or private who appeared "in an unfit condition," appeared intoxicated, used

abusive language, quarreled, or instigated quarrel among fellow soldiers).   And although these

militia laws originated during the Revolutionary War, they continued to be passed even in times

of peace.  See Militia Act of 1792 § 7, 1 Stat. 271, 273, TD Ex. 17 (requiring muster of national

militia); 1822 Pa. Laws 340, TD Ex. 25.

In the period before and after the ratification of the Fourteenth Amendment, Congress and

the states began to implement firearm licensing regimes involving a discretionary determination

of whether an individual was potentially dangerous.[13]  See, e.g., An Act to punish the carrying or

---

[13] Licensing was not a new invention of post-bellum America.  As early at the Fourteenth Century,
English subjects were disallowed from carrying weapons without a license unless they were an
officer of the peace.  John Carpenter, Liber Albus: The White Book of the City of London 335
(Henry Thomas Riley ed., London, 1861), TD Ex. 53; Patrick J. Charles, The Faces of the Second
Amendment Outside the Home: History Versus Ahistorical Standards of Review, 60 Cleveland St.
L. Rev. 1, 27 & n.129 (2012).  And the license to carry weapons was generally confined only to
wealthy landowners and members of the nobility, who were presumed to be in no danger of
committing violence or disturbing the peace.  1 William Hawkins, A Treatise of the Pleas of the
Crown, at 136, ch. 63, § 9, TD Ex. 54 (allowing "Persons of Quality" to wear common weapons
in public because they are unlikely to "cau[se] the leaft Sufpicion of an intention to commit any
Act of Violence or Difturbance of the Peace"); see also Charles, The Faces of the Second

selling of deadly or dangerous weapons within the District of Columbia, and for other purposes §

2, Public Law 52-159, 27 Stat. 116, 116-17 (1892), TD Ex. 26; Patrick J. Charles, <u>Armed in</u>

<u>America: A History of Gun Rights from Colonial Militias to Concealed Carry</u> 156 & n.219 (2018)

(collecting ordinances from more than two dozen cities, passed between the mid-19th century and

early 20th century, requiring a permit to carry firearms in cities across the United States subject to

the discretionary determination of an official); <u>see also</u> <u>id.</u> at 157-62 & nn.220-247 (compiling

evidence of "[b]road public support for armed carriage laws" requiring individuals to demonstrate

their fitness to carry firearms).   These laws required individuals to demonstrate their suitability to

carry firearms through various means.   In Fourteenth Amendment-era New York City, for instance,

an individual who wanted to carry a pistol for his protection was obligated to appear for an in-

person interview with a local officer. 1881 Ordinances of the Mayor, Aldermen and Commonality

of the City of New York art. XXVII, § 265, at 214-15 (rev. Elliott F. Shepard & Ebenezer B.

Shafer, 1881), TD Exs. 27 & 28.   If, based on this interview, the officer was "satisfied that the

applicant is a proper and law-abiding person," the officer would recommend that the

superintendent of police issue a permit to the individual.[14]  <u>Id.</u>

---

<u>Amendment Outside the Home</u>, 60 Cleveland St. L. Rev. at 26 & nn.122-23.   And individuals granted these licenses were required to appear before the Clerk of the Privy Council to register these licenses.  <u>See</u> <u>Id.</u> at 27.

[14] These licensing requirements were often more permissive than the alternatives, with some states instead enacting complete bans of certain groups to possess weapons because they were a suspect group, <u>see, e.g.,</u> Revised Statutes of 1880, Section 6995, 76 Ohio Laws 191, TD Ex 29 (prohibiting vagrants from carrying dangerous weapons), banning entire categories of weapons from use, <u>see</u> 1879 Tenn. Pub. Acts ch. 186, TD Ex. 30 (forbidding the carrying of any "pocket pistol, revolver, or any kind of pistol, except the army or navy pistol, usually used in warfare, which shall be carried openly in the hand"), or broadly banning the carrying of firearms, <u>e.g.,</u> 1876 Wyo. Comp. Laws ch. 52, § 1, TD Ex. 31 (prohibiting carrying of "any firearm or other deadly weapon, within the limits of any city, town or village"); Ark. Act of Apr. 1, 1881, TD Ex. 32; Tex. Act of Apr. 12, 1871, TD Ex. 33.

Each of these sets of precedents: 1) colonial laws providing for disarmament of dissident or hostile groups, 2) Revolutionary laws individually disarming persons "disaffected to the cause of America," 3) militia mustering statutes providing for disarmament if person was deemed unfit at inspection, and 4) Reconstruction-era and later licensing requirements like New York City's that involved an individualized assessment of dangerousness – is "relevantly similar" to the good moral character assessment under the CCIA, and therefore satisfies the <u>Bruen</u> standard.  142 S.Ct. at 2132.  Each set of measures involved an assessment of whether potentially dangerous persons had "the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others."  2022 N.Y. Laws ch. 371 § 1(b).  And the <u>Bruen</u> test "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."  142 S.Ct. at 2133 (emphasis in the original); <u>see also</u> <u>id.</u> (modern measure need not be "a dead ringer for historical precursors").  Because an individualized assessment of potential dangerousness is "consistent with the Nation's historical tradition of firearm regulation," 142 S.Ct. at 2130, New York's good moral character requirement, and the similar requirements in many other states, are constitutional.

    C.    <u>New York's Licensing Procedures Are Constitutional</u>

        1.    New York's Interview and Reference Requirements Are Constitutional, Both Under <u>Heller</u> and <u>Bruen</u> and as Part of the Longstanding Tradition Requiring In-Person Inspections of Those Carrying Firearms

Under the CCIA, any applicant seeking a license to carry a firearm must meet in person with the licensing officer for an interview and provide certain information, such as the names and contact information for any adults living in the applicant's home, whether there are minors residing in the applicant's home, the names and contact information of at least four character references who can attest to the applicant's character, whether the applicant has "engaged in any acts, or made

any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others," and certification of completion of a training course.  2022 N.Y. Laws Ch. 371 § 1(o).[15]  These requirements provide information about an applicant's associates, behavior, and demeanor that go to the heart of his fitness to possess a firearm.  Indeed, throughout the relevant historical periods, officials have made use of in-person inspection and knowledge of a person's reputation, associates, and behavior to assess his suitability to possess a firearm.

It is well-established that, consistent with the Second Amendment, states may ensure that only "law-abiding, responsible citizens" carry arms in public.  Bruen, 142 S. Ct. at 2131 (quoting Heller, 554 U.S. at 635).  To reach this goal, states may permissibly require applicants to undergo a background check.  Id. at 2138 n.9; see also id. at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements.").  New York's interview and reference requirements are a useful tool for licensing officers because they allow these officials to speak directly with the applicant and get a sense of their temperament and veracity and provide officials with insight into the applicant's behavior outside of the official's presence.  There is nothing unique about these requirements, which are present in the laws of many states, including several of the "shall-issue" states specifically endorsed by the opinion in Bruen.  See, e.g., 11 Del. Code § 1441(2) (requiring

---

[15] Because of the utility of an in-person interview in judging an applicant's character, many jurisdictions within New York State utilized their own interview requirements prior to the enactment of the CCIA.  See, e.g., Sibley, 2020 WL 57200 at *1 (noting that pistol application led to "an investigation including a series of background checks and an in-person interview with a Steuben County Sheriff's deputy."); Corbett v. City of N.Y., No. 18 Civ. 7022, 2019 WL 2502056, at *3 (S.D.N.Y. June 16, 2019) (noting that plaintiff's permit application in New York City involved "an in-person interview, a mandatory part of the application review process").

references from "5 respectable citizens of the county in which the applicant resides at the time of filing the application"); Or. Rev. Stat Ann. § 166.291(4) (requiring two "character references"); see also Md. Code Regs. 29.03.02.03(B)(5) ("Information received from personal references and other persons interviewed" will "be a part of the investigation of every applicant."); N.J. Admin. Code § 13:54-2.3 ("The application . . . shall be endorsed by three reputable persons who have known the applicant for at least three years . . . and who shall also certify thereon that the applicant is a person of good moral character and behavior."); Application for a Pennsylvania License to Carry Firearms, TD Ex. 34 at 3, available at https://bit.ly/3zJtWaC (requiring "two references who are 21 years of age or older and are of no relation to you").

