**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

IVAN ANTONYUK,
GUN OWNERS OF AMERICA, INC.,
GUN OWNERS FOUNDATION, and
GUN OWNERS OF AMERICA
NEW YORK, INC.,

      Plaintiffs,

v.

KEVIN P. BRUEN, in his official
capacity as Superintendent of the New
York State Police,

      Defendant.

Civil Action No. 1:22-cv-00734-GTS-CFH

**EXHIBIT 1**

**BRIEF OF AMICUS CURIAE NATIONAL POLICE ASSOCIATION IN
SUPPORT OF PLAINTIFFS' PRAYERS FOR DECLARATORY AND
INJUNCTIVE RELIEF**

Robert S. Lafferrandre
Oklahoma Bar No. 11897
John C. Lennon
Oklahoma Bar No. 30149
**PIERCE COUCH HENDRICKSON
BAYSINGER & GREEN, L.L.P**
1109 North Francis Avenue
Oklahoma City, Oklahoma 73106
Telephone: (405) 235-1611
Facsimile: (405) 235-2904
jlennon@piercecouch.com

ATTORNEYS FOR AMICUS CURIAE
NATIONAL POLICE ASSOCIATION

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ............................................................................................. i

**TABLE OF AUTHORITIES** ....................................................................................... 1

**INTEREST OF *AMICUS CURIAE*** ............................................................................ 1

**INTRODUCTION** ....................................................................................................... 1

**ARGUMENT** .............................................................................................................. 8

**I.      THE COURT SHOULD GRANT PLAINTIFFS' MOTION FOR
         PRELIMINARY INJUNCTION BECAUSE DOING SO IS IN THE
         PUBLIC INTEREST** ....................................................................................... 8

      A.      THE ENGLISH SURVEY AND STUDY, THE MOST RECENT
            SOCIAL SCIENCE ON THE TOPIC AT ISSUE, SUGGEST THAT
            CONCEALED-CARRY LAWS DO NOT INCREASE VIOLENT
            CRIME RATES ...................................................................................... 10

      B.      CONCEALED-CARRY LAWS MAY EVEN DECREASE VIOLENT
            CRIME RATES—BUT THE SCIENCE IS NOT CLEAR ...................... 13

**CONCLUSION** .......................................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ......................................................................................................... 5
*Martin-Marietta Corp. v. Bendix Corp.*,
    690 F.2d 558 (6th Cir. 1982) ..................................................................................... 8, 12
*McDonald v. City of Chicago, Ill.*,
    561 U.S. 742 (2010) ......................................................................................................... 6
*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ......................................................................................... 21
*New York State Rifle & Pistol Assn., Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ............................................................................................. 1, 6, 8

**Constitutional Amendments**                                                **Page(s)**

U.S. Const. amend. XVIII ..................................................................................................... 4
U.S. Const. amend. XXI ........................................................................................................ 4

**Other Authorities**

Cato Institute
    John R. Lott, Jr. et al.
    *Research Perceptions of Lawful, Concealed Carry of Handguns* (2016)
    https://www.cato.org/regulation/summer-2016/researcher-perceptions-lawful-
    concealed-carry-handguns .............................................................................................. 4

Federal Bureau of Investigation, Uniform Crime Reporting Program
    *Crime in the U.S.* (2019),
    https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-
    pages/tables/table-77 ...................................................................................................... 2

Government of the District of Columbia, Metropolitan Police Department
    *2019 Annual Report*
    https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/MPD%
    20Annual%20Report%202019_lowres.pdf. ................................................................... 2

John J. Donohue, et al.,
  *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using*
  *Panel Data and a State-Level Synthetic Control Analysis*,
  JOURNAL OF EMPIRICAL LEGAL STUDIES, Vol. 16, (2019),
  https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 ............................................... 11

John R. Lott, Jr. et al.,
  *Crime, Deterrence, and Right-to-Carry Concealed Handguns* (1996),
  COASE-SANDOR INSTITUTE FOR LAW & ECONOMICS,
  https://www.journals.uchicago.edu/doi/10.1086/467988 ............................................ 11

Lambda Legal
  Sanjali De Silva
  Lambda Legal Reacts After Supreme Court Strikes Down New York's Gun Law
  (June 23, 2022), https://www.lambdalegal.org/news/ny_20220623_ll-reacts-after-
  scotus-strikes-down-new-york-gun-law (last accessed Aug. 12, 2022) ........................ 9

National Research Council,
  *Firearms and Violence: A Critical Review* (2005)
  THE NATIONAL ACADEMIES PRESS, 150 ...................................................................... 13

PoliceOne
  *Gun Policy & Law Enforcement Survey* (2013)
  https://media.cdn.lexipol.com/p1_gunsurveysummary_2013.pdf .................................. 4

RAND Corporation,
  *The Science of Gun Policy: A Critical Synthesis of Research Evidence on*
  *the Effect of Gun Policies in the United States*, (2d. ed. 2020) .................................... 12

SCOTUSblog
  Esther Sanchez-Gomez
  *The Right to Fear, In Public: Our Town Square After Bruen* (June 29, 2022),
  https://www.scotusblog.com/2022/06/the-right-to-fear-in-public-our-town-square-
  after-bruen/ (last accessed Aug. 13, 2022) ..................................................................... 9

William English,
  Br. of Amicus Curiae Supporting Petitioners in *New York State Rifle & Pistol Ass'n. v.*
  *Bruen*, 2021 WL 3127144 (U.S., July 19, 2021) ........................................................... 8

William English,
  *2021 National Firearms Survey* (July 14, 2021),
  GEORGETOWN UNIVERSITY MCDONOUGH SCHOOL OF BUSINESS
  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887145 .................................... 11

William English,
   *The Right to Carry Has Not Increased Crime: Improving an Old Debate*
   *Through Better Data on Permit Growth Over Time* (July 18, 2021),
   GEORGETOWN UNIVERSITY MCDONOUGH SCHOOL OF BUSINESS,
   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887151 .............................. 11, 12

For a list of additional studies made available for the Court's review, see pages 14-20 of
the Brief of Amicus Curiae.

