**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

---

IVAN ANTONYUK, GUN OWNERS OF
AMERICA, INC., GUN OWNERS
FOUNDATION, and GUN OWNERS OF
AMERICA NEW YORK, INC.,

                    Plaintiffs,

-v.-

KEVIN P. BRUEN, in his Official Capacity as
Superintendent of the New York State Police,

                    Defendant.

---

Case No.  1:22-cv-00734-GTS-CFH


**BRIEF OF GIFFORDS LAW
CENTER TO PREVENT GUN
VIOLENCE AS *AMICUS CURIAE*
IN SUPPORT OF DEFENDANT'S
OPPOSITION TO MOTION FOR
A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I.      Statement of Interest of the *Amicus Curiae* ........................................................ 1

II.     Introduction.......................................................................................................... 2

III.    Argument .............................................................................................................. 2

        A.      The Efficacy of Gun Laws in Accomplishing Their Purpose Is Relevant
                Under the *Bruen* Standard.......................................................................... 2

        B.      Social Science Shows New York's Law Effectively Accomplishes the
                Underlying Public Safety Purpose. ............................................................. 6

                1.      Stronger Gun Regulations Reduce Violent Crime and Enhance
                        Public Safety. ................................................................................. 6

                2.      Firearms Are Rarely Used in Self-Defense in Public Settings and
                        More People Carrying Guns in Public Undermines Public Safety. ............ 9

                3.      Social Science Supports the Conclusion that New York's Law Will
                        Promote Public Safety................................................................... 13

IV.     Conclusion ......................................................................................................... 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018)................................................................................................1

*District of Columbia v. Heller*,
  554 U.S. 570 (2008).............................................................................................................1

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  417 F. Sup. 3d 747 (W.D. Va. 2019) ..................................................................................1

*Libertarian Party v. Cuomo*,
  970 F.3d 106 (2d Cir. 2020)................................................................................................1

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010).............................................................................................................1

*Md. Shall Issue v. Hogan*,
  353 F. Sup. 3d 400 (D. Md. 2018) .......................................................................................1

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)................................................................................... *passim*

*Peruta v. County of San Diego*,
  824 F.3d 919 (9th Cir. 2016) .............................................................................................1

*Stimmel v. Sessions*,
  879 F.3d 198 (6th Cir. 2018) .............................................................................................1

**Statutes**

1763–1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game,
  and to Prevent Trespassing with Guns, ch. 539, § 10 ..................................................4

1784–1785 N.Y. Laws 152, An Act to Prevent Firing of Guns and Other Firearms
  within this State, on Certain Days Therein Mentioned, ch. 81. ...................................4

A Law for the Better Securing of the City of New York from the Danger of Gun
  Powder (1763)..............................................................................................................4

Ordinances of the City of Pittsburgh, An Act to Suppress the Disorderly Practice
  of Firing Guns, etc. on the times therein mentioned, § 1 (1774)................................4

Proceedings of the Conventions of the Province of Maryland Held at the City of
  Annapolis, in 1774, 1775, & 1776, https://bit.ly/3BKRH4N ....................................4

**Other Authorities**

Abhay Aneja et al., *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (Stan. L. and Econ. Olin Working Paper No. 461, 2014)..................................................................13

Arlin J. Benjamin, Jr. et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature* PERSONALITY & SOC. PSYCH. REV. 22(4) (2018) ...............................................................................................................12

Brad J. Bushman, et al., *The Weapons Effect on Wheels: Motorists Drive More Aggressively When There Is a Gun in the Vehicle* 73 J. EXPERIMENTAL SOC. PSYCH. 82-85 (2017) ..........................................................................................12

Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034, 2037 (Nov. 2009)...................................10, 11

Daniel W. Webster et al., *Firearms on College Campuses: Research Evidence and Policy Implications* (Oct. 15, 2016)............................................................8

David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007–2011* 79 PREVENTIVE MED. 22, 23 (Oct. 2015)...........................................................10

Emily Badger, *More Guns, Less Crime? Not Exactly*, WASH. POST (July 29, 2014)....................13

