**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IVAN ANTONYUK, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, and GUN OWNERS OF AMERICA NEW YORK, INC., | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | Civil Action No. 1:22-cv-00734-GTS-CFH |
| v. | ) ) | |
| KEVIN P. BRUEN, in his Official Capacity as Superintendent of the New York State Police, | ) ) ) | |
| | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Introduction.................................................................................................................................1

I.      Plaintiffs Have Standing to Pursue Their Claims.............................................................2

        A.  GOA/GOF/GOA-NY Have Standing............................................................................2

        B.  Plaintiff Antonyuk Has Standing.................................................................................4

        C.  Defendant Kevin P. Bruen is the Proper Party...........................................................8

        D.  The Eleventh Amendment Does Not Bar Suit.............................................................9

II.     Defendants' Defense of the CCIA Confirms Plaintiffs' Likelihood of Success on the Merits..................................................................................................................................9

        A.  *Bruen* Did Not "Specifically Endorse" the CCIA's "Good Moral Character" Requirement.................................................................................................................9

        B.  New York Has Failed to Support Its Good Moral Character Requirement.......................12

        C.  The Racist Pedigree of the "Good Moral Character" Requirement...................................16

            1.  Naturalization and Professional Licensure.................................................................16

            2.  Good Moral Character and Enumerated Constitutional Rights....................................18

            3.  The Discretion Involved in Determining "Good Moral Character."...........................21

        D.  Character References, Interview, Divulging Family, Friends, and Associates.................22

        E.  Defendant's Justification for Access to Social Media is Unpersuasive............................25

        F.  Sensitive Locations......................................................................................................30

        G.  Restricted Locations (Private Property)........................................................................36

        H.  The CCIA's Onerous Training Requirements Violate the Second Amendment..............38

III.    Plaintiffs Meet the Remaining Elements for Injunctive Relief.........................................40

**Introduction**

In his 65-page filing, Defendant has adopted a see-what-sticks approach in responding to Plaintiffs' motion for a preliminary injunction. First, offering a smorgasbord of theories, Defendant claims that none of the Plaintiffs has standing. Then, Defendant attempts to justify the CCIA on the outlandish theory that the Supreme Court in *Bruen* somehow expressly validated thousands of laws, across dozens of states, dealing with concealed carry licensure, none of which were subject to review in that case. Finally, Defendant attempts to validate the CCIA's enactments by reference to a host of alleged historical analogues, each one more racist, bigoted, and patently unconstitutional than the last, many from irrelevant historical periods, and which (at best) represent one or two outlier jurisdictions with idiosyncratic laws that were neither widely adopted nor generally accepted. Nevertheless, Defendant argues, past constitutional violations "based on racial or religious animus" justify New York's present day constitutional violations. For the reasons alleged in Plaintiffs' complaint, motion, and below, the CCIA is patently and uniquely unconstitutional, and should be enjoined.[1]

---

[1] As an initial matter, Defendant claims that Plaintiffs "provided this Court the wrong standard" for preliminary injunctions, on the theory that that Plaintiffs seek a "mandatory" injunction because, supposedly, the relief they seek will somehow "alter[] the status quo." *See* Opp. 9 and n.1. To the contrary, Plaintiffs seek to *preserve* the status quo, as existing when their case was filed, up until the CCIA takes effect. *See* Memorandum, p. 5. Indeed, a "mandatory injunction … is said to alter the status quo by *commanding some positive act*," whereas "[t]he typical preliminary injunction is *prohibitory* and generally seeks only to maintain the status quo pending a trial on the merits." *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). Plaintiffs in this case ask the Court to order Defendant *not* to enforce a law that is *not* yet in effect. *See* Compl. at Prayer for Relief ¶ 1. *See also Barrett v. Maciol*, No. 9:20-CV-537 (MAD/DJS), 2022 U.S. Dist. LEXIS 8000, at *3-4 (N.D.N.Y. Jan. 14, 2022) ("A higher standard, however, applies to mandatory injunctions, which alter the status quo."). Regardless, irrespective of Defendant's claim and which standard applies, Plaintiffs meet even the heightened standard, it being a virtual certainty that the CCIA is unconstitutional in many ways.

IV.   **Plaintiffs Have Standing to Pursue Their Claims.**[2]

    **E.  GOA/GOF/GOA-NY Have Standing.**

It should be noted that the United States Supreme Court apparently had no issue with the representational standing of New York State Rifle & Pistol Association as a plaintiff in *Bruen*.[3] It seems as though, since standing is a jurisdictional issue, had there been a standing problem, the Supreme Court would have said something. To the extent that this Court believes that circuit precedent dictates a different outcome in this matter, the Supreme Court's decision in *Bruen* should be read as to have implicitly overruled that precedent. And for good reason, as the Supreme Court has routinely upheld representational standing by organizations such as Plaintiffs here. *See Hunt* v. *Washington Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 8-9 (1988) (first and fourteenth amendment challenge to a City of New York law). Indeed, organizations "may have standing to challenge actions that cause them direct injury. But an organization also has standing to bring suit on behalf of its members when: '(a) its members … have standing to sue in their own right; (b) the interests it seeks to protect are germane to [its] purpose; and (c) neither the claim asserted nor the relief requested requires the participation of

---

[2] While Plaintiffs believe they have standing for the reasons stated in their pleadings, to the extent that the Court is concerned that Plaintiffs have not alleged sufficient facts to establish standing, the proper pathway forward is to allow Plaintiffs to amend their Complaint. *See Haddad Bros. v. Little Things Mean a Lot, Inc*., 00 Civ. 0578 (AGS), 2000 U.S. Dist. LEXIS 11035, at *31 (S.D.N.Y. Aug. 4, 2000) ("Initial defects in standing are remediable through an amended complaint. Where an amendment cures a standing defect, nothing in the nature of that amendment would prohibit it from relating back to the initial complaint."). As such, Plaintiffs request leave to amend their Complaint prior to September 1, 2022, should the Court believe it to be necessary.

[3] *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2125 ("Petitioner New York State Rifle & Pistol Association, Inc., is a public-interest group organized to defend the Second Amendment rights of New Yorkers. Both Koch and Nash are members," and "petitioners Koch and Nash, along with the New York State Rifle & Pistol Association, Inc., brought this lawsuit in federal court against Justice McNally and other State representatives responsible for enforcing New York's firearms laws. Petitioners claimed that the State's refusal to modify Koch's and Nash's licenses violated the Second Amendment." *Id.* at 2169.

individual members….'" *Faculty Alumni, & Students Opposed to Racial Preferences v. New York Univ.*, 11 F.4th 68, 75 (2d Cir. 2021) (citing *Hunt*).   Moreover, "where the organization seeks a purely legal ruling without requesting that the federal court award individualized relief to its members, the *Hunt* test may be satisfied."   *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004).

Defendant cites Second Circuit precedent concluding that there is no representational standing for "'organizations suing *under Section 1983*'…."   Opp. at 11 (emphasis added) (citation omitted).   Of course, Plaintiffs' Complaint alleges causes of action *not only* under Section 1983, *but also* directly under the Second Amendment (Count I) and the First Amendment (Count III).[4] Thus, to the extent that organizational Plaintiffs are determined to be unable to litigate the interests of their members and supporters under Section 1983, then they do so pursuant to the remaining causes of action, which Defendant's opposition glaringly fails to address.[5]

---

[4] Plaintiffs invoked this Court's jurisdiction pursuant to 28 U.S.C. Section 1331 (Compl. ¶ 8), which gives "[t]he district courts … original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," and Section 1343, which provides that "[t]he district courts shall have original jurisdiction of any civil action authorized by law … [t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States…."   This Court has authority to provide a remedy pursuant to 28 U.S.C. Section 2201 and 2202 (Compl. ¶ 8), which states that "[i]n a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party," including "relief based on a declaratory judgment…."   Indeed, "as plaintiffs appear to allege violations of the United States Constitution, section 1331 provides this Court subject matter jurisdiction over plaintiffs' claims." *Scheiner v. Bloomberg*, 2009 U.S. Dist. LEXIS 21176, at *5 n.2 (S.D.N.Y. Mar. 17, 2009).

[5] Additionally, and alternatively, the Second Circuit has something of a relaxed standing requirement when it comes to an organizational plaintiff establishing standing of its own, such that "an organization establishes an injury-in-fact if it can show that it was 'perceptibly impaired' by defendant's actions. *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017).   Indeed, "only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.'" *Nnebe v. Daus*, 644 F.3d 147 (2d. Cir. 2011).   For example, "where an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer

### F.  Plaintiff Antonyuk Has Standing.

Defendant claims that Plaintiff Antonyuk lacks standing for a variety of reasons.  First, Defendant opines that Plaintiff "will not be required to have his license re-issued or renewed" but only "recertified after five years," and thus "will … never need to have an interview, never need to disclose his social media, and never need to go through the training required for new applicants or renewals."  Opp. at 16 and n.3.  Of course, even if that were the case,[6] if the state's foundational "good moral character" requirement, as recently expanded/defined by the CCIA, is struck down, then these additional requirements necessarily topple as well.[7]  Indeed, Defendant expressly concedes that these "requirements provide information about an applicant's associates, behavior, and demeanor that go to the heart of his fitness to possess a firearm."  Opp. at 34.  In other words, if New York cannot require an applicant to demonstrate "good moral character," then it cannot require an interview, a list of his family "associates," social media history, or character references.[8]

---

organizational standing."  *Centro* at 111.  As explained further by the organizational Plaintiffs are likely to suffer direct harm as a result of the CCIA, including being impaired in communicating with their members, being unable to attract new members and supporters, and being hampered in receiving contributions, such as at an upcoming gun show which the CCIA may ban entirely.  *See* Exhibit "1."

[6] Reportedly, New York (and Defendant specifically) has given conflicting information about whether someone who already has a license will be subject to these provisions. However, if Defendant wishes to go on the record in order to detail how the CCIA is more limited either than it appears or than the State has advised, Plaintiffs will not stand in the way.

[7] Defendant apparently does not contest Mr. Antonyuk's standing to challenge the "good moral character" requirement *itself* (see Opp. at 1, conceding that Plaintiffs have brought a challenge to "the requirement of 'good moral character' for licensing"), which is an ongoing standard to which every licensee is held.  *See* Exhibit 1 at 13 (providing that a license may be suspended or revoked at any time if a person becomes "ineligible" or "engag[es] in conduct that would have resulted in the denial of a license….").

[8] Even if the Court concludes that these "good moral character" sub-requirements cannot be challenged by Plaintiff Antonyuk, then the organizational plaintiffs have standing to challenge those requirements on behalf of their members and supporters. Exhibits "1" and "2." Alternatively, Plaintiffs could simply amend their Complaint to add one or more of these *same* GOA/GOF/GOA-NY members and supporters as individual parties.

