UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------x
IVAN ANTONYUK; GUN OWNERS OF AMERICA, INC.;
GUN OWNERS FOUNDATION; and GUN OWNERS OF
AMERICA NEW YORK, INC.,

                                  Plaintiffs.

vs.                              1:22-CV-734

KEVIN P. BRUEN, in his Official Capacity as
Superintendent of the New York State Police,

                                  Defendant.

---------------------------------------------x

        Transcript of a Motion Hearing held on

August 23, 2022, at the James Hanley Federal

Building, 100 South Clinton Street, Syracuse,

New York, the HONORABLE GLENN T. SUDDABY, Chief

Judge, Presiding.

                    A P P E A R A N C E S

For Plaintiffs:     STAMBOULIEH LAW, PLLC
                    Attorneys at Law
                    P.O. Box 428
                    Olive Branch, Mississippi  38654
                      BY:  STEPHEN D. STAMBOULIEH, ESQ.

For Defendant:      STATE OF NEW YORK
                    Office of the Attorney General
                    28 Liberty Street
                    New York, New York  10005
                      BY:  JAMES M. THOMPSON, ESQ.

                    STATE OF NEW YORK
                    Office of the Attorney General
                    The Capitol
                    Albany, New York  12224
                      BY:  MICHAEL G. McCARTIN, ESQ.

1

2                    I N D E X   O F   T E S T I M O N Y

3

4    Witnesses              Direct    Cross    Redirect    Recross

5    Erich Pratt               5         6        13         --

6    William Robinson         14        15        22         --

7    Ivan Antonyuk            23        24        --         --

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Open Court, 10:38 a.m..)

2          THE CLERK:  Case is Ivan Antonyuk Gun Owners of

3   America, Inc., Gun Owners Foundation and Gun Owners of

4   America New York Inc. versus Kevin Bruen, 22-CV-734, Counsel,

5   please note your appearances for the record.

6          MR. STAMBOULIEH:  Stephen Stamboulieh for the

7   plaintiffs.

8          MR. THOMPSON:  Good morning, your Honor, James

9   Thompson from the Attorney General's office for defendant

10   Bruen.

11          MR. McCARTIN:  Good morning, your Honor, Michael

12   McCartin with the Attorney General's office for defendant

13   Bruen as well.

14          THE COURT:  Okay.  Good morning.  We're here for a

15   hearing this morning on the motion for preliminary injunction

16   and we're going to -- we'll start with witnesses, then I'll

17   give both parties an opportunity to make their arguments,

18   certainly your arguments may be affected by some of the

19   testimony that's elicited so we'll wait to hear any argument

20   at the end, I think that makes the most sense.  I'll give

21   each of you an opportunity to present your arguments and then

22   give a reply, so that you feel like you had an opportunity to

23   cover everything, obviously an opportunity to respond to your

24   opposing counsel.  Okay?

25          So I think it makes the most sense, because our

4

1   technology has been a little iffy lately, technology's great

2   when it works, and so far we've got it working so this

3   witness that had travel issues and can't be here today, we're

4   going to do remotely so why don't we call that witness first

5   and so that it can be addressed quickly and while we know

6   it's working and then we'll go from there, okay?

7           MR. STAMBOULIEH:  Yes, sir.

8           THE COURT:  Okay.  Go ahead, sir.

9           MR. STAMBOULIEH:  The plaintiffs will call Erich

10  Pratt, your Honor.

11          THE COURT:  Okay.

12          MR. STAMBOULIEH:  And your Honor, if it pleases the

13  court, my understanding of your order was that we would

14  submit supplemental affidavits and then subject the witnesses

15  to cross-examination, so would the court like me to just

16  authenticate he filed an affidavit and then have the state

17  cross-examine him?

18          THE COURT:  Yeah, I mean I'm sure they'll

19  cross-examine him based on the affidavit that's been

20  submitted and whatever testimony you offer, so that's pretty

21  standard.

22          MR. STAMBOULIEH:  Yes, sir, thank you.

23          THE COURT:  No issues, all right?

24          MR. STAMBOULIEH:  Thank you.

25          THE COURT:  So we'll swear him in.

1          THE CLERK:  Mr. Pratt, can you please raise your

2     right hand.

3

4          E R I C H   P R A T T , called as a

5     witness and being duly sworn, testifies as follows:

6          MR. STAMBOULIEH:  May I proceed?

7          THE COURT:  You may, sir.

8     DIRECT EXAMINATION BY MR. STAMBOULIEH:

9     Q    Mr. Pratt, would you state your name for the record,

10    please?

11    A    My name is Erich Pratt, and I'm the senior vice

12    president of Gun Owners of America.

13    Q    Mr. Pratt, did you execute an affidavit yesterday for

14    filing in response to the opposition to the motion for

15    preliminary injunction?

16    A    Yes, I did.

17    Q    And you signed that affidavit yesterday.  I don't have

18    a copy of it to show you.

19    A    Yes, I did.

20    Q    Right.  I'm just going to -- can't see anything.  Okay.

21    Your signature, it's Erich Pratt, correct, August 22nd, 2022?

22    A    That's correct.

23         MR. STAMBOULIEH:  All right.  Your Honor, we'll

24    rest on the declaration, I'll let my friends here cross.

25         THE COURT:  Okay.

Erich Pratt - Direct                    6

1          MR. McCARTIN:  Thank you, your Honor.

2          THE COURT:  When you're ready, sir, go ahead.

3    CROSS-EXAMINATION BY MR. McCARTIN:

4    Q     Sir, good morning, my name's Michael McCartin, I

5    represent Superintendent Bruen in this litigation.  Your

6    organization, Gun Owners of America, is a 501(c)(4)

7    organization, is that correct?

8    A     For Gun Owners of America, yes; we also have a

9    foundation as well.

10   Q     And what is the foundation as far as, it's not a

11   501(c)(4), right?

12   A     That's correct, it's a 501(c)(3).

13   Q     Now, as far as Gun Owners of America being a 501(c)(4),

14   that means your organization is an advocacy group, it lobbies

15   as part of its main core mission, is that correct?

16   A     That's correct.

17   Q     And your whole purpose in being a political and

18   lobbying organization is to listen to your members and

19   advocate on their behalf to legislatures and courts for the

20   interest of the members, is that fair to say?

21   A     We do do that, and I would say organizationally, we

22   heard from an incredibly big number, large number of our

23   members on this way beyond anything that I can remember in

24   recent years, so we actually had to pull resources from what

25   we were currently doing --

Erich Pratt - Direct                     7

1    Q     Sir, if I could ask you just to answer my questions
2    before you get into that.  Okay?
3    A     Sure.
4    Q     All right.  Now, on page 1 of your website or a page of
5    your website for Gun Owners of America states, "Over the last
6    30 years, Gun Owners of America has built a nationwide
7    network of attorneys to help fight court battles in almost
8    every state in the nation to protect gun owners' rights," is
9    that correct?
10   A     That's correct.
11   Q     Now, last year your contributions were over $6 million,
12   is that fair to say?
13   A     I don't have that information in front of me, but -- so
14   I can't, with, you know, willfully knowing what the number
15   is, but it's certainly in the millions.
16   Q     Now, you began to discuss the phone calls that you
17   received.  Is it correct that your organization Gun Owners of
18   America received 28 telephone calls and e-mails in regard to
19   the new legislation that we're addressing here today?
20   A     That's correct.
21   Q     How many phone calls on an average day would you
22   normally have prior to July 1st of 2022?
23   A     On any particular issue, you'd be able to count phone
24   calls that we would get on one hand.
25   Q     And who answers the phones at your organization?

Erich Pratt - Direct                    8

1    A      We have several people who do.

2    Q      And who are they?

3    A      You're looking for names?

4    Q      Yes.

5    A      So we have Nico Gonzalez, we have Megan Browning who

6    is -- heads up the team, and I can get you other names as

7    well.

8    Q      As a result of the passage of the CCIA, did you receive

9    an increase in the amount of e-mails or snail mail that you

10   received?

11   A      Yes, we certainly did, far exceeding anything that I

12   can remember in recent years.

13   Q      Now when you say 28 calls and e-mails, is that combined

14   or individually?

15   A      Could you clarify?

16   Q      Sure, I'm looking at paragraph 6 of your declaration

17   and you indicate, "Relative to this issue, we received

18   approximately 28 calls and e-mails."  Is that 28 combined

19   calls and e-mails?

20   A      I guess I don't see -- I don't understand the

21   distinction between combined versus individually.

22   Q      Well, did you receive --

23   A      There were 28 different people if that's what you mean.

24   Q      28 different people contacted you?

25   A      Yes.

Erich Pratt - Direct                    9

1    Q     Okay.  Now, during the normal course of the day, prior

2    to July 1st of 2022, how many e-mails would your organization

3    generally get?

4    A     Um, it really depends on what's happening but I would

5    say -- honestly I'd probably have to defer to Megan and get a

6    statement from her because that's not something that I'm day

7    to day at all tracking.

8    Q     So you don't --

9    A     But I'm guessing, I have in the past I will say -- I'm

10   not currently but in the past when I was more operationally

11   looking at that, I would say it would be like a dozen to 15 a

12   day.

13   Q     Dozen to 15 a day.  And in total, you received 28 calls

14   and e-mails relative to this particular legislation?

15   A     That's correct.  Right.  And just for clarification,

16   the 12 to 15 of course would be, I mean, that could be, you

17   know, membership question, something like that, these aren't

18   necessarily people who are calling on an issue.

19   Q     Sir, did members of your organization contact you at an

20   increased pace as a result of the Supreme Court's *Bruen*

21   decision that was issued on June 23rd, 2022?

22   A     Yes, it was certainly concentrated around the time of

23   the passage.

24   Q     Between the time period of June 23rd, 2022 and

25   June 30th, 2022, how many phone calls and correspondence did

Erich Pratt - Direct                    10

1    you receive in that one-week period?

2    A    I don't have that information in front of me but that's

3    something that I can get.

4    Q    Did you continue to receive phone calls as a result of

5    the legislation in question being signed into law on July 1st

6    of 2022?

7    A    I don't know when, what day it began, what day the

8    calls and contacts began.

9    Q    Your lawsuit in this case began on July 11, 2022,

10   correct?

11   A    I'm assuming so, I don't have the document in front of

12   me.

13   Q    Assuming that's correct?

14   A    Sorry.

15   Q    Assuming that's correct, sir?

16   A    Okay.

17   Q    Between the 1st of July and the 11th of July, how many

18   of the phone calls of the 28 phone calls and the e-mails did

19   you receive in that 11-day period?

20   A    Again, I don't have that information as to when the

21   calls came, you know, on which days they came, I only know

22   the total numbers.

23   Q    How many more members did your organization obtain

24   since July 1st of 2022?

25   A    Again, that's not information that I have, but

Erich Pratt - Direct                    11

1    certainly information that I can get.

2    Q     Can you give me an estimate of how many more members

3    you obtained as a result of the act being passed?

4    A     As we're -- as I'm sitting here, I cannot, because

5    again, that's, you know, I'm one who deals with the media and

6    so, you know, we have a lot of division of labor, that's just

7    not something I deal with on a day-to-day basis.