New York's interview and reference requirements find historical support in the long Anglo-American tradition discussed in Section II(B)(2), above, which contemplates conducting assessments of a person's dangerousness, and disarming persons whose possession of firearms would pose a credible threat. These assessments necessarily involved an assessment of the person's reputation and known associate, a historical antecedent of the character reference requirements in New York and many other states. The Massachusetts Bay Colony's 1637 disarmament of the known followers of dissident preacher John Wheelwright, for instance, did not apply to persons who appeared in person to disavow any potential for religious violence; the 1637 law stated that if they "do not iustify [Wheelwright's preachings], but acknowledg it evill to two magistrates, they shalbee thereby freed from delivering in their armes. [sic]" 1 Records of Mass. 1628-1641, TD Ex. 7, at 211-12. Revolutionary loyalty statutes similarly involved an in-person appearance and an assessment of a person's dangerousness, including an analysis of their reputation. New Jersey, for instance, enacted measures whereby persons could be summoned "on suspicion of being dangerous or disaffected to the present Government," and if they refused to take

an oath of loyalty, (or if they otherwise were "judge[d] disaffected and dangerous to the present Government") the Council of Safety was "empowered and directed to take from such persons . . . all the Arms, Accountrements and Ammuntion by them owned or poffered."  1778 N.J. Laws 39, 41, TD Ex. 19.

Militia mustering laws similarly provided for in-person inspection of citizens bearing arms, and disarmament if a person failed.  See, e.g., 1806 N.J. Laws 563, TD Ex. 24 (if a citizen at muster shall "appear drunk, or shall disobey orders, or use any reproachful or abusive language to his officers or any of them, or shall quarrel himself, or promote any quarrel among his fellow soldiers, he shall eb disarmed and put under guard.").  And licensing laws from around the time of the Fourteenth Amendment allowed for an in-person appearance and an individualized assessment of a person's dangerousness.  New York City's licensing law, passed in 1878, required any person wishing to carry a pistol to "apply to the officer in command at the station-house of the precinct where he resides," and required that he or she be given a permit only if the officer was "satisfied that the applicant is a proper and law-abiding person."  1881 Ordinances of the Mayor, Aldermen and Commonality of the City of New York art. XXVII, TD Ex. 27, § 265, at 214-15 (rev. Elliott F. Shepard & Ebenezer B. Shafer, 1881).

Each of these laws are examples of broader traditions in American history establishing that people who wish to carry guns may be evaluated individually for indicia of dangerousness, and that the evaluation can involve an in-person appearance and an assessment of their reputation. New York's current licensing laws are consistent with this historical understanding of how the right to bear arms could be regulated.  Indeed, New York's licensing requirements are more solicitous of the applicant's right to bear arms than these historical analogues: rather than rely on officials' suspicions about a person's suitability or whatever information they have gleaned about

36

the individual's reputation, New York gives control to the individual to select four references who can attest to his character as a responsible, law-abiding citizen.  2022 N.Y. Laws ch. 371 § 1(o). And rather than require an applicant to swear an oath of loyalty, the individual simply meets with a licensing individual to confirm the information in his application.  Id.

> 2. The Requirement to Share Social Media in Connection With a Gun License Application Is Constitutional

In keeping with this long tradition of laws preventing dangerous persons from accessing firearms, and Bruen's endorsement of licensing laws that "are designed to ensure [] that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" 142 S.Ct. at 2138 n.9 (quoting Heller 554 U.S. at 635), the CCIA requires an applicant for a gun license to disclose to a license officer "a list of former and current social media accounts . . . from the past three years to confirm the information regarding the applicant's character and conduct."  2022 N.Y. Laws ch. 371 § 1(o)(iv).  Plaintiffs challenge this requirement on the grounds that it violates both the Second Amendment and First Amendment, but neither argument has a clear or substantial likelihood of success, particularly on a facial challenge where each "can only succeed . . . by 'establish[ing] that no set of circumstances exists under which the Act would be valid.'"  SAM Party v. Kosinski, 483 F. Supp. 3d 245, 265 (S.D.N.Y. 2020) (quoting Salerno, 481 U.S. at 745).

> a. The Disclosure Requirement Does Not Violate the Second Amendment

"The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions."  Bruen, 142 S. Ct. at 2156. For instance, as Justice Kavanaugh explained in his concurrence in Bruen, joined by Chief Justice Roberts, the government "may require a license applicant to undergo fingerprinting, *a background check*, a mental health records check, and training in firearms handling and in laws regarding the

use of force, among other possible requirements." Id. at 2162 (emphasis added).  As the Second

Circuit has previously held on step one of the Heller analysis, such a licensing requirement "does

not burden the ability of '*law abiding, responsible* citizens to use arms.'" Libertarian Party, 970

F.3d at 127 (emphasis in the original) (quoting Heller, 554 U.S. at 635).  Although Plaintiffs paint

vivid hypotheticals where licensing officials deny permits to "someone who attends a BLM parade

or rally," someone who "publicly advocate[s] against Covid-19 vaccination," or someone who

"happens to be critical of the Governor, the local sheriff, a judge, or even the licensing official,"

ECF No. 9 at 14, there is no actual evidence that any such thing has happened, or ever would.  Cf.

Libertarian Party, 970 F.3d at 128 (affirming dismissal where "the Complaint does not allege that

any law-abiding, responsible citizen who applied for a New York firearm license had been

denied").  Moreover, the Plaintiffs have the law backwards – they do not satisfy their burden by

inventing a hypothetical where the law would be unconstitutional; instead, they must demonstrate

"that the law is unconstitutional in all of its applications." SAM Party, 483 F. Supp. 3d at 265; cf.

Bruen, 142 S.Ct. at 2162 (Kavanaugh, J., concurring) (gun licensing laws are "subject of course to

an as-applied challenge if a shall-issue licensing regime does not operate [constitutionally] in

practice.").

Moreover, as discussed above, these types of background checks have a strong historical

pedigree.  As early as 1878, New York City required an applicant for a pistol license to satisfy an

officer that he or she was "a proper and law-abiding person." 1881 Ordinances of the Mayor,

Aldermen and Commonality of the City of New York art. XXVII, § 265, TD Ex. 27 at 214-15

(rev. Elliott F. Shepard & Ebenezer B. Shafer, 1881).  Justice Barrett, who was in the majority in

Bruen, provided a detailed analysis of the history of prohibiting dangerous persons from

possessing firearms when she was serving on the Court of Appeals. See Kanter v. Barr, 919 F.3d

38

437 (7th Cir. 2019) (Barrett, J., dissenting).  "History is consistent with common sense," Justice Barret wrote, "[because] it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. . . [Indeed, in] 1791 – and for well more than a century afterward – legislatures disqualified categories of people from the right to bear arms only when they judged that doing so was necessary to protect the public safety."  Id. at 451 (Barret, J., dissenting) (emphasis added); see also NRA of Am. v. ATF, 700 F.3d 185, 200 (5th Cir. 2012) ("It appears that when the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee.").

As Justice Barrett explained, a review of American Colonial history shows that states could and did ban the carrying of arms, not only by those convicted of crimes, but also by "those who have not committed a crime but nonetheless pose a danger to public safety," i.e., those who had "a proclivity for violence."  Id., at 456 (Barrett, J., dissenting).  "And it may do so based on present-day judgments about categories of people whose possession of guns would endanger the public safety," and such "exclusions need not mirror limits that were on the books in 1791."  Id. at 464-65 (Barrett, J., dissenting).  The Second Circuit, and Second Amendment scholars, have reached the same conclusion.  For example, the Second Circuit has explained that "individuals who have failed to abide by the law or are otherwise 'unvirtuous,' as that word was understood by the political elite of the Founding generation, are not entitled to Heller's protections."  United States v. Jimenez, 895 F.3d 228, 233 (2d Cir. 2018) (collecting cases); see also United States v. Yancey, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'") (omits internal citation).