## INTEREST OF *AMICUS CURIAE*

The National Police Association ("NPA") is an Indiana non-profit corporation founded to provide educational assistance to supporters of law enforcement and support to individual law enforcement officers and the agencies they serve. The NPA seeks to bring important issues in the law enforcement realm to the forefront of public discussion in order to facilitate remedies and broaden public awareness.

## INTRODUCTION

It is self-evident that firearms – the weapons themselves, the regulation thereof, and citizens' rights there regarding – are of critical importance to the law enforcement community in this country.  Firearms are workaday "tools of the trade" to law enforcement officers, not unlike a spade to a contractor, a compass to a sailor, or a gavel to a judge.  Yet firearms also pose dangers to those exact same personnel, with scores of American officers killed by assailants' criminal misuse of guns in just this young decade alone.  Firearms falling into the wrong hands is a serious concern in the law enforcement community.  The NPA, like many similar organizations, supports firearms regulations tailored to avoiding that phenomenon, when such laws are sensible and consistent with state and federal constitutions.   The U.S. Supreme Court has repeatedly observed that the Second Amendment codified a preexisting right belonging to all, but that the right was and is subject to forfeiture; the right described in this critical portion of our nation's founding legal charter is one belonging to the people, but "the people" protected are, in pertinent part, "ordinary, **law-abiding**, adult citizens." *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 142 S. Ct. 2111, 2119 (2022) (emphasis added) (herein *Bruen*).

Yet often neglected in the tumultuous public conversation about firearms is the other side of the "wrong hands" maxim.  Just as it is an important policy goal to take constitutional measures to reduce instances of guns falling into the "wrong" hands, due consideration must be given to what is and is not in the "right" hands.

A common form of the law enforcement Code of Ethics begins: "As a law enforcement officer, my fundamental duty is to serve; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all to liberty, equality and justice."

As scrupulously as any officer or department attempts to safeguard lives and property, however, criminals rarely commit such crimes within the immediate vicinity of uniformed police.  It is simply a fact of social life – ancient, modern and presumably in perpetuity – that citizens are and must be their own "first responders."  Bureau of Justice statistics reveal that, when violent crimes are reported, police are able to arrive on the scene within five minutes less than 30% of the time. U.S. Dept. of Justice, Bureau of Justice Statistics, Criminal Victimization in the United States—Statistical Tables, Table 107 (May 2011).[1] Indeed, consistent with the portion of their creed pertaining to respecting the rights

---

[1] Washington, D.C. has the Nation's highest number of law enforcement officers per capita, but, according to a 2019 D.C. Metropolitan Police Department report, the average response time to a 911 call nonetheless exceeds seven minutes.  *See* Fed. Bureau of Investigation, Uniform Crime Reporting Program, Crime in the U.S. 2019: Table 77, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-77; Gov't of the Dist. of Columbia, Metro. Police Dep't, 2019 Annual Report, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/MPD%20A nnual%20Report%202 019_lowres.pdf.

of all to liberty and justice, **good "police" are adamantly opposed to a "police state."**  In a country that values liberty, the primary role of preventing crime will always fall first to the people, not the executive or any other branch of government.

This is why the NPA considers itself to be a supporter of the Second Amendment, not merely in the neutral sense that it supports constitutional government and the Second Amendment lies within the nation's constitution, but in that self-protection is a valued and critical aspect of ordered liberty.  While of course many good, civic-minded, law-abiding citizens choose not to exercise their right to keep and bear arms, many others do, and the law enforcement community embraces these individuals as partners within our efforts as a civil society as a whole to safeguard lives and property.

The "laboratories of democracy" created by our federalist system have given us ample opportunities over the last several decades to study the ways that crime is affected when state governments restrict or liberalize their firearms regulations, particularly when it comes to the public carry of handguns.  The primary purpose of the present filing is to collect and bring to the Court's attention certain of these studies, which we do below. Newspaper headline writers, partisan politicians writing speeches, and regular citizens wishing to go about their day without worrying about gun policy may all wish that the data could serve as a litmus strip that would turn up one uniform color or another in answer to grand questions such as "are guns good or bad?"  Unfortunately, such conclusions, to no surprise to those familiar with social science studies on complicated subject matters, turn out not be available.

What is available, though, is telling.  Whatever policy sub-debates remain outstanding about which the data may be said to remain ambiguous, there is simply no scientific, data-driven justification for draconian state level laws that practically prevent ordinary law-abiding adults from being able to carry guns in public so such individuals can safeguard lives and property in partnership with law enforcement, the latter of which is simply not designed to and is unable to take on the primary role of preventing criminal activity.  Broad carry rights *probably* make states safer; but to the extent there is some hesitancy to draw the conclusion absolutely, such laws *certainly* have some deterrent effects with no proven increase of violence.  This data is part and parcel with the experienced judgments of the vast majority of law enforcement officers—those perhaps in a position to know and care most about the issue—who are in full support of liberally extending public carry rights to law-abiding adults wishing to utilize those rights.[2]

Constitutional government is a good in itself, but there is no guarantee in the abstract that any particular constitutional feature, rights-granting provision, or rights-limiting provision of our country's or any other constitution will be or is wise public policy.[3]  And, of course, part of the purpose of placing a right in a constitution is to *enshrine* an "interest