*Firearms and Violence—A Critical Review* 137 (Charles F. Wellford et al. eds., 2004) ..............................................................................................................13

Gun Industry's Advertising: Effective, Deadly, and Actionable, Petition to the Federal Trade Commission (Apr. 7, 2022) .........................................................9

Ian Ayres & John Donohue, *Shooting Down the 'More Guns, Less Crime' Hypothesis*, 55 STAN. L. REV. 1193, 1230 (2003)....................................................13

John Donohue et al., *More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in U.S. Cities* (Nat'l Bureau of Econ. Res. Working Paper No. 30190, June 2022)......................................6

John R. Lott, Jr., *More Guns Less Crime* (3d ed. 2010) ................................................12

Joshua Rhett Miller, *9-Year-Old Houston Girl Dies after Being Shot by Robbery Victim*, N.Y. POST (Feb. 16, 2022)..........................................................................11

Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States* AM. J. PUB. HEALTH, Dec.  2017.....................................9

Mitchell L. Doucette et al., *Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020*, J. URBAN HEALTH (2022)......................................................................................8

Rashna Ginwalla et al., *Repeal of the Concealed Weapons Law and Its Impact on Gun-Related Injuries and Deaths*, 76 J. TRAUMA ACUTE CARE SURG. 569, 569, 573 (2014)......................................................................................................8

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*......................................................5

*Teen Crash Victim Shot, Killed Bystander Trying to Help at Lowell Intersection, Police Say*, WSOC TV (Aug. 10, 2022) ...............................................................11

Violence Policy Center, *Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use* 7 (June 2015).........................................................................10

William English, *2021 National Firearms Survey* (Geo. McDunough Sch. of Bus. Res. Paper No. 3887145, July 14, 2021).............................................................7

William Saletan, *Friendly Firearms*, SLATE, Jan. 11, 2011 ..........................................12

I.      **Statement of Interest of the *Amicus Curiae***

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is

a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence

survivors, and others who seek to reduce gun violence and improve the safety of their

communities.  The organization was founded more than a quarter-century ago following a gun

massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after

joining forces with the gun-safety organization led by former Congresswoman Gabrielle

Giffords.  Today, through partnerships with gun violence researchers, public health experts, and

community organizations, Giffords Law Center researches, drafts, and defends the laws, policies,

and programs proven to effectively reduce gun violence.  Giffords Law Center also advocates for

the interests of gun owners and law enforcement officials who understand that Second

Amendment rights have always been consistent with gun safety legislation and community

violence prevention strategies.

Giffords Law Center has contributed technical expertise and informed analysis as an

*amicus* in numerous cases involving firearm regulations and constitutional principles affecting

gun policy.  *See, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022);

*McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570

(2008); *Libertarian Party v. Cuomo*, 970 F.3d 106 (2d Cir. 2020).  Several courts have cited

research and information from Giffords Law Center's *amicus* briefs in Second Amendment

rulings.  *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 910 F.3d 106, 121-22 (3d

Cir. 2018); *Stimmel v. Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta v. County of

San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring); *Hirschfeld v.

Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 754, 759 (W.D. Va.

2019); *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 403-05 (D. Md. 2018).

1

## II.     Introduction

As the Supreme Court has held, law-abiding, responsible citizens have a right to carry guns, but that right is not unlimited.  In its recent decision, *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court explained courts should undertake a historical analysis when considering regulations that may impinge upon the Second Amendment.  Recognizing that modern regulations often will not have a corresponding "historical twin," the Court endorsed an approach that allows for analogical reasoning, specifically one that examines the "hows" and "whys" of modern and historical gun regulations to determine if they are part of the nation's history and tradition.  As explained below, social science research can be critical evidence that courts may consider when analyzing these hows and whys.  And, the social science research is clear:  More guns in public spaces make us less safe.  This confirms that laws limiting public carry, like the one in question here, are driven by a motivation to keep the public safe, a motivation that has deep roots in the historical tradition of gun regulations in this country.  This social science research, set out below, supports the conclusion that New York's law is constitutional.