Second, Defendant claims that Plaintiffs do not have standing because no one has "yet filed" for a license under the CCIA. Opp. at 16.  Defendant claims that "until [someone] seeks a license and is rejected, the law has not impacted [] Second Amendment rights…."  Opp. at 17. Defendant concedes that this "requirement … may be excused," but only if application "'would have been futile,'" but Defendant claims Plaintiffs do not specifically allege that it would be futile to seek a license without first (a) submitting to an in-person interview, (b) providing contact info for family, friends, and/or associates, (c) providing character references, (d) disclosing social media history, and (e) obtaining the training required by the CCIA.  Opp at 17.  This claim is absurd.  The CCIA expressly states that "***no license shall be issued or renewed except*** for an applicant" who meets no fewer than 22 different statutory requirements.  Exhibit 1 at 2-5.  It is hardly unreasonable to conclude that state licensing officers (judges and police) *will obey the law* and, tasked with enforcing the provisions of N.Y. Penal Law 400.00(10), will not issue a carry license until the statute's plain terms are fulfilled.[9]  But more fundamentally, Defendant's claim that no one has yet applied for a permit under the CCIA is a curious assertion, because the CCIA *has not yet gone into effect* and thus, by definition*, no one can apply* under its provisions. Defendant's theory would mean that the CCIA could not be challenged until after it was effective.

Third, because Antonyuk currently has a valid license, as of September 1, 2022 he will be subjected to a litany of new of restricted locations in which, up until now, he was free to carry. Nevertheless, Defendant again objects to Plaintiff's standing on the grounds that the CCIA, which

---

[9] Defendant misdirects, claiming that there is no reason to speculate that any particular person will be denied on the basis of "good moral character" and, thus, that "the CCIA's licensing requirements would actually stop" anyone from obtaining a license. Opp. at 17.  Defendant misses the point.  Plaintiffs never alleged that anyone in particular would be denied.  Rather, Plaintiffs object to being forced to comply the CCIA's unconstitutional demands including, for example, forfeiting one constitutional right to exercise another.  Compl. ¶¶ 95, 109, 121-23.

has yet to take effect, "has never been enforced against" anyone.  Opp. at 18.  Defendant claims that, in order to challenge the litany of "sensitive locations" or so-called "private property protection," Plaintiff Antonyuk[10] must specifically announce[11] his intent to carry in each such place.  *Id.*  Of course, as this Court has noted, "Plaintiff Antonyuk has already alleged what would happen if he were to carry his handgun into a gas station or store…."  ECF #36, referencing Compl. ¶¶ 112, 114; *see also* Exhibit "6", ¶ 12; ¶¶14-18.  It would be simply farcical to require each Plaintiff (including each of the members and supporters of the representational plaintiffs) to specifically list and allege every single piece of private property within New York state (*i.e.,* every store in which one shops, every gas station where one purchases fuel, every doctor's office where one is a patient, every club in which one is a member, *etc*, *see* Mot. at 13) in which they would like to carry their firearms.  Indeed, the members and supporters of the organizational plaintiffs "with unrestricted carry permits will no longer be allowed to carry in New York in the same manner and to the same extent as they have been before this new law went into effect," as more fully explained in the supplemental declarations of Pratt (Exhibit "1") and Robinson (Exhibit "2").

Fourth, Defendant claims that Plaintiffs fail to allege "facts that indicate a credible threat of prosecution."  Opp. at 19.  On the contrary, sufficient injury-in-fact exists for pre-enforcement review when Plaintiffs demonstrate fear of criminal prosecution under an allegedly unconstitutional statute that "is not imaginary or wholly speculative" and, to do so, a plaintiff need

---

[10] Defendant's claims focus only on Antonyuk, ignoring that the organizational Plaintiffs represent numerous carry license holders who are affected by the CCIA's "sensitive place" restrictions.

[11] Defendant notes that, for example, there is no "credible allegation that [Plaintiff] intends to take a gun into a homeless shelter, a bar, a church, a preschool [etc...]," and concludes that he "has not alleged [] a concrete plan to violate the CCIA … but he wants the Court to adjudicate the constitutionality [of] each of them" Opp. at 18-19.

not "first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute."[12] *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 302 (citation omitted).[13]  This Circuit has explained that "the *Babbitt* standard sets a "low threshold" and is "quite forgiving" to plaintiffs seeking such preenforcement review." *Id* at 197. The Court further explained that courts should presume the government will enforce the law so long as the relevant statute is "recent and not moribund." *Id*. Here, far from being ancient or moribund, the challenged statute is the newest iteration of New York's attempt to curtail Second Amendment rights, an emergency situation for New York's anti-gun politicians created by the Supreme Court's recent vindication of the Second Amendment in *Bruen*.  It is axiomatic that the CCIA has not yet been enforced against Plaintiff Antonyuk, as it has not yet gone into effect.  However, Plaintiff Antonyuk's fear is not "wholly speculative," as he has alleged in his Declaration that he desires to continue to carry as he has been carrying.  *See* Exhibit "6", ¶ 12; ¶¶14-17, 112, 114 (discussing disarming himself to enter restricted locations under CCIA); and ¶ 18 (can carry in all places that are not posted or restricted currently).  Should Plaintiff Antonyuk continue carrying as he did before, he will be committing felony crimes, as the CCIA which makes off limits nearly all places which were previously lawful to carry.  The threat of prosecution under this recent law goes far beyond a fear that is wholly imaginary.[14]

---

[12] Defendants conflate the required threat of prosecution requirement needed for standing with a question of whether Plaintiff Antonyuk has alleged a "concrete plan" to violate the CCIA. (Opp. at 18). No such concrete plan is needed when there is a credible threat of prosecution.

[13] In *Babbit*, although the challenged statute applied broadly to "any person … who violates any provision," nevertheless the court found Appellees were "not without some reason in fearing prosecution" and thus had standing. *Id* at 302.  Indeed, the Second Circuit has applied this permissive standard in a number of cases challenging criminal statutes—finding standing where the plaintiff "will have to take significant and costly compliance measures or risk criminal prosecution." *Hedges v. Obama*, 724 F.3d 170, 196 (2d. Cir. 2013).

[14] Not to mention, the licensing requirement of "good moral character" and its sub-requirements of an interview, providing contact information of family/friends, character references, and social media history, along with the training requirement, are not criminal laws that can be "enforced" or

### G. Defendant Kevin P. Bruen is the Proper Party.

None of the cases Defendant string-cites support the proposition that he is foreclosed from being a proper party.[15]  In fact, for a constitutional challenge of this nature, Defendant *Bruen* may be the *only* proper party available,[16] given his CCIA enforcement duties as Superintendent, and his authority over all State Police officers.[17]  As Defendant points out, Plaintiff will be required to "recertify" his license in January of 2022 (Opp. at 16 n.3), and Defendant is responsible for that process.  Exhibit 1 at 12.  Moreover, federal courts have taken no issue with the Superintendent as a party on multiple occasions, even under circumstances with *lesser* involvement than here.[18]  Plaintiffs need not await denials from licensing officers or criminal prosecution to challenge the

---

[^] "prosecut[ed]" against Plaintiffs, but rather administrative barriers to licensure which are applied (there is no speculation here) by licensing officials.

[15] *See Sibley v. Watches*, 501 F. Supp. 3d 210, 222–23 (W.D.N.Y. 2020) (claims against Governor, State Police Superintendent, and county DA dismissed *for failure to allege intention to engage in proscribed conduct and credible threat of prosecution*, not for want of a proper party); *Aron v. Becker*, 48 F. Supp. 3d 347, 367–69 (N.D.N.Y. 2014) (claims against Governor dismissed because they sought monetary damages and the Governor's general obligation to enforce the laws was too tenuous of a connection); *Osterweil v. Bartlett*, No. 1:09-cv-00825, 2010 U.S. Dist. LEXIS 147397, at *4 (N.D.N.Y. Feb. 24, 2010) (claims against Governor and Attorney General dismissed because defendants claimed they were improper parties and plaintiff *agreed to their dismissal*).

[16] "A state official is a proper party to a lawsuit seeking to enjoin enforcement of an unconstitutional act if he is specifically authorized to enforce that act."  *Green Party v. Weiner*, 216 F. Supp. 2d 176, 185 (S.D.N.Y. 2002).  "It is well-settled that a state official may properly be made a party to a suit seeking to enjoin the enforcement of an allegedly unconstitutional act if that official *plays some role in the enforcement of the act*."  *Schulz v. Williams*, 44 F.3d 48, 61 n.13 (2d Cir. 1994) (emphasis added).

[17] *See* N.Y. Exec. Law § 223.  Further, *under the CCIA itself*, Defendant has personal and direct responsibility for the enforcement of numerous provisions.  *See* Ex. "1," pp. 9 (appeals), 12 (recertification), 15 (training course, appeals board), 22 (criminal records and background checks), 31 (same), 33 (same), 39 (safety course); *see also Kevin P. Bruen*, N.Y. St. Police, https://on.ny.gov/3T0jLY9.

[18] *See, e.g.*, *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2125 (2022) (listing Superintendent as a respondent who merely "oversees the enforcement of the State's licensing laws … seeking a declaration that New York's total ban on the civilian possession of tasers and stun guns violates the Second Amendment).

CCIA's impending curtailment of constitutional rights, when Defendant has the power to make law enforcement "stand down."[19]

### H.  The Eleventh Amendment Does Not Bar Suit.

It is black letter law that, "under the venerable doctrine of *Ex parte Young* …a plaintiff may sue a state official acting in his official capacity – notwithstanding the Eleventh Amendment – for 'prospective injunctive relief' from violations of federal law."  *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007).[20]   The Eleventh Amendment "does not bar the proceeding against a state … [i]f a complaint 'alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md*., 535 U.S. 635, 645 (2002).   Here, the prayer for injunctive relief would prevent Defendant, who is responsible for the actions of law enforcement officers statewide and who is statutorily required to "prevent and detect crime," from further enforcement of the CCIA.   Defendant has also demonstrated a willingness to enforce similar statutes in the past and, in doing so, demonstrates a clear willingness to enforce the CCIA. See *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 211.

### V.   Defendants' Defense of the CCIA Confirms Plaintiffs' Likelihood of Success on the Merits.[21]

### A. *Bruen* Did Not "Specifically Endorse" the CCIA's "Good Moral Character" Requirement.

---

[19]  If Defendant is not deemed the proper party, addition of a licensing officer can be added to Plaintiffs' Complaint.