8    Q     How much more in donations did you receive between

9    July 1st, 2022, and this date?

10   A     Again, I don't have that information, I can get it.  I

11   can tell you how our media kicked up because that is what I

12   deal with, and we were slammed with media and had several

13   staffers having to handle media requests, so that I can say

14   definitely took an uptick.

15   Q     Is it possible that your membership and contributions

16   took an uptick as well so you have a financial net benefit as

17   a result of the act being passed?

18   A     I can only speculate that's something that I can --

19   again, that's information we can certainly get for you.

20   Q     But you don't have it here today?

21   A     Nope, sorry, I don't.

22   Q     So you don't know if the act has been a financial boon

23   to your organization as opposed to a detriment?

24   A     Again, that's information that, you know, I'll have to

25   check with our financial officer to find out what's been the

Erich Pratt - Direct                    12

1    uptick in New York.

2    Q     Sir, you mentioned in your declaration that you had a

3    concern about a gun show in Hamburg, New York, is that

4    correct?

5    A     That's correct.

6    Q     Has that gun show been canceled to your knowledge?

7    A     To my knowledge, no, although I believe that they are

8    very concerned about whether they can have it, so our

9    understanding is that it might be.

10   Q     It might be but you don't know if it has?

11   A     I don't know for sure, no.

12   Q     Has that gun show been threatened to be canceled by the

13   New York State Police, to your knowledge?

14   A     I don't personally have that information.

15   Q     Do you know if any members of either the Gun Owners of

16   America or the Gun Foundation of America are former members

17   of the New York State Police?

18   A     I personally don't have knowledge of that.

19   Q     Other than through this lawsuit, has your organization

20   had any contact with the New York State Police about the

21   CCIA?

22   A     Not that I know of.

23   Q     Has the New York State Police threatened you or your

24   organization with any consequences related to a violation of

25   the CCIA?

Erich Pratt - Redirect                          13

1    A      Not that I've been made aware of.

2              MR. McCARTIN:  Thank you, sir.  Your Honor, I have

3    no other questions at this time, thank you.

4              THE COURT:  Any redirect?

5              MR. STAMBOULIEH:  Just a brief redirect, your

6    Honor.

7              THE COURT:  Go ahead, sir.

8    REDIRECT EXAMINATION BY MR. STAMBOULIEH:

9    Q      Mr. Pratt, you heard my friend's questions about

10   whether or not the act was a financial boon to Gun Owners of

11   America and Gun Owners Foundation, do you recall that

12   question?

13   A      I do.

14   Q      Do you pay your attorneys, Mr. Pratt?

15   A      Yes, we do.

16   Q      Do you anticipate making more money in donations than

17   what you're going to pay me to litigate this case?

18   A      It has never been our experience that the contributions

19   coming in related to a case pay for the expenses of our

20   attorneys.

21             MR. STAMBOULIEH:  Okay.  Thank you so much.  Thank

22   you, your Honor.

23             THE COURT:  Okay.  Any followup --

24             MR. McCARTIN:  I would just note, your Honor, that

25   attorneys' fees aren't able to establish standing.  Other

William Robinson - Direct                              14

1    than that, I'll rest on this.

2           THE COURT:  Okay.  Is that it with regard to this

3    witness?

4           MR. STAMBOULIEH:  Yes, your Honor.

5           THE COURT:  Okay.  Thank you, sir.  We appreciate

6    you appearing.

7           THE WITNESS:  Thank you.

8               (The witness was excused.)

9           THE COURT:  All right.  You may call your next

10   witness.

11          MR. STAMBOULIEH:  Plaintiffs will call William

12   Robinson.

13          THE CLERK:  You can step right over here.  Can you

14   please state your name for the record.

15          THE WITNESS:  William Robinson.

16          THE CLERK:  Please raise your right hand.

17

18          W I L L I A M   R O B I N S O N , called

19   as a witness and being duly sworn, testifies as

20   follows:

21          MR. STAMBOULIEH:  May I proceed?

22          THE COURT:  You may, sir.

23   DIRECT EXAMINATION BY MR. STAMBOULIEH:

24   Q    Mr. Robinson, will you state your name for the record,

25   please.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

William Robinson - Direct                    15

1    A    William Robinson.

2    Q    Mr. Robinson, did you execute an affidavit yesterday in

3    this matter?

4    A    Yes, I did.

5    Q    Can I show you -- I don't have an exhibit to show you

6    but it's just this affidavit document.

7                   May I approach, your Honor?

8                   THE COURT:  You may.

9    Q    Is this your signature at the bottom of this document?

10   A    Yes, it is.

11   Q    And this is your affidavit, correct?

12   A    Yes.

13   Q    Along with the exhibits attached, correct?

14   A    Yes.

15        MR. STAMBOULIEH:  Okay, thank you.  Your Honor,

16   we'll rest on Mr. Robinson's declaration, tender him to the

17   state.

18                   THE COURT:  Okay.  Counsel.

19        MR. McCARTIN:  Thank you, your Honor.

20   CROSS-EXAMINATION BY MR. McCARTIN:

21   Q    Good afternoon, sir, my name is Michael McCartin, I

22   represent Superintendent Bruen in this matter.  Can you tell

23   me again the name of your organization?

24   A    It's Gun Owners of America New York.

25   Q    And is that a 501(c)(4) organization?

William Robinson - Cross                           16

1   A      (c)(3).

2   Q      (c)(3).  And does that mean that your organization is

3   an advocacy group that deals with political and lobbying

4   organizations?

5   A      We're a 501(c)(3) so technically we can't recommend

6   anybody to vote for, that type of thing.  We do, our primary

7   mission is to educate the public on gun laws, gun rights,

8   Second Amendment issues.

9   Q      And that is your primary mission, to advocate on behalf

10  of your members in legislatures and courts, is that fair to

11  say?

12  A      Well, if we see something we're interested in or that's

13  going to violate our constitutional rights, yeah, we will

14  pursue that.

15  Q      Now how many phone calls did your organization receive

16  as a result of the passage of the CCIA?

17  A      Well, I'm not sure the figure I put down on the

18  affidavit but 20, could be, right, since I did that actually

19  it's probably another three or four more so in the 20s.

20  Q      And how many phone calls would you get on an average

21  day at your organization prior to July 1st of 2022?

22  A      Well, we don't -- I wouldn't say, a week, can I say

23  weekly?  Like three to four a week say.  We didn't have a lot

24  of phone calls on, you know, only, as Erich Pratt said

25  earlier, when things are hot, there's a serious concern of

1    our members, then I get the phone calls.  I personally take

2    most of the phone calls.

3    Q     Did you receive a number of phone calls as a result of

4    the Supreme Court's decision on *Bruen*?

5    A     Yes, received a number of them, positive phone calls,

6    people were really very happy that that happened.

7    Q     How many phone calls did you receive from June 23rd,

8    the date of the issuance of the decision, until July 1st?

9    A     I can't -- I'm sorry, I can't tell you, I'm not sure, I

10   don't know.

11   Q     Who answers the phones at your organization; was that

12   you?

13   A     Pretty much, we have a 24-hour answering service,

14   machine type of thing and it kicks into my cell phone.

15   Q     So a lot of the phone calls that you received, in the

16   20s or so, went to your message machine, your voice mail?

17   A     Well, it doesn't leave a message, it flips over right

18   to my cell phone after a few calls -- few rings, then it

19   kicks into my cell phone.

20   Q     Okay.  So did you answer all of those 20 or so phone

21   calls?

22   A     Eventually I did, yes, yeah.

23   Q     Oh, so you would call them back?

24   A     I tried to call most of them back, I'm still behind a

25   couple.

William Robinson - Cross                              18

1    Q      How many e-mails did you receive, after July 1st?

2    A      Not sure I put on that document because I get them

3    every day, a lot of e-mails, quite a few, dozens of them.

4    Q      Dozens like 24?

5    A      Yeah, something like that, I would say, related to ...

6    Q      How many e-mails would you get in a normal day, prior

7    to July 1st, 2022?

8    A      Related to Gun Owners of America and gun material, not

9    that often, every -- well, two or three a day.

10   Q      I want you to assume that the standing period is

11   between July 1st, the date of the act being passed, and the

12   date of your lawsuit being July 11th, how many phone calls

13   and e-mails did you receive in that 11-day period?

14   A      I don't know.  I can get back to you on it, I mean I

15   think I can get back to you on it, but I'm not sure.

16   Q      Did your organization gain additional funds as a result

17   of having new members sign up with your organization and

18   after July 1st, 2022?

19   A      Well, looking back listening to Erich Pratt's interview

20   earlier, the -- we did get a slight increase in membership,

21   so we did get some positive, more members, we did get some

22   more -- new signups but mainly the contributions we get from

23   people because they're concerned about hiring the lawyers to

24   go after these recent, you know, gun laws passed.

25   Q      I'm sorry, sir, I didn't mean to interrupt.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

William Robinson - Cross                              19

1    A     I was going to say so we got an increase on funding to

2    hire lawyers to go after the suit regarding these new laws

3    passed, that was a big increase.

4    Q     How much more of an increase in contributions did you

5    receive?

6    A     Money wise I'm not sure, I'd have to get back to you on

7    that but it was mainly notes, we have checks were sent in to

8    hire attorneys to fight, you know, to fight the new gun laws,

9    that's what was primarily the increase was.  We did get some

10   new members obviously and additional funding but -- does that

11   answer your question or --

12   Q     Well, let's focus first on the new members.  About how

13   many more did you get?

14   A     Maybe a dozen.

15   Q     And the contributions, is it in the thousands of

16   dollars in addition?

17   A     Well, the thousands for to hire a lawyer, for lawyer

18   fee.

19   Q     Right, that's what I'm talking about.

20   A     Legal action.

21   Q     How much more did you receive in contributions since

22   July 1st of 2022?

23   A     I can't give you the figure off -- I can just tell you

24   that what I know and I'm fairly positive of is about -- over

25   5, $6,000 we received for legal fees, to put towards legal

William Robinson - Cross                    20

1   fees, to hire an attorney.

2   Q     Your declaration indicated that you spent about $700 on

3   hotels, $400 on gas and $400 on meals?

4   A     Yeah, that's correct.

5   Q     But you've taken in thousands of dollars from

6   additional donations, right?

7   A     For legal matters, yes.

8   Q     So it's been, the act itself has been a net positive

9   for you as far as your finances go, is that correct?

10  A     Up to this point, so far, yes.

11  Q     So the act being passed is a boon for your

12  organization, is that fair to say?

13  A     Wouldn't call it a boon, it was money sent necessarily

14  to make the rounds, as I say in that affidavit, to talk to

15  groups of people throughout the state of New York, time,

16  energy, gas, hotel bills, food, it was designed to shall we

17  say strengthen our end, put together a team to go after these

18  new gun laws, legally.

19  Q     Now, your whole purpose in your employment with your

20  organization is to do that very thing, meet with members and

21  explain to them what's going on in the gun world, is that

22  fair to say?

23  A     Yeah, yes.

24  Q     So that's your core mission, right?

25  A     That's what I been doing as the communications

William Robinson - Cross                                    21

1    director, making the rounds.

2    Q     So you haven't been diverted from your core mission,

3    you've been doing your core mission, is that fair to say?

4    A     For this specific thing I have been diverted, I haven't

5    had to in the past run all over the state of New York to put

6    together this information and the concerns of gun owners

7    throughout the state of New York.  This is a heavy duty

8    problem to our gun owners.