In a pre-enforcement facial challenge such as this one, Plaintiffs can only prevail if "there

is 'no set of circumstances under which' [the challenged law] would be valid." <u>Nat'l Shooting</u> <u>Sports Found., Inc. v. James</u>, ___ F. Supp. 3d ___, 2022 WL 1659192, at *10 (N.D.N.Y. May 25, 2022) (quoting <u>Salerno</u>, 481 U.S. at 745). But there are obviously constitutional applications of the social media provision, for example where specific online threats or indicators of violence demonstrate a clear and present intention to kill. Nor are such applications speculative or hypothetical: again and again, persons who commit mass shootings have turned out to have a long trail of disturbing content on their social media feeds, often posted well before they legally purchase the guns used to commit their atrocities. For instance, an investigative committee of the Texas House of Representatives found that in the year before his attack, the Uvalde shooter "began to demonstrate interest in gore and violent sex, watching and sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like, as well as sending unexpected explicit messages to others online." Texas House of Representatives Investigative Committee on the Robb Elementary Shooting, Interim Report 2022, TD Ex. 35 at 32. "In late 2021, he shared a video online that showed him driving around with 'someone he met on the internet' holding a clear plastic bag that contained a dead cat, which he discarded in the street and spit on while his driver laughed. The video then showed the attacker wearing a tactical plate carrier, went on to show him dryfiring BB guns at people, and ended with footage of emergency services responding to a serious car accident, which he claimed his driver had caused." <u>Id.</u> at 33. He later "developed a fascination with school shootings, of which he made no secret. His comments about them coupled with his wild threats of violence and rape earned him the nickname 'Yubo's school shooter' on that platform." <u>Id.</u> at 34. All of this activity took place well before the shooter bought his gun – legally – when he turned 18 in May 2022. <u>See</u> <u>id.</u> at 36.

Again and again, the weeks after a mass shooting reveal that the murderer left a disturbing

trail of content on social media.  The Parkland, Florida shooter posted photos of himself with masks and guns, in body armor, showing off his "arsenal" of weaponry, and a photo of a body of a dead frog that he killed.  Florida Department of Law Enforcement, Unreported Information Showing [Shooter]'s[16] Troubling Behavior, TD Ex. 36, available at https://bit.ly/3zEdPuZ.  The Pittsburgh shooter's presence focused on the microblogging site Gab, where he "began sharing anti-Jewish images, conspiracy theories about Jews controlling the world, and criticism of President Trump – whom, he implied, was too accommodating of Jewish influence. . . . His bio on the site read, "Jews are the children of Satan," and a photo on his profile included the number 1488, a reference to Nazism that is popular among white supremacists."  Kevin Roose, On Gab, an Extremist-Friendly Site, Pittsburgh Shooting Suspect Aired His Hatred in Full, N.Y. Times, Oct. 28, 2018, at A1.  And the shooter who killed ten people in Buffalo this May had a history of disturbing posts on social media networks such as Discord and 4Chan.  See Travis Caldwell, et al., Online posts reveal suspected gunman spent months planning racist attack at a Buffalo supermarket, cnn.com, available at https://cnn.it/3djje36.  If a potential shooter's posts are brought to the attention of licensing officials – or even if potential shooters decide not to go through the licensing process rather than share their social media accounts – their inability to get a license will pose a barrier to legally obtaining a weapon that can kill en masse.

These online indicia of violence are as relevant, or more so, than behavior indicating that someone was "notoriously disaffected to the Cause of America" in Revolutionary Massachusetts, 1775-76 Mass. Acts & Laws 31, TD Ex. 11, or an in-person assessment of whether "the applicant is a proper and law-abiding person," conducted at a New York City stationhouse in 1881.  TD Ex.

---

[16] This memorandum of law does not publicize the names of mass shooters.

27.   Of course, social media as we know it today did not exist in the Colonial era, but as shown above, Anglo-American history and doctrine have for centuries included provisions whereby individuals could (and would) be denied the right to bear arms based on an individualized assessment of potential dangerousness, often based only on an officer's mere *suspicion*.   The assessment of social media for indicia of dangerousness is merely a modern analogue for this longstanding tradition.   Cf. Bruen, 142 S.Ct. at 2132 (measures and historical analogues need only be "relevantly similar").   The social media disclosure requirement imposes a comparable burden to traditional disqualifications for dangerousness and based on a comparable individualized assessment of a person's character – the only difference is that part of the assessment involves online behavior.   Cf. Bruen, 142 S.Ct. at 2133 ("[L]ogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.   So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." (emphasis in the original)).   Indeed, New York's law is far less burdensome than laws the founders enacted, in which a person's identity or beliefs—including Native Americans, Catholics, loyalists, and followers of certain preachers— presumptively disqualified them for bearing arms. And if the inspection of social media is constitutional in *some* circumstances – even the disturbing real-life examples of mass shooters discussed above – then a facial challenge must fail.   See Salerno, 481 U.S. at 745 (challenger facially attacking a legislative act "must establish that no set of circumstances exists under which the Act would be valid.").

As the Supreme Court has held in another context, "past conduct is essential to an assessment of the danger [that an individual] poses to the public."   Maryland v. King, 569 U.S. 435, 453 (2013).   And courts are regularly tasked with making these types of "future

42

dangerousness" assessments.  See Jurek v. Texas, 428 U.S. 262, 275 (1976) (plurality opinion) ("prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system," including determining bail, sentencing, and release on parole); see also Faisal Nabin Kashem v. Barr, 941 F.3d 358, 364, 373 (9th Cir. 2019) ("No Fly List criteria" are not impermissible "merely because they require a prediction of future criminal conduct," nor are they unconstitutional because they do not "delineate the types of … online activities in which an individual can safely engage or, alternatively, that would raise suspicion"); Anderson v. United States, No. 05-CR-418, 2022 WL 1912937, at *5 (E.D.N.Y. June 3, 2022) ("[t]he issue of future criminal conduct involves prediction … [e]ven when made by an experienced, careful trial judge on a full record").  Courts and authorities have long been empowered to protect the public by evaluating a person's conduct to determine whether his bearing arms would pose a danger to others; the Second Amendment is not infringed simply because some of the conduct considered occurred online.

b.     The Disclosure Requirement Does Not Violate the First Amendment

The CCIA's social-media disclosure requirement is also consistent with the First Amendment.  As with his Second Amendment challenges, Plaintiff Antonyuk does not argue that this provision has been unconstitutionally applied to him, but instead claims that the provision is unconstitutional on its face.  In raising a facial First Amendment challenge, a plaintiff faces a "heavy burden." Nat'l Endowment of the Arts v. Finley, 524 U.S. 569, 580 (1998).  To prevail, he "must demonstrate from the text of [the law] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally.  N.Y. State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 14 (1988).  The Supreme Court has "vigorously enforced the

43

requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." United States v. Williams, 553 U.S. 285, 292 (2008). "Facial invalidation is 'strong medicine,' and is used 'sparingly and as a last resort.'" Amidon v. Student Ass'n of SUNY at Albany, 508 F.3d 94, 98 (2d Cir. 2007) (citations omitted).

Plaintiffs do not appear to dispute that the social media disclosure requirement is content-neutral. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163 (2015). By contrast, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). Here, the CCIA is content neutral because it "says nothing about the ideas or opinions that [applicants] may or may not express, anonymously or otherwise. Neither is it aimed at 'supress[ing] the expression of unpopular views.'" Doe v. Shurtleff, 628 F.3d 1217, 1223 (10th Cir. 2010). Instead, as explained above, the social media requirement applies equally to all applicants, regardless of their views or political affiliation, and its purpose is merely to be used as a tool during a background check to determine whether it would be dangerous for an applicant to possess a firearm.

Because the disclosure requirement is a content-neutral regulation, it is subject to intermediate scrutiny, not strict scrutiny. See Time Warner Cable Inc. v. F.C.C., 729 F.3d 137, 160 (2d Cir. 2013). To satisfy intermediate scrutiny, the disclosure requirement must "advance[] important governmental interests unrelated to the suppression of free speech and . . . not burden substantially more speech than necessary to further those interests." Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180, 189 (1997). In making this determination, "courts must accord substantial deference to the predictive judgments of [the legislature]." Id. at 195 (internal quotation marks

44

omitted).  Moreover, as the Second Circuit has explained, "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks."  NYSRPA v. Cuomo, 804 F.3d 242, 261 (2d Cir. 2015) (quotation marks omitted). The Court's "sole obligation is to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence."  Turner, 520 U.S. at 181.