---

[2] A seminal 2013 survey of verified law enforcement professionals is telling.  While 91 percent of officers believed that use of a firearm while perpetuating a crime should result in "stiff, mandatory sentences with no plea bargains," the exact same percentage said they supported "concealed carry of firearms by civilians who have not been convicted of a felony and/or not been deemed psychologically/medically incapable." https://media.cdn.lexipol.com/p1_gunsurveysummary_2013.pdf.  Relatedly, in a survey of North American economists who study gun control issues, concealed handguns lower the murder rate." https://www.cato.org/regulation/summer-2016/researcher-perceptions-lawful-concealed-carry-handguns#overview-of-results

[3] *See, e.g.,* U.S. Const. amend. XVIII, U.S. Const. amend. XXI.

balance" already made by the people such that it does not matter, barring constitutional amendment, precisely how subsequent legislatures or judicial bodies "weigh" the data and the public policy values.[4]  Nonetheless, whether a happy coincidence or another example of the marked prescience of the framers of the original Constitution and of the Fourteenth Amendment, the NPA respectfully submits that it is an objectively positive good that our Constitution guarantees an individual right to possess and carry weapons in case of confrontation outside the home, and an objectively positive good that the Supreme Court recently made the existence of this guarantee undeniably clear as a matter of established controlling jurisprudence in *Bruen*.

This leads us to New York's Concealed Carry Improvement Act ("CCIA").  No close calls cloud the analysis.  The CCIA makes an utter mockery of the rights of the people described in *Bruen*.  If allowed to go into place as law, the Second Amendment will be a legal fiction in the fourth most populous state in our union, even though the nation's highest court *just told us all, explicitly*, that the Second Amendment is *not* a legal fiction but a full partner with the other "Bill of Rights" guarantees such as freedom of speech.

*Amicus curiae* will not clutter the Court's records with a rehash of the legal arguments.  Suffice it to say for present purposes that upon reading the controlling law set forth in *Bruen*, and then reviewing the provisions of the CCIA, no other conclusion is possible except that the CCIA represents a knowing and deliberate "thumbing of the nose" by an outlier anti-gun legislature at the Constitution and the rule of law.  Indeed, only one

---

[4] "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all."  *District of Columbia v. Heller*, 554 U.S. 570, 634.

example is needed (although there are many). The *Bruen* opinion made clear that the Second Amendment is inconsistent with a firearm licensing regime that gives government officials subjective discretion to deny licenses, *i.e.* discretion outside of objectively set-forth statutory criteria (such as not having a misdemeanor assault record, showing one's residency, etc.). It also affirmed that the right to bear arms in public for self-defense "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Id*. at 2121, *citing McDonald v. City of Chicago, Ill*., 561 U.S. 742, 780, 130 S. Ct. 3020, 3043, 177 L. Ed. 2d 894 (2010). No other constitutional rights are contingent on a government official formulating an opinion about whether one particular citizen is or is not deserving of the right based only on broad discretionary factors. If one has to earn a "gold star" from a government official in advance of being able to exercise a "right," then it wasn't a right to begin with.

In response, the CCIA appears to retort: "If the standard cannot involve subjective discretion, then we will bound the discretion to the 'objective' criteria of 'good moral character.'" To state the contention is to refute it. It is simply beyond doubt that the CCIA is a "response" to *Bruen*, surely enough. But no part of the "response" is aimed at enacting a firearms regulation regime consistent with what the Supreme Court has decided. The "response" is, to put it bluntly, obvious non-conformity. If "good moral character" is an "objective" criteria consistent with the kind of licensing regimes left for now intact in *Bruen*, then words have lost all meaning. A scheme which gives licensing officials discretion to deny gun-carry licenses based on a perceived lack of suitability is anathema

to the Constitution.  If that sounds familiar, it is because it is not an argument but a near-exact paraphrase of what the Supreme Court said just weeks ago.[5]

Even more so than the general public, the law enforcement community and the NPA are very concerned about firearms reaching the wrong hands.  Indeed, the NPA believes that at least some state and local firearm-related laws should be made more restrictive than they are at present, at least in certain respects, in the interests of safety and in the interests of (or at least consistent with the interests of) the safeguarding of lives and property and the prevention of crime, and could be done fully in accord with robust protection of Second Amendment rights extended to ordinary, law-abiding adults.

But such debatable "edge tinkering" is **not** what is before the Court at present.  What is at hand is a legislative repudiation of the very core of a constitutionally-protected right.  The CCIA is bad for safety; it is bad for public policy; it is bad for law enforcement; it is bad for the rule of law.  Most importantly it is patently unconstitutional and the Plaintiff's sought declaratory and injunctive relief should be granted in advance of the flawed act's enactment date.

---

[5] *See Bruen*, at *17 ("New York is not alone in requiring a permit to carry a handgun in public. But the vast majority of States—43 by our count—are 'shall issue' jurisdictions, where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability. Meanwhile, only six States and the District of Columbia have 'may issue' licensing laws, under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license.").

## ARGUMENT

The Plaintiffs' Complaint and Motion for Preliminary Injunction make the legal points above in spades. The NPA wishes to draw the Court's attention to the bevy of social science investigating the impact of concealed-carry laws to emphasize, despite much public hollering to the contrary, the fact that concealed-carry regimes do not have a statistically significant impact on violent crime rates. *See* Brief of Amici Curiae William English, Ph.D., et al., pg. 8, *Bruen*, 142 S. Ct. 2111 (2022) (English Brief). A fundamental right need not bear the weight of ends-based scientific support to merit protection, but the argument below nonetheless shows that the Second Amendment *does just that*. As such, a ruling for Plaintiffs on their Motion for Preliminary Injunction vindicates not only the right's existence, but the scientific principles underlying it.

## I. THE COURT SHOULD GRANT PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION BECAUSE DOING SO IS IN THE PUBLIC INTEREST.