## III.     Argument

### A.     The Efficacy of Gun Laws in Accomplishing Their Purpose Is Relevant Under the *Bruen* Standard.

In *Bruen*, the Supreme Court articulated the standard for assessing regulations that may impinge upon the Second Amendment.  Under *Bruen*, if a regulation involves conduct that is covered by the Second Amendment's plain text, the government must demonstrate that the regulation is "consistent with this Nation's historical tradition," to justify the regulation.  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022).  The Court

emphasized that "historical analysis can be difficult," and that the analysis may require "nuanced

judgments about which evidence to consult and how to interpret it."  *Id.* at 2130.

The Court explained that there was no need for a modern regulation to be the "historical

twin" of a regulation in place at the time of the founding, and that lower courts should engage in

analogical reasoning to determine if a regulation is consistent with the Nation's historical

tradition.  *Id.* at 2133.  The Court gave two examples of metrics lower courts could use to

determine whether a modern regulation was "relevantly similar" to a historical regulation—the

"how and why" of the regulation's effect on the Second Amendment.  *Id.* at 2132–33.  While the

Court noted that these were not the only considerations the lower courts could examine, their

inclusion in the Court's opinion, and their role in pointing the analysis toward consideration of

the motivations behind regulations and the effects of regulations, must be significant.

Of further significance, *Bruen* makes clear that many regulations that implicate Second

Amendment rights will survive scrutiny under the decision's analytical framework.  The majority

opinion emphasized that the "analogical reasoning under the Second Amendment is neither a

regulatory straightjacket nor a regulatory blank check," and that many common regulations, such

as restrictions on guns in sensitive places, can continue under *Bruen*.  *Id.* at 2133–34.  Likewise,

the concurrences emphasized the Court's narrow focus on the specific law at issue.  Justice Alito

noted that the opinion "decides nothing" about who may purchase a gun, what requirements must

be met to purchase a gun, or the kinds of guns that can be available for purchase.  *Id.* at 2757

(Alito, J. concurring).  Justice Kavanaugh, joined by Chief Justice Roberts, further clarified that

states are still permitted to impose licensing requirements so long as they are objective.  *Id.* at

2162–63 (Kavanaugh, J. concurring).  As Justice Kavanaugh summarized, "[p]roperly

3

interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J. concurring).

Thus, when analyzing whether a gun regulation is one of the variety of regulations permitted under the Second Amendment, a court may consider the motivations, methods, and effects—the hows and whys—of said regulation. Many gun regulations are passed with the motivation of public safety.[1] This was true at the time of the Nation's founding, as reflected by numerous contemporary gun regulations. *See, e.g.*, "A Law for the Better Securing of the City of New York from the Danger of Gun Powder" (1763) https://bit.ly/3oZ9Vrw (setting storage requirements due to the danger of gun powder); 1763–1775 N.J.  Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 https://bit.ly/3A3lg00 ("Whereas a *most dangerous* Method of setting Guns has too much prevailed in this Province . . . .") (emphasis added); Ordinances of the City of Pittsburgh, An Act to Suppress the Disorderly Practice of Firing Guns, etc. on the times therein mentioned, § 1 (1774), https://bit.ly/3p2y7cE (preventing firing guns in urban setting because of the danger it posed to the public); Proceedings of the Conventions of the Province of Maryland Held at the City of Annapolis, in 1774, 1775, & 1776, https://bit.ly/3BKRH4N (requiring permission from the "*council of safety*" to transport guns out of the province) (emphasis added); 1784–1785 N.Y. Laws 152, An Act to Prevent Firing of Guns and Other Firearms within this State, on Certain Days Therein Mentioned, ch. 81., https://bit.ly/3QpYRzw (noting that "*great dangers have arisen*" due to the "pernicious practice of firing guns") (emphasis added).

---

[1] *See, e.g.*, Defendant's Opposition to Motion for Preliminary Injunction at 3 (noting a "long line of Anglo-American precedents . . . permitting the disarmament of dangerous persons in the interest of public safety"); *id.* at 51 (highlighting the "centuries-long Anglo-American tradition of protecting public safety by banning guns in vulnerable places").