[20] A simple allegation of a violation of federal law satisfies this requirement because the analysis should not include an analysis into the merits of the claim. See *Verizon Md. Inc. v. PSC*, 535 U.S. 635, 646; *Coeur d' Alene, supra,* 521 U.S. at 281

[21]  Defendant claims that Plaintiffs can only bring a facial challenge to the various provisions of the CCIA.  *See, e.g.*, Opp. at 20.  It is hard to see how an as-applied challenge could be brought to a statute which has yet to go into effect and therefore cannot been applied.  But that is of no moment, as "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010).

Repeatedly, Defendant claims that the Supreme Court in *Bruen* has "endorsed" and "specifically endorsed" not only all of the various statutes of the states that are considered "shall issue," but also all iterations of "good moral character" found in the laws of other states (*see* Opp. at 3, 7, 8, 21, 22, 23, 24, 25, 34) making it constitutional without analysis.   Opp. at 21-25. Defendant claims that the Supreme Court, in contrasting New York's tyrannical regime with the more permissive licensing of other states, has somehow "approved of" the entire statutory licensing schemes of 43 states that are known as "shall issue." Opp. at 3.[22]  But *Bruen* resolved the constitutionality of only a single requirement of a single state — while recognizing it also had invalidated the similar "good cause" requirements in other states (*see Bruen* at 2122)  The Court certainly *did not sanction* the constitutionality of a "good moral character" standard, let alone any other provision of the New York licensing regime, nor decide that *other* provisions of *other* states *are per se* constitutional.  In fact, the Court stated the opposite: because "any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes…." *Bruen* at 2138 n.9.

Second, Defendant points to "a Connecticut statute" which denies "licenses to 'individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon,'" and claims this was "specifically endorsed by the majority in *Bruen*."[23]  Opp. At 3, 8; *see also* at 23.  In fact, Defendant claims that the CCIA's language "wasn't

---

[22] According to Defendant, the CCIA's "[r]equirements for in-person interviews and character references are merely common elements of the 'shall-issue' licensing laws approved of by the *Bruen* majority," and are therefore constitutional.  *Id.*  Defendant even seems to claim that the CCIA (which makes public carry more onerous and impossible even than it was before *Bruen*) has somehow transformed New York into such a "shall issue" regime.  Opp. at 7.

[23] Defendant also references the laws of Delaware and Rhode Island, based on the same misreadings of *Bruen*. Opp. 8, 23.  Defendant also claims that the CCIA is analogous to the statutes of Pennsylvania, Virginia, Colorado, and Illinois.  Opp. at 24.  But those states do not provide open-ended discretion, but instead only *limited* authority based on *specific* findings that a person

pulled out of thin air" but rather was "derived directly from the *Bruen* opinion." Opp. at 22-23 ("Justice Thomas deemed constitutional"). Actually, the Court's reference to Connecticut's statute was an aside, noting it to be one of three *outliers* among the shall-issue states and the states which require no license at all. *Bruen* at 2123 n.1. The Court explained that, even though these states' statutes contain "discretionary criteria" in theory, in practice they "appear to operate like 'shall issue' jurisdictions." *Id.* In that regard, New York is nothing like Connecticut.

Third, Defendant claims that "[t]he *Bruen* majority specifically endorsed 'shall-issue' licensing regimes that included an evaluation of the applicant's responsibility and fitness to carry a gun...." Opp. at 22. In support, Defendant does not cite the *Bruen* majority (where no such language appears), but rather to Justice Kavanaugh's *concurrence*, joined only by Chief Justice Roberts. *Id.* But even that states only that "shall-issue licensing regimes are constitutionally permissible" (a position the majority did not expressly reach), adding the critical caveat that "those shall-issue regimes do not grant open-ended discretion to licensing officials...." *Bruen* at 2162 (Kavanaugh, J., concurring). That concurrence does not sanction New York's "discretion" to license based on its "open ended" inquiry into "good moral character" – a discretionary standard.

After its exercise in eisegesis with *Bruen*, Defendant distills his misreadings into the head-scratching conclusion that "*Bruen* does not forbid 'discretionary criteria' so long as those criteria are focused on an applicant's fitness to own a deadly weapon...." Opp. at 23; *see also* at 24 ("not discretion alone, but rather discretion combined with a 'proper cause' requirement.").[24] In the

_____

is a "danger" to himself, others, or "public safety." *Id.* That is a far cry from the CCIA's amorphous "good moral character" requirement.

[24] Defendant cites Justice Kavanaugh's concurrence which addressed the two problems with New York's law (discretion and "good cause"), joining them with an "and." Opp. at 25. The use of this conjunction, in a concurrence by two justices, Defendant asserts, is proof positive that these two attributes must occur *together*. Defendant's reliance on a conjunction is grasping at straws, as Justice Kavanaugh later makes clear his view that states may continue with their shall-issue

same way that many anti-gun lawyers misread the *Heller* decision to apply *only* to "a handgun in the home," Defendant seeks to confine *Bruen* to its specific fact pattern. Rather, *Bruen* established important principles to govern future challenges to laws like CCIA, including the rule that states *may not* create regimes which "grant[] discretion to deny licenses based on a perceived lack of ... suitability." *Id.* at 2123. Defendant assumes that the Court did not mean to include "discretionary criteria" when it talked about "discretion," and that "fitness" is entirely different than "suitability.[25]

### B. New York Has Failed to Support Its Good Moral Character Requirement.

*Bruen* makes clear that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen* at 2126. There is no dispute that this textual standard has been met. Therefore, the right of New Yorkers to be licensed without meeting New York's "good moral character" test is presumptively protected. The only way that the state can "justify its regulation" is "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* Strikingly, in his Opposition at 25-33, Defendant fails to identify a single historical illustration before "the mid-19[th] century and early 20th century) (Opp. at 32) of the government imposing a requirement that an American demonstrate "good moral character" to a licensing official before being allowed to obtain a license to carry a firearm. The

---

regimes *only* "so long as those States employ objective licensing requirements" — the antithesis of New York's entirely discretionary "good moral character" requirement. *Id.* at 2162.
[25] Alternatively, Defendant relies heavily on *Libertarian Party of Erie Cty. v. Cuomo*, 970 F.3d 106, 126-27 (2d Cir. 2020), claiming that the Second Circuit has foreclosed any challenge to "good moral character" based on "'the first step of the [*Heller*] analysis'" — which Defendant believes was left unchanged by *Bruen*. Opp. at 7, 22, 25. Defendant fails to acknowledge that *Libertarian Party* also upheld "good cause" on the same basis — a decision now abrogated by *Bruen*. Indeed, the *Bruen* Court specifically pointed to the *Libertarian Party* decision as having applied the two-step test that the Court rejected. *Bruen* at 2126 n.4. Moreover, the court's conclusion in *Libertarian Party* was that the New York statutes did not "place[] ... onerous ... conditions on the core Second Amendment right," while acknowledging that the statute did "affect[] the core Second Amendment right...." *Id.* at 127-28. This is precisely the method of analysis that *Bruen* has now rejected, and no longer remains good law. *See Bruen* at 2126.

government has failed to meet its burden to establish a historical tradition of such a practice.

Having failed to locate any relevant antecedents, Defendant addresses a different question – the authority of a government to deprive a person of firearms when the individual has *demonstrated by his actions to present a danger*, offering a Hastings Law Journal article: "American legislators at the time of the Bill of Rights seem to have been aware of this tradition of excluding ... suspect persons from the right to arms." Of course, the words that Defendant replaced by ellipses tell the real story. The full quotation is that "American legislators at the time of the Bill of Rights seem to have been aware of this tradition of excluding **criminals and other** suspect persons from the right to arms." Defendant's selective quotation comes from a section of the article entitled "Do Criminals, the Mentally Ill, or Children Have a Right to Arms?" Those disqualified categories are specifically addressed by the CCIA (Exhibit 1 at 2 (Sections 1(a), (c), (i) and (j)) — not under the "good moral character" requirement. *See also Heller*, 554 U.S. at 626.

Defendant then pivots to arguing that people may be disarmed for belonging to a class disfavored by government officials. Opp. at 26-28 (referencing historical sources disarming American Indians, followers of certain sects,[26] and Catholics. Defendant denies embracing the legitimacy of racial or religious animus (Opp. at 27, n. 11), but still relies on these authorities. Next, Defendant demonstrates dissatisfaction with *Bruen*, relying on the confiscation of arms by King Charles II from the hands of his political opponents (Opp. at 27) – which was expressly considered and rejected as authority by the Supreme Court in *Bruen*, at 2140. Discretionary standards such as "good moral character" provide the mechanism to enable those in power, such

---

[26] Defendant relies on a single curious colonial "order" from 1637, disarming the followers of a dissident preacher. Yet *Bruen* warns against use of such early colonial sources — here not even a law. *See Bruen* at 2144 ("At most [a limited period of time] roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.").

as New York's unelected Governor, and members of the legislature, to reward the rich, the powerful, and political supporters with licenses, while denying licenses to their political opponents.[27]  Such a system undermines a right which belongs to "the People," not just elites.

Defendant relies on statutes disarming Roman Catholics as precedent for New York's law, as if the reason was that Catholics had bad moral character.  But such laws were grounded in protecting political power, and religious animus – not good moral character.

Defendant then cites to a case which characterizes Joyce Lee Malcom's book, To Keep and Bear Arms: The Origins of an Anglo-American Right at 140-41 (1994), as follows: "Colonial governments often barred 'potential subversives' from owning firearms."  Opp. at 28.  Defendant did not quote directly from Professor Malcom's book, which explains that those holding political power often disarmed those who they did not trust, principally Catholics, Indians, and black slaves.  Importantly, Malcom's book points out another reason that these precedents cited by Defendant are irrelevant – "[n]either the Indian nor the slave was a citizen, therefore neither was entitled to the rights of English subjects."  Malcom at 141.  Malcom also explains that "[t]he emphasis of colonial governments was on ensuring that the populace was well armed…."  *Id*. at 140.  There is not one word in the cited pages about "good moral character."

Next, Defendant references *wartime* loyalty oaths which were forced upon the competing side during or shortly after a conflict – hardly a representative sample of American law (not unlike Japanese internment camps during World War II).  *See* Opp. at 26-28.  Moreover, the Supreme Court has rejected such oaths outside the context of public employment or military service (much less connected to the exercise of an enumerated right).  *See West Virginia State Board of Education*

---

[27]  New York City's discretionary license scheme creates a form of political currency for the politically powerful to compensate their friends and supporters, *see* R. Parascandola, "Lifestyles of the rich and packin'," *Daily News* (Sept. 27, 2010).

*v. Barnette*, 319 U.S. 624 (1943); *Speiser v. Randall*, 357 U.S. 513.  Defendant's reliance on such historical analogues is unpersuasive to justify the CCIA's constitutionality.  *See Bruen* at 2149.