9    Q     Well, sir, you've told me that your core mission is to

10   do what you've been doing, is to go around the state --

11   A     On --

12   Q     -- and talk to your members?

13   A     Of late.

14   Q     And educate them on gun issues, is that fair to say?

15   A     Of late, yeah, I've had to do that of late.  Normally

16   it's just Monroe County area out of, you know, e-mails, phone

17   calls and our local meeting, GOA New York meetings in the

18   greater Rochester area, so this is unusual for me to have to

19   be running all over the state of New York.

20   Q     But it's fair to say that every dime that you spent on

21   this, you've taken in a dollar, is that fair to say?

22   A     I guess, it's off -- I'd have to think about that, but

23   it sounds ... as far as taking in a dollar, would you explain

24   that more?

25   Q     Sure.  You've taken in a lot more money than you've

1    spent dealing with this act, fair to say?

2    A     Up to this date, at this point, yes.

3              MR. McCARTIN:  Thank you, sir.  I have no other

4    questions.  Wait, I just want to confer with counsel.

5              THE COURT:  Go ahead.

6              MR. McCARTIN:  No other questions, your Honor,

7    thank you very much.

8              THE COURT:  Any redirect?

9              MR. STAMBOULIEH:  Brief redirect, your Honor.

10             THE COURT:  Go ahead.

11   REDIRECT EXAMINATION BY MR. STAMBOULIEH:

12   Q     Mr. Robinson, you haven't paid your attorneys yet, have

13   you?

14   A     No.

15   Q     Okay.  And then one other question.  Gun Owners of

16   America New York, is that a sister corporation of Gun Owners

17   of America?

18   A     No, it's strictly a separate corporation.

19   Q     Okay.  Just named kind of the same?

20   A     We have worked together on projects.

21   Q     But you're not affiliated with GOA or GOF?

22   A     No, totally separate entity, separate corporation.

23             MR. STAMBOULIEH:  Okay, thank you so much.

24             THE COURT:  Anything further on that?

25             MR. McCARTIN:  No, your Honor, thank you.

1          THE COURT:  Okay, you may step down, sir, thank

2     you.

3               (The witness was excused.)

4          THE COURT:  Next witness, please.

5          MR. STAMBOULIEH:  Plaintiffs will call Ivan

6     Antonyuk.

7          THE CLERK:  Please state your name for the record.

8          THE WITNESS:  Ivan Antonyuk.

9

10          I V A N   A N T O N Y U K , called as a

11     witness and being duly sworn, testifies as follows:

12          MR. STAMBOULIEH:  May I proceed, your Honor?

13          THE COURT:  You may.

14     DIRECT EXAMINATION BY MR. STAMBOULIEH:

15     Q    Would you state your name for the record, please?

16     A    Ivan Antonyuk.

17     Q    And can you spell your last name for the court

18     reporter?

19     A    Sure, it's A-n-t-o-n-y-u-k.

20     Q    Mr. Antonyuk, did you execute an affidavit yesterday to

21     be filed in this case?

22     A    Yes, I did.

23          MR. STAMBOULIEH:  Judge, may I approach?

24          THE COURT:  You may.

25     Q    I'm going to show you Docket 41-3.  Do you recognize

Ivan Antonyuk - Cross                                    24

1   this document?

2   A      Yes, I do.

3   Q      And is this your signature on page 4?

4   A      Yes, that is.

5          MR. STAMBOULIEH:  Plaintiffs will rest on his

6   affidavit, your Honor.

7          THE COURT:  Okay.  Cross-examination?

8          MR. McCARTIN:  Thank you, your Honor.

9   CROSS-EXAMINATION BY MR. McCARTIN:

10  Q      Morning, sir.

11  A      Morning.

12  Q      My name is Michael McCartin, I'm with the Attorney

13  General's office and I represent Superintendent Bruen.  What

14  city do you live in, sir?

15  A      Schenectady.

16  Q      And have you ever been a trooper at any point in your

17  past, New York State police officer?

18  A      No, I did not.

19  Q      When did you obtain your concealed carry permit in

20  New York?

21  A      2009.

22  Q      I'm sorry, could you repeat that?

23  A      2009.

24  Q      2009, thank you.  And which county in New York issued

25  your concealed carry permit?

Ivan Antonyuk - Cross                                    25

1   A      Schenectady.

2   Q      Now, is it true that when you obtained your concealed

3   carry permit in 2009, you had to fill out a concealed carry

4   application, a PP3?

5   A      Well, I don't remember the name or numbers of the forms

6   but I paid all the regulations and requirments to obtain my

7   pistol permit.

8           MR. McCARTIN:  Your Honor, I wish to put Exhibit 1

9   on the ELMO if that's okay to show the witness?

10          THE COURT:  Plaintiff's counsel has seen it?

11          MR. McCARTIN:  Yes, he has a copy.

12          THE COURT:  Okay, go ahead.

13  Q      Sir, do you recognize that form PP3 just to be like the

14  form that you filled out in 2009 for your concealed carry

15  permit?

16  A      Been awhile ago but looks familiar.

17  Q      Looks familiar to you?

18  A      Correct.

19  Q      Now isn't it true, sir, that in order to obtain your

20  concealed carry license in 2009, you had to provide the

21  issuing body with four character witnesses to vouch for

22  your -- on your behalf?

23  A      Yes.

24  Q      Now, there was nothing arduous about that for you, was

25  there?

 1    A      No.

 2    Q      The person that issued you a concealed carry license

 3    back in 2009 was a judge in Schenectady County, is that

 4    correct?

 5    A      Correct.

 6    Q      And it was not anyone dealing with the state police, is

 7    that fair to say?

 8    A      I would assume so.

 9    Q      Did you personally appear before that judge in his

10    courtroom or her courtroom?

11    A      I did not.

12    Q      Sir, do you use your weapon only in a manner that does

13    not endanger oneself or others?

14    A      I'm safely carrying my gun when I'm allowed to, I'm

15    exercising my rights and also doing competition events and

16    hunting and my -- always been concerned to do it safely and

17    to do it by the law.

18    Q      Sir, since 2009, have you made it a regular practice to

19    carry your concealed firearm onto the private property of

20    others even if you knew that they did not consent to you

21    bringing your firearm on their private property?

22    A      As of right now, I'm still allowed to carry my firearm

23    if I'm going to the gas station, if I'm going to pick up my

24    kids from their friends' houses, if I'm going to the stores

25    or pharmacy to pick up prescriptions for my children.  I'm a

1    father, I'm a husband, so sometimes some requirements during

2    the day that I have to do, like I mentioned before, picking

3    up my kids, dropping my kids off --

4    Q     Sir, I don't want to interrupt but you're drifting off

5    from the question that I actually asked.  Now if you know

6    that somebody does not want you to have a firearm on their

7    private property, do you still bring that firearm on their

8    property?

9    A     If somebody will have little sensitive case regarding a

10   firearm, I will, just would not come over to this person's

11   property if I'm not welcome there.

12   Q     So would you therefore admit that if another man or

13   woman does not want you to be armed with a firearm on their

14   private property, that is something that you must honor?

15   A     Correct.

16   Q     You mentioned wanting to take the gun to your doctor's

17   office.  Do you know if your doctor wants you to take the gun

18   onto his property or her property?

19   A     I never knew any doctor that would require me not to

20   carry the gun or to have any opinions regarding the firearms.

21   I've never been approached with the question, I've never been

22   approached with a requirement not to be able to bring the gun

23   over.  Beside my children's doctors or my own doctors, I also

24   have a consulting business and some of my clients are doctors

25   and anytime during the day or night, I can receive a phone

Ivan Antonyuk - Cross                                     28

1    call with system problems, I'm supporting IT environment,

2    that I have to come over right away to address one or another

3    issue with the systems, and like I mentioned before, I always

4    try to carry to protect myself and protect my family.  And as

5    of right now, I'm still allowed to bring my firearm to see my

6    clients, as I mentioned before, who is also in the health

7    care industry.

8    Q    Did you ever ask your doctor if your doctor wanted you

9    to be armed on his or her property?

10   A    I did not, but I do know some of my clients are hunters

11   and they know that I'm a gun owner and never had any issues

12   with that.

13   Q    Now you mentioned in your declaration that you wanted

14   to bring a gun to your church.  Do you know if your church

15   wants guns on its property?

16   A    Again, I never been told that there's anybody, any

17   church have any issues with firearms, and I didn't see any

18   signs stating that I'm not allowed to bring the firearm.  And

19   as of right now, I want to say that I don't see nothing

20   prohibiting me to bring a firearm if I want to bring it to go

21   for service at the church but as of right now, I did not

22   bring any guns to the church.

23   Q    You mentioned that you wanted to carry a gun into

24   Walmart --

25   A    Correct.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Ivan Antonyuk - Cross                                    29

1   Q    -- firearm into Walmart.  Do you know if Walmart wants
2   you to carry a firearm onto its property?
3   A    Well, I didn't ask and as far as I know it's still
4   legal to carry and if I'm somewhere and my wife call me, ask
5   me to pick up some groceries or if I'm on the way to
6   somewhere and I have to do quick shopping, I would have to go
7   home to disarm or leave my firearm in the car, I would have
8   it on me safely and that's usually, absolutely one of my
9   concerns, to carry when I can and if I'm told not to, I will
10  leave the premise.
11  Q    Now you mentioned wanting to carry a firearm into a
12  movie theater.  Do you know if a movie theater that you go to
13  wants you to have firearms on their property?
14  A    As far as I know, some movie theaters have signs
15  outside that will not -- ask you not to bring the guns over.
16  I'm not really a big movie goer because of not, you know, the
17  diminished feeling of safety that I will get by going to a
18  movie theater without being able to protect myself.
19  Q    Do you know if any of these groups or organizations,
20  the doctor's office, Walmart, the movie theater, do you know
21  if any of them know that you're carrying a firearm on their
22  property?
23  A    I know that physicians, some of my clients, they know
24  that I'm a gun owner, they know that I'm carrying, and they
25  never stated any issues with that.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Ivan Antonyuk - Cross                                    30

1    Q      Is there any harm in you asking these individuals if

2    you could carry on their property?

3    A      Can you repeat the question, please?

4    Q      Sure.  Is there any harm to you to ask these

5    individuals if they want you carrying on their property?

6    A      No, not really.

7    Q      Would you ever go onto the private property of another

8    over their objection with you carrying a firearm?

9    A      No, I will not.

10   Q      Now isn't it true that you're up for recertification of

11   your concealed carry license sometime around January of 2023?

12   A      Correct.

13   Q      Have you been recertified in the past every three years

14   since 2009 when you first obtained your concealed carry

15   license?

16   A      I did it once, I believe it's five years ago, I'm also

17   required to recertify every five years.

18   Q      Can you tell me what your recertification entails?

19   A      I have to go to the website and put in any new firearms

20   on my license and take any firearms that are no longer

21   possessed or owned.

22   Q      So what's the difference between a renewal of a

23   license, carry license, and recertification, do you know?

24   A      Well, by the new CCIA requirements, it will require to

25   take additional safety courses, additional firearm training

Case 1:22-cv-00734-GTS-CFH   Document 46   Filed 08/25/22   Page 31 of 76

Ivan Antonyuk - Cross                                    31

1   at the fire range that I wasn't required to do before.