The CCIA's social media disclosure requirement satisfies intermediate scrutiny.  *First*, "[i]t is beyond cavil that . . . states have substantial, indeed compelling, governmental interests in public safety and crime prevention."  NYSRPA v. Cuomo, 804 F.3d at 261; see also Schall v. Martin, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted." (cleaned up)).  Plaintiffs do not appear to contest this point.  Moreover, recent events have demonstrated that the social media disclosure requirement advances the government's interest in crime prevention.  As explained above, even in the past several months there have been multiple mass shootings where the perpetrators' social media accounts contained clear signs of dangerousness.  If the perpetrators had been required to disclose their social media accounts before obtaining a firearms license, these signs of dangerousness could have been discovered – and the perpetrators prevented from obtaining a firearms license – long before they committed their crimes.  Even if the perpetrators were bent on committing violence, their task would be significantly more difficult without access to the legitimate market in firearms.

*Second*, the CCIA's social media disclosure requirement does not burden substantially more speech than necessary to further New York's compelling interest in preventing gun violence. Unlike strict scrutiny, for intermediate scrutiny, "the fit between the challenged regulation [and the government interest] need only be substantial, not perfect."  NYSRPA v. Cuomo, 804 F.3d at

45

261 (quotation marks omitted).  Contrary to Plaintiffs' argument, the CCIA does not equip licensing officers with "unbridled discretion" to "rummage through [applicants'] personal affairs." Pls' Prelim. Inj. Mem. at 12, 15.  Rather, the CCIA specifically delineates that applicants need to disclose their social media accounts from the past three years so that that the license officer can "confirm" the information provided by the applicant's character references as to whether the applicant has "engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others."  2022 N.Y. Laws ch. 371 § 1(o)(ii), (iv).  Nor does the CCIA permit licensing officers to, as Plaintiffs argue, deny a license to an applicant who engages in political speech that does not demonstrate that they are likely to engage in harmful acts.[17]

Plaintiffs' argument largely boils down to the assertion that the social media disclosure requirement is unconstitutional simply because it would chill applicants' ability to engage in anonymous speech.[18]  See Pls' Prelim. Inj. Mem. at 12-13.  But that is not the standard.  Even though an individual may have a right to speak anonymously on the internet, "a state may permissibly infringe upon this right when its interest is important enough and the law is appropriately tailored to meet the stated interest."  Doe, 628 F.3d at 1222.  And because the application of the standard would certainly be constitutional in instances where social media posts

---

[17] Even if a licensing officer were to operate in such an unconstitutional manner, the proper response would be an as-applied challenge to the officer's decision, not a facial challenge to the statute as a whole.  See Bruen, 142 S.Ct. at 2162 (Kavanaugh, J., concurring) ("shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice").  Normal appellate review would be available, as would an Article 78 challenge or declaratory judgment action in New York State court.  See N.Y. CPLR § 7803(3).

[18] Here again, Plaintiffs' lack of standing is dispositive because the organizational plaintiffs lack standing to sue in their own right, and Plaintiff Antonyuk has not alleged that he engages in any anonymous speech on social media.

contain indicia of a desire to engage in imminent mass violence, it has a plainly legitimate sweep, and a facial challenge must fail.  See Picard v. Magliano, ___ F.4th ___, 2022 WL 2962548, at *8 (2d Cir. July 27, 2022) (reversing district court and vacating facial injunction where challenged statute "can likely be found to further a compelling state interest in at least some circumstances").

Moreover, and in any event, "the Supreme Court has suggested a distinction between the mandatory disclosure in public of a speaker's identity and the requirement that a speaker provide information to the government that could later be used to trace speech back to its source."  Doe, 628 F.3d at 1222.  The CCIA involves the latter, as the disclosure requirement "affect[s] anonymity only after the" applicant has already spoken.  Id.

D.    New York's Protections For Sensitive Places Are Constitutional

Plaintiffs' motion papers do not specify which categories of sensitive places they are challenging – other than all of them[19] – or why they contend that these critical public safety laws violate the constitution.  There is no possible likelihood of success on a facial challenge to all of the CCIA's sensitive place provisions – under which "the challenger must establish that *no set of circumstances* exists where the Act would be valid," NYSRPA v. Cuomo, 804 F.3d 242, 265 (2d Cir. 2015) (emphasis in the original) – when the Supreme Court has reiterated the constitutionality of such provisions in both Heller and Bruen, and when history actually shows that broad restrictions on guns in vulnerable locations were commonplace in Eighteenth- and Nineteenth-Century America.

Prohibitions on the carrying of guns in vulnerable places are explicitly contemplated in the

---

[19] See Compl. ¶ 69 (listing every category of sensitive location, from places of worship to playgrounds to addiction service centers to Times Square); id. ¶ 131 ("the Defendant must historically justify *each* of its 'sensitive locations' defined in the CCIA").

Supreme Court's guns jurisprudence.   In <u>Heller</u>, the decision announcing the authoritative interpretation of the Second Amendment, Justice Scalia declared that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" were "presumptively lawful." 554 U.S. at 626-27 & n. 26.  Justice Thomas re-emphasized the constitutionality of such laws in <u>Bruen</u>, declaring that "we are [] aware of no disputes regarding the lawfulness of such prohibitions." 142 S.Ct. at 2133.  In fact, the constitutionality of restrictions on guns in sensitive places appears to have been critical to the formation of the <u>Bruen</u> majority: writing for himself and Chief Justice Roberts, Justice Kavanaugh emphasized that "the second amendment allows a variety of gun regulations," before excerpting <u>Heller</u>'s sensitive places language in full, including the statement that such measures are "presumptively lawful," then writing, "with those additional comments, I join the opinion of the Court." <u>Id.</u> at 2162 (Kavanaugh, J., concurring).

Moreover, prohibitions on the carrying of guns in sensitive places are deeply rooted in "the Nation's historical tradition of firearm regulation,"[20] <u>Bruen</u>, 142 S.Ct. at 2130, with states having enacted statutes protecting a wide variety of sensitive places during the Eighteenth and Nineteenth Centuries.  Delaware's 1776 constitution required that "[t]o prevent any violence or force being used at . . . elections, no persons shall come armed to any of them." Del. Const. Art. 28 (1776), TD Ex. 37.  Virginia in 1786 prohibited anyone to "go nor ride armed by night nor by day, in fairs or markets." 1786 Va. Laws 35, TD Ex. 38.  Universities, including public universities, could ban guns on campus – in particular, the University of Virginia Board of Visitors met in October 1824 (roughly six months before the first classes) to enact a rule that "[n]o student shall, within the

---

[20] In fact, sensitive places restrictions are far older than the United States.  In his <u>Bruen</u> opinion, Justice Thomas quoted from the Statute of Northampton, enacted by England in 1328, which prohibited arms "by night nor by day, in Fairs, Markets, nor in the presence of the [King's] Justices or other Ministers." 142 S.Ct. at 2139 (quoting 2 Edw. 3 c. 3 (1328)).

precincts of the university . . . keep or use weapons or arms of any kind, or gunpowder."  Univ. of Va. Bd. of Visitors Minutes (Oct. 4-5, 1824), TD Ex. 39, at 6-7, available at https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/.  Among the leaders enacting the rule were the University's founder, Thomas Jefferson, and another Board member: James Madison, author of the Second Amendment.  Id. at 1; cf. Bruen, 142 S.Ct. at 2132 (Second Amendment's "meaning is fixed according to the understandings of those who ratified it").