For reasons which need no explanation, Plaintiffs' injunction briefing focuses for the most part on the likelihood of success on the merits. *Amicus curiae* agree with Plaintiff that, per *Bruen*, as to the merits: "There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered.  The ubiquitous problems of crime or the density of the population do not affect the equation." (Br. at 9.)  The "public interest" is also a part of the injunction analysis, though.  Again as to this component, NPA agrees with Plaintiffs' observation (Br. at 25) that it is in the public interest "not to perpetuate the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp*., 690 F.2d 558, 568 (6th Cir. 1982).  However, *amicus curiae* respectfully aver that relief would have

- 8 -

other salubrious consequences in the public interest, or, at an absolute minimum, that purported fears for the public interest in the name of "public safety" if relief is granted are vastly overstated (if not invented entirely for political reasons) and should be given little to no weight.

In the days following the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, many commenters argued the decision meant more guns on the streets and, *ipso facto*, more gun violence. Richard Saenz, attorney for Lambda Legal, argued that the *Bruen* decision "take[s] away an important tool to fight against gun violence." *See* "Lambda Legal Reacts After Supreme Court Strikes Down New York's Gun Law," https://www.lambdalegal.org/news/ny_20220623_ll-reacts-after-scotus-strikes-down-new-york-gun-law (last accessed Aug. 12, 2022). Esther Sanchez-Gomez, senior litigation counsel for the Giffords Law Center to Prevent Gun Violence, wrote on the widely-read website SCOTUSblog that "with more guns in our public squares, we are likely to see more violence, more fear, and greater gun sales, exacerbating our already devastating epidemic of violence." *See* "The Right to Fear, in Public: Our Town Square After *Bruen*," SCOTUSblog.com, https://www.scotusblog.com/2022/06/the-right-to-fear-in-public-our-town-square-after-bruen/ (last accessed August 13, 2022).

To put it mildly, the reaction was swift and strong. And, of course, the reductive facial appeal is there. More guns, more gun violence. But for concealed-carry regimes that require background checks, mental-health certifications, fingerprinting, and training regimes, among other things, *is this really true*? Current research suggests no. In July 2021, William English, a political economist and Georgetown professor, published the largest-

- 9 -

ever nationally representative survey of firearms owners and an accompanying study that contended that, with the appropriate research methodology in tow, concealed-carry laws had no appreciable effect on violent crime in either direction. The English study comprehensively rejected methodologies employed by researchers that previously drew positive ties between an increase in carry laws and violent crime in the course of reaching a fairly straightforward conclusion: *"There is No Compelling Empirical Basis for Concluding that Right-to-Carry Laws Increase Crime."* See English Brief, at i.

Moreover, a number of studies suggest that objective concealed carry regimes—meaning those discussed in the previous sentence, and *not* the subjective, arbitrary regime put in place by the CCIA—can both lower violent crime and reduce the number of officer fatalities in many jurisdictions.[6] For this reason, plus those articulated in the Plaintiffs Complaint and Motion for Preliminary Injunction, the NPA supports Plaintiffs' effort to have this Court declare the CCIA unconstitutional under the text of the Second Amendment and the principles recently articulated in *Bruen*.

A.   **THE ENGLISH SURVEY AND STUDY, THE MOST RECENT SOCIAL SCIENCE ON THE TOPIC AT ISSUE, SUGGEST THAT CONCEALED-CARRY LAWS DO NOT INCREASE VIOLENT CRIME RATES.**

To put it mildly, social science has struggled to analyze the effect of gun restrictions on crime. Due perhaps to some combination of the polarizing nature of topic, the available sample sizes, and the uniqueness of sampling models, researchers in this area frequently produce studies on similar questions that reach diametrically different results. *See*, *e.g.*,

---

[6] This latter set of research is not without its detractors, which are identified as well.

John R. Lott, Jr., et al. "Crime, Deterrence, and Right-to-Carry Concealed Handguns," Coase-Sandor Institute for Law & Economics Working Paper No. 41, 1996, https://www.journals.uchicago.edu/doi/10.1086/467988 (right-to-carry laws *decrease* violent crime); *cf.* John J. Donohue et al., "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis," Journal of Empirical Legal Studies, Vol. 16, pgs. 198-247, https://onlinelibrary.wiley.com/doi/10.1111/jels.12219 (right-to-carry laws *increase* violent crime). Unsurprisingly, attacks on the methodology of studies are a routine theme of the genre. Recently, however, a nuanced middle-ground is taking hold, as embodied by a recent survey and study released by Professor William English, Ph.D., a political economist and public policy professor at Georgetown University.

In July 2021, Professor English conducted the "largest-ever nationally representative survey of firearms owners in order to estimate reliably the frequency of firearm carriage and use for self-defense." *See* English Brief, pg. 1; *see also* William English, "2021 National Firearms Survey," (July 14, 2021), Georgetown McDonough School of Business, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887145, last accessed August 15, 2022. From this survey, Professor English developed a study in which he concluded, in sum, that the "dramatic growth in the ability to carry firearms for self-defense in recent decades has not exacerbated crime." *See* William English, "The Right to Carry Has Not Increased Crime: Improving an Old Debate Through Better Data on Permit Growth Over Time, (July 18, 2021), Georgetown McDonough School of Business,

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887151, last accessed August 15, 2022.