Moreover, there were many laws that spelled out licensing schemes and restricted public carry throughout the states during Reconstruction, another timeframe the *Bruen* court noted was relevant for its historical analysis. *Bruen*, 142 S. Ct. 2111 at 2138. Dozens of these types of laws were enacted during this time, affecting millions of Americans. *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 169 (2022). These laws were enacted with a goal of protecting public safety and were a direct response to the "newly-rising levels of gun violence." *Id.* at 168.

When analogizing modern regulations to historic regulations, courts may look to see if the regulations share a common "why." That is, whether the historic regulation and modern regulation are "comparably justified." *Bruen*, 142 S. Ct. at 2118. Social science research can be useful evidence that the courts, in their discretion, may consider when determining whether the methods of a regulation point to a "why" with a historical analogue, like promoting public safety. Examining social science alone may not be the end-all, be-all of the court's analysis, but social science research is something the court may properly consider in its "nuanced judgment about which evidence to consult and how to interpret it."

Ultimately, *Bruen* held that objective regulations implicating the Second Amendment's protections are permissible if they set out objective standards and can be analogized to historical gun laws. *Id.* at 2133–34. It further held that when analogizing modern laws to historical laws, it is appropriate for courts to consider the "why" behind both the modern and historical regulations. The foundational justification—or "why"—underpinning both historical gun

regulations and the regulation before this Court is public safety.  This Court may examine social

science research to assess New York's law under *Bruen's* "why" and "how" analogical inquiry.[2]

> **B.**     **Social Science Shows New York's Law Effectively Accomplishes the Underlying Public Safety Purpose.**

For decades, academic researchers have studied the effects of gun possession on public

safety.  Though the details of the studies and their specific focuses vary, one consistent theme

has emerged from the reliable scientific data available:  more guns in public places make us less

safe, not more safe.  This social science consensus illustrates that New York's law at issue here,

which specifically limits the ability to carry guns in public, is driven by public safety, the same

motivation—the why—that inspired regulations on guns at the founding, during Reconstruction,

and into the modern era.

> **1.**     **Stronger Gun Regulations Reduce Violent Crime and Enhance Public Safety.**

Reliable studies consistently demonstrate that lenient right-to-carry ("RTC") laws are

associated with increased violent crime and homicide rates.[3]  Indeed, "the predominant

conclusion from studies in the last five years has been that RTC laws increase violent crime."[4]

---

[2] Even *amicus curiae* for Plaintiffs, the National Police Association, implicitly acknowledges social science research is relevant.  Its *amicus* brief focuses primarily on describing (albeit flawed) social science studies.  Brief of *Amicus Curiae* National Police Association in Support of Plaintiffs' Prayers for Declaratory and Injunctive Relief (Aug. 16, 2022) ("Nat'l Police Ass'n Br.").

[3] It is important to note that reliable and respected social science research, like research in all scientific disciplines, involves peer-reviewed studies with methodologies that can be replicated. Neither the English study nor the English survey discussed by *amicus* the National Police Association is peer reviewed, and neither has been replicated.  Further, of the eighteen studies listed on pages 14–20 of the National Police Association's brief, only one is from a medical journal, and was published 18 years ago.  Five more of these studies (like English's research) are hosted on the SSRN database, meaning they can be posted by anyone and are not necessarily published in any journal, and thus are not peer reviewed.

[4] *See* John Donohue et al., *More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in U.S. Cities*, at 1 (Nat'l Bureau of Econ. Res.