Next, Defendant relies on laws which authorized disarming members of the *organized* militia (*i.e.*, the standing military force) for offenses such as being drunk or disobeying orders. Opp. at 29-31.  Yet as the Supreme Court explained in *Heller*, "[t]his contrasts markedly with the phrase 'the militia' in the prefatory clause. … the 'militia' in colonial America consisted of a subset of 'the people' – those who were male, able bodied, and within a certain age range." *Heller*, 554 U.S. at 580; *see also* at 584 (explaining that "'bear arms' was unambiguously used to refer to the carrying of weapons outside of an organized militia").  Military discipline is hardly precedent for requiring civilians to demonstrate "good moral character" to carry arms in the first place.

Next, addressing licensing, Defendant relies licensing in the Fourteenth Century.  Opp. at 21, n.13.  *Bruen* makes clear that precedents found in such early history is of next to no value. Finally, Defendant relies on licensing schemes begun at the tail end of the Nineteenth Century. Opp. at 32.  Yet *Bruen* also establishes that such precedents, quite distant from the ratification of the Second Amendment and even the Fourteenth Amendment, are not helpful in determining ruling on Second Amendment challenges.  *See Bruen* at 2137.  Indeed, Defendant contrasts such licensing standards with "the alternatives, with some states instead enacting complete bans of certain groups to possess weapons" and "or broadly banning the carrying of firearms…."  Opp. at 32 n.14.  But if these are the relevant historical analogues, then neither *Heller* (keeping of arms) nor *Bruen* (bearing of arms) would have been decided as they were.  Despite its recent loss in *Bruen*, Defendant resorts again to the same sorts of historical references that the Court has twice rejected. Defendant's reference to the "early 20th century" would include the Sullivan Act, which the Supreme Court just explained has no relevance to the meaning of the Second Amendment.

### C.  The Racist Pedigree of the "Good Moral Character" Requirement.

As Defendant's historical analogues for "good moral character" are thin, Plaintiffs add some additional references to flesh out the origin of "good moral character."

### 1.  Naturalization and Professional Licensure.

Historically, the standard of "good moral character" has been used as a threshold for special professional or occupational license, not as a precondition for the People's exercise of God-given, pre-existing, constitutionally enumerated rights.  The requirement also appears in immigration and naturalization contexts where applicants have no inherent *right*, constitutional or otherwise.[28]  It appeared as a requirement for U.S. citizenship first appeared in the Naturalization Act of 1790, 1 Stat. 103, a statute tainted by racial favoritism, which limited citizenship to "*free white person[s] … of good character.*" § 1 (emphasis added). Indeed, early proponents of this immigration policy sought only "the worthy part of mankind to come and settle" the continent.  J. Pfander & T. Wardon, *Reclaiming the Immigration Constitution of the Early Republic: Prospectivity, Uniformity, and Transparency*, 96 VA. L. REV. 359, 397 (2013). "The 1790 Act called for common law courts of record to decide, essentially as a matter of discretion since no statutory criteria existed, if the applicant was a person of 'good moral character,'" which codified a system of arbitrary exclusion by immigration authorities. *Id.* at 438.  Subsequent immigration laws are similar. *See* Immigration Act of 1924, 43 Stat. 153 (prohibited Asian immigration); Immigration and Nationality Act of 1952, 66 *Stat*. 163 (maintained ethnic discrimination by quota). The 1952 Act, fueled by Nevada Senator Pat McCarran's concerns about immigration "from a flood of

---

[28] *See, e.g.*, 8 U.S.C. § 1427(a); 8 C.F.R. § 316.10(b) (2022); Larry Craddock, *"Good Moral Character" as a Licensing Standard*, 28 J. NAT'L ASS'N ADMIN. L. JUDICIARY 449, 451 (2008) (noting widespread use of good moral character in licensing attorneys and doctors and that "[n]ot much has been written about good moral character as a licensing standard outside the legal and medical professions"); MASS. GEN. LAWS ch. 112, § 74 (2022) (for a registered nurse).

undesirables," "Jewish interests," and the preservation of "the ethnic and racial status quo established in the 1920s," provides further context into the application of the "good character." *See* M. Marinari, *Divided and Conquered: Immigration Reform Advocates and the Passage of the 1952 Immigration and Nationality Act*, 35 J. AM. ETHNIC HIST., Spring 2016, at 9, 12–13.[29]

In the occupational licensing area, South Carolina's 1860's slave codes required that "[n]o person of color shall pursue … any [] trade, employment or business (besides that of husbandry, or that of a servant under a contract for service or labor), until (among other things) having paid a $100 application fee and **having satisfied a local judge "of his good moral character**." Acts of the General Assembly of the State of South Carolina Passed at the Sessions of 1864-65 (Columbia: 1865), pp. 291-304 (emphasis added).  In time, laws specifically restricting "persons of color" were made generally applicable to all.  However, even though the good moral character requirements in the professional realm have generally avoided the tarnish of racism, they face similar criticisms for arbitrariness, subjectivity, and unequal application. *See* Craddock, *supra*, at 451–52 ("good moral character as a licensing standard or a deportation standard … places *too much discretion* in officials to exercise their individual whims and prejudices… [T]he phrase fails to give helpful guidance to license applicants and license holders."); D. L. Rhode, *Moral Character as a Professional Credential*, 94 YALE L.J. 491, 529 (1985) (emphasis added) ("judicial attempts to give content to the standard have been infrequent and unilluminating.  In part, the problem stems

---

[29] The 1952 Act reimagined the 1790 conception of "good character" as "good *moral* character," which disqualified prospective immigrants for being alcoholics, § 101(f)(1), adulterers, § 101(f)(2), gamblers, § 101(f)(5), polygamists, § 212(a)(11), and prostitutes, § 212(a)(12), among other prohibitors, but those categories did "*not preclude a finding that for other reasons* such person is or was not of good moral character." § 101(f) (emphasis added).  Today, "good moral character" maintains its place in the naturalization process.  8 C.F.R. § 316.10(a)(2) (2022).

from the inherent subjectivity of any concept of moral fitness.'"). Tracing the history of "good moral character" back hundreds of years, Stanford Law Professor Deborah Rhode observed:

> the moral fitness requirement has functioned primarily [to] excommunicate[] a diverse and changing community [such as] women, minorities, adulterers, radicals, and bankrupts….. In the absence of meaningful standards or professional consensus, the filtering process has proved inconsistent, idiosyncratic, and needlessly intrusive. [Rhode, *supra*, at 493–94.]

Even if the "good moral character" standard – with all its subjectivity, shortcomings, disparate outcomes, and discriminatory enablement – is applied in other contexts, it should never empower government officials to deny "the People" the exercise of a Constitutionally *enumerated right*.

### 2. Good Moral Character and Enumerated Constitutional Rights.

The "good moral character" standard has been used in other contexts as well. For example, Georgia's 1840's slave codes, much like the CCIA, prohibited the exercise of First Amendment rights without government licensure, prohibiting any "person of color" from being "allowed to preach or exhort without written license," one of the qualifications of which was proof of "the good moral character of the applicant...." J. M. Cooper, A Codification of the Statute Law of Georgia (1845), p. 840. With respect to the Second Amendment, the first usage of the phrase "good moral character" that has been found occurred in 1909, with respect to a Florida statute which, like the CCIA, required a person to demonstrate his "good moral character" to county licensing officials. *State ex rel. Russo v. Parker*, 57 Fla. 170 (Fl. 1909). [30] There, the application

---

[30] To be sure, prior to *Russo*, while the states generally permitted free citizens to keep and bear arms without restriction, several imposed almost impassible statutory hurdles upon slaves and freed blacks, often requiring them to obtain permits from local magistrates. *See, e.g.*, Brief Amicus Curiae of National African American Gun Association, Inc. in *NYSRPA v. Bruen*, No. 20-843, at 5-11 (discussing slavery-era statutes in Virginia, Kentucky, Maryland, Alabama, Tennessee, Georgia, Delaware and North Carolina); *see also* at 18-24 (discussing the black codes of various states). For example, in Maryland it was a crime "for any negro or mulatto to go at large with any gun" unless he had obtained "a certificate from a justice of the peace, *that he is an orderly and peaceable person*." Ch. 86 Sec. II (1806), 3 Laws of Md. 297 (1811) (emphasis added).

was denied because the "applicant here was unknown" to the county commissioners and therefore not "known to them to be a person of good moral character." *Id.* at 171.  The applicant had offered two affidavits of others, however "both of [them] were unknown to respondents...." *Id.*  Upholding the denial of the application, the Supreme Court of Florida refused to decide the constitutionality of the requirement, [31] concerned that if the provisions were deemed unconstitutional, "there would remain no authority in the county commissioners to issue a permit to anyone...." *Id.* at 173.

The context of the *Russo* case is significant.  The license applicant in *Russo* was Giocomo Russo, and those who provided affidavits in support of his application were named Lorenzo Fucarino and Nicolo Arcuri.  The decision took place during a time of widespread negative public opinion against those of Italian heritage (especially those who were immigrants, as is Plaintiff Antonyuk), especially in the southern states.  In 1891, "the largest single mass lynching in U.S. history" had occurred in New Orleans, where "a mob of 10,000 people ... dragged 11 Sicilians from their cells and lynched them...."[32]  Then, in 1910, the year after *Russo* was decided, Florida had its own similar experience.[33]  In what is hardly a coincidence, the *Russo* decision originated from Hillsborough County, Florida – Tampa (the location of the lynching) is its county seat.  Thus, the earliest known historical analogy for "good moral character" with respect to the carrying of firearms involves its use to permit disarm persons not favored by the political authorities – who

---

[31] Several decades later, Florida Supreme Court Justice Buford provided some insight on why the *Russo* court may have carefully avoided deciding the constitutionality of the statute, explaining that "the [Florida] Act was passed for the purpose of disarming the negro laborers [and] was never intended to be applied to the white population … there has never been, within my knowledge, any effort of enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention to the Constitution and non-enforceable if contested."  *Watson v. Stone*, 4 So. 2d 700, 703 (Fl. 1941).

[32] https://www.loc.gov/classroom-materials/immigration/italian/under-attack/.

[33] https://nyti.ms/3AcuHsR.

likely were in greatest need of exercising the right to bear arms.[34]   That is hardly a noble pedigree

for the CCIA.[35]   Fortunately, the Supreme Court recently provided clear guidance about use of a

"good moral character" test as a prerequisite to exercise constitutional rights.   Discussing the

"more subtle methods engineered to deny blacks the right to vote" including "'good character'

tests," the Court referenced such tests as a "concerted effort in these jurisdictions to engage in the

'unremitting and ingenious defiance of the Constitution'…."   *See Northwest Austin Mun. Util.*

---

[34] In stark contrast, "in 1892, armed black men … thwarted a lynch mob that was attempting to break into a prison to murder a black prisoner."  N. Johnson, D. Kopel, G. Mocsary, E.G. Wallace, D. Kilmer, "Firearms Law and the Second Amendment," Wolters Kluwer (2021) at 522.