2   Q     Are you aware that the state police has indicated that

3   for recertification, additional training is not necessary?

4   A     No, I do not.  The way the law is written, it's -- I'm

5   not a lawyer, for me as not a lawyer reading these laws is

6   really confusing.

7   Q     Have you ever been denied recertification of your

8   license?

9   A     No, I did not.

10  Q     Have you taken any steps to apply for a concealed carry

11  license under the new provisions of the CCIA?

12  A     No, not yet.

13  Q     Other than through this lawsuit, have you had any

14  interactions with the New York State Police over the past

15  three months?

16  A     No.

17  Q     Has any member of the New York State Police ever

18  threatened you with arrest or prosecution?

19  A     No.

20        MR. McCARTIN:  Your Honor, I don't have any other

21  questions.  Thank you very much.

22        MR. STAMBOULIEH:  I have no followup, your Honor.

23        THE COURT:  Okay.  Okay, sir, you can step down,

24  thank you.

25              (The witness was excused.)

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1          MR. STAMBOULIEH:  Your Honor, I don't see -- is

2     defendant Bruen here?

3          MR. THOMPSON:  Your Honor, we understood, as we

4     said in our letter of last night, that Superintendent Bruen

5     was relieved of any requirement to be here based on a

6     conversation with your chambers back in July.

7          THE COURT:  I think you were told that was your

8     decision.

9          MR. THOMPSON:  Yes.

10         THE COURT:  As to whether or not you had him attend

11    and apparently you made a decision that he's not here.

12         MR. THOMPSON:  That's correct.

13         THE COURT:  So --

14         MR. STAMBOULIEH:  Well, may I briefly just explain

15    to the court what I wanted to ask defendant Bruen, because I

16    think it's germane to the issue and it's something that I

17    wanted to ask, maybe like two minutes, Judge?

18         THE COURT:  Well, you can certainly get into it in

19    your argument.

20         MR. STAMBOULIEH:  That's fine.

21         THE COURT:  And if you, you know, if you feel that

22    it's vital to your proof, you certainly could subpoena him

23    and I can adjourn the hearing to have him attend if you feel

24    that it's, you know, that critical to your proof.

25         MR. STAMBOULIEH:  I'm not going to make the court

1    do that, your Honor, and I don't think it's critical but I do

2    just want to make a few points.

3              THE COURT:  Okay.

4              MR. STAMBOULIEH:  Thank you.

5              THE COURT:  Okay.  And we'll allow you to do that.

6    So any other witnesses other than --

7              MR. STAMBOULIEH:  No, your Honor.

8              THE COURT:  -- the ones you've called?

9              MR. STAMBOULIEH:  No, your Honor.

10             THE COURT:  Okay.  And then we'll proceed to

11   argument in the manner I described.  We'll give you an

12   opportunity to make your initial argument, let the defense

13   counsel respond, and then we'll go back and forth one more

14   time, shorter probably.  But we'll hear you, okay?

15             MR. STAMBOULIEH:  Yes, sir.  May I proceed?

16             THE COURT:  You may proceed when you're ready.

17             MR. STAMBOULIEH:  Thank you, your Honor.

18             Your Honor, we're here today because New York did

19   not like the Supreme Court's decision in *Bruen* and we know

20   that they didn't like it because the Governor came out either

21   the day of or the day after and made a bunch of statements

22   that the Supreme Court was a politicized branch and just

23   excoriated them.  And then we have this law that was put in

24   the day before July 1st, no public debate, no three day for

25   the public to look at it, no comments accepted, and then

1    passed the next day.

2            It will fundamentally change and has fundamentally

3    already affected the way that New York is issuing permits and

4    the way that New Yorkers can carry and exercise their Second

5    Amendment right which, as the Supreme Court held in *Bruen*, is

6    a right, you know, you have a right to publicly carry a

7    firearm.

8            So right now, as Mr. Antonyuk explained, he can go

9    into Walmart, he doesn't need to ask permission before he

10   goes in, he's not a prohibited person, and as long as they

11   don't have a sign on the front of Walmart saying he can't

12   carry, he's allowed to carry there, because it's a place

13   that's open to the public.  The same for his doctor's office

14   clients.  This bill will change it to where not even the

15   doctor in charge of his own facility can carry a firearm and

16   cannot authorize Mr. Antonyuk to carry a firearm in his

17   premise.  And it's like that for all kinds of different

18   things.  Like if there was a psychiatrist that had to deal

19   with crazy patients, she or he wouldn't be able to carry in

20   the health care provider location.  GOA has a member who's an

21   oral surgeon on Long Island, we spoke to him, he can't carry

22   a firearm in his business after September 1st, and he can't

23   authorize anyone to carry.

24           So the way that New York has gone about this, it's

25   not that they're trying to protect private property rights,

1     even where I live in Mississippi, Judge, it's you can carry

2     except where you're not allowed to carry, right?  So if I go

3     into a building that has a no-gun sign, I know that I'm not

4     welcome there with the firearm.  If I decide that I want to

5     take it off and go in, that's perfectly fine and it's my

6     choice, just like it's the property owner's choice to

7     disallow someone from carrying.  But the state has taken away

8     all of this and said, the default position is no carry unless

9     specifically authorized to carry by the proprietor.  So if

10    the experience is anything like in any other state that I've

11    been to, people aren't going to post signs saying this is

12    allowed.  Most places, if they don't want you to carry, will

13    post a no-gun sign.  It works everywhere else and there's no

14    reason that New York should be different than all of the

15    other places.  Because it fundamentally eviscerates the right

16    to publicly keep and bear arms when you have all of these

17    places that are now off limits.

18          As Mr. Antonyuk said in his first declaration that

19    was filed with this court, he's very concerned about having

20    to disarm himself to simply go to a gas station.  And what

21    makes this law worse is, number one, he has to keep the gun

22    in the car which they tell you, don't keep guns in your car

23    because if the car gets stolen, now we've got a thief with a

24    gun.  The second thing is he has to unload his firearm which

25    entails taking the ammunition out of it, racking the slide,

1    taking the ammunition out of the chamber and then separating

2    them, putting them in a lockbox.  Well, that's great, I

3    guess, but if I'm on the side of the road because the gas

4    station won't let me carry there and let's say this gentleman

5    over here, your security guard, sees me, you know, unholster

6    my firearm and sees a man with the gun, the police are going

7    to do something about that, I would think.  So he's now

8    increased his chances of having a negligent discharge because

9    he's manipulating a firearm, it's not in a holster.  So it

10   just introduces all of these additional risks that don't need

11   to be there.  He's licensed, he's met all of the standards,

12   and he should be able to carry in all of the places that he's

13   allowed to carry.

14           I will say in *Bruen* and in *Heller*, and we briefed

15   this in our reply, they listed a very narrow group of places

16   that are the, quote, real sensitive places, the real

17   sensitive locations, you know, government buildings, schools,

18   but it's not all of these places.  Like Times Square, it

19   can't be a sensitive place and even the Supreme Court talked

20   about, you know, the state of New York declaring Manhattan a

21   sensitive place and that that wouldn't be allowed.  And yet

22   here we are, we're saying that all of Times Square is

23   sensitive.  It could that be Times Square is sensitive at

24   certain times, but not all the time.  For airlines they say

25   you can't carry it in an airport and that, logically that

1    might make sense but for people that travel with firearms,

2    they have to go into the airport with a checked bag because

3    the TSA requires you, when you're traveling with a firearm,

4    to check it in a certain way.  Can't carry it in an airport,

5    Judge, if it's in my suitcase because I'm flying home, I'm

6    committing a felony and felonies strip you of your

7    constitutional rights to bear arms and there's no way to get

8    around it except for a Presidential pardon.

9           Judge, we've offered, I think, we've totaled their

10   briefing pages, both briefed 65 pages, we briefed a lot and I

11   know that it's a lot for the court to go over, we filed at

12   like 5:40 something last night.  I'm happy to answer any

13   questions the court has, but all of the arguments are

14   contained in my brief so I don't want to waste the court's

15   time, I'm certainly happy to answer any questions.

16          THE COURT:  I would like you to address some of the

17   standing issues that have been raised.

18          MR. STAMBOULIEH:  Yes.

19          THE COURT:  Facial standing, particularly with

20   regard to the memberships, the members within New York State,

21   the different organizations that have been made a part of

22   this suit.

23          MR. STAMBOULIEH:  Yes, sir, yes, sir.  So in every

24   other circuit except the Second Circuit, organizational

25   plaintiffs have like representational standing.  So the

1    Second Circuit obviously holds that the organizations can't

2    bring 1983 claims under, and the name of the case escapes me

3    but it says that they can't bring 1983 claims, and that's

4    fine because we've also brought the case under 1331 which

5    gives the court jurisdiction to decide constitutional claims,

6    and if we shoehorn that in with 2201, declaratory judgment

7    act, then we can come to this court with constitutional

8    claims that the organizational plaintiffs raise on behalf of

9    their members that are not also Section 1983 claims, and I

10   don't think that there's a standing problem if you look at it

11   in the lens of 1331.  Okay, I thought you were going to ask a

12   question.

13           THE COURT:  No, go ahead.

14           MR. STAMBOULIEH:  So some of the other facial --

15   the question was address the facial challenge.  These laws,

16   they're not just a little unconstitutional or they're

17   constitutional in some instances.  They're unconstitutional

18   across the board.  Now I'll say, certain parts in there where

19   they talk about the sensitive locations about the schools,

20   *Bruen* and *Heller* said that, so you know, I'm not going to

21   come in here and tell you that the court was wrong because

22   that's what they said.  I don't agree with it but that's what

23   they said and that's what it is.  But not every piece of

24   educational property, that's obviously not a constitutional

25   thing to say, well, they're teaching a class in this building

1    right here so now it becomes educational property and it's a

2    felony, it's a felony if you carry in that building.

3          One second.  There's another section in here,

4    it's -- I believe it's subsection S that talks about any

5    gathering of individuals to collectively express their

6    constitutional rights to protest or assemble.  Judge, that

7    could be anything.  If we go outside and we're, quote,

8    assembling, then neither one of us can carry a gun, and

9    New York would make it a felony to do so.  There's no way

10   that that's constitutional.

11         But the same thing with, they keep putting in their

12   brief that New York has a compelling interest to control

13   crime.  Sure, under the old *Heller* standard, we could get

14   into the interest balancing by another name and that's what

15   it is here is they're trying to say that we have a compelling

16   interest.  And I'll submit to the court this absurd example.