An even wider variety of restrictions on the carrying of guns in vulnerable places was understood to be permissible during the Reconstruction era, providing key "[e]vidence from around the adoption of the Fourteenth Amendment."  Id. at 2150; see also supra at 32 n.14.  Here in New York State, for instance, it was understood that guns could be forbidden in public parks: by 1861, it had already been established that "[a]ll persons are forbidden . . . [t]o carry firearms" within Central Park.  Fourth Annual Report of the Board of Commissioners of the Central Park (Jan. 1861), TD Ex. 40, at 106.  In 1870 Texas banned guns in an extraordinary variety of sensitive places, establishing criminal liability "if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party, or other social gathering composed of ladies and gentlemen, or to any election . . . or any other public assembly, and shall have about his person . . . fire-arms, whether known as a six shooter, gun or pistol of any kind."  1870 Tex. Gen. Laws 63, TD Ex. 41; see also 1871 Tex. Gen. Laws 25-26, TD Ex. 33.  Missouri enacted a similarly broad ban, prohibiting anyone from "having upon or about his person any kind of firearms" in areas including churches, schools, courtrooms, election precincts, places used informally for "religious worship" or "educational, literary or social purposes," as well as "any other public assemblage of

49

persons met for any lawful purpose other than for militia drill."  1883 Mo. Laws 76, TD Ex. 42.[21]

These statutes demonstrate the breadth of the historical public understanding of the kinds of sensitive places that could be protected from gun violence, and the Supreme Court's Bruen opinion makes clear that the areas where New York can protect the public are not limited only to the ones protected in the past.  Instead, "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."  Bruen, 142 S.Ct. at 2133 (emphasis in the original).[22]  The categories of places protected by the CCIA either fall comfortably into these broad historical understandings – for example courthouses, places of worship, libraries, public parks, schools, or public gatherings – or else are modern areas equivalent to those categories.  Times Square, for instance, is analogous to the "fairs and markets," protected in English and Colonial law, while the CCIA's ban on guns in "amusement parks, performance

---

[21] The cited statutes from Texas and Missouri are only representative examples.  Other states across the nation enacted similarly broad prohibitions on carrying firearms in vulnerable places during the period around the ratification of the Fourteenth Amendment.  See, e.g., 1869-70 Tenn. Pub. Acts 23-24, TD Ex. 43 ("it shall not be lawful . . . for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, bowie-knife, Arkansas tooth-pick, . . . or any other deadly or dangerous weapon.); 1870 Ga. Laws 421, TD Ex. 44 ("from and immediately after the passage of this act, no person in said State of Georgia be permitted or allowed to carry about his or her person any dirk, bowie-knife, pistol, or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds.").  Pennsylvania went so far as to ban all deadly weapons within the city limits of the state capital of Harrisburg.  1873 Pa. Laws 735-36, TD Ex. 45.

[22] Plaintiffs have done no historical analysis of their own regarding what kinds of places were actually understood as sensitive at the time of the Second and Fourteenth Amendments.  For instance, they assert that public parks, theaters, and public gatherings are "obviously nonsensitive," citing to nothing but their own complaint for authority.  Dkt. No. 9-1 at 3.  In fact, each of these categories of locations was historically protected, as the statutes cited above prove.  History is more complex than the Plaintiffs imagine, and our forebears well understood the importance of protecting the public from gun violence in places where they would be particularly vulnerable.

50

venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities" is analogous to Texas' 1870 ban on guns in a "ball room, social party, or other social gathering composed of ladies and gentlemen."  1870 Tex. Gen. Laws 63, TD Ex. 41.

In the face of the Supreme Court's clear language in <u>Heller</u> and <u>Bruen</u>, and the centuries-long Anglo-American tradition of protecting public safety by banning guns in vulnerable places, the Plaintiffs have made no argument based on history, and have adduced no facts to support their contentions.  They argue without citation that the CCIA "declares nearly all of New York to be a 'sensitive place,'" Pls' Prelim. Inj. Mem. at 17, but there is no factual basis for that assertion, and Plaintiffs have adduced no evidence to support it.  As shown above, restrictions on guns in sensitive places deeply rooted in American history and doctrine, meaning that there is no likelihood of success in a facial challenge against the entirety of the statute, under which "the challenger must establish *that no set of circumstances* exists under which the regulation would be valid."  <u>Jacoby & Meyers</u>, 82 F.3d at 184 (emphasis in the original).

E.    <u>New York's Law Preventing Armed Persons From Entering Other People's Property Without Consent Is Constitutional And Deeply Rooted In Anglo-American Property Law And Tradition</u>

The Second Amendment guarantees "the right of the people to keep and bear Arms," but no part of its text or the tradition it belongs to guarantees the right to bear arms *on someone else's property*.

Plaintiffs challenge the CCIA's provision requiring that a person carrying a gun have the consent of the property owner before carrying a gun onto his or her private property.  The private property protection, contained in Section 265.01-d of the Penal Law, states that

> A person is guilty of criminal possession of a weapon in a restricted location when
> such person possesses a firearm, rifle, or shotgun and enters into or remains on or
> in private property where such person knows or reasonably should know that the

51

> owner or lessee of such property has not permitted such possession by clear and
> conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on
> their property is permitted or has otherwise given express consent.

Although Plaintiffs claim that this provision "eviscerate[s] the general right to publicly carry arms

for self-defense," Compl. ¶ 80, nothing in Bruen states – or in any way supports – the proposition

that the Second Amendment guarantees a right to take guns onto another person's property without

their express consent.  Instead, Bruen speaks only to the right of law-abiding, responsible citizens

to bear arms "in public," 142 S.Ct. at 2135, or "when they venture outside their homes."  Id. at

2157 (Alito, J., concurring); see also id. ("That is all we decide.").

In fact, the CCIA's private property protection merely ensures that owners and lessees

continue to enjoy their fundamental (and constitutionally-protected) dominion over their own

property.[23]  "The Founders recognized that the protection of private property is indispensable to

the promotion of individual freedom.  As John Adams tersely put it, 'property must be secured, or

liberty cannot exist.'"  Cedar Point Nursery v. Hassid, 141 S.Ct. 2063, 2071 (2021) (quoting

Discourses on Davila, in 6 Works of John Adams 280 (C. Adams ed. 1851)).  Central to the right

of property is the right to exclude others – the right to keep private property private.  Blackstone

explained that "the very idea of property entails 'that sole and despotic dominion over which one

man claims and exercises over the external things of the world, in total exclusion of the right of

any other individual in the universe.'"  Id. (quoting 2 W. Blackstone, Commentaries on the Laws

---

[23] The CCIA's private property protection overlaps in substantial part with New York's longstanding statute prohibiting first-degree criminal trespass, which applies when a person "knowingly enters or remains unlawfully in a building, and when, in the course of committing such crime, he . . . possesses a firearm, rifle, or shotgun" and ammunition.  N.Y. Penal Law § 140.17.  "Enters or remains unlawfully," within the meaning of the statute, means that a person has not "obtained the consent of the owner or another whose relationship to the premises gives him authority to issue such consent."  In re Lonique M., 93 A.D.3d 203, 205 (1st Dep't 2012) (quoting N.Y. Penal Law § 140.00(5) and People v. Graves, 76 N.Y.2d 16, 20 (1990)).

of England 2 (1766)).   The Supreme Court has held that this "right to exclude" is itself "fundamental" under the Constitution.  Kaiser Aetna v. U.S., 444 U.S. 164, 179-80 (1979).

This respect for private property rights is reflected in statutes both before and after the Founding that prohibited the carrying of guns onto another's property without consent.   For instance, a 1721 Pennsylvania statute provided that "if any person or persons shall presume, . . . *to carry any gun* or hunt on the improved or inclosed lands of any plantation other than his own, *unless he have license or permission from the owner of such lands* or plantation . . . he shall for every such offense forfeit the sum of ten shillings."  James T. Mitchell et al., Statutes at Large of Pennsylvania from 1682 to 1801 vol III, p. 254 (Clarence M. Busch, Printer, 1896), TD Ex. 46 (emphasis added).[24]  New Jersey in 1741 similarly enacted a law providing that "if any Person or Persons shall presume, at any Time after the Publication hereof, *to carry any Gun*, or hunt on the improved or inclosed Lands in any Plantation, other than his own, *unless he have License or Permission from the Owner of such Lands* or Plantation . . . he shall, for every such Offence, forfeit the Sum of Fifteen Shillings, with Costs attending such Conviction."  1741 N.J. Laws 101, TD Ex. 47 (emphasis added).[25]

---

[24] In 1715, Maryland likewise enacted a statute wherein a person that shall "be seen to *carry a gun*, upon any person's land, whereon there shall be a seated plantation, *without the owner's leave* . . . shall forfeit and pay one thousand pounds of tobacco, one half to our sovereign lord the king, his heirs and successors, the other half to the party grieved, or those who shall sue for the same, to be recovered in any county court of this province."  1715 Md. Laws 90, TD Ex. 48 (emphasis added). The penalty applied only to those "convicted of . . . crimes, or that shall be of evil fame, or a vagrant, or dissolute liver," and only to such a person "having been once before warned."  Id.