The English Study differed from previous examinations by looking at a key metric: the growth of the number of concealed carry permits over time. *See* English Brief, at 4. This data point better reflects the impact of carry laws because it accounts for the fact that change takes time—so any impact on violent crime rates from carry laws would not show up in data immediately after the law's passage. *Id.* at 17.[7] Using data from states that report the number of carry permits issued every year since that state's carry law took effect (and other sources, but primarily the aforementioned) Professor English concluded that there is "no statistically significant relationship between carry permit rates and crime rates." *Id.*

This result tracked with additional research conducted in the years before 2021. Namely, in 2020, the RAND Corporation published a survey of firearms research that concluded "the best available studies provide inconclusive evidence for the effect of shall-issue laws on total homicide." *See* RAND, "The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effect of Gun Policies in the United States," at ii (2d. ed. 2020); *see also* English Brief, at pgs. 3-4. Fifteen years before that, the National Research Council—in a similar literature survey—found that "with the current evidence,

---

[7] In his *amicus curiae* brief to the U.S. Supreme Court in *Bruen*, Professor English discussed why the "change-over-time" measurement is superior to the "before-and-after" measurement used by opponents of carry laws. Briefly, measuring crime rates shortly before a concealed-carry law is passed and then again shortly after a concealed-carry law is passed will not produce useful information about the effect the concealed-carry law on crime rates because the impact of such a law takes time to show up in data. *See* English Brief, at 4, 15-16.

it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." *See* National Research Council, "Firearms and Violence: A Critical Review," the National Academies Press, 150 (2005); *see also* English Brief, at pg. 4, for more studies confirming the same.

This contention—that there's no evidence that concealed carry laws increase violent crime—is not groundbreaking policy news, but when a new law seeks to so radically suppress a constitutional right as the CCIA does to New Yorkers' Second Amendment rights, from a policy standpoint that is the headline: ***the old law does not wreak the policy problem the new law is supposed to fix***. In addition the legal contentions ably advanced by Plaintiffs in their Complaint and Motion for Preliminary Injunction, there is no policy reason to think that striking down the CCIA will lead to an increase in violent crime in New York. The public interest is squarely in the Plaintiffs' favor, and as such, the Court should grant Plaintiffs' Motion for Preliminary Injunction.

### B.   CONCEALED-CARRY LAWS MAY EVEN DECREASE VIOLENT CRIME RATES—BUT THE SCIENCE IS NOT CLEAR.

A positive correlation between concealed-carry laws and the *reduction* of violent crime is less clear, but there is a vigorous debate on the question. Insofar as the Court's decision implicates this question—as opposed to the more clear-cut one discussed in Section I(A) above—below is a table of studies presenting both proposing and opposing research for the Court's use.[8]

---

[8] Additionally, a survey of most of the relevant studies cited in the amici curiae briefing in *Bruen* is available here: https://reason.com/volokh/2021/11/02/social-science-on-the-right-to-bear-arms/ (last accessed August 15, 2022).

| No. | Study |
|---|---|
| **1.** | **Name:** *The Impact of Gun Laws on Police Deaths* <br> **Author(s):** David B. Mustard <br> **Institution/Publisher:** *University of Georgia* <br> **Link:** https://www.jstor.org/stable/10.1086/323312 <br> **Author's abstract:** "This paper uses state-level data from 1984-96 to examine how right-to-carry laws and waiting period affect the felonious deaths of police. Some people oppose concealed weapon carry laws because they believe these laws jeopardize law enforcement officials, who risk their lives to protect the citizenry. This paper strongly rejects this contention… Allowing law-abiding citizens to carry concealed weapons does not endanger the lives of officers and may help reduce the risk of being killed." |
| **2.** | **Name:** *Crime, Deterrence, and Right-to-Carry Concealed Handguns* <br> **Author(s):** John R. Lott, Jr. & David B. Mustard <br> **Institution:** Law and Economics program, University of Chicago Law School <br> **Link:** https://www.journals.uchicago.edu/doi/10.1086/467988 <br> **Authors' abstract:** "Using cross-sectional time-series data for U.S. counties from 1977 to 1992, we find that allowing citizens to carry concealed weapons deters violent crimes, without increasing accidental deaths. If those states without right-to-carry concealed gun provisions had adopted them in 1992, county- and state-level data indicate that approximately 1,500 murders would have been avoided yearly. Similarly, we predict that rapes would have declined by over 4,000, robbery by over 11,000, and aggravated assaults by over 60,000. We also find criminals substituting into property crimes involving stealth, where the probability of contact between the criminal and the victim is minimal. Further, higher arrest and conviction rates consistently reduce crime. The estimated annual gain from all remaining states adopting these laws was at least $5.74 billion in 1992. The annual social benefit from an additional concealed handgun permit is as high as $5,000." |
| **3.** | **Name:** *Privately Produced General Deterrence* <br> **Author(s):** Bruce L. Benson, and Brent D. Mast <br> **Institution/Publisher:** Florida State University/American Enterprise Institute <br> **Link:** https://www.journals.uchicago.edu/doi/10.1086/323766 <br> **Authors' abstract:** "In this study, we use county data on private security establishments and employment for 1977–92 to test two hypotheses. First, we test whether private security deters crime. Second, we test whether John Lott and David Mustard's estimates of the impact of shall-issue laws on crime are biased because of a lack of controls for private security. We find little evidence that private security reduces the crime rates for assault or larceny. Some estimates suggest murder, robbery, and/or auto theft may be deterred by private security, although these results are not robust. Of all the index crime categories, only rape is estimated to have a consistent negative relationship with private security. In addition, we find little evidence that the Lott and Mustard results are biased |