Stanford professor John Donohue's work in this area shows persistent increases in violent crime rates in states with more permissive licensing regimes.  In a recent June 2022 study analyzing a sample drawn from 47 major U.S. cities, Donohue and his colleagues concluded that right-to-carry gun laws "increase overall firearm violent crime as well as the component crimes of firearm robbery and firearm aggravated assault by remarkably large amounts with an attendant finding of no sign of any benefit from RTC laws."[5]  As *amicus* the National Police Association implies, some academics took issue with methodologies Donohue employed in a 2019 study. Nat'l Police Ass'n Br. at 11, 17 ("Purists in statistical analysis object with some cause to some of methods employed both by Ayres and Donohue").  Importantly, Donohue's June 2022 study confirms the findings of his 2019 study via a different analytic methodology, neutralizing the criticism of his prior methodology and providing independent support for his conclusion that lenient gun laws lead to increases in violent crime.[6]

In particular, Donohue's study found that these lenient RTC laws led to 29 and 32 percent increases in firearm violent crime and firearm robbery respectively.[7]  The study found a

---

Working Paper No. 30190, June 2022).  *Amicus* the National Police Association claims the contrary, and points to a 2021 survey conducted by Georgetown professor William English on the demographics of gun ownership and use.  *See* Nat'l Police Ass'n Br., at 11 (citing William English, *2021 National Firearms Survey* (Geo. McDunough Sch. of Bus. Res. Paper No. 3887145, July 14, 2021)).  However, English's survey does not contain any statistical analysis regarding the causal relationship between gun ownership and crime, and instead merely provides a factual overview of gun ownership data as of 2021.  As such, it is less relevant for understanding the public safety justifications behind New York's law because it does not provide an explanation for how gun ownership actually impacts public safety.

[5] Donohue et al, *supra* note 4 at 25.

[6] *See id.*, at 1 (reporting that, when compared to the 2019 study, "[t]he results are virtually identical:  the static estimate shows that RTC laws increase violent crime by 9.25 percent ($p < 0.01$), and the event-study analysis . . . again highlights the validity of the model and buttresses the causal finding that RTC laws elevate violent crime").

[7] *See id.*, at 3, 25.

"massive 35 percent increase in gun theft, with further crime stimulus flowing from diminished police effectiveness."[8]  The study observed that right-to-carry laws "cause a roughly 13 percent decline in the rates that police clear violent crime, suggesting that [right-to-carry] laws strike at the very heart of law enforcement's abilities to address criminal conduct."[9]  Moreover, lenient gun laws make it more likely that interactions between the public and the police will become more violent.  A recent study published by researchers at Johns Hopkins University found that states moving to more lenient, permitless concealed carry regimes experience an almost 13% increase in officer-involved shootings.[10]  Further compounding the danger posed by more guns in public, and as discussed in more detail below, social science research confirms that guns are rarely used in self-defense in public settings, and can cause harm on innocent bystanders when they are.[11]  Ultimately, Donohue and his colleagues conclude that "any such [deterrent] benefits are substantially offset by the crime-enhancing impacts of increased gun carrying."[12]

The recent research by Donohue is supported by additional social science research that confirms lenient gun laws increase violent crime.[13]  For example, in December 2017, researchers

---

[8] *Id.* at 27.

[9] *Id.* at 3.

[10] *See* Mitchell L. Doucette et al., *Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020*, J. Urban Health (2022)

[11] *See infra* I.2.

[12] Donohue et al., *supra* note 4 at 2.

[13] *See, e.g.*, Rashna Ginwalla et al., *Repeal of the Concealed Weapons Law and Its Impact on Gun-Related Injuries and Deaths*, 76 J. Trauma Acute Care Surg. 569, 569, 573 (2014), https://www.academia.edu/10480999 (lax concealed carry permitting laws are associated with increased gun fatalities); Daniel W. Webster et al., *Firearms on College Campuses: Research Evidence and Policy Implications* 8 (Oct. 15, 2016) (discussing data on 111 high-fatality mass shootings from 1966–2015, finding that in the 41 states with RTC laws or no concealed carry regulations, the average death toll in high-fatality mass shootings increased following the implementation of an RTC law).

at Boston University and Duke University released the first-ever analysis of the impact of

concealed carry laws on handgun and long-gun homicide rates.[14]  Their study concluded that

permissive right-to-carry concealed carry laws were significantly associated with higher crime

rates—in particular, 6.5 percent higher total homicide rates, 8.6 percent higher firearm-related

homicide rates, and 10.6 percent higher handgun-specific homicide rates, compared to states

with stronger regulations.[15]  This robust, settled body of evidence confirms that, just as

governments at the founding and during Reconstruction sought to protect their citizens by

restricting the public use of guns, New York's licensing law promotes public safety by protecting

New York citizens from statistically-proven increases in violent crime and firearm homicide.