[35] Today, only four **Error! Main Document Only.**outlier states have concealed carry licensing schemes with a similar requirement to New York's.  *See* Cal. Pen. Code §§ 26150, 26155 (requiring "good moral character"); HRS 134-9 (requiring "good moral character," but in practice Hawaii *does not issue any permits* for either concealed or open carry. *See Young v. Hawaii*, 896 F.3d 1044, 1071 n.21 (9th Cir. 2018) (reversed by *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) (vacated by, remanded by *George K. Young v. Hawaii*, 2022 U.S. LEXIS 3235 (U.S., June 30, 2022)); N.J. Stat. § 2C:58-4(b) ("good moral character" for permit to carry a handgun); D.C. Code § 22-4506 ("that he or she is a suitable person to be so licensed").  These are the same states which, prior to *Bruen*, contained a "good cause" requirement for issuance of a concealed carry license. Massachusetts has a more limited requirement, where licensing authorities may *only consider certain enumerated factors*.  *See* ALM GL ch. 140, § 131 ("A determination of unsuitability shall be based on: (i) reliable and credible information that the applicant or licensee has exhibited or engaged in behavior that suggests that, if issued a license, the applicant or licensee may create a risk to public safety; or (ii) existing factors that suggest that, if issued a license, the applicant or licensee may create a risk to public safety.").  Three other states have statutes containing similar language however, as the *Bruen* Court noted, these states operate in a "shall-issue" manner in practice. *Bruen* at 2123 n.1; Conn. Gen. Stat. § 29-28 ("a suitable person to receive such permit"); 11 Del. C. § 1441 ("[a] person of full age and good moral character"); R.I. Gen. Laws § 11-47-11 ("suitable person to be licensed").  Finally, three states contain "good moral character" language in their permitting statutes, but are "constitutional carry" states where *no permit is required*.  *See* Ind. Code Ann. § 35-47-2-15 (license issued "if it appears to the superintendent that the applicant is (A) of good character and reputation; and (B) a proper person to be licensed"); O.C.G.A. § 16-11-129 (a judge "shall issue" a license "unless the judge determines such applicant ... is not of good moral character...."); 25 M.R.S. § 2473 (licenses issued to a person who "[d]emonstrates good moral character"), *but see* 25 MRSA §2003 (but cabining that inquiry by providing in subsection (4) that the "issuing authority in judging good moral character shall make its determination in writing based solely upon information recorded by governmental entities within 5 years of receipt of the application....").  Two states require permits to purchase a handgun and demand an applicant show "good moral character."  *See* N.C. Gen. Stat. § 14-404; N.J. Stat. Sec. 2C:58-3(c).

*Dist. No. One v. Holder*, 557 U.S. 193, 220 (2009); *see also Simmons v. Galvin*, 575 F.3d 24, 36-37 (1st Cir. 2009) (characterizing "good moral character" as a "historically discriminatory test").[36]

### 3.   The Discretion Involved in Determining "Good Moral Character."

The CCIA's "good moral character" requirement is so vague that in practice that it empowers officials to apply whatever standard they subjectively choose to favor some and rule against whomever they wish.[37] *See* ECF 9-1 at 4, 15.  As the Supreme Court has explained:

> the term 'good moral character' ... by itself, is unusually ambiguous.  It can be defined in an almost unlimited number of ways for any definition will necessarily reflect the attitudes, experiences, and prejudices of the definer.  Such a vague qualification, which is easily adapted to fit personal views and predilections, can be a dangerous instrument for arbitrary and discriminatory denial of the right to practice law.  [*Konigsberg v. State Bar of Cal*., 353 U.S. 252 (1957).]

Even if it is a useful tool for state bar admission[38] (which is not a constitutionally enumerated right), the Supreme Court in *Bruen* rejected outright the licensing schemes of jurisdictions which "grant[] licensing officials *discretion* to deny licenses based on a perceived lack of ... suitability ... even when the applicant satisfies the statutory criteria...."  *Bruen* at 2124 (emphasis added); *see also id.* at 2161 (Kavanaugh, J., concurring) ("New York's regime [grants] unchanneled *discretion* for licensing officials ... in effect deny[ing] the right to carry handguns for

---

[36] *See also* 52 U.S. Code § 10501 ("No citizen shall be denied, because of his failure to comply with any test or device [including] any requirement that a person as a prerequisite for voting or registration for voting ... possess good moral character....").  This Court similarly should reject New York's "unremitting and [un]ingenious defiance of the Constitution."

[37]  Such a standard provides cover to exercises of both favoritism and discrimination: "Ye shall do no unrighteousness in judgment: thou shalt not respect the person of the poor, nor honour the person of the mighty: but in righteousness shalt thou judge thy neighbour."  *Leviticus* 19:15.

[38] As one commentator has noted, "good moral character" in the context of state bars "allows the states a great deal of discretion in determining who will be admitted ... [a]ny determination of character is clearly a discretionary determination."  W. Tyser Jr., *Admission to the Bar – "Good Moral Character*," 45 N.C. L. Rev. 1008 (1967).  *See also Smith's Appeal from County Commissioners*, 65 Conn. 135, 138 (1894) (in the context of a liquor license, "[t]he word 'suitable' … is insusceptible of any legal definition that wholly excludes the personal views of the tribunal authorized to determine the suitability of the applicant.").

self-defense to many 'ordinary, law-abiding citizens.'").  In other words, the Supreme Court in *Bruen* rejected state licensing regimes that grant officials discretion to decide who may or may not receive a license to carry a firearm in public.  The Court in *Konigsberg* declared the phrase "good moral character" to be perhaps one of the most "unusually ambiguous," "vague," and "arbitrary" standards of complete discretion ever devised.[39]

Bad decisions by one's associates apparently is also apparently disqualifying.  In *Matter of Biganini v. Gallagher*, 293 A.D.2d 603, 603, 742 N.Y.S.2d 73, 74 (App. Div. 2nd Dept. 2002), an applicant was denied a New York carry license on the grounds that he "was a member of the Long Island chapter of the Hell's Angels Motorcycle Club," and "[a]t least one [other] current member … had been convicted of a weapon possession charge, and two other members had been linked to shooting incidents with a rival motorcycle gang...."  *Id.* at 603.  Yet the Supreme Court explicitly rejected disqualification for bar licensure (again, not an enumerated right) of an accused communist, explaining that "the mere fact of membership would not support an inference that he did not have good moral character."  *Id.* at 267.  Being standardless, there is every reason to believe the New York "good moral character" standard can be applied *sub silentio* to disarm individuals for reasons that are arbitrary, and those that the Supreme Court has rejected.

### D.  Character References, Interview, Divulging Family, Friends, and Associates.

---

[39] **Error! Main Document Only.**In *Sibley v. Watches*, 501 F. Supp. 3d 210 (W.D.N.Y. 2020) (recently remanded to district court for reconsideration in light of *Bruen*), the court defined "good moral character" to include "the ideal state of a person's beliefs and values that provides the most benefit to a healthy and worthy society.  Good moral character is more than having an unblemished criminal record.  A person of good moral character behaves in an ethical manner and provides the Court, and ultimately society, reassurance that he can be *trusted to make good decisions*."  *Id.* at 219 (emphasis added).  Life teaches that everyone makes bad decisions in one context or another and, who can always be "trusted to make good decisions?"

In order to demonstrate "good moral character," CCIA imposes the requirement that an applicant submit "no less [sic] than four character references who can attest to the applicant's good moral character…." Compl. ¶ 59. In addition, an applicant must meet in person with the licensing official, and provide detailed information about his family, friends, and associates. *See* Opp. at 33-34. Defendant seeks to justify these provisions by claiming that *Bruen* sweepingly approved of "states … ensur[ing] that only 'law-abiding, responsible citizens' carry arms in public." Opp. at 34 (citing *Bruen* at 2131). The Court never concluded that states may implement any litmus test they want, so long as they believe it to be "a useful tool" in order to "get a sense of [the] temperament and veracity" of the applicant. *See id.* Rather, as Defendant acknowledges, the Court specified exactly what it had in mind with respect to qualifications – "undergo a background check or pass a firearms safety course." *Bruen* at 2138 n.9. That's it. Defendant again references a *Bruen* concurring opinion as if it was a holding by the majority – by quoting from Justice Alito's approving words for "fingerprinting, a background check, a mental health records check, and training…." Opp. at 34; *Bruen* at 2162. And each requirement on Justice Alito's more expansive list is objective, leaving no discretion to state officials – the very opposite of the challenged provisions of the CCIA's "good moral character."[40] Next, Defendant claims that character references have been "specifically endorsed by the opinion in *Bruen*, as certain allegedly shall-issue states have similar requirements – but *Bruen* never conducted a review of the licensing schemes of 43 shall issue states, and certainly never approved of their requirements.

Next, Defendant points to two types of colonial era statutes he claims provide sufficient historical analogue to justify the CCIA's requirements. First, Defendant references historical

---

[40] Plaintiffs assume for purposes of this case – but in no way concede – the constitutionality of requiring a person to obtain a government issued license or permit in order to exercise the enumerated constitutional right to bear arms.

sources disarming certain disenfranchised or disfavored groups, claiming that this "tradition …
*contemplates* [and *necessarily involved* … conducting assessments of a person's dangerousness,"
even if not through forcing the applicant's participation, as the CCIA does.  Opp. at 35 (emphasis
added).  Defendant relies on penumbras and emanations.  Second, Defendant relies on loyalty
oaths, addressed above.  Third, Defendant relies again on "militia mustering laws," which are
irrelevant for the reasons already provided.  Fourth, Defendant references a single New York City
licensing law requiring a person to appear in person and "satisfy[y]" a licensing officer "that the
applicant is a proper and law-abiding person."  Opp. at 36 (citation omitted).  But one example of
one city's fairly recent ordinance (long after the ratification of the Second Amendment and well
after ratification of the Fourteenth Amendment) does not a historical tradition make.  *See Bruen* at
2156.  Fifth, Defendant justifies the CCIA's requirements as being "more solicitous of the
applicant's right to bear arms than [] historical analogues," referencing a loyalty oath. Opp. at 36-
37.  In other words, Plaintiffs apparently should be grateful the CCIA is not even worse than it is.