17   If New York State's interest was so compelling to control

18   crime, we could set up a federal roadblock right here on the

19   interstate and stop every single car and maybe catch a couple

20   people with drugs in their car and they'll say, but we found

21   drugs, and therefore it's constitutional because facially,

22   you have to prove that it's unconstitutional in every

23   circumstance, and I don't think that's what the law says.  We

24   could all agree that if we set up a roadblock right here on

25   this road just to check to see if people had drugs in their

1    car, we would be violating a whole host of constitutional

2    provisions and it shouldn't be any different with the Second

3    Amendment.

4           So when we look at these provisions that say that

5    we're not allowed to assemble together and have a firearm,

6    and that's where the gun show comes in, that's what Mr. Pratt

7    and Mr. Robinson were talking about, we don't know if these

8    gun shows now are going to be gun-free zones and it seems

9    absurd that we're even talking about a gun show being a

10   gun-free zone but people are assembling, right, they're

11   exercising their Second Amendment right, they're exercising

12   their First Amendment right and this makes it a felony,

13   Judge.  And a lot of these, and we've briefed them

14   extensively, about which ones are addressed by *Bruen* and

15   *Heller*, and which ones are like wholly unsupported by the

16   analogues that the state has put up.  And I don't envy the

17   state having to defend this because it's so bad and they have

18   to rely on really old, really racist and unconstitutional

19   things that we would look at today.  When good moral

20   character was used in the 1800s to stop Black people from

21   being members of the bar, or to talk about the good moral

22   character of a slave so we could see that they were docile

23   individuals and not prone to running away.  This is the kind

24   of stuff that's been put in this law.  Not by name, they're

25   of course not going to admit to it, but the analogues that

1    they show point to this and the analogues that we've put up

2    point to this being only justifiable if you look at saying we

3    can ban Catholics from owning guns because they might be

4    subversive or we think that they have bad moral character

5    because they're unrepentant papists, and it's just all of

6    this stuff, all of it.

7            So I hope I've addressed your question, your Honor,

8    I will end with this.  To the extent that there's any issue

9    that the court perceives that doesn't like what our standing,

10   whatever it is, all we ask is that we be allowed to amend

11   prior to September 1st.  It's easily correctable in an

12   amended complaint, we'll sue everybody if we have to.  I

13   mean, this issue is very, very important, and we'll be happy

14   to amend.

15           THE COURT:  Okay.  Thank you, sir.

16           MR. STAMBOULIEH:  Thank you.

17           THE COURT:  Defense counsel.

18           MR. THOMPSON:  Thank you, your Honor, James

19   Thompson from the Office of the Attorney General for

20   defendant Bruen.  Figured you'd like me over here.

21           THE COURT:  Wherever you like as long as I can hear

22   you.

23           MR. THOMPSON:  So I have a whole spiel here but

24   Mr. Stamboulieh cut his down, I'll do everyone the benefit of

25   cutting mine down as well.

1          THE COURT:  You cover the points you need to cover.

2     We're not -- I'm not worried about the time you spend, go

3     ahead.

4          MR. THOMPSON:  Yes, sir, your Honor.  I think the

5     place to start is with Judge Amy Coney Barrett in *Kanter v.*

6     *Barr*, who wrote, "History is consistent with common sense:

7     It demonstrates that legislatures have the power to prohibit

8     dangerous people from possessing guns."  In *Kanter*, Judge

9     Barrett surveyed early American legal history and concluded

10    that in order to disarm a dangerous person, the government

11    should have "evidence that he either belongs to a dangerous

12    category or bears individual markers of risk."  The measures

13    that the plaintiffs are trying to eliminate today are the

14    ones that allow us to determine whether there are in fact

15    those individual markers of risk for someone who wants to

16    have a gun.

17         In this facial challenge, the plaintiffs want the

18    court to make it impossible to conduct the assessment that

19    Judge Barrett found so critical.  The Supreme Court majority

20    in *Bruen* acknowledged both the importance and the

21    constitutionality of this analysis.  Pointing out that there

22    is nothing wrong with "shall-issue" licensing laws that have

23    discretionary criteria so long as they "are designed to

24    ensure only that those bearing arms in the jurisdiction are,

25    in fact, law-abiding responsible citizens."

1          I'd like to talk a little bit about good moral

2     character because that's something that Mr. Stamboulieh has

3     focused on.  The plaintiffs have never, not once addressed

4     the good moral character standard as it actually appears in

5     the CCIA.  They didn't in their briefing, they didn't in

6     their reply, and didn't in the discussion right now.  It's

7     not just good moral character in general.  The CCIA says that

8     it means "having the essential character, temperament, and

9     judgment necessary to be entrusted with a weapon and to use

10    it only in a manner that does not endanger oneself or

11    others."  And plaintiffs --

12          THE COURT:  Can I interrupt you for a second right

13    there?

14          MR. THOMPSON:  Of course, your Honor.

15          THE COURT:  You point to that language and you

16    refer to the Connecticut statute that it was modeled after.

17    Explain to me how someone's going to carry a gun and not

18    endanger themselves or someone else when the purpose of that

19    is self-defense, in most circumstances that you would have a

20    gun.  I have some problems with that language.

21          MR. THOMPSON:  Well, I think endanger oneself or

22    others is understood to mean outside of the self-defense

23    situation.  We -- there are many laws that have that standard

24    in, you know, being a danger to oneself or others and that's

25    not something that's as applied involves self-defense.  You

1    know, for instance, mental hygiene laws talk about somebody

2    being a danger to themselves or others, we would never say

3    that somebody is subject to the mental hygiene law because

4    they engaged in lawful self-defense.

5         THE COURT:  Okay.  So you're saying that the

6    language assumes that self-defense is permitted.

7         MR. THOMPSON:  I think that, I think that's true

8    and I think that language, endangering oneself or others or

9    being a danger to oneself or others, that's a standard that's

10   well known in the law and it speaks to a person's

11   dangerousness and a person's unreasonable dangerousness.  And

12   that's something that the plaintiffs have never acknowledged.

13        THE COURT:  Okay.  But we're -- you're talking

14   about two different things.  The good moral character

15   standard within the statute and then the prohibition against

16   how someone's supposed to use that weapon or what's the

17   appropriate use for someone carrying a weapon.  In my view.

18        MR. THOMPSON:  I'm sorry, your Honor, can I ask you

19   to explain the question a little more, I'm not sure I'm

20   following you.

21        THE COURT:  I'm saying there's two different things

22   you're pointing to, the good moral character standard where

23   you're trying to say, you know, we want people of good moral

24   character and not dangerous-type people as opposed to the use

25   of a weapon and how the statute and that language is written,

1     you know, and the language that I pointed out saying that it

2     cannot be used in a manner that was going to endanger

3     yourself or other people.  Self-defense necessarily endangers

4     somebody.

5            MR. THOMPSON:  I think that's true, but I think

6     that the standard being a danger to oneself or others does

7     not --

8            THE COURT:  Prohibit?

9            MR. THOMPSON:  -- prohibit lawful self-defense.  I

10    think, and obviously if we had a standard that prohibited

11    lawful self-defense, you know, we would have a profound

12    Second Amendment problem.

13           THE COURT:  Okay.  You're saying that language does

14    not present that problem.

15           MR. THOMPSON:  I think no.  When we talk about

16    being a danger to oneself or others, you talk about being an

17    affirmative danger, not a reactive danger to someone else who

18    is a danger to you.

19           THE COURT:  Thank you, sir, go ahead.

20           MR. THOMPSON:  Of course.

21           THE COURT:  Sorry to interrupt, get back to your

22    argument.

23           MR. THOMPSON:  No, no, no, please, I'm here to

24    answer your questions.

25           So the plaintiffs never engage on the dangerousness

1    standard and that's critical because that's what ties this

2    law into the history.  They talk about the standard as vague

3    or open-ended or entirely discretionary but it's not.  It's

4    tied directly to indicators of violence and that's consistent

5    with American history, which is full of examples of laws

6    attempting to disarm persons who would be dangerous to others

7    or to society.

8            This is a facial challenge to a statute enacted by

9    the legislature which requires the plaintiffs to show clear

10   likelihood of success on the merits and that there is no set

11   of circumstances where these statutes could be

12   constitutional.  And that's something I believe

13   Mr. Stamboulieh agreed with when he was up.  Under that

14   standard, there is no possible likelihood of success in

15   plaintiff's challenge to laws protecting people from guns in

16   vulnerable places which are presumptively lawful.  As Justice

17   Scalia said in *Heller* and as Justice Thomas reiterated in

18   *Bruen*, "We are also aware of no disputes regarding the

19   lawfulness of such prohibitions."

20           And you heard from the plaintiffs that they agreed

21   that some of the places are constitutional, some of them they

22   disagree with.  That is the definition of a statute that has

23   a plainly legitimate sweep.  We may disagree with how broad

24   the legitimate sweep of the statute is and that's something

25   that should be adjudicated in as-applied challenges down the

1    line.

2         Similarly, on private property, laws prohibiting

3    the carrying of guns on private property without an owner's

4    consent are deeply rooted in American history and doctrine

5    going back to the 18th century.  We believe that the Supreme

6    Court meant what it said in *Bruen*, we believe that the

7    "shall-issue" state laws that the Supreme Court said were

8    constitutional are constitutional and that's why New York

9    CCIA was based on that.  And we believe that the *Bruen* test

10   of history and doctrine, fairly applied, will show that the

11   CCIA should be upheld.

12        THE COURT:  On that particular point, on private

13   property, your statute flips the responsibility and says

14   that, you know, the property owner now has to post explicitly

15   guns are allowed or else they're prohibited.  Address that.

16        MR. THOMPSON:  First I would say that it doesn't

17   say that the private property owner has to post that guns

18   aren't prohibited, any form of express consent is sufficient

19   under the statute.  I think you're right that it puts the

20   default that guns are not allowed unless the private property

21   owner has consented, but there's nothing ahistorical about

22   that and we cite a number of statutes from American history

23   on that point.  Pennsylvania 1721, "If any person or persons

24   shall presume to carry any gun or hunt on the improved or

25   inclosed land of any plantation other than his own, unless he

1   have license or permission from the owner of such lands or

2   plantation," he commits a crime.

3           New Jersey, 1771, "If any person or persons shall

4   presume to carry any," there's an ellipsis in here, "to carry

5   any gun on any lands not his own and for which the owner pays

6   taxes or is in his lawful possession, unless he hath license

7   or possession in writing from the owner or owners or legal

8   possessor, every person so offending and convicted thereof

9   shall," have a crime.  And that New Jersey statute, if the

10  violators were not from New Jersey, that's very much a helper

11  statute, but if the violators were not from New Jersey, they

12  were required to forfeit his or their gun or guns.

13          Texas, 1866, "It shall not be lawful for any person

14  or persons to carry firearms on the inclosed premises or

15  plantation of any citizen without the consent of the owner or

16  proprietor."

17          Oregon, 1893, "It shall be unlawful for any person

18  other than an officer on lawful business being armed with

19  gun, pistol, or other firearm to go or trespass upon any

20  enclosed premises or lands without the consent of the owner

21  or possessor thereof."

22          So this is a statute that is deeply rooted to

23  American history.  Private property rights are fundamental

24  under the Constitution.  And I would refer your Honor to the

25  *GeorgiaCarry* case out of the 11th Circuit because it really

1    is right on point here and does a very thorough historical

2    analysis of its own.  The statute there goes far beyond what

3    New York statute did.  It requires the gun holder to

4    affirmatively go up to the management of, in this case the

5    church, notify such security or management personnel of the

6    presence of the weapon or long gun and then explicitly follow

7    the security or management personnel's direction for

8    removing, securing, storing, or temporarily surrendering such

9    weapon or long gun.  New York's statute does not put any such

10   burden on that.  You -- it is satisfied so long as there is

11   the consent of the property owner or the lessee.