[25] New Jersey updated the law in 1771, requiring that "if any Person or Persons shall presume, at any Time after the Publication hereof, *to carry any Gun on any Lands not his own*, and for which the Owner pays Taxes, or is in his lawful Possession, *unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor*, every such Person so offending, and convicted thereof . . . shall, for every such Offence, forfeit and pay to the Owner of the Soil, or his Tenant in Possession, the Sum of Forty Shillings, with Costs of Suit."  1771 N.J. Laws 344, TD

States continued to enact similar laws into the 19th Century – for instance, Texas declared in 1866 that "[i]t shall not be lawful for any person or persons to carry firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor."  George Paschal, ed., 4 <u>Digest of the Laws of Texas Containing the Laws in Force, and the Repealed Laws on Which Rights Rest, from 1754 to 1875</u>, TD Ex. 50, at 1321-22.  Oregon in 1893 enacted a law stating that "[i]t shall be unlawful for any person, other than an officer on lawful business, being armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof."  1893 Or. Laws 79, TD Ex. 51.  To this day, states across the country have laws on the books prohibiting carrying guns onto private property without the owner's consent.  <u>See, e.g.,</u> Ark. Code Ann. § 5-39-203(b)(2); Fla. Stat. §§ 810.08(2)(c), 810.09(2)(c); Haw Rev. Stat. § 708-813(1)(b)(ii); Or. Rev. Stat § 164.265; Tex. Penal Code Ann. § 30.06(1).

The leading modern case on the interaction between the Second Amendment and private property rights is the Eleventh Circuit's opinion in <u>GeorgiaCarry.Org, Inc. v. Georgia</u>, 687 F.3d 1244 (11th Cir. 2012).  The <u>GeorgiaCarry</u> panel unanimously upheld the constitutionality of a state statute that barred the carrying of guns in categories including places of worship, with an exception for "a license holder" who "approaches security or management personnel upon arrival . . . and notifies such security or management personnel of the presence of the weapon or long gun and explicitly follows the security or management personnel's direction for removing, securing, storing, or temporarily surrendering such weapon or long gun."  <u>Id.</u> at 1248-49 (quoting Ga. Code Ann. § 16-11-127).  Noting that places of worship are private property, the Circuit rejected the

---

Ex. 49 (emphasis added).  If the offender or offenders were not New Jersey residents, the penalty increased to five pounds and they were required to "forfeit his or their Gun or Guns."  <u>Id.</u>

54

contention that "the individual right protected by the Second Amendment, in light of <u>Heller</u> and <u>McDonald</u>, trumps a private property owner's right to exclusively control who, and under what circumstances, is allowed on his or her own premises." <u>Id.</u> at 1261.  The Court traced the history of both gun and property rights through English law and the debates around the Constitution,[26] concluding that "[a]n individual's right to bear arms as enshrined in the Second Amendment, whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land." <u>Id.</u> at 1265.

Moreover, a contrary rule, where the law provided that persons bearing guns had a default right to access private property absent an express statement by the property owner or lessee excluding them, would itself be unconstitutional.  By requiring an owner to permit the entry of others onto his or her property without permission, such a measure would violate the Fifth Amendment because "appropriations of a right to invade are *per se* physical takings." <u>Cedar Point Nursery</u>, 141 S.Ct. at 2077.  That is the case even where an "access regulation merely regulates the owner's right to exclude," because "the right to exclude . . . . 'is a fundamental element of the property right' that cannot be balanced away." <u>Id.</u> at 2077 (quoting <u>Kaiser Aetna</u>, 444 U.S. at 179).

"Plaintiffs, in essence, ask us to turn <u>Heller</u> on its head by interpreting the Second Amendment to destroy one cornerstone of liberty – the right to enjoy one's private property – in order to expand another – the right to bear arms." <u>GeorgiaCarry</u>, 687 F.3d at 126.  There is no

---

[26] <u>GeorgiaCarry</u> remains good law even after the recent decision in <u>Bruen</u>.  Although the Eleventh Circuit noted that the test applicable at the time involved two steps, with the second one involving strict or intermediate scrutiny, the Court found that "[i]n this case, we need only reach the first step," and declined to apply any mode of means-ends analysis.  687 F.3d at 1260 n.34; <u>cf.</u> <u>Bruen</u> 142 S.Ct. at 2127 ("Step one of the predominant framework is broadly consistent with <u>Heller</u>, which demands a test rooted in the Second Amendment's text, as informed by history.").

basis to do so, either in the Supreme Court's jurisprudence or in the Anglo-American legal tradition. New York's private property protection should be upheld.

    F.    <u>New York's Training Requirements Are Constitutional.</u>

        1.    In-person Firearms Training Requirements Are Provided For In the Constitution Itself And Are Deeply Rooted In American Tradition.

Although Plaintiffs argue in passing that New York's 18-hour training requirement is unconstitutionally burdensome, Pls' Prelim. Inj. Mem. at 19-20, this argument does not withstand scrutiny. From the very beginning of American history, training in the use of arms was required as part of a citizen's mandatory duty to serve in the local militia. <u>See, e.g.</u>, 1779 N.Y. Laws 237, TD Ex. 22; <u>see also</u> <u>supra</u> at 29-31 (collecting militia mustering laws). Indeed, as the Supreme Court has recognized, "to bear arms implies something more than mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use." <u>Heller</u>, 554 U.S. at 617-18 (2008) (quoting Thomas Cooley, General Principles of Constitutional Law 271 (1880)); <u>see also</u> <u>id.</u> (recognizing that the right to bear arms "cannot exist unless the people are trained on bearing arms"); <u>Bruen</u>, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (citing with approval licensing regimes that require training in firearms handling). Accordingly, 31 states in addition to New York require an individual take a training course to carry a firearm.[27] Nor is New York's hours requirement unique or out of step with other states. <u>See,</u>

---

[27] <u>See</u> Alaska Stat. § 18.65.705(6); Ariz. Stat. § 13-3112(E)(6); Ark. Stat. § 5-73-309(13); Colo. Stat. § 18-12-203(1)(h)(VI); Conn. Gen. Stat. § 29-28(b); 11 Del. Code Ann. § 1441(a)(3); Fla. Stat. § 190.06(2)(h)(2)-(4); Idaho Stat. § 18-3302K(4)(c); 430 Ill. Stat. § 66/25(6); Iowa Stat. § 724.9; Kan. Stat. 75-7c04(b)(1); Ky. Stat. § 237.110(4)(i); La. Rev. Stat. § 1379.3(D); 25 Maine Stat. § 2003(1)(E)(5); Mich. Stat. § 28.425j; Minn. Stat. § 624.714; Mo. Stat. 571.101(2)(10); Mont. Stat. § 45-8-321(3); Nev. Rev. Stat. § 202.3657(3)(c); N.M. Stat. Ann. § 29-19-4(A)(10); N.C. Stat. § 14-415.12(4) (effective Oct. 1, 2022); Ohio Rev. Code § 2923.125; 21 Okla. Stat. Ann. § 1290.12(A)(2); Or. Rev. Stat. Ann. § 166.291(1)(f); R.I. Gen. Laws § 11-47-16; S.C. Code § 23-31-215(A)(5); Tenn. Code Ann. § 39-17-1366(b)(4)(A); Va. Code § 18.2-308.02(B); W.Va. Code § 61-7-4(e); Wis. Stat. Ann. § 175.60(4); Wyo. Stat. Ann. § 6-8-104(b)(vii).

e.g., Alaska Admin. Code § 30.070(a)(1)(A) (curriculum must "include[] at least 12 hours of training in the use of handguns . . . including a test of competence with a handgun"); Cal. Penal Code § 26165(a)(3), (c) ("up to a maximum of 24 hours" and "shall include live-fire shooting exercises on a firing range"); 430 Ill. Comp. Stat. 66/75 ("at least 16 hours, which includes range qualification time"); N.M. Stat. Ann. § 29-19-7 ("not less than fifteen hours in length").