| No. | Study |
|---|---|
|  | because of a lack of controls for the private security measures employed in this study." |
| 4. | **Name:** *The Concealed-Handgun Debate*<br>**Author(s):** John R. Lott, Jr.<br>**Institution/Publisher:** University of Chicago Law School<br>**Link:** https://www.journals.uchicago.edu/doi/10.1086/468020<br>**Author's abstract:** "Dan A. Black and Daniel S. Nagin state that my article with David Mustard assumes that the effect of concealed-handgun laws is constant over time, that the effect is the same across states, that the article does not control for local time trends, and that we did not investigate whether the results were sensitive to the missing values of the arrest rate. None of these claims are correct, and this is easily verified by anyone who reads the original article. Their statement that the results are sensitive to including Florida applies to fewer than 1 percent of the regressions that I have reported. Using results from previous drafts of Black and Nagin's comment as well as new estimates of my own, I provide additional evidence that allowing law-abiding citizens to carry concealed handguns deters criminals. Violent crime rates were rising before the law was passed and fell thereafter." |
| 5. | **Name:** *Does the Right to Carry Concealed Handguns Deter Countable Crimes? Only a Count Analysis Can Say*<br>**Author(s):** Florenz Plassmann & T. Nicolaus Tideman<br>**Institution/Publisher:** State University of New York at Binghamton/Virginia Polytechnic Institute and State University<br>**Link:** https://www.journals.uchicago.edu/doi/10.1086/323311<br>**Authors' abstract:** "An analysis of the effects of right-to-carry laws on crime requires particular distributional and structural considerations. First, because of the count nature of crime data and the low number of expected instances per observation in the most appropriate data, least-squares methods yield unreliable estimates. Second, use of a single dummy variable as a measure of the nationwide effect of right-to-carry laws is likely to introduce geographical and intertemporal aggregation biases into the analysis. In this paper, we use a generalized Poisson process to examine the geographical and dynamic effects of right-to-carry laws on reported homicides, rapes, and robberies. We find that the effects of such laws vary across crime categories, U.S. states, and time and that such laws appear to have statistically significant deterrent effects on the numbers of reported murders, rapes, and robberies." |
| 6. | **Name:** *Testing for the Effects of Concealed Weapons Laws: Specification Errors and Robustness*<br>**Author(s):** Carlisle E. Moody<br>**Institution/Publisher:** College of William and Mary - Department of Economics<br>**Link:** https://papers.ssrn.com/sol3/papers.cfm?abstract_id=281240 |

| No. | Study |
|-----|-------|
|     | **Author's abstract:** "In 1997, Lott and Mustard published an important paper which found that right-to-carry concealed weapons laws reduce violent crime. Although Lott and Mustard appear to do all possible variations of the analysis, a closer reading reveals that the study might suffer from several possibly important errors. I re-estimate the model and check for incorrect functional form, omitted variables, and possible second order bias in the t-ratios. Lott and Mustard's basic conclusions are generally robust with respect to these potential econometric problems. Overall, right-to-carry concealed weapons laws tend to reduce violent crime. The effect on property crime is more uncertain. I find evidence that these laws also reduce burglary." |
| 7.  | **Name:** *Criminal Deterrence, Geographic Spillovers, and Right-to-Carry Concealed Handguns*<br>**Author(s):** Stephen G. Bronars & John R. Lott<br>**Institution/Publisher:** University of Texas at Austin/Crime Prevention Research Center<br>**Link:** https://papers.ssrn.com/sol3/papers.cfm?abstract_id=56862<br>**Authors' abstract:** "Increased law enforcement or penalties may deter crime, but they may also cause criminals to move to other crimes or other areas. This paper examines whether the adopting a shall issue concealed weapons law in one state alters crime in neighboring areas... Taken together these results imply that concealed handguns deter criminals and that the largest reductions in violent crime will be obtained when all the states adopt these laws. We find little evidence that increased arrest rates create similar spillovers." |
| 8.  | **Name:** *A Note on the Use of County-Level Ucr Data: A Response*<br>**Author(s):** John R. Lott & John E. Whitley<br>**Institution/Publisher:** Crime Prevention Research Center<br>**Link:** https://papers.ssrn.com/sol3/papers.cfm?abstract_id=320102<br>**Authors' abstract:** "Maltz and Targonski (2002) have provided an important service by disaggregating the county level data to help researchers examine measurement errors in the county level data, but their conclusion 'that county-level crime data, as they are currently constituted, should not be used, especially in policy studies' is not justified... The evidence provided here indicates right-to-carry laws continue to produce substantial reductions in violent crime rates when states with the greatest measurement error are excluded. In fact, the restricting the sample results in somewhat larger reductions in murders and robberies, but smaller reductions in aggravated assaults." |
| 9.  | **Name:** *Using Placebo Laws to Test "More Guns, Less Crime"*<br>**Author(s):** Eric Helland & Alexander Tabarrok<br>**Institution/Publisher:** Claremont-McKenna College/George Mason University<br>**Link:** https://crimeresearch.org/wp-content/uploads/2015/03/Helland-Tabarrok-Placebo-Laws.pdf |