### 2. Firearms Are Rarely Used in Self-Defense in Public Settings and More People Carrying Guns in Public Undermines Public Safety.

Further, regulating public carry is motivated by public safety.  Contrary to popular

belief,[16] carrying firearms in public for self-defense produces no safety benefits and likely

exposes gun carriers to greater harm.  Recent research confirms that crime victims rarely use

guns in self-defense in public settings and that persons carrying firearms are, in fact, no safer

than other crime victims.  For one, the English study cited by *amicus* the National Police

Foundation confirms that the vast majority of defensive incidents occurred within the gun

---

[14] Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, AM. J. PUB. HEALTH, Dec.  2017, at 1.

[15] *Id.*

[16] For decades, the gun industry has been deceptively marketing firearms as a safe means of protection.  *See generally*, The Gun Industry's Advertising: Effective, Deadly, and Actionable, Petition to the Federal Trade Commission (Apr. 7, 2022), available at https://firearmsaccountability.org/FTCPetition.pdf.

owner's home or on their property, rather than in a public setting.[17]  A 2015 study found that

victims of violent crimes use firearms in self-defense in less than one percent of all criminal

incidents.[18]  And, compared to other self-protective actions that do not involve a firearm, data

from the National Crime Victimization Surveys provide little evidence that defensive gun use is

beneficial in reducing the likelihood of injury or property loss.[19]  A 2019 analysis of data from

the FBI's Uniform Crime Reporting program confirmed that while guns can be, and sometimes

are, successfully used for self-defense, these cases are the exception, rather than the rule.[20]

 In fact, one study concluded that carrying a firearm may *increase* a victim's risk of

firearm injury during the commission of a crime.  In an analysis of 677 shootings over a two-

and-a-half-year period in Philadelphia, researchers found, after adjusting for confounding

factors, that individuals carrying a gun were 4.46 times more likely to be shot in an assault than

those not carrying a gun, and they were more than 4.23 times as likely to be fatally shot.[21]  Even

---

[17] *See* English, at 1 ("Approximately a quarter (25.2%) of defensive incidents occurred within the gun owner's home, and approximately half (53.9%) occurred outside their home, but on their property.")

[18] *See* David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007–2011*, 79 PREVENTIVE MED. 22, 23 (Oct. 2015).

[19] *See id.*, at 23-24.

[20] *See* Violence Policy Center, *Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use* 7 (June 2015), https://www.vpc.org/studies/justifiable17.pdf ("The reality of self-defense gun use bears no resemblance to the exaggerated claims of the gun lobby and gun industry. . . . When analyzing the most reliable data available, what is more striking is that in a nation of more than 300 million guns, how *rarely* firearms are used in self-defense.").

[21] *See* Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034, 2037 (Nov. 2009), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2008.143099.

in assaults where the victim had at least some opportunity to resist, individuals carrying a gun were 5.45 times more likely to be shot than those not carrying a gun.[22]

To the extent members of the public may attempt to use a firearm in self-defense, it is unlikely they possess the skills to do so safely.  As a 2016 report from public health experts at Johns Hopkins University observed, "[s]hooting accurately and making appropriate judgments about when and how to shoot in chaotic, high-stress situations requires a high level of familiarity with tactics and the ability to manage stress under intense pressure."[23]  Accuracy "is influenced by distance, the opponent shooter's actions, lighting, use of cover, type of gun, and more."[24]  The report confirmed that most people simply do not have the tactical ability to successfully use a gun for self-defense, particularly in urban or densely populated areas, and may end up "wounding or killing innocent victims" if they attempt to do so.[25]  Such incidents occur with tragic regularity.[26]

Moreover, regardless of their degree of tactical training, recent examples demonstrate that when individuals carry guns in public, there is an increased risk that they will wield their

---

[22] *See id.*

[23] *See* Webster et al.*, supra* note 13, at 10.