Defendant's brief does not lay out *all* of the relevant analogues of every "good moral
character" provision, because historical examples do not paint a pretty picture.  In 1824, South
Carolina Governor John Wilson sought an exemption on behalf of "Jehu Jones" from an act
"restraining the free ingress & egress of persons of color into & from the State of South Carolina,"
attesting under oath that "his ward is a *man of good moral character*, attached to the Laws &
Government of this state…." The Southern Debate Over Slavery: Petitions to Southern
Legislatures, 1778-1864, University of Illinois Press (2001), p. 87 (emphasis added).  Similarly,
an 1853 publication by abolitionist William Wells Brown recounted the auction of a slave girl,
named Clotel, as follows:

She enjoys good health, and *has a sweet temper*.[41] How much do you say?" … Here, gentlemen, *I hold in my hand a paper certifying that she has a good moral character*." … "This paper also states that she is very intelligent." … "She is a devoted Christian, and perfectly trustworthy.  [W.W. Brown, <u>Clotel or, The President's Daughter</u> (Laughing Dogs Press: 1853), p. 12-13 (emphasis added).]

Finally, an 1829 <u>bill of sale</u> for "Gabriel" included certifications to the justice of the peace "that they have known the said slave named Gabriel in the foregoing certificate mentioned, for several years, and that he has not, within their knowledge, been guilty or convicted of any crimes, but that *he has a good moral character and is not in the habit of running away*."  "Searching for Truth in the Garden: Gonzaga's History with Slavery" (2019), pp. 18-19 (emphasis added).[42]

To be sure, the CCIA's demand that others speak up for the good moral character of a person *does* have historical analogs – but largely grounded in demonstrating the docility of slaves.

### E.  Defendant's Justification for Access to Social Media is Unpersuasive.

Defendant defends the CCIA's demand for disclosure of all social media history on the theory that, without a comprehensive examination of that information by a licensing official, leading to a finding of "good moral character," it would be possible for "unvirtuous" persons may be able to purchase and possess firearms lawfully.  Opp. at 37-39.  Defendant's analysis skips over what *Bruen* declares to be the threshold issue — the text.  *See Bruen* at 2127.  The right "to keep and bear Arms" is a right protected for all "the people." To be sure, there are a few narrow categories of persons who historically have been declared to be outside of "the people," but it is

---

[41] Similarly, Defendant wants to "get a sense of [an applicant's] temperament…."  Opp. at 34.

[42] *See also* J. Pritchett & M. Smith, *Sequential Sales as a Test of Adverse Selection in the Market for Slaves*, <u>The Journal of Economic History</u>, Vol. 73, No. 2 (June 2013), pp. 477-497 (referencing "an 1829 Louisiana law required the certification of the slave's good moral character as an attempt to prevent the importation of criminal slaves into the state the certificate had to be signed by two or more freeholders [who] were to declare under oath that they had known the slave for several years and that the said slave was not guilty of any crimes, 'but that he or she has a good moral character and is not in the habit of running away.'").

quite another thing for the state to undertake an evaluation of the virtue of each New Yorker before they are permitted to enjoy a pre-existing, constitutionally enumerated right.  Defendant believes the Second Amendment protects only "those deemed to be of good moral character by the State."

New York relies on loose language contained in non-majority opinions, and those few narrow categories of persons who historically have been barred from firearms ownership, and the permissibility of licensing schemes quite different from New York. Defendant's continued reliance on *Libertarian Party v. Cuomo*, 970 F.3d 106 (2d Cir. 2020) (Opp.  at 38), for the idea that its scheme is not a burden on Second Amendment rights, is curious in light of the fact that there, the Second Circuit found no issue with the "good cause" requirement struck down in *Bruen*.  Again, the court's analysis focused on what level of "burden" (infringement) was being imposed, an inquiry *Bruen* rejected.  *Libertarian Party* at 127.

Defendant relies on then-Judge Barrett's dissent in *Kanter v.  Barr*, 919 F.3d 437 (7th Cir. 2019).  Carefully tailoring her statements to imply that states have *carte blanche* to prevent "dangerous people from possessing guns" (Opp. at 38-39), Defendant skips what Judge Barrett wrote next: "[b]ut that power extends only to people who are dangerous.  Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons."  *Kanter* at 451 (Barrett, J., dissenting).  In other words, Judge Barrett's dissent took the position that non-violent felons could *not* be disarmed simply because their crime was categorized as a felony.  Even more ironically, she then stated precisely the opposite of what Defendant claims here, explaining that "[n]or have the parties introduced any evidence the founding-era legislatures imposed virtue-based restrictions on the right."  *Id*.  Defendant has helpfully brought to the court's attention one Justice's view that all felons cannot be disqualified from gun ownership, and that there are no historical antecedents to "virtue-based restrictions" such as "good moral character."

New York's relies on *NRA v. ATF*, 700 F.3d 185 (5th Cir: 2012), because it has language about civic virtue underpinning the Second Amendment, which the court describes as a "theory." But again, a closer look shows the court to be discussing only "unvirtuous citizens (*i.e.* criminals) [or] minors, felons, and the mentally impaired.' *Id*. at 201 (citations omitted). *United States v. Yancey*, 621 F.3d 681 (7th Cir.  2010), also relied on by Defendant, similarly contains an explanation provided by Thomas Cooley that "constitutions protect rights for 'the People' excluding, among others, 'the idiot, the lunatic, and the felon.'" *Id*. at 685.  Minors, felons, and the mentally impaired are already barred by CCIA, and thus cannot be used to justify "good moral character" or a demand for social media history.

Defendant repeats his claim that Plaintiffs must prove elements of the CCIA are "unconstitutional in all … applications," claiming that Plaintiffs must prove "actual evidence that any such thing has happened, or ever would," and giving as a counter-hypothetical an example where specific online threats or indicators of violence demonstrate a clear and present intention to kill." Opp. at 38, 40.  Defendant's hypothetical misses wide of the mark.  The unconstitutionality of the CCIA's demand does not depend on what the state might find in a person's social media history, but the demand itself, just as the legality of a vehicle search does not depend on whether the police ultimately find cocaine in the trunk.  Defendant then appeals to emotion in an attempt to paper over the constitutional problems with the CCIA, noting that some who have committed acts of evil had posted "disturbing content" on social media.  Opp. at 40.  But the fact that an interstate highway is a drug corridor does not permit the police to stop and search every vehicle on the road.  *Cf.* "anti-Jewish images [and] conspiracy theories about Jews controlling the world" (Opp. at 41) with *Konigsberg v. State Bar of Cal*., 353 U.S. 252 (1957) (state may not deny bar license to suspected communist).  In his recitation of the social media history of mass shooters,

Defendant inadvertently has expressed his desire and intent to deny carry license applications for perfectly lawful (even if unpalatable) behavior and views.

Finally, Defendant claims that the CCIA's demand for a person's social media history is akin to "Colonial era" laws where certain persons were "presumptively disqualified" from "bearing arms." Opp. at 42. Of course, none of the examples Defendant provides required a person to *provide information* about himself to authorities. Defendant discusses the federal "no fly list" and "dangerousness assessments" by courts, where a person would be protected by the Fifth Amendment against self-incrimination, and never forced (especially as a condition to gain other constitutional rights) to provide potential evidence against himself. Opp. at 42-43.

Claiming that the CCIA's demand for social media does not violate the First Amendment, Defendant claims the "CCIA is content neutral because it "says nothing about the ideas or opinions that [applicants] may or may not express, anonymously or otherwise. Neither is it aimed at 'supress[ing] the expression of unpopular views.'"[43] Opp. at 44 (citation omitted). On the contrary, the requirement of social media disclosure is not content neutral in three important ways. First, the disclosure requirement only applies to persons who are pro-gun, in that they are seeking to exercise rights relating to firearms. Second, the disclosure is made directly to "licensing officials" who, at least prior to *Bruen*, granted only a handful of licenses, and thus can be expected to be disinclined to believe Second Amendment rights are particularly robust. Third, any New Yorker who might wish to apply for a license will be required to "self-censor" his on-line presence.[44] There is no way to anticipate what a licensing official, especially those hostile to gun

---

[43] Defendant curiously claims that "Plaintiffs do not appear to dispute that the social media disclosure requirement is content neutral." Opp. at 44. Apparently, Defendant missed the part of Plaintiffs' memorandum (ECF #19-1) which explained the CCIA's social media history demand is "not only content-based discrimination, but viewpoint discrimination." *Id.* at 15.

[44] *See* K. Waddell, "How Surveillance Stifles Dissent on the Internet," *The Atlantic* (Apr. 5, 2016)

rights, will find disqualifying.  Thus, few applicants would want to criticize elected or appointed officials, when those same officials could later determine the scope of a person's constitutional rights.  In this way, if CCIA is allowed to go into effect, the New York Assembly will have altered the public debate on all manner of topics, just by its requirement of disclosure of social media, and conditioning the exercise of gun rights on the content of those posts.  The chilling of speech would be of two kinds — speech which identifies the speaker, and speech where the speaker chooses to be anonymous.[45]  It would be folly to assume that this tamping down of criticism of government officials in the CCIA was never anticipated and wholly unintended by the Governor and the Assembly.[46]  The CCIA could scarcely be more content based or chilling of speech.

New York concludes by asking it to defer to the legislature: "'[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks. *NYSRPA v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015).'" Opp. at 45.  Yet Plaintiffs have brought a constitutional challenge, not a policy challenge, and an appeal to policy is reminiscent of Justice Breyer's dissents in both *Heller* and *Bruen*, where he advocated "interest balancing" based on policy, and in both cases the Court refused.  New York acts as if the

---

[45]  It is beyond question that each American has the First Amendment right to determine whether or not to disclose his identity on both electoral and issue-related matters.  *See McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995).  The rich history of anonymous speech in America in many different contexts was reviewed by Justice Thomas in his concurring opinion in *McIntyre*. Social media postings should have no less protection than the humble pamphlet distributed by Margaret McIntyre.  Defendant claims that "Plaintiff Antonyuk has not alleged that he engages in any anonymous speech on social media." Opp. at 46 n.18.  Of course, to identify one's anonymous speech means it would no longer be anonymous, and a person need not yet have engaged in certain speech for his expression to be chilled.

[46] In fact, New York's anti-gun Attorney General recently sent a letter to General Michael Flynn and other "extremist" conservative leaders with respect to an upcoming event at a New York church, threatening to use her office to exact retribution against her political enemies. https://bit.ly/3Az8tTo.

Second Amendment is the only constitutional provision that is associated with risk, but it is not. *See Bruen* at 2126 n.3. The Second Amendment is not a second class right. *Id.* at 2156.