12          And as you heard my colleague speak with

13   Mr. Antonyuk, it does no harm to the gun holder to ask if

14   the -- if he should be permitted to carry a gun onto a

15   property that he's intending to go onto.  And it allows the

16   private property owner to make an informed decision about

17   whether he wants not just the person but the person's gun on

18   his property.  And I think that is entirely reasonable and

19   entirely consistent with both history and the *Bruen* text.

20          THE COURT:  But isn't there a new requirement

21   within this statute that specifically puts the onus that the

22   property owner is going to post that guns are allowed,

23   otherwise the gun owner has to assume that they're not?

24          MR. THOMPSON:  The statute says that there can be a

25   sign or there can otherwise be express consent.  So it

1    doesn't have to be a sign.  If Mr. Antonyuk has spoken with

2    some of his medical clients and he understands that they know

3    that he carries a gun and that they have no problem with

4    that, then of course he would be able to go on to their

5    premises because he has their consent.  No sign required.

6    And so no, it's not a sign requirement, it's a consent

7    requirement.

8            THE COURT:  Okay.

9            MR. THOMPSON:  Your Honor, if I could take a step

10   back and talk a little bit about the issues of standing and

11   justiciability.  On the organizational standing point, I want

12   to refer you to a very recent Second Circuit case,

13   *Connecticut Citizens Defense League, Inc. v. Lamont*, 6 F.4th

14   439, the relevant portion of it is 447 through 48.  This case

15   is almost exactly on point.  It's, the Connecticut governor

16   enacted a COVID-related measure that the plaintiff

17   organization felt was violative of the Second Amendment.

18   They filed a lawsuit.  And the Second Circuit held that there

19   wasn't standing even though the organization had had to talk

20   to its members and file a lawsuit and lobby the governor,

21   because that's what the organization did.  That's the

22   definition of what an interest or advocacy group does.

23            And you heard from Mr. Pratt and Mr. Robinson that

24   this is part of the core mission of these groups, including

25   to engage in litigation.  Similarly, I would point to *Lawyers*

1    *Committee for 9/11 Inquiry, Inc. v. Garland*, this is a very

2    recent case, it is reported but it's only on Westlaw right

3    now so it's 2022 WL 3130649, and that's for the proposition

4    that voluntary litigation activity does not confer

5    organizational standing.  That's an affirmative choice that

6    organizations make.

7            As to the plaintiff's argument that they may not be

8    able to have organizational standing under 1983 claims but

9    they have a free standing constitutional claim, as I'm sure

10   your Honor deals with quite regularly, Section 1983 is the

11   exclusive constitutional remedy for a claim that a state

12   actor has violated the Constitution, and for that we would

13   cite *Marino v. CUNY*, 18 F.Supp.3d 320 at 341 and that cites

14   to a number of controlling precedents as well.  So I think as

15   a matter of law there's no organizational standing.

16           I think there's also no organizational standing as

17   a matter of fact.  You heard from Mr. Pratt that he didn't

18   know if there had been a gain or loss to the gun owners based

19   on their work on the CCIA.  And you heard Mr. Robinson say

20   that they had a big increase in contributions.  So I think

21   certainly at the preliminary injunction stage, and standing

22   is something on which the plaintiffs bear the burden, I think

23   there's not a factual record to find it.

24           Moving beyond organizational standing, there's no

25   traceability here.  You've heard from each of the witnesses,

1    no one has been contacted by the state police, no one has

2    been threatened by the state police, there's no allegation

3    that any plaintiff will imminently suffer any injury

4    traceable to Superintendent Bruen.  The same analysis gives

5    rise to an Eleventh Amendment issue, because "a state

6    official's duty to execute the laws is not enough by itself

7    to make that official a proper party in a suit challenging a

8    state statute," that's a quote from the *Citizens Union* case,

9    2017 WL 2984167, at *4.  And there's been no specific

10   enforcement connection or activity alleged, let alone

11   established, for preliminary injunction purposes between

12   Superintendent Bruen and any of the CCIA provisions being

13   challenged here.

14          Now plaintiffs do point out that the CCIA does have

15   some aspects in which the state police is involved, including

16   setting up an appeals board and querying the National Instant

17   Background Check database, but none of the provisions in

18   which the state police are involved are the provisions that

19   the plaintiffs claim are going to harm them, and so there

20   really is no connection here.

21          Now there is obviously a big elephant in the room

22   which is that Superintendent Bruen was in fact the defendant

23   in *Bruen*, has his name on it.  But that was a case in which

24   he was not the only defendant, he was also, he had a

25   co-defendant who was the Rensselaer County judge who had in

1    fact denied pistol permits of the plaintiffs.  So this issue

2    was not raised in that case and it would, wouldn't have made

3    a dime's worth of difference, just we would be talking about

4    the *McNally* standard instead of the *Bruen* standard which

5    might actually relieve some of our confusion, but it wouldn't

6    make a difference on the legal end.

7         In terms of the plaintiff Antonyuk, as he said,

8    he's not required to renew his license and the interview

9    social media disclosure and training requirements only apply

10   when the license is issued or renewed.  That's from Penal Law

11   400.00(1).  All plaintiff Antonyuk has to do is recertify his

12   license which as he said on the stand just involves going to

13   a website, updating his contact information, updating his

14   list of guns and affirming that he's not disqualified from

15   owning a gun.  So these -- these aspects of the law that he's

16   challenging are not going to be applied to him and that's

17   fatal to standing.

18        THE COURT:  Aren't the private property regulations

19   that are in the new statute, they're going to apply to him?

20        MR. THOMPSON:  I think we would concede that at

21   some point, Mr. Antonyuk is going to go on private property

22   and so that would apply to him.  I don't think that there's

23   anything before your Honor indicating that that is traceable

24   to the state police, and your Honor in your text order

25   pointed to the amended complaint in the *Libertarian Party*

1   case which had a number of allegations about the statutory

2   duty to enforce the laws, actions that the state police had

3   taken related to enforcing gun laws and that in and of itself

4   was not enough, as the Second Circuit held, to confer

5   standing against Superintendent D'Amico it was at that point

6   or any of the other state officials that were sued in that

7   case.  So there's no traceability, there's no -- you know,

8   there's no injury in fact, there's no imminent threat of

9   enforcement from the state police, as you've heard, and I

10  think there's just no standing here, either for the

11  organizational plaintiffs or for Mr. Antonyuk.  In the event

12  that the CCIA is applied against them in an unconstitutional

13  manner, they will have the opportunity to challenge that, of

14  course, and under an as-applied challenge, but there's just

15  no threat that would give rise to a claim here.

16          THE COURT:  So it's your position they would need

17  to refile after September 1?

18          MR. THOMPSON:  I -- no, I think they would need to

19  refile after being threatened with some sort of imminent

20  harm, and the mere enactment of the statute doesn't do that.

21  Some sort of imminent threat of enforcement is what's

22  required.

23          THE COURT:  Okay.

24          MR. THOMPSON:  Moving on very briefly, we talked

25  about the facial challenge standard, I don't think that's

1     seriously disputed, the plaintiffs dropped a footnote in

2     their reply saying you don't have to apply it, I don't think

3     that that's supported by the law and so really what has to be

4     proven here is that there is no legitimate -- there is no

5     potentially constitutional application of any of these

6     statutes and I don't think that that's supported, either by

7     the history or by the doctrine.

8              And we discussed good moral character, we discussed

9     how it is similar to other licensing laws that were deemed

10    "shall-issue", not just that Connecticut law.  Pennsylvania:

11    Whether the applicant's character and reputation are such

12    that the applicant will not be likely to act in a manner

13    dangerous to public safety.  Virginia:  If the applicant is

14    likely to use a weapon unlawfully or negligently to endanger

15    others.  Colorado:  If the sheriff has a reasonable belief

16    that documented previous behavior by the applicant makes it

17    likely that the applicant will present a danger to self or

18    others.  Illinois:  If the applicant does not pose a danger

19    to himself, herself, or others as determined by the concealed

20    carry licensing review board.  Rhode Island statute that the

21    Supreme Court discussed just says that, "that he or she is a

22    suitable person to be so licensed."  And the Supreme Court

23    found that even that was technically "shall-issue" because a

24    "demonstration of a proper showing of need is not a part of

25    it."  The Supreme Court said that, "Nothing in our analysis

1    should be interpreted to suggest the unconstitutionality of

2    these laws," and that's why it made perfect sense for

3    New York to take its standard from these laws, and have a

4    standard that involves character as linked to dangerousness.

5            We go through our historical analysis in some

6    detail.  We talk about four categories of statutes:  Colonial

7    laws on dangerous groups, Revolutionary era loyalty laws,

8    militia mustering laws, and Reconstruction era licensing

9    laws.  The plaintiffs like to chide us for the idea that some

10   of, some of the Colonial era laws are based in racial or

11   religious animus and that is in fact true.  As Judge Barrett

12   wrote in *Kanter*, these laws were adapted to the fears and

13   threats of the time and place.  Obviously such laws would not

14   be constitutional today, as we say in our brief, they would

15   violate the Fourteenth Amendment.  That said, what they do

16   stand for is the idea that there was a concern about

17   dangerousness, and that there could be an individual and at

18   some times a group determination of dangerousness made.  I

19   will say that your defense counsel are both, as they say,

20   unrepentant papists, we would not say that such laws would be

21   constitutional now, but that was, when we look to what the

22   understanding was, the public understanding was in 1791,

23   sometimes the public understanding is going to be something

24   other than what it would be in 2022.  And sometimes that's

25   for the best and sometimes that's for the worst.  But a

1     clear-eyed look at history is what the *Bruen* case requires of

2     us, and so that's what we've given you.

3             Similarly, we talk about Revolutionary era loyalty

4     laws.  There is this fanciful passage in the plaintiff's

5     moving brief where they talk about William Floyd, signer of

6     the Declaration of Independence, talking to a British

7     licensing officer and how that would never happen.  In fact

8     it was the Continental Congress in 1776, including presumably

9     Mr. Floyd, they did it in March 1776, I know he was on it in

10    July but I would assume he would be there in March as well.

11    That directive states to go and find people who were

12    disaffected to the present government of America and make

13    sure they appeared in person, made an oath of loyalty, and if

14    they didn't or couldn't or wouldn't, make sure that they

15    would be disarmed so that they would not be a danger.

16            Militia mustering laws similarly, we discussed

17    militia laws extensively in the training section but it's

18    relevant here as well.  Every male citizen, every white male

19    citizen between 18 and 45 was required to muster multiple

20    times a year and drill and if you show yourself unfit at that

21    time, you would be court martialed and you would have your

22    guns taken away at least on a temporary basis.

23            And then we discuss Reconstruction era licensing

24    laws from around the time of the Fourteenth Amendment,

25    including New York City's which is right on point.  It's from

1   1878, so ten years after Fourteenth Amendment was enacted.

2   And we similarly cite to the Patrick Charles book *Armed in*

3   *America* which has an extensive list of such laws.