As a threshold matter, training requirements are manifestly constitutional because they are explicitly contemplated by the Second Amendment's text.  The Second Amendment has a "prefatory clause," explaining that the right to bear arms is related to "a well-regulated militia, being necessary to the security of a free state."  That prefatory clause has a defined meaning, authoritatively pronounced by the Supreme Court in Heller: as Justice Scalia noted for the majority, "the adjective 'well-regulated' implies nothing more than *the imposition of proper discipline and training*."  554 U.S. at 597 (emphasis added) (citing, inter alia, Va. Declaration of Rights § 13 (1776), in 7 Thorpe 3812, 3814 (referring to "a well-regulated militia, composed of the body of the people, trained to arms")).  Training requirements are also explicitly contemplated in Article I, Section 8 of the Constitution, which provides for "the Authority of training the Militia according to the discipline prescribed by Congress."

Moreover, New York's training requirement is permissible under Bruen itself.  The Bruen majority emphasized that "[t]o be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality" of 43 states' licensing standards, even though Justice Thomas noted that they "often require applicants . . . to pass a firearms safety course."[28]  142 S.Ct. at 2138 n.9.  Justice

---

[28] Plaintiffs acknowledge this fact, noting that the laws endorsed by the Bruen court include "clear, attainable, objective licensing requirements, such as the . . . receipt of a training certification."  Pls' Prelim. Inj. Mem. at 9.

Kavanaugh, joined by Chief Justice Roberts, also pointed out that many states' licensing procedures "require a license applicant to undergo . . . training in firearms handling," but that these statutes "are constitutionally permissible." Id. at 2162 (Kavanaugh, J., concurring), see also id. ("New York . . . may continue to require licenses for carrying handguns for self-defense so long as [it] employ[s] objective licensing requirements like those used by the 43 shall-issue States.").

Even if the analysis were to ignore the role of training in the plain text of the Constitution and the clear language of Bruen, New York's training requirement nonetheless passes constitutional muster because it is entirely consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." Bruen, 142 S.Ct. at 2127. Both state and federal law required that all citizens engage in extensive weapons training, to be conducted in-person. For instance, the first Militia Act, passed by the Second Congress in 1792, required "[t]hat each and every free able-bodied white male citizen of the respective states" between the ages of 18 and 45 must "be enrolled in the militia," and that "it shall be the duty of the commanding officer at every muster . . . to cause the militia to be exercised and trained agreeably to the [] rules of discipline." See Militia Act, 1 Stat 271, 273, TD Ex. 17; cf. Friedrich von Steuben, Regulations for the Order and Discipline of the Troops of the United States (Styner & Cist ed. 1779), TD Ex. 52.

The "manual exercise," as described in Von Steuben's Regulations, involved repeated drilling in the carrying, aiming, firing, and reloading of a person's firelock, described (and drilled) in minute detail: 27 separate actions, divided into separate motions, and those motions in turn divided into minute sub-actions. See Von Steuben, Regulations at 16 et seq. The exercises also involved the "opening of the ranks" (a kind of marching maneuver), "the fire by platoons," instruction in several different kinds of march, which must be done "in different sorts of ground," "wheeling," "breaking off," "forming by the oblique step," and additional battalion-level exercises.

58

Id. at 31-36.  Each of these elements of the exercise was described in extreme detail (which New

York will omit from this brief out of mercy to both the Court and the parties), but the details were

zealously enforced: in von Steuben's words, "[t]he officers must not suffer the least inattention,

but punish every man guilty of it."  Id. at 33.

Federal law required that "it shall be the duty of the commanding officer" to conduct these

exercises at "every muster."  1 Stat. 273, TD Ex. 17.  For a New Yorker, that could mean up to six

times per year.  See 1779 N.Y. Laws 239, TD Ex. 22 (two regimental parades and four company

musters); see also 1782 N.Y. Laws 442-43, TD Ex. 23.  The laws of the other states in the young

American Republic similarly required extensive in-person exercises and drilling, conducted

multiple times per year.  See, e.g., United States v. Miller, 307 U.S. 174, 181 (1939) (noting that

Virginia's militia statute required that "there shall be a private muster of every company once in

two months").  The penalties for failure to take part in these exercises were severe.  An ordinary

citizen "who shall neglect to appear when called out" would "for every such offence forfeit the

sum of eight pounds."  1779 N.Y. Laws 240, TD Ex. 22.  This sum of money was tremendous at

a time when the average citizen's income was approximately 14 pounds per year.  Cf. Peter H.

Lindert and Jeffrey G. Williamson, American Incomes Before and After the Revolution, 73 J. of

Econ. Hist. No. 3, 725, 742 & table 3 (Sept. 2013).

Next to the dozens of hours of training, marching, and drilling required annually of every

citizen during the Founding era, the training requirements of the CCIA pale in comparison.  The

modern act requires only sixteen hours of training (with two additional hours of live-fire training)

when applying for a new license or during the first renewal of a license that occurs after September

1, 2022 (only New York City, Westchester, Nassau, and Suffolk Counties require a license to be

renewed; other counties in New York State are issued a license with no expiration date).  See N.Y.

Penal Law § 400.00 § 19.  Our forebears would have been thrilled at a statutory requirement averaging so few hours of firearms training – indoors, optional, and with no marching.  Because in-person firearms training requirements are "consistent with this Nation's historical tradition," Bruen, 142 S.Ct. at 2126, and because training requirements are specifically provided for in the text of the Second Amendment itself, the measure should be upheld.

> 2. **Plaintiffs' Allegations About Training Costs Are Entirely Hypothetical, While American History And Tradition Support Gun Owners Bearing The Reasonable Cost Of Firearms Training**

Plaintiffs separately assert, based on nothing more than their own say-so, that the costs of obtaining this training "will run into the many hundreds of dollars," and that the result will be that "[f]or those who cannot afford such costs, their right to bear arms is extinguished."  Pls' Prelim. Inj. Mem. at 20.  As an initial matter, since Plaintiff Antonyuk will never be subject to this requirement because his license does not need to be renewed, as discussed in Section I(C)(1),  he lacks standing to press this point.  And Plaintiffs' assertions about costs are entirely speculative: they assert that "the cost to obtain such training could run in the neighborhood of $400," id. at 19, but there is no actual evidence offered for the proposition other than a citation to the Plaintiffs' own complaint, which is similarly unsourced.[29]  Cf. Scarbrough v. Evans, No. 09 Civ. 850, 2010 WL 1608950, at *3 (N.D.N.Y. Apr. 20, 2010) (noting that "[b]are allegations, without more, are insufficient for the issuance of a preliminary injunction," and that "[p]reliminary injunctive relief cannot rest on mere hypotheticals." (quotations and citations omitted)).  Moreover, Plaintiffs' own complaint indicates that the true cost is likely to be significantly less, as they assert that rates for a

---

[29] Notably, the Complaint does not allege that Plaintiff Antonyuk has incurred such costs, or will need to take off work.  The entire argument is phrased in terms of a hypothetical "applicant."

four-hour course are as low as $50.00.[30]   See Compl. ¶ 83.   Plaintiffs' complaints about costs, in

addition to being entirely speculative, are foreclosed by Kwong v. Bloomberg, 723 F.3d 160 (2d

Cir. 2013), in which the Second Circuit approved a firearms license fee of $340, stating, "we find

it difficult to say that the licensing fee, which amounts to just over $100 per year, is anything more

than a 'marginal, incremental or even appreciable restraint' on one's Second Amendment rights."

Id. at 167.   There is no basis for the Court to find that the Plaintiffs have alleged the elements of a

claim against Superintendent Bruen based on the costs of training, much less put forward evidence

showing a clear or substantial likelihood of success.

But even if they could, requiring individuals to bear the reasonable costs of their firearms

training is entirely "consistent with this Nation's historical tradition of firearms regulation."