| No. | Study |
|-----|-------|
|     | **Authors' abstract:** *"We reexamine Mustard and Lott's controversial study on the effect of "shall-issue" gun laws on crime using an empirical standard error function randomly generated from "placebo" laws. We find that the effect of shall-issue laws on crime is much less well-estimated than the Mustard and Lott (1997) and Lott (2000) results suggest. We also find, however, that the cross equation restrictions implied by the Lott-Mustard theory are supported."* |
| **10.** | **Name:** *The Debate on Shall-Issue Laws* <br> **Author(s):** Carlisle E. Moody & Thomas B. Marvell <br> **Institution/Publisher:** College of William and Mary/Director of Justice Research <br> **Link:** https://econjwatch.org/File+download/234/2008-09-moodymarvell-com.pdf?mimetype=pdf <br> **Authors' abstract:** *"…Lott and Mustard's article created a furor and the debate continues. Much of this debate takes place in op-ed columns, letters to editors, internet chat rooms, and web logs. In this article we concentrate on the academic debate. We review the main threads of the discussion in the literature and extend the debate with our own statistical analyses. In particular, we extend the investigation of influential work in Stanford Law Review by Ian Ayres and John J. Donohue III (2003a, 2003b), who, contrary to Lott and Mustard, claim to find that shall-issue laws actually lead to an overall increase in crime. The new statistical analysis contained in the present article finds that shall issue laws are generally beneficial. Purists in statistical analysis object with some cause to some of methods employed both by Ayres and Donohue, by us, and by the literature in general. But the new investigation presented here upgrades Ayres and Donohue in a few significant ways, so, at least until the next study comes along, our paper should neutralize Ayres and Donohue's 'more guns, more crime' conclusion."* |
| **11.** | **Name:** *Revisiting the Question "More Guns, Less Crime?" New Estimates Using Spatial Econometric Techniques* <br> **Author(s):** Donald J. Lacombe & Amanda Ross <br> **Institution/Publisher:** West Virginia University <br> **Link:** https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2389105 <br> **Authors' introduction:** *"…We find that concealed weapon laws reduce the assault rate, consistent with the arguments of Lott and Mustard (1997) that the potential of an armed victim deters criminals. However, we find a positive effect for all property crimes, robbery, larceny, and motor vehicle theft (MVT). Our findings also indicate that adoption of a shall-issue law has a positive spillover effect on neighboring states for rape, robbery, larceny, MVT, and all property crimes. Policy makers should be cognizant of our findings, as they suggest that anti-crime policies have spillover effects on adjacent states."* |
| **12.** | **Name:** *An Examination of the Effects of Concealed Weapons Laws and Assault Weapons Bans on State-Level Murder Rates* <br> **Author(s):** Mark Gius |

| No. | Study |
|-----|-------|
|  | **Institution/Publisher:** Applied Economics Letters |
|  | **Link:** https://www.tandfonline.com/doi/abs/10.1080/13504851.2013.854294 |
|  | **Author's abstract:** "The purpose of the present study is to determine the effects of state-level assault weapons bans and concealed weapons laws on state-level murder rates. Using data for the period 1980 to 2009 and controlling for state and year fixed effects, the results of the present study suggest that states with restrictions on the carrying of concealed weapons had higher gun-related murder rates than other states. It was also found that assault weapons bans did not significantly affect murder rates at the state level. These results suggest that restrictive concealed weapons laws may cause an increase in gun-related murders at the state level. The results of this study are consistent with some prior research in this area, most notably Lott and Mustard (1997)." |
| **13.** | **Name:** *The Impact of "Shall-Issue" Concealed Handgun Laws on Violent Crime Rates* |
|  | **Author(s):** Tomislav V. Kovandzic, Thomas B. Marvell, Lynne M. Vieraitis |
|  | **Institution/Publisher:** University of Alabama at Birmingham, Justec Research |
|  | **Link:** https://www.hoplofobia.info/wp-content/uploads/2015/08/2005-The-Impact-of-RTC-Laws-on-Violent-Crime-Rates.pdf |
|  | **Abstract:** "What happens when states ease access to permits to carry concealed handguns in public places? Supporters maintain the laws can reduce violent crime rates by raising the expected costs of crime, because of criminals anticipating greater risks of injury and lower rates of success completing their crimes. Opponents argue that the laws are likely to increase violent crime, especially homicide, as heated disputes involving permit holders are more likely to turn deadly because of the greater lethality of firearms… The authors measure the effects of the laws using a time-trend variable for the number of years after the law has been in effect, as opposed to the dummy variable approach used in prior research. They also address many of the methodological problems encountered in previous studies. The results provide no evidence that the laws reduce or increase rates of violent crime." |
| **14.** | **Name:** *The Effect of Nondiscretionary Concealed Weapon Carrying Laws on Homicide* |
|  | **Author(s):** Lisa Hepburn 1, Matthew Miller, Deborah Azrael & David Hemenway |
|  | **Institution/Publisher:** Harvard School of Public Health |
|  | **Link:** https://pubmed.ncbi.nlm.nih.gov/15128143/ |
|  | **Abstract:** "… Methods: Pooled cross-sectional time-series data (1979-1998) for 50 states and Poisson regression methods were used to estimate the effect of changes in state laws on homicide rates. Results: No statistically significant association exists between changes in concealed weapon laws and state homicide rates. This finding is consistent across all models. Conclusions: The current findings are consistent with those of other published studies indicating that |

| No. | Study |
|-----|-------|
|  | nondiscretionary concealed weapon laws are not associated with significant increases or decreases in homicide." |
| **15.** | **Name:** *How Do Right-to-Carry Laws Affect Crime Rates? Coping with Ambiguity Using Bounded-Variation Assumptions* <br> **Author(s):** Charles F. Manski & John Pepper <br> **Institution/Publisher:** Northwestern University/University of Virginia <br> **Authors' Abstract:** "Despite dozens of studies, research on crime has struggled to reach consensus about the impact of right-to-carry (RTC) gun laws. With this in mind, we formalize and apply a class of bounded-variation assumptions that flexibly restrict the degree to which outcomes may vary across time and space… Imposing specific assumptions that we believe worthy of consideration, we find that RTC laws increase some crimes, decrease other crimes, and have effects that vary over time for others." |
| **16.** | **Name:** *Texas Concealed Handgun Carriers: Law-abiding Public Benefactors* <br> **Author(s):** H. Sterling Burnett <br> **Institution/Publisher:** National Center for Policy Analysis <br> **Link:** http://www.ncpathinktank.org/pub/ba324 <br> **Author's introduction:** "In 1998 and again in 1999, the Violence Policy Center, a research organization opposed to concealed carry, released reports highlighting the numbers of Texas' concealed carry licensees who have been arrested since the law went into effect. Using Texas Department of Public Safety records, the center pointed out that Texas licensees had been arrested for nearly two crimes a day through 1998 - with more than one arrest each month for a violent crime. In isolation these numbers paint a troubling picture. However, the reports are misleading for several reasons. First, they do not separate crimes that involve concealed weapons from those that don't. In addition, they ignore the fact that more than 55 percent of licensees arrested for violent crimes are cleared of the crimes for which they are arrested. Most tellingly, when the arrest rates of Texas' concealed carry holders are compared with those of the general population, licensees are found to be more law-abiding than the average person. In an unpublished report, engineering statistician William Sturdevant found that concealed carry licensees had arrest rates far lower than the general population for every category of crime. For instance: Licensees were 5.7 times less likely to be arrested for violent offenses than the general public - 127 per 100,000 population versus 730 per 100,000. Licensees were 14 times less likely to be arrested for nonviolent offenses than the general public - 386 per 100,000 population versus 5,212 per 100,000." |
| **17.** | **Name:** *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction* <br> **Author(s):** David B. Kopel <br> **Institution/Publisher:** Connecticut Law Review <br> **Link:** https://davekopel.org/2A/LawRev/Kopel-School-Zones.pdf |