[24] *Id.*

[25] *Id.*

[26] *See Teen Crash Victim Shot, Killed Bystander Trying to Help at Lowell Intersection, Police Say*, WSOC TV (Aug. 10, 2022), https://www.wsoctv.com/news/local/lowell-police-investigate-wreck-deadly-shooting-busy-intersection-suspect-custody/AG2C7SJNGNDU7PR2U4XDI2PUTQ/ (reporting that a bystander was fatally shot by a car crash victim when he opened a car door to render aid); Joshua Rhett Miller, *9-Year-Old Houston Girl Dies after Being Shot by Robbery Victim*, N.Y. POST (Feb. 16, 2022), https://nypost.com/2022/02/16/9-year-old-dies-after-being-shot-by-houston-robbery-victim/(reporting that a 9-year-old girl was fatally shot by a robbery victim who opened fire on a vehicle that he thought contained the robber, but actually contained an innocent family of five).

firearms in situations that actually place themselves and others in greater danger.  Gun carriers—

even those with training—have injured and killed innocent people after mistakenly perceiving a

threat.[27]  And the mere presence of a gun can also exacerbate everyday disputes into lethal

confrontations.  In the case of road rage, for example, a 2017 study from researchers at The Ohio

State University found that people drove more aggressively when a gun was present in their

car.[28]  This is consistent with a broader body of behavioral research demonstrating that merely

seeing a weapon can increase aggressive thoughts and hostile appraisals, and possibly even

aggressive behavior.[29]

Thus, the body of reliable social science evidence demonstrates both that (1) guns are

unlikely to be used in self-defense, and (2) if guns are used in self-defense, they are likely to be

used in a dangerous way.  Despite this scientific consensus, gun rights activists often point to

discredited arguments made by John Lott, an economist, who claims loose concealed carry

regulations reduce violent crime.[30]  But in fact, Lott's conclusion that RTC laws are associated

---

[27] *See, e.g.*, *Police: Man Arrested for Shooting Uber Driver Thought He Was Helping*, FOX 4 NEWS (May 16, 2017), https://www.foxla.com/news/police-man-arrested-for-shooting-uber-driver-thought-he-was-helping.amp; William Saletan, *Friendly Firearms*, SLATE, Jan. 11, 2011, http://www.slate.com/articles/health_and_science/human_nature/2011/01/friendly_firearms.html

[28] *See* Brad J. Bushman, et al., *The Weapons Effect on Wheels: Motorists Drive More Aggressively When There Is a Gun in the Vehicle*, 73 J. EXPERIMENTAL SOC. PSYCH. 82-85, at 4 (2017), https://crimeresearch.org/wp-content/uploads/2017/09/The-weapons-effect-on-wheels.pdf (concluding "the mere presence of a gun in a vehicle can cause motorists [to] drive more aggressively")

[29] *See* Arlin J. Benjamin, Jr. et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, PERSONALITY & SOC. PSYCH. REV. 22(4) (2018), https://www.researchgate.net/publication/319878868_Effects_of_Weapons_on_Aggressive_Thoughts_Angry_Feelings_Hostile_Appraisals_and_Aggressive_Behavior_A_Meta-Analytic_Review_of_the_Weapons_Effect_Literature

[30] *See* John R. Lott, Jr., *More Guns Less Crime* (3d ed. 2010).

with lower crime rates has been widely rejected.[31]  Lott's research is infamous because its core

conclusion has been debunked by researchers who were either unable to replicate his findings[32]

or reached opposite conclusions,[33] or who believe Lott's model—which relies on probabilistic

statistical assumptions—is unreliable and may be used to achieve almost any desired outcome.[34]

Gun policy experts now consider Lott's research to be "completely discredited,"[35] and, as

discussed above, recent research shows the very opposite of Lott's hypothesis is true:  stronger

restrictions on public carry reduce crime and enhance public safety.  In any event, outlier

activists and questionable research methodologies do not change the conclusion reached by

reliable study after reliable study:  more guns in public make us less safe.