Defendant's conclusory analysis under "intermediate scrutiny" (Opp. at 44-47) fails because that is not the proper test for viewpoint discrimination. Defendant claims that "the government's interest in crime prevention" is fulfilled (i) if the perpetrators had been required to disclose their social media history ***and*** (ii) if "the perpetrators [had been] prevented from obtaining a firearms license." Opp. at 45. But that assumes facts not in evidence (both the Uvalde and Buffalo shooters were 18 years old and flatly ineligible under the CCIA) and, as already explained, it is hard to see how posting a picture of a dead frog on Facebook can be used to deny someone a firearms license. Likewise, Defendant's hypothetical also assumes a "mass shoot[er]" will be stopped from committing his heinous act merely by being denied a license to carry a firearm. Defendant laughably claims the CCIA "does not burden substantially more speech than necessary…." Opp. at 45. On the contrary, for some (if not many) Americans, social media represents *virtually all* speech that could be subjected to government review.

### F.  Sensitive Locations.

Defendant asserts that the State may ban the possession of firearms in places well beyond, and without any real regard to the types of sensitive places identified in, *Heller* and *Bruen*, resulting in a situation which undermines the right to carry for self-defense throughout the State. *Heller* listed only two illustrative sensitive places, "schools and government buildings," where carrying of firearms could be prohibited. *Heller*, 554 U.S. 570, 626, (2008). *Bruen* added to the list "legislative assemblies, polling places, and courthouses…." *Bruen*, at 2133. Perhaps anticipating that states would try to use the sensitive places exception to swallow the rule allowing broad public carry for self-defense, the Court barred the expansion of that exception:

In [Respondents'] view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available."  Brief for Respondents 34.  It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But **expanding the category of "sensitive places" simply to all places of public congregation** that are not isolated from law enforcement defines the category of "sensitive places" **far too broadly**. Respondents' argument would **in effect exempt cities** from the Second Amendment and would **eviscerate the general right to publicly carry arms for self-defense**....  [*Bruen*, at 2133-34 (emphasis added).]

The CCIA's myriad of sensitive locations carries out the plan announced in the aftermath of the *Bruen* decision by the Governor of New York when she reported the State would test the limits of, if not disregard entirely, *Bruen's* narrowing ruling on sensitive places: "[w]e do not need people entering our **subways**, our **restaurants**, our **movie theaters** with concealed weapons" and that **"[w]e're not going to cede our rights that easily**. Despite the best efforts of the **politicized Supreme Court** of the United States of America, we have the power of the pen."[47]  The listing of "sensitive locations" in CCIA is almost limitless:  almost all lack any historical analogues, while some are wholly outside any rational notion what a "sensitive location" could be – for instance, public sidewalks, restaurants, healthcare services, childcare facilities, public transportation, and subsection (s), which bans firearms in any "gathering of individuals to collectively express their constitutional rights to protest or assemble."  Exhibit 1 at 18.

When it comes to historical analogues, to start, Defendant misrepresents the Statute of Northampton, and fails to note the Supreme Court's rejection of that Statute as a historical analog, explaining that "the Statute of Northampton—at least as it was understood during the Middle Ages — has little bearing on the Second Amendment adopted in 1791."  *Bruen*, at 2139.  Opp. at 47, n. 20.  Contrary to Defendant's claim, that ancient Statute did **not** impose a complete ban on weapons

---

[47]  "Governor Hochul Issues Response to Supreme Court Ruling Striking Down New York's Concealed Carry Restriction" *New York State* (June 23, 2022) (emphasis added).

in "Fairs [or] Markets" but, as Justice Breyer noted in his recent dissent, the Statute "[b]y its terms, ... made it a criminal offense to carry arms without the King's authorization" (perhaps akin to a modern day carry license). *Bruen*, at 2182 (Breyer, J. dissenting) (emphasis added).

Next, Defendant relies on a provision in Delaware's 1776 constitution, "[t]o prevent any violence or force being used at . . . elections, no persons shall come armed to any of them[]." Opp. at 48. But New York fails to mention that Delaware dropped the prohibition only months after the ratification of the Bill of Rights, in its 1792 constitution. Likewise, Delaware's 1897 constitution, in effect today, also contains no such language. Defendant claims that "Virginia in 1786 prohibited anyone to 'go nor ride armed by night nor by day, in fairs or markets.'" Opp. at 48. The punctuation at the end of the sentence, a period, suggests that it is the end of the quotation. Yet as has become common with Defendant's defense of New York laws and, much as Justice Alito challenged in the Supreme Court in *Bruen*,[48] New York *left off the remainder of the quotation*, which alters the meaning substantially: "nor go nor ride armed by night nor by day, in fairs or markets, or in other places, **in terror of the county**..." *See* Def's. Ex. 20-38 (emphasis added). Thus, Virginia did not ban carrying, but carrying a weapon while committing a specific offense.[49]

Next, Defendant supports the CCIA's ban firearms in "Universities, including public universities" because the University of Virginia banned students from possessing "weapons or

---

[48] During oral argument in *Bruen*, Justice Alito challenged counsel for New York on a similar omission: "**what it actually says is** 'you shall arrest all such persons as in your sight shall ride or go armed offensively.' And somehow that word 'offensively' got dropped ... from your brief." Justice Alito then asked "Do you think that's an irrelevant word?" *Bruen* Oral Argument (Nov. 3, 2021), pp. 86-87 (emphasis added).

[49] *Bruen* rejected Defendant's argument: "A by-now-familiar thread runs through these three statutes: They prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people. … Respondents give us no reason to think that the founding generation held a different view. Thus, all told, in the century leading up to the Second Amendment and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry." *Id.* at 2144-45.

arms of any kind, or gunpowder" in 1824.  Opp. at 48-49.  The University of Virginia may be a state institution, but in setting rules, it exercises its rights as a proprietor, so this provides no historical analog for a State to ban possession at *all* universities.  Additionally, the offenses listed apparently were merely university rules, not felony crimes, sanctioned "on pain of any of the minor punishments at the discretion of the Faculty[]" which was "punished the same as using "tobacco[.]" Def's. Ex. 39, at 6-7.  With respect to the Reconstruction era, Defendant cites an 1871 statute from Texas banning firearms including in "any school room" or where people gather for "educational, literary or scientific purposes[.]" Opp. at 49.  Missouri in 1883 appeared to copy the Texas statute. *Id*.  New York describes these laws as "only representative examples[,]" but the burden is on New York to justify its ban by showing a broad historical tradition of such laws, not an outlier or two. As *Bruen* explained, one or two laws from the past – laws which were likely never challenged, and enacted before the Second Amendment was deemed in *Heller* to be an "individual right," do not prove a "well-established and representative historical analogue" sufficient to demonstrate a "tradition" showing that these restrictions are constitutional.  Id. at 2133.  *Bruen* explained that "we doubt that three colonial regulations could suffice to show a tradition…." *Bruen*, at 2142.

Most of Defendant's supposed analogues stem from the period after ratification of the Fourteenth Amendment.  *See* Opp. at 49-51.  To be sure, Defendant footnotes some historical laws establishing off-limits places, *see* 1869-70 Tenn. Pub. Acts 23-24 (fairs, race course, public assembly); 1870 Ga. Laws 421 (courts, election ground, place of worship, public gathering); 1873 Pa. Laws 735-36 (banning deadly weapons in city of Harrisburg).  Opp. at 50, fn.21.  Of course, the Pennsylvania law represented precisely what *Bruen* says is prohibited, "declar[ing] the island of Manhattan [or in that case, Harrisburg] a 'sensitive place'…." *Id*. at 2118.  Moreover, these late arriving outliers, well after ratification of the Second Amendment, do not demonstrate a broad

tradition that public carry could be banned.  As the Supreme Court stated, "*Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence 'only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions.'" *Bruen*, at 2137.  Interestingly, while violations of these later statutes were punishable by fines from $25 to $500, and discretionary imprisonment up to 3 months, Defendant cites them as precedent for the CCIA's creation of a felony.  Exhibit 1 at 19.

Interestingly enough, even after his historical canvassing, Defendant does not identify a single historical analogue for many (if not most) of the CCIA's "sensitive locations," including (but not limited to) its numerous healthcare and treatment settings deemed off limits, shelters, residential settings, childcare facilities, public transportation, public sidewalks, etc.  To be sure, Defendant offers the conclusory statement that some of the CCIA's "sensitive locations … are modern areas equivalent to those categories" but, other than for Times Square and places like amusement parks,[50] does not further explain.  Opp. at 50.  Many of are owned establishments located on private property, and even the proprietor (such as a doctor, dentist, or therapist) cannot carry a firearm in his or her own office and, unlike "restricted locations," cannot waive the CCIA's prohibition for staff or patients.  The proprietor of a "domestic violence shelter" cannot even carry a firearm to defend a battered woman.  Guns are banned on ferries, presumably even in one's own vehicle during transport.  May a homeowner defend his family if rioters "collectively express their constitutional rights to protest or assemble."[51]

---

[50] An 1870 law does not tell us anything about what the framers thought during ratification.  Texas' 1870 ballroom ban law carved out an exception for those in "locations subject to Indian depredations." Def.s' Ex. 41. But even so, *Bruen* teaches that "because post-Civil War discussions of the right to keep and bear arms … do not provide as much insight into its original meaning as earlier sources..." *Bruen*, at 2137 (cleaned up, citations omitted).
[51] https://bit.ly/3KioGzG.

Likewise, it appears that there could no longer be a "gun show" in New York State, to the extent that it occurred at a place that could be construed as a "public park" or "exhibit" or "conference center," or separately because such an event would represent "any gathering of individuals to collectively express their constitutional rights to protest or assemble."  Exhibit 1 at 16-18.  Not only would this harm individual gun owners represented by GOA/GOF/GOA-NY, but also it would directly harm the organizational plaintiffs, who routinely attend gun shows to meet with gun owners, sign up new members, and receive contributions from supporters.  *See* Exhibits "1" and "2."  In fact, the CCIA's broad prohibition would mean that gun owners could not "assemble" while armed *for any purpose* (such as to attend a speech given by a GOA/GOF/GOA-NY spokesman), potentially extending even to prohibiting applicants from obtaining the training that the CCIA requires.  *See* Exhibit 1 at 19 (exempting only "hunter education training").  Likewise, the CCIA's ban on firearms in "train cars" and "buses" and "railroad" and "airports" and "rail stations" would seem to conflict with federal law and regulations, including the safe harbor provision of 18 U.S.C. § 926A, along with TSA[52] and Amtrak[53] regulations authorizing the transportation of firearms.  *See* Dec. of Pratt, Exhibit "1."  Similarly, banning all firearms "in or upon any building or grounds, owned or leased, of any educational institution[]" would mean that a college could not have a shooting range, club, or hold matches or events.[54]

Finally, CCIA bans carrying a firearm in any "public park."  Strikingly, there is no exception for those that live *within a park*, which is a problem for the individuals in "Adirondack Park, a mountain range covering a fifth of the state's landmass.  It is larger than several U.S. states,

---

[52] https://www.tsa.gov/travel/transporting-firearms-and-ammunition.
[53] https://www.amtrak.com/firearms-in-checked-baggage.
[54] *See* list of NY colleges that have such facilities, at https://bit.ly/3Kesnq7.

and home to 130,000 people..."[55]  Reuters reports conflicting views on whether some or all of the Adirondacks is now a gun-free zone, with the Governor saying "some" and the bill sponsors opting for "all."  "Two-fifths" of the New York state cannot be considered a "sensitive location" under *Bruen*, on the theory that, in 1861, New York the banned firearms in Central Park. The CCIA's broad, vague bans on firearms in huge swaths of locations is unconstitutional on its face.