4            So we would say that they, these laws are deeply

5   rooted in American history and doctrine, they allow for

6   individualized assessment of dangerousness as Justice -- or

7   Judge Barrett as she was then said in *Kanter*.  The plaintiffs

8   take a different view.  They argue in their brief that, "The

9   Second Amendment's plain text protects the right of the

10  people to bear arms in public without having to demonstrate

11  anything to the government or obtain anything from the

12  government such as approval or a license."  And there are

13  some italicized points in there.  That's just manifestly

14  wrong under *Bruen*.  The majority says, "Again, to be clear,

15  nothing in our analysis should be interpreted to suggest the

16  unconstitutionality of the 43 states 'shall-issue' licensing

17  regimes."  Justice Alito in his concurrence says, "Our ruling

18  decides nothing about who may lawfully possess a firearm or

19  the requirements that must be met to buy a gun, nor have we

20  disturbed anything that we said in *Heller* or *McDonald* about

21  restrictions that may be imposed on the possession or

22  carrying of guns."  And Justice Kavanaugh and Justice Roberts

23  likewise say, "The court's decision does not prohibit states

24  from imposing licensing requirements for carrying a handgun

25  for self-defense."  That's what New York does, that's what 43

1    other states do, and I suspect the other six as well.

2            I won't go too deep into the discussion of social

3    media because the plaintiffs didn't but it falls under the

4    same individualized assessment of dangerousness.  Obviously

5    no one had Facebook in 1791.  But these historical laws do

6    stand for the proposition that the state can and should and

7    must try to figure out whether there is an individualized

8    indicia of dangerousness.  The *Bruen* decision talks about

9    background check.  Similarly Justice Kavanaugh, writing for

10   himself and Chief Justice Roberts, talks about fingerprinting

11   and background check and mental health records check.

12   Fingerprinting and mental health records checks also did not

13   yet exist in 1791.  And as we point out and I know that in

14   discussing the plainly legitimate sweep, there are certainly

15   instances where, and here in the third decade of the 21st

16   century, where the individual indicia of dangerousness will

17   be present on social media.  We show a couple of them from

18   the Robb Elementary shooting report, from the Florida

19   Department of Law Enforcement report on the Parkland shooter,

20   and although I know your Honor accepted it only for the

21   purposes of the public interest prong, the amicus brief of

22   Professor Schildkraut essentially is a broader and deeper

23   analysis going into about 20 pages what we go into in two and

24   including far more examples of disturbing instances of social

25   media postings prior to violence.

1          THE COURT:  Okay, but I'd like you to address the

2    issue that you're putting the onus on the gun-carrying

3    applicant to disclose their social media accounts or

4    postings.  Is there any such correlation in the historical

5    record?  You know, there's an argument that it would be

6    equivalent that you apply for a pistol permit, you'd have to

7    turn over written correspondence, if you want to talk

8    historically, and the First Amendment issues that have been

9    raised by plaintiffs in that regard.  I'd like you to address

10   that because this is new and different with regard to the

11   statute and it's certainly a law or regulation that states

12   that the state has the ability and should be authorized to do

13   a search of social media would be one thing, but to ask an

14   applicant to affirmatively turn over correspondence, what's

15   the basis for that?

16         MR. THOMPSON:  Sure, your Honor.  I think there's

17   two parts to that question, let me take on the first part

18   first.  In terms of historic analogues, *Bruen* requires a

19   historical analogue, it doesn't require a historical twin.

20   So obviously we don't have any statutes before you that

21   discuss, you know, please show us your anonymous pamphlets,

22   but what we do have is a long history and tradition saying

23   where there are indicia of dangerousness, individual elements

24   of risk as Justice -- as Justice Barrett said, that is

25   something that state should be able to take into mind in

1    determining whether someone is too dangerous to have a gun.

2    And I think as a practical matter, postings on social media

3    are very relevant to that.

4              Now, you know, you say that it would be different

5    if there was a search that was authorized versus having to

6    disclose it.  I think that's relevant to the First Amendment

7    issue; I'm not sure that it is to the Second Amendment issue.

8    I think the Second Amendment issue is about history and it's

9    about dangerousness.

10              So with that, let me pivot to the First Amendment

11   discussion, and here, and this is something that

12   Mr. Stamboulieh I think conflated, here we are back in

13   traditional intermediate scrutiny which still governs for

14   First Amendment purposes.  And the social media requirement

15   is content neutral.  I know the plaintiffs dispute that.  But

16   a regulation that serves purposes unrelated to the content of

17   expression is deemed neutral even if it has an incidental

18   effect on some speakers or messages, but not others.  So yes,

19   it's only people -- it's only gun license applicants that

20   have to disclose their social media but the purpose is not

21   geared toward that.  The purpose is geared toward public

22   safety.  So to satisfy intermediate scrutiny, the disclosure

23   requirement must advance important governmental interests

24   unrelated to the suppression of free speech and not burden

25   substantially more speech than necessary to further those

1    interests.

2         I think the first part of that test is pretty

3    straightforward.  There's absolutely a compelling public

4    safety and crime prevention goal in gun licensing and that is

5    something that was held by the Second Circuit in *NYSRPA v.*

6    *Cuomo*, 804 F.3d at 261 and a number of other cases that we

7    cite.  So it's really a question about the fit under

8    intermediate scrutiny.  And under intermediate scrutiny, the

9    fit between the challenged regulation and the government

10   interest need only be substantial, not perfect.  So there is

11   no requirement that in order to pass First Amendment scrutiny

12   that the law must follow the least restrictive means

13   possible.

14        Your Honor talks about, raises the issue of

15   anonymous speech.  I don't think that any plaintiff has

16   raised that.  Mr. Antonyuk has not alleged that he has any

17   anonymous social media accounts, none of the declarations

18   submitted by any of the organizational plaintiffs talk about

19   them having anonymous social media accounts so I don't think

20   it's properly before the court.  But what I would say is that

21   we believe that the law is narrowly tailored within the

22   intermediate scrutiny framework.  It's limited to a list of

23   former and current social media accounts from the past three

24   years and the use of those accounts is tied to the good moral

25   character standard and the dangerousness element of it.  And

1     the Second Circuit in *Libertarian Party* previously indicated
2     that there is a plainly legitimate sweep there.  They said
3     that examples of the sound application of the standard, "are
4     not beyond an ordinary person's comprehension nor are they
5     rare."  And the *Libertarian Party* case also gives examples
6     like for instance if there have been threats made, specific
7     threats made of a person or indicators that a person has been
8     significantly intoxicated while carrying a firearm.  So one
9     could imagine similarly if there were those same threats or
10    those same indicia on social media, I think it absolutely
11    would be a constitutional application and for the purpose of
12    this facial challenge, that's enough.  If it's entirely -- if
13    it were to be applied in an unconstitutional manner against
14    an individual plaintiff, that may give rise to an as-applied
15    challenge down the line, but here there is a plainly
16    legitimate sweep.

17              THE COURT:  Okay.  Do you envision in the permit
18    process that certain people making the application may take
19    the Fifth with regard to their social media account?

20              MR. THOMPSON:  That's an interesting hypothetical.

21              THE COURT:  Because what you're asking them to do
22    is basically turn over all of my correspondence for the
23    state's review to find possibly dangerousness, and somebody's
24    going to read those presumably and make a determination which
25    may open them up possibly to some type of prosecution.

1    There's all sorts of interesting things that you're opening

2    up here with that sort of requirement.  Which is why I say it

3    seems to me that the state's interest would have been, we

4    have the authority to check, as opposed to asking an

5    applicant to turn over their social media accounts.

6              MR. THOMPSON:  I think the question is -- well, let

7    me -- two answers to that question, let me do the first one

8    first?

9              THE COURT:  You got it, go ahead.

10             MR. THOMPSON:  There are, there is a case where

11   there have been a number of hypotheticals put out, by

12   Mr. Stamboulieh, by us, and by your Honor, and again we come

13   back first to the facial standard.  If there is a plainly

14   legitimate sweep here, and there is, then at this stage it is

15   constitutional facially.  Now if that hypothetical came to

16   pass that someone took the Fifth, I think that would be a

17   very interesting case to litigate in front of your Honor.  As

18   you know, taking the Fifth can give rise to a civil inference

19   but I don't even want to speculate.  I think that's a very

20   interesting case that could happen in the future but it's not

21   one that's presented here, it's not one that really matters

22   to the facial challenge to the statute.

23             THE COURT:  Okay.

24             MR. THOMPSON:  As to sensitive places, I won't go

25   too far into what we've already said.  There is I think an

1    agreement between the plaintiffs and the defendants that at

2    least some of these sensitive places are constitutional.

3    That is a plainly legitimate sweep for the purpose of the

4    facial analysis and we've -- beyond that, I'll rely on our

5    brief in terms of the historical statutes and analysis that

6    we've cited.

7              Private property we've discussed.  We have a number

8    of historical analogues, and again I refer, I would refer

9    your Honor to the *GeorgiaCarry* case.  And in terms of the

10   challenge to training requirements, as we went into some

11   great historical detail on and if your Honor's interested in

12   jumping down a rabbit hole, you can take a look at Friedrich

13   von Steuben's Regulations for the Troops of the United States

14   that talk about what actually goes into militia training or

15   went into militia training at that time, in 1791 and after.

16   All of us, with the exception of your Honor because judicial

17   officials were exempted, would be meeting multiple times a

18   year and spending hours on mandatory training and be

19   potentially punished criminally or by court martial if we

20   didn't.

21             THE COURT:  You want to address the argument that

22   it's particularly arduous to try and dissuade people from

23   their constitutional right to carry?

24             MR. THOMPSON:  I'm not sure if I understand, who is

25   dissuading?

1          THE COURT:  The applicant.

2          MR. THOMPSON:  I don't think that there's any

3   effort here to dissuade anyone from the constitutional right

4   to carry.  I think that there is a training requirement in

5   order to make sure that, in order to make sure that the

6   applicant is capable of effectively handling a firearm.  I

7   think that training requirements are deeply rooted in

8   American law and New York's training requirements are not

9   dramatically out of step with other states as we point out.

10   I don't think there's any dissuading going on.

11          THE COURT:  Your position is that it's not

12   particularly arduous in comparison to other training

13   requirements in other states?

14          MR. THOMPSON:  I think that's our position.  It's

15   also not particularly arduous in terms of the amount of hours

16   or in terms of the amount of cost.  Again, this is a

17   requirement that applies only when a license is issued or

18   renewed.  So it's something that you have to do in Mr. --

19   well, not in Mr. Antonyuk's case but in the case of another

20   Schenectady County resident, it's something that you have to

21   do once.  If you're a resident of New York City, Nassau,

22   Westchester, or Suffolk, it's something that you have to do

23   when you first apply and then on the first renewal and after

24   that you only recertify.  So I think, you know, if you're

25   talking about hours, it's, you know, 16 hours once or 16

1    hours twice over a period of three to five years.  I don't

2    think that is unconstitutionally onerous.

3              And similarly, in terms of any costs, first of all,

4    those costs are not imposed by the state police, they're

5    imposed by localities or private trainers, and I think under

6    the *Kwong* case, *Kwong v. Bloomberg*, although Mr. Stamboulieh

7    is correct as he pointed out that that was decided under the

8    pre-*Bruen* standard, I don't think that there is an

9    unconstitutionally onerous burden from the training

10   requirements.

11             And so your Honor, if you have no further

12   questions, we believe that under the *Bruen* standard, CCIA's

13   constitutional and the preliminary injunction motion should

14   be denied.  Thank you.