Bruen, 142 S.Ct. at 2126.   New York's April 5, 1786 "Act to regulate the militia," for instance,

required "[t]hat every citizen . . . shall, within three months [of being enrolled in the militia]

provide himself, *at his own expence*, with a good musket or firelock, a sufficient bayonet and belt,

a pouch, with a box therein to contain not less than twenty-four cartridges suited to the bore of his

musket or firelock, each cartridge containing a proper quantity of powder and ball, two spare flints,

a blanket and knapsack; and shall appear so armed, accoutered and provided, when called out to

exercise or duty, as herein after directed."   Thomas Greenleaf, Laws of the State of New-York,

*supra*, TD Ex. 21 at 228 (1792), (emphasis added); see also Militia Act, 1 Stat at 271, TD Ex. 17;

Dukakis v. Dep't of Defense, 686 F. Supp. 30, 33 (D. Mass. 1988) ("[V]irtually every able-bodied

---

[30] Even if there were evidence to support the Plaintiffs' exaggerated hypotheticals, their brief acknowledges that none of these costs are imposed by Superintendent Bruen or the State Police, but instead by "localities," Pls' Prelim. Inj. Mem. at 20; see also id. at 20 n.25 ("For example, Schenectady County, where Mr. Antonyuk resides, charges . . ."), or by private party "trainers." Compl. ¶ 83; see also Compl. at 24 n. 9-11 (citing to private party webpages for Plaintiffs' assertion regarding the cost of training courses).

man between 18 and 45 was enrolled in the militia and required to arm himself at his own expense.").

Similarly, the militia statutes provided that citizens were required to take time out of their schedules for training in arms, without separate compensation for doing so.  As discussed in Section II(F)(1), above, state militia statutes could require that citizens participate in military exercises six times a year or more.  See, e.g., 1779 N.Y. Laws 239, TD Ex. 22 (six times per year); Henning, Collection of All the Laws of Virginia, *supra*, TD Ex. 20 at 11 ("private muster of every company once in two months," plus additional regimental and general musters).  This necessarily involved a significant commitment of time: militia "membership was service to the state that always disrupted one's chosen round of activities."  David C. Williams, Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment, 101 Yale L.J. 551, 580 (Dec. 1991). However, the militia statutes did not require that the states compensate citizens for the time spent in occasional mandatory training, instead reserving wages for times of "actual service."  Greenleaf, Laws of the State of New-York, *supra*, TD Ex. 21 at 232; accord 1781 N.Y. Laws 445, TD Ex. 23 (pay received "from the time of his marching out into said service until he be properly discharged therefrom"); Henning, Collection of All the Laws of Virginia, *supra*, TD Ex. 20, at 18-19 ("And whenever any militia shall be in actual service, they shall be allowed pay and rations, as follows . . ").  Plaintiffs have adduced no facts to support their assertions about the potential costs of training (let alone facts connecting those costs to Superintendent Bruen), and even if they had, the Founding-era tradition of firearms training laws demonstrates that it is constitutional to require an applicant to bear the reasonable costs of training.

## III.    PLAINTIFFS HAVE FAILED TO SHOW IRREPARABLE HARM

"In the Second Circuit ... [the] presumption of irreparable harm arising from a

62

constitutional deprivation is not automatic." <u>Joglo Realties, Inc. v. Seggos</u>, No. 16-CV-1666, 2016 WL 4491409, at *16 (E.D.N.Y. Aug. 24, 2016).   Instead, "[b]ecause the violation of a constitutional right is the irreparable harm asserted [], the two prongs of the preliminary injunction threshold merge into one" and "in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." <u>Frey</u>, 2022 WL 522478, at *9 (quoting <u>Turley v. Giuliani</u>, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000)).   As the Second Circuit has held that it is "more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights," <u>Time Warner Cable v. Bloomberg L.P.</u>, 118 F.3d 917, 924 (2d Cir. 1997), the alleged violations of Plaintiffs' Second Amendment rights, by themselves, are not sufficient to show irreparable harm.   And as discussed in Section I(C) , above, Plaintiffs have not even alleged an injury-in-fact that Plaintiff Antonyuk would suffer in the absence of an injunction, let alone made the "strong showing" of irreparable harm" required to obtain a mandatory injunction against a validly enacted statute. <u>Actavis</u>, 787 F.3d at 650.

## IV.   THE EQUITIES AND THE PUBLIC INTEREST FAVOR ALLOWING THE CCIA TO PROTECT THE PUBLIC FROM GUN VIOLENCE

Lastly, the balancing of the equities and the public interest strongly favor allowing the CCIA to become effective.  Although Plaintiffs note – with barely contained glee – that the interest of regular people in being safe from gun violence plays no part in the <u>Bruen</u> standard, <u>see</u> Pls' Prelim. Inj. Mem. at 7 ("There are no relevant statistical studies to be consulted.  There are no sociological arguments to be considered.  The ubiquitous problems of crime or the density of the population must not affect the equation."), the public's interest still plays a role at this stage of the preliminary injunction analysis.  And "it is beyond cavil" that there is a "substantial, indeed

compelling, governmental interest[] in public safety and crime prevention." NYSRPA v. Cuomo, 804 F.3d at 261.

In addressing the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winter v. NRDC, 555 U.S. 7, 24 (2008). Here, any prejudice to Plaintiff Antonyuk from the denial of a preliminary injunction is almost entirely theoretical, as his motion papers seem to acknowledge. See Pls' Prelim. Inj. Mem. at 23 ("Even an ephemeral constitutional violation causes irreparable harm."). If the CCIA goes into effect, he will be subject to the same restrictions on carrying guns in vulnerable places as any other New Yorker, but as discussed in Section I(C)(3), above, he has never actually articulated any concrete plan to carry guns into any of the statutorily-protected areas. He would be subject to the same bar on carrying guns onto other people's property as any other New Yorker, but he has not articulated any specific plan to violate the private property protection, and any such violation would still almost certainly be prohibited by New York's ban on first-degree trespassing, which Plaintiff has not challenged. And as discussed in Section I(C)(1), above, as a current Schenectady County pistol permit holder whose license has never been revoked, he will never be subject to the interview, social media disclosure, or training requirements that he is challenging. See N.Y. Penal Law § 400.00(10).

On the other hand, if the Court were to grant Plaintiffs the extraordinarily broad relief demanded, the harm would be real, and potentially catastrophic. New York would lose the ability to evaluate applicants' moral character before they acquire deadly weapons, despite the long Anglo-American tradition of evaluating persons for dangerousness and Second Circuit precedent noting that examples of the "good moral character" standard protecting life "are not beyond an ordinary person's comprehension, nor are they rare." Libertarian Party, 970 F.3d at 126. Enjoining

64

the requirements for in-person interviews, references, or social media checks would severely undermine the ability to assess a person's dangerousness, resulting in licenses (and guns) going to people who should not have them. Guns would immediately be allowed in a host of inappropriate places – courts, churches, playgrounds, libraries, nursery schools, addiction facilities, domestic violence shelters, and polling places, just to name a few, see 2022 N.Y. Laws ch. 371 § 4(2) – sending those locations into entirely predictable chaos and causing fear in places where the public should be able to feel safe. To the extent an injunction purported to allow people to carry guns onto private property, it would do tremendous harm to the rights of property owners and lessees statewide, without their ever having a chance to be heard. And an order enjoining training requirements would result in licenses being granted to persons who have not established the competence to handle a deadly weapon. Cf. Heller, 554 U.S. at 597 ("the adjective 'well-regulated' implies nothing more than the imposition of proper discipline and training.").

Any notional prejudice to Plaintiff Antonyuk – who cannot even show a concrete plan to encounter the many statutory provisions he asks the Court to enjoin – pales in comparison to the chaos that would result from granting him the sweeping preliminary injunctive relief he seeks. Both the equities and the public interest require that the motion be denied.

## **CONCLUSION**

For all of the reasons stated above, Plaintiffs' motion for a preliminary injunction should be denied, the accompanying motion to dismiss should be granted, and the Court should grant any further relief to Superintendent Bruen that it deems just and proper.

Dated: August 15, 2022

LETITIA JAMES
Attorney General
State of New York

By: _____

James M. Thompson
Special Counsel
Bar Roll No. 703513
28 Liberty Street
New York, NY 10005
(212) 416-6556
james.thompson@ag.ny.gov


*Michael McCartin*

Michael G. McCartin
Special Counsel
Bar Roll No. 511158
The Capitol
Albany, NY 12224
Tel.: (518) 776-2620
Michael.McCartin@ag.ny.gov

*Attorney for Superintendent Bruen*

66