| No. | Study |
|---|---|
|  | **Excerpt:** "Although there is debate on whether there is a statistically significant crime reduction as a result of "Shall Issue" laws, there is unanimity that there is no statistically significant increase in crime caused by the acts of the licensees. There is also extensive evidence of particular cases in which licensees have used their permitted handguns to save their own lives, or the lives of other people, or to thwart other serious violent crimes… since 2003 [in Minnesota], we have 56,919 [concealed handgun] permitees and forty handgun crimes, or about one such crime per 1423 permitees.  It would be difficult to find a significant demographic group in the United States with a lower rate of handgun crimes." |
| 18. | **Name:** *The Effect of Right-to-Carry Laws on Crime Rates* |
|  | **Author(s):** Gary Kleck |
|  | **Institution/Publisher:** Florida State University-College of Criminology and Criminal Justice |
|  | **Link:** https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3810840 |
|  | **Excerpt:** "Thus, carry permit holders could not have committed more than 3/100ths of one percent of Florida's violent crimes. And even if these 35-gun crimes were spread out over 35 different permit holders, it would still mean that less than 4/1000th of one percent of active Florida carry permit holders committed any kind of gun crime. In sum, gun crimes committed by carry permit holders are so extremely rare that it is virtually impossible that they could exert a measurable effect on rates of AAs or other violent crimes." |

The second question, the reductive effect of concealed-carry laws on violent crime, is complicated. Should the Court consider such a question in its assessment of Plaintiffs' Motion for Preliminary Injunction, the referenced research provides a thorough background of each side's principal scientific contentions. That said, the thrust of this brief is *not* to tell the Court that concealed-carry laws reduce crime. It is to explain, as set forth in Section I(A), that public-facing commentary *so often* gets it wrong when hyperbolically discussing the impact of concealed-carry laws on crime. The fact is, despite caterwauling to the contrary, concealed-carry laws appear to have no appreciable impact on violent crime. It is for that reason that Judge Posner, in a 2012 ruling on Illinois' then-sweeping ban on carrying in public, opined that:

"The theoretical and empirical evidence (which overall is inconclusive) is consistent with concluding that a right to carry firearms in public may promote self-defense. *Illinois had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety*. It has failed to meet this burden."

*Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (emphasis added). Things have not

changed, appreciably. Given this, any policy-based reason to uphold the CCIA's

constitutionality falls by the way side, meaning the public's interest would be squarely

served via the Court granting Plaintiff's Motion for Preliminary Injunction.

## CONCLUSION

The Court should grant Plaintiffs' Motion for Preliminary Injunction.

Dated August 15, 2022.

Respectfully submitted,

s/

Robert S. Lafferrandre
Oklahoma Bar No. 11897
John C. Lennon
Oklahoma Bar No. 30149
**PIERCE COUCH HENDRICKSON
BAYSINGER & GREEN, L.L.P**
1109 North Francis Avenue
Oklahoma City, Oklahoma 73106
Telephone: (405) 235-1611
Facsimile: (405) 235-2904
jlennon@piercecouch.com

ATTORNEYS FOR AMICUS CURIAE
NATIONAL POLICE ASSOCIATION

## CERTIFICATE OF SERVICE

The attached **Brief Of Amicus Curiae National Police Association In Support Of Plaintiffs' Prayers For Declaratory And Injunctive Relief** was filed as **Exhibit 1** to Amicus Curiae National Police Association's **Motion for Leave to File Brief as Amicus Curiae in Support of Plaintiffs** on August __, 2022, via the CM/ECF system for filing. Based on the records currently on file, a Notice of Electronic Filing will be distributed to the following counsel of record:

Stephen D. Stamboulieh
N.D.N.Y. Bar Roll No. 520383
**STAMBOULIEH LAW, PLLC**
P.O. Box 428
Olive Branch, Mississippi 38654
Telephone: (601) 852-3440
stephen@sdslaw.us

*- and -*

Robert J. Olson
Virginia Bar No. 82488
**WILLIAM J. OLSON, PC**
370 Maple Avenue West, Suite 4
Vienna, Virginia 22180
Telephone: (703) 356-5070
wjo@mindspring.com

Attorneys for Plaintiffs

Michael G. McCartin
Assistant Attorney General
N.D.N.Y. Bar Roll No. 511158
**ATTORNEY GENERAL'S OFFICE
STATE OF NEW YORK**
The Capitol
Albany, New York 12224
Telephone: (518) 776-2620
michael.mccartin@ag.ny.gov

- and -

James M. Thompson
Special Counsel
N.D.N.Y. Bar Roll No. 703513
**ATTORNEY GENERAL'S OFFICE
STATE OF NEW YORK**
28 Liberty Street
New York City, New York 10005
Telephone: (212) 416-6556
james.thompson@ag.ny.gov

Attorneys for Defendant
Kevin P. Bruen

s/
John C. Lennon