### 3.   Social Science Supports the Conclusion that New York's Law Will Promote Public Safety

As explained above, social science demonstrates that more guns do not make the public

safer—in fact, it tends to have the opposite effect.  New York's Concealed Carry Improvement

Act takes steps to promote public safety by defining sensitive locations where guns are not

permitted, requiring an interview with a licensing agency before a concealed carry permit will be

---

[31] *See, e.g.*, Ian Ayres & John J. Donohue III, *Shooting Down The More Guns, Less Crime Hypothesis*, 55 STAN. L. REV. 1193, 1284 (2003), http://digitalcommons.law.yale.edu/fss_papers/1241("We take these results to be generally devastating to Lott's 'More Guns, Less Crime' hypothesis"); Emily Badger, *More Guns, Less Crime? Not Exactly*, WASH. POST (July 29, 2014), https://www.washingtonpost.com/news/wonk/wp/2014/07/29/more-guns-less-crime-not-exactly/.

[32] The National Research Council disagreed with Lott's central claim and noted that in fact, "it is at least possible that errors" in the crime data Lott used may account for his results. *Firearms and Violence—A Critical Review* 137 (Charles F. Wellford et al. eds., 2004), https://www.nap.edu/read/10881/chapter/8#137.

[33] Abhay Aneja et al., *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (Stan. L. and Econ. Olin Working Paper No. 461, 2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2443681.

[34] *See* Ayres & Donohue, *supra* note 31 at 1230.

[35]  *See* Badger, *supra* note 31.

issued, mandating firearm safety training, and setting storage requirements, among other measures.  These steps both limit the ability to carry guns in certain areas, in line with the social science data that shows guns in public pose dangers, and ensure that those who do carry guns in public are doing so safely, in line with concerns raised in the social science data that not all who carry publicly do so with the proper training.  In passing this law, New York has acted in the interest of public safety, just as governments have done since the founding.

IV.    **Conclusion**

Under *Bruen*, when evaluating a law that may impinge upon the Second Amendment, courts will analyze whether the modern regulation has a historical analogue.  The Supreme Court identified two considerations for courts to weigh when determining whether modern and historic regulations are analogues—the how and the why of the respective regulations.  The Supreme Court also noted that courts will have discretion in the types of evidence they consider to determine these hows and whys.

Gun regulations, both at the time of the founding, and at the time of Reconstruction, were motivated by public safety concerns.  For decades, social scientists have studied the effect of guns on public safety, and have found that more guns in public make people less safe.  Thus, New York's law is motivated by the same why—public safety—as the historic regulations relevant under the *Bruen* analysis.  Given a court's broad discretion to determine the types of evidence that would aid in their historical analysis under *Bruen*, this Court, in reviewing Plaintiffs' Motion for a Preliminary Injunction, may properly consider social science evidence to evaluate this why.

Dated: New York, NY
        August 17, 2022               COVINGTON & BURLING LLP

By:   /s/ Andrew Leff
Andrew Leff (Bar Roll No. 702871)
620 Eighth Avenue
New York, NY 10018
Tel: (212) 841-1297
aleff@cov.com

*Attorney for Amicus Curiae*

OF COUNSEL
Peter Chen*
Covington & Burling LLP
3000 El Camino Real
Palo Alto, CA 94306
Tel: (650) 632-4700
pchen@cov.com

Simon J. Frankel*
Covington & Burling LLP
Salesforce Tower
415 Mission St Suite 5400
San Francisco, CA 94105
Tel: (415) 591-6000
sfrankel@cov.com

Allison Hawkins*
Covington & Burling LLP
One CityCenter
850 10th St NW
Washington, DC 20001
Tel: (202) 662-6000
ahawkins@cov.com

Nicholas Mendez*
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
Tel: (212) 841-1000
nmendez@cov.com

*Attorneys for Amicus Curiae*
*not admitted to this Court