### G.  Restricted Locations (Private Property).

Defendant attempts to justify declaring all private property within New York State off-limits to firearms unless specifically posted, as merely being a way to "keep private property private."  Opp. at 52.  But this is backwards.  By declaring a policy governing all property owners, New York is usurping – not protecting – the rights of property owners to decide things for themselves.  Private property owners are, and have always been, free to post their places off-limits if they so desire.  Defendant claims that the Second Amendment does not protect the right to bear arms on someone else's property (Opp. at 51, 52), but Plaintiffs have not made any argument to the contrary.  But that does prove the flip side of the coin, authorizing the state to seize property rights and declare all property to be a gun free zone.  The CCIA flips the default from "lawful carry is allowed unless otherwise posted" to "lawful carry is a felony unless expressly allowed."[56] Defendant glibly claims that "[c]entral to the right of property is the right to exclude others" (Opp. at 52) – but then makes a default decision about the use of all private property.

---

[55] https://reut.rs/3QMWWpm.
[56] It is unknown how many businesses will choose to "opt out" and post signs allowing carry, but if history is a guide, it is probably very few.  Doing nothing is the path of least resistance for businesses and, in a state where gun rights are generally disparaged, many will likely do nothing.

Defendant cites to statutes it claims stands for barring carrying of firearms from private property without prior consent, but they are anti-poaching laws.[57]  Then, Defendant claims that a variety of "states across the country have laws on the books prohibiting carrying guns onto private property without the owner's consent" (Opp. at 54), but these statutes only apply to trespassers, and do not set up default anti-gun rules for all private property.[58]  Thus, none helps Defendant.

Finally, Defendant relies heavily on the Eleventh Circuit's case in *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), which challenged a state statute prohibiting carry "[i]n a place of worship, unless the governing body or authority of the place of worship permits the carrying of weapons or long guns by license holders…."  Ga. Code Ann. 16-11-127(b)(4).  That case does not save the CCIA.  The Georgia statute merely required a church to "permit" firearms, whether through a policy, a posting, a statement, or otherwise, whereas the CCIA demands "clear and conspicuous signage" or "express consent."  Moreover, that case involved a *license holder*

---

[57] The 1721 Pennsylvania statute (Opp. at 53) is more akin to an anti-poaching law (due to the inclusion in the preface: "by persons carrying guns and presuming to hunt on other people's lands").  Def's. Ex. 46 at 3.  The 1715 Maryland statute is surrounded by an anti-poaching provision (*i.e.,* prohibition against killing "unmarked swine above three months old, if not upon his or their own land").  The penalty for violation was one thousand pounds of tobacco.  Def's. Ex. 48 at 3.  New Jersey's 1741 statute is also an anti-poaching statute, entitled "An ACT to prevent Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not Qualified."  Def's. Ex. 47 at 2.  The 1771 amendment to New Jersey's law mandated that violators were liable to compensate the landowner directly "Forty Shillings, with Costs of Suit[.]"  Def's. Ex. 49 at 2.

[58] Defendant's citation to Ark. Code Ann. § 5-39-203(b)(2) pulls in another anti-hunting/poaching statute and applies only when a person "enters or remains unlawfully" – i.e., trespasses.  Similarly, Fla. Stat. § 810.08(2)(c) begins with "[w]hoever, without being authorized, licensed, or invited," again applying only to a trespasser.  Hawaii's statute involves trespass if a person "[k]nowingly enters or remains unlawfully."  Or. Rev. Stat § 164.265 only forbids "enter[ing] or remain[ing] unlawfully in or upon premises."  Texas's statute likewise applies only if a person lacks "effective consent" and has "received notice that entry on the property by a license holder with a concealed handgun was forbidden."  Tex. Penal Code § 30.06(a).  *See* https://bit.ly/3dPeSRx.  ("Private property owners may exclude license holders from carrying concealed handguns on their property by giving the license holder effective notice as provided in Section 30.06, Texas Penal Code.").  Each of Defendant's citations simply do not stand for what he reads into them.

*seeking to force a private property holder to permit him to carry* (desiring to "bring a firearm on the private property of another against the wishes of the owner"), and the court held that "the individual right protected by the Second Amendment" does not "trump[] a private property owner's right to exclusively control … his or her premises." *Id.* at 1261. Here, the CCIA denies "a private property owner's right to exclusively control rules to govern his or her premises."

### H. The CCIA's Onerous Training Requirements Violate the Second Amendment.

To be sure, a citizen's voluntary decision to obtain training in the safe and responsible handling of firearms – not to mention skill and proficiency in their use – is laudable. One might even argue that it is a duty for a gun owner. Of course, so too is the ability to read and write a basic necessity in order for a person to be a responsible and informed citizen, but that does not justify a literacy test for voting. Making matters worse for the CCIA is the extreme degree to which it goes to force law-abiding gun owners to receive particular, state-mandated training as a barrier to entry for a license to carry a firearm, requiring many times the number of hours of training (at many times the cost) as other states.[59] Such wealth or class-based requirement are similar to South Carolina's 1865 statute (referenced above) requiring that "persons of color" to pay a $100 business licensing fee.

First, Defendant claims that the Second Amendment's *text* permits the CCIA's training requirements, as it secures a "well regulated militia" which *Heller* defined to be "the imposition of discipline and training." Opp. at 57. But the Court did not mean "imposition of discipline and

---

[59] To be sure, the *Bruen* majority contrasted New York's discretionary regime to "shall-issue" states which contain objective criteria such as "pass[ing] a firearms safety course" (*id.* at 2318 n.9), but that does not mean the Court found any (much less all) such requirements to be constitutional, or opened the door for New York to enact any degree of onerous requirement it wished. Once again, Defendant references Justice Kavanaugh's concurring opinion, rather than the *Bruen* majority, for its defense of the CCIA. Opp. at 56.

training" *by the state*; rather, it was merely defining the meaning of the term.  Defendant similarly

opines that *Heller's* discussion of bearing arms to mean "learning to handle and use them" implies

that New York may *require* persons to do so.  *Id.* at 56.  But as is typical, Defendant leaves off the

rest of the quotation from Thomas Cooley, which explains that this learning to use arms "implies

the *right* to meet for *voluntary* discipline in arms," a far cry from Defendant's use of this passage

to permit the state-imposed *duty* to meet for *mandatory* training.  Nor can the Court's approval for

the CCIA's training requirement be found in "*Bruen* itself" because, again, the Court did not

expressly approve of the licensing regimes of 43 shall-issue states.  *See* Opp. at 57-58.[60]

Next, Defendant claims that the CCIA's demand of at least 18 hours of training is no

aberration, because of four other states with requirements ranging from 12-24 hours (with the other

45 states requiring far less, if any, training and, again, with 25 of them needing no license at all).

But all this proves is that New York is one of a few outlier states – in fact, by Defendant's own

admission, the CCIA's requirements are *more onerous than any state* with the exception of

California (hardly a good model for protecting Second Amendment rights).

Next, claiming there to be historical analogues to the CCIA's training requirement,

Defendant relies exclusively on founding era militia statutes.  Opp. at 56, 58-60.  But again, these

training requirements for soldiers (on the government's dime) applied to the organized militia, not

"the people" in the Second Amendment.  Finally, Defendant disputes Plaintiffs' estimation of the

cost of a CCIA-mandated 18-hour training course.  Opp. at 60-61.  Defendant claims that Plaintiffs'

estimate of the cost of training is "entirely speculative," and "the true cost is likely to be

significantly less," with "four-hour courses [being] as low as $50.00."  *Id*.  On the contrary, the

---

[60] Contrary to Defendant's misleading claim, Plaintiffs never "acknowledged" that "*Bruen* … endorsed" training requirements.  Opp. at 57 n.28.  Rather, Plaintiffs merely recounted the Court's comparison between New York and more permissive states.  Mem. at 9.

Court may take judicial notice of mathematics – that a training requirement of several times as many hours as before will come with a price tag several times as much as before.  Moreover, the Second Circuit case cited by Defendant, claiming that excessive licensing fees are justifiable, was pre-*Bruen* and based on the very interest balancing that *Bruen* rejected.  Opp. at 61.  Lastly, Defendant claims that Plaintiffs may be required to bear the costs of their own training, again referencing founding era militia laws that have no application here.  Opp. at 61-62.

## VI.     Plaintiffs Meet the Remaining Elements for Injunctive Relief.

Defendant contends that Plaintiffs have not demonstrated irreparable harm and "have not even alleged an injury-in-fact," without explanation.  Opp. at 63.  On the contrary, this Court has already recognized one of those harms, that if Plaintiff Antonyuk "were to carry his handgun into a gas station or store…."  ECF #36.  Plaintiffs' Complaint and declarations are full of specific allegations of irreparable harm, and Defendant only disputes them in broad conclusory terms.

For the last factor, Defendant dismisses Plaintiffs' side of the balance by, again, claiming that they will suffer no irreparable harm, while claiming that the harm to New York caused by enjoining the CCIA before it becomes effective "would be real, and potentially catastrophic."  Opp. at 64.  But Defendant's theories are framed as if the CCIA were already in effect.[61]

Respectfully submitted,

---

[61]  First, Defendant claims that to enjoin the good moral character requirements "would severely undermine the ability to assess a person's dangerousness" (Opp. at 65), but the state currently does not demand any of these things.  Second, Defendant claims that "[g]uns would immediately be allowed in a host of inappropriate places" but, neither the CCIA's "sensitive locations" nor its "restricted locations" prohibition is yet in effect.  Third, Defendant claims that an injunction striking down the CCIA's ban on firearms on all private property would "do tremendous harm to the rights of property owners," but they now are free to decide who may enter their property, a status quo that an injunction would not change.  Finally, Defendant claims that enjoining the CCIA "would result in licenses being granted to persons who have not established the competence to handle a weapon" but the current law already has a training requirement.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us
NDNY Bar Roll# 520383

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com

## CERTIFICATE OF SERVICE

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing document or pleading to be electronically filed with the Court's CM/ECF system which caused a notice to be generated and a copy of the foregoing to be delivered to all counsel of record.

Dated: August 22, 2022.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh

42