15             THE COURT:  Thank you.  And the reply, I'm going to

16   limit parties just because of the time.

17             MR. STAMBOULIEH:  Yes, sir.

18             THE COURT:  If 15 to 20 minutes is sufficient for

19   you to cover --

20             MR. STAMBOULIEH:  Yes.

21             THE COURT:  -- let's try and shoot for that mark.

22             MR. STAMBOULIEH:  Sure, yes.

23             THE COURT:  You can go a little over, but I don't

24   know that everybody wants to be here all day.

25             MR. STAMBOULIEH:  Right, right, sir, of course.

1    May I proceed?

2              THE COURT:  You may.

3              MR. STAMBOULIEH:  So there's just a couple things

4    that I want to point out that probably demonstrate to the

5    court how confusing this new law is.

6              So your Honor mentioned something about carrying in

7    a medical provider's, health provider's location and my

8    friend over here talked about, well, you just need to have

9    consent, it's not a matter of being prohibited.  If we read

10   the statute though, the statute eliminates the ability to

11   carry into a -- one second, just want to make sure I get it

12   right.  Any location providing health, behavioral health, or

13   chemical dependence care or services.  There's nothing that

14   anyone that owns one of these providers can post a sign

15   saying that someone else can carry and that's what I said at

16   the beginning of my argument.  Mr. Antonyuk, who has medical

17   doctors as clients, can't tell him, you know, Ivan, we know

18   you're a good guy, a decent guy and you carry a gun, come on

19   over, it's specifically banned from doing this.

20             And like the *GeorgiaCarry* case about carrying in a

21   church, New York has taken that off the table.  New York says

22   that you can't have -- you can't carry in any place of

23   worship or religious observation.  But what the court will

24   not see is anything in here that says if you post a sign,

25   you're okay.  And you can't even go up to the person at the

1    front door of the church like in *GeorgiaCarry* and say, hey,

2    I've got a gun, is it okay if I come in here?  And it's a

3    little bit different in this case where the church doesn't

4    care if you carry or where the church posts something that

5    says you can't carry there.  So, and I think that that -- the

6    *GeorgiaCarry* person wanted to be able to carry in a church

7    that was otherwise off limits and didn't want that there, and

8    that's their right if they don't want it there.  And the

9    plaintiff, as you heard Mr. Antonyuk say earlier, he's not

10   going to go -- if he's not wanted, he's not going to go

11   there.  And so I think that that case doesn't really help the

12   defendants at all because you can't carry in New York in a

13   church, period, end of story on September 1st.

14          He also discussed Judge, now Justice Amy Coney

15   Barrett's dissent in the *Kanter v. Barr* case, and the

16   fascinating thing about Justice Barrett is in that case she

17   would have held, and she was in the dissent, but she would

18   have held that nonviolent felons probably don't lose their

19   gun rights, and that's not even the case we're making here,

20   Judge, so what she was talking about when she said that

21   dangerous people can be disarmed but they have to be

22   dangerous.  And luckily, the state has a way to find out if

23   someone's dangerous without having to go into the social

24   media stuff, they can run a NICS background check, they can

25   go to the state police, they can say, Mr. Stamboulieh, where

1    have you lived the last five years?  I can say, oh, I lived

2    in Mississippi, I spent some time in North Carolina, I lived

3    overseas too, but you know, they can do some things without

4    saying, Mr. Stamboulieh, let me look at your Twitter.  And

5    that's another good point.  What is social media?  I have an

6    idea of what it is, I'm sure the defendants have an idea of

7    what it is, but it's going to depend on who we're talking to

8    because I don't believe it's defined in the law.  So is it

9    only Twitter?  Is it also my e-mails?  Is it my posts on

10   Reddit?  If someone has an Onlyfans account, which I don't

11   have, but if they did, are they going to have to put that up

12   and then maybe the person looking at it is saying, well, I

13   don't want this person to carry a gun, they're not dangerous

14   but I just don't agree with selling naked pictures of myself

15   online.  So there's all kinds of different things that aren't

16   defined well in this law that are only going to cause

17   confusion and we believe are unconstitutional.

18           One thing I would say about the private property,

19   that they don't have to post but they need express consent.

20   That's kind of a little scary because if someone comes in

21   only on the word of someone, you know, come in, I have a gun,

22   you can come in, and then that person says, maybe you should

23   leave now because you're carrying a gun, we're going to have

24   a he said/she said versus -- on the word of I told them they

25   could come in, I didn't tell him he could come in, and that

1    just strikes me as something that we really shouldn't force

2    people to have to go down those rabbit holes.  It needs to be

3    if you can't carry there, you can't carry there without this

4    consent, express consent or whatever that means.

5              I would also say that the six states that are

6    discussed in the Supreme Court case that had the heightening

7    justifiable need in New Jersey, exceptional case requirement

8    in Hawaii, it wasn't enough to hold the day, at the end of

9    the day we have a right to public carry.  So when we

10   cherrypick these statutes, and I'm not saying that

11   pejoratively, there's not a lot of them and so they picked

12   the ones that they had that say you can't have a gun on

13   someone's land in Texas in 1870 or you can't have a gun in

14   someone else's land in New Jersey in 1720, these are very few

15   places, very few states, colonies, what have you, that don't

16   establish that it was a tradition that you couldn't carry

17   onto someone else's property.  And a lot of these statutes,

18   as we briefed in our reply, look like they're antipoaching

19   laws, it says you can't bring a killing device.  Well, the

20   people that write statutes now don't call them killing

21   devices, and they don't call them killing devices in the

22   CCIA, it's firearms and guns.  So I think these are mostly

23   antipoaching statutes versus something else.

24             There is one other group of individuals that are

25   required to give social media and those are sex offenders.

1   So there's a case that they cite in their brief, I believe
2   it's the *Doe* case where it says that sex offenders have to
3   provide identifiers, identifiers meaning what's your Twitter
4   handle, some other identifiers I would guess like maybe IP
5   address.  The court in *Utah*, I think that was the case they
6   cited, struck that statute as unconstitutional, as an
7   invasion of the First Amendment.  And then Utah went back and
8   said, well, you don't really have to give us your passwords
9   but if we are doing an investigation and we just happen to
10  know you're a sex offender, you still have to provide us with
11  the identifiers and the court at that point said, okay, it's
12  okay because this guy's already convicted of a serious crime
13  and what you're providing the police is material for an
14  active investigation into child exploitation or some other
15  type of crime like that.  But so, you know, it's just weird
16  being, as a gun owner being lumped in with a group of sex
17  offenders that I have to turn over my social media.

18          I will say two other things.  The traceability,
19  it's not implemented yet, Judge, we're not saying that
20  they're implementing it right now, there's no allegation that
21  they're currently implementing it.  When Ivan recertifies his
22  permit, it's going to go to the superintendent of state
23  police.  One of the questions I wanted to ask defendant Bruen
24  is about the training.  Everything I've heard says that the
25  training's not going to be even a thing until April of 2023

1    and so on September 1st when people -- when other GOA members

2    go to apply for their permit, there's no training that they

3    can have because the superintendent has to come up with it.

4    There's no training.  And I guess we'll just have to see what

5    comes out with that.

6              I'll answer the court what we're trying to do, we

7    want to maintain the status quo.  It does maintain, you know,

8    we're asking to just maintain the status quo.  Obviously

9    we're post-*Bruen* right now so that is going to preclude the

10   proper cause but all of the parade of horribles that the

11   defendant has put forth in the briefing could happen right

12   now because right now the CCIA is in effect.  So all of these

13   things that New York has been doing since the Sullivan Act,

14   1911 or '13, whichever date it was, has been this way since

15   then.  So the horrible things, the public safety, all of this

16   extra stuff could have always happened in these past 110

17   years or however long it's been, and just now it's an

18   emergency for them to pass something without going through

19   all the procedural stuff that I don't really know, but to put

20   this in to further restrict people's carry, and we're just

21   asking for status quo and we only need a substantial

22   likelihood of success on the merits, we don't need to be

23   certain that we're going to win.  But we need a substantial

24   likelihood and I think that we've provided that to the court

25   in the briefing, your Honor.

1          THE COURT:  Okay, sir.

2          MR. STAMBOULIEH:  Thank you.

3          THE COURT:  Thank you.  And brief reply.

4          MR. THOMPSON:  Very brief, your Honor.  Three

5   points, hopefully I'll be out within two minutes.  First of

6   which, Mr. Stamboulieh is correct that the recertification

7   does go to New York State Police, this is the website that

8   Mr. Antonyuk talked about where you input your information,

9   but there's no harm alleged from the recertification process.

10  That doesn't carry with it any of the consequences that the

11  plaintiffs are talking about.  There's no social media check,

12  no interview, there's no harm from recertification.

13          Number two, the plaintiffs discuss our historical

14  antecedents on property and sort of deride them as

15  antipoaching laws.  I don't think that that's something that

16  is a valid reading of these laws, they are not so limited.

17          And number three, and this is sort of an

18  overarching point that I think touches on the standing

19  issues, touches on the facial standard, and touches on the

20  merits as well.  These hypotheticals that we've gone

21  backwards and forwards on, could Mr. Antonyuk be arrested for

22  bringing a gun here versus there, could there be assembling,

23  could they, you know, could a licensing officer require a

24  fingernail test, that's in their brief, all of this is the

25  point of the difference between a facial and an as-applied

1  challenge.  There are going to be enforcement decisions that

2  are made about whether and how to enforce this statute and

3  whether and how to do that in a reasonable way or in a

4  potentially unconstitutional way, and part of the reason we

5  have as-applied challenges rather than facial challenges is

6  so that courts adjudicate the statute as it actually is, and

7  not as we lawyers put in our hypotheticals.  And because

8  there is a plainly legitimate sweep to these statutes because

9  they are grounded in American history and doctrine, we ask

10  that the injunction be denied.  Thank you, your Honor.

11          THE COURT:  Thank you.  Okay.  That will conclude

12  our hearing.  And I'm assuming, plaintiff's counsel, that

13  based on our earlier discussions and your argument, you no

14  longer are requesting the appearance of Superintendent Bruen?

15          MR. STAMBOULIEH:  That's correct, your Honor.

16          THE COURT:  Okay.  All right.  So then we'll take

17  what we have and we'll get a decision out to you.  Okay.

18          MR. STAMBOULIEH:  Thank you, your Honor.

19          MR. THOMPSON:  Thank you, your Honor.

20          THE COURT:  Thank you.  Have a good day.

21          THE CLERK:  Court's adjourned.

22              (Court Adjourned, 12:24 p.m.)

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4        I, JODI L. HIBBARD, RPR, CRR, CSR, Federal

 5   Official Realtime Court Reporter, in and for the

 6   United States District Court for the Northern

 7   District of New York, DO HEREBY CERTIFY that

 8   pursuant to Section 753, Title 28, United States

 9   Code, that the foregoing is a true and correct

10   transcript of the stenographically reported

11   proceedings held in the above-entitled matter and

12   that the transcript page format is in conformance

13   with the regulations of the Judicial Conference of

14   the United States.

15

16                   Dated this 24th day of August, 2022.

17

18

19                   /S/ JODI L. HIBBARD
                     _____
20                   JODI L. HIBBARD, RPR, CRR, CSR
                     Official U.S. Court Reporter
21

22

23

24

25
```