UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
────────────────────────────────

IVAN ANTONYUK; GUN OWNERS OF
AMERICA, INC.; GUN OWNERS
FOUNDATION; and GUN OWNERS OF
AMERICA NEW YORK, INC.,                          1:22-CV-0734
                                                 (GTS/CFH)
                          Plaintiffs,

v.

KEVIN P. BRUEN, in his Official Capacity as
Superintendent of the New York State Police

                          Defendant.
────────────────────────────────

APPEARANCES:                          OF COUNSEL:

STAMBOULIEH LAW, PLLC                  STEPHEN D. STAMBOULIEH, ESQ.
    Counsel for Plaintiff
P.O. Box 428
Olive Branch, MS 38654

WILLIAM J. OLSON, P.C.                 ROBERT J. OLSON, ESQ.
    Co-Counsel for Plaintiff
370 Maple Avenue W, Suite 4
Vienna, VA 22180

HON. LETITIA A. JAMES                  MICHAEL G. McCARTIN, ESQ.
Attorney General for the State of New York   JAMES M. THOMPSON, ESQ.
    Counsel for Defendant              Assistant Attorneys General
The Capitol
Albany, NY 12224

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this civil rights action filed by Ivan Antonyuk and the three

above-captioned organizations ("Plaintiffs") against Kevin P. Bruen in his official capacity as

Superintendent of the New York State Police ("Defendant"), is Plaintiffs' motion for a preliminary injunction. (Dkt. No. 9.) For the reasons set forth below, Plaintiffs' Complaint is *sua sponte* dismissed without prejudice for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3), and their motion for a preliminary injunction is denied without prejudice as moot.

## I.   RELEVANT BACKGROUND

### A.   Relevant Procedural History

On June 23, 2022, the Supreme Court held that N.Y. Penal Law § 400.00(2)(f), which conditioned the issuance of an unrestricted license to carry a handgun in public on the existence of "proper cause," violated the Second and Fourteenth Amendments by impermissibly granting a licensing official the discretion to deny a license to a law-abiding, responsible New York State citizen based on a perceived lack of a special need for self-protection distinguishable from that of the general community. *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022) ("*NYSRPA*").

On July 1, 2022, New York State passed the Concealed Carry Improvement Act ("CCIA"), which generally replaced the "proper cause" standard with, in pertinent part, (1) a definition of the "good moral character" that was required in order to complete the license application or renewal process, (2) the requirement of an in-person interview, social-media-account disclosure and review, at least four "character references" and additional hours of required in-person firearm training in order to complete the license application or renewal process, and (3) a list of "sensitive locations" and "restricted locations" where carrying arms is prohibited. 2022 N.Y. Sess. Laws ch. 371.

On July 11, 2022, Plaintiffs filed their Complaint in this action. (Dkt. No. 1.) Generally,

in their Complaint, Plaintiffs assert four claims against Defendant: (1) a claim for violating the Second Amendment; (2) a claim for violating the Second Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983 ("Section 1983"); (3) a claim for violating the First Amendment; and (4) a claim for violating the First Amendment, Fourteenth Amendment, and Section 1983. (*Id*.) Each of these claims challenge one or more of the following seven aspects in the revised law: (a) its allegedly subjective definition of "good moral character"; (b) its allegedly onerous requirement of an in-person interview by the licensing officer; (c) its allegedly onerous requirement that the applicant disclose a list of his or her current and past social media accounts for the past three years; (d) its allegedly onerous requirement of at least four "character references" who can attest to the applicant's "good moral character and that such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others"; (e) its allegedly onerous requirement of a minimum of 16-hours of in-person training (plus a minimum of two hours of live-fire training) and accompanying fees; (f) its expansive list of "sensitive locations"; and (g) its expansive definition of "restricted locations." (*Id*.)

On July 20, 2022, Plaintiffs filed their motion for preliminary injunction. (Dkt. No. 9.) On August 15, 2022, Defendants filed their opposition. (Dkt. No. 19.) On August 22, 2022, Plaintiffs filed their reply. (Dkt. No. 40.) On August 23, 2022, the Court held a hearing on Plaintiffs' motion, at which it not only received evidence, but heard oral argument. (Text Minute Entry dated Aug. 23, 2022; Dkt. 46 [Hrg. Tr.].)

**B.     Summary of Parties' Arguments on Plaintiffs' Motion for a Preliminary Injunction**

**1.     Plaintiffs' Memorandum of Law**

Generally, in their memorandum of law, Plaintiffs assert five arguments. (Dkt. No. 9, Attach. 1 [Plfs.' Memo. of Law].)

First, Plaintiffs argue, they have standing because (a) even setting aside the need to undergo onerous training and social-media-disclosure requirements before he recertifies his carry permit in January 2023, Plaintiff Antonyuk faces a real, immediate, and direct threat of arrest, prosecution or other enforcement action if he carries his firearm in any of the numerous "sensitive locations" and "restricted locations" defined in the CCIA, after the CCIA takes effect on September 1, 2022, (b) the three organizational Plaintiffs have members and supporters in New York State who will face the same or similar harms as Plaintiff Antonyuk due to the impending implementation of the CCIA, and (c) these injuries are fairly traceable to Defendant, who is tasked with enforcing these impending restrictions. (*Id*. at 3-7 [attaching pages "1" through "5" of Plfs.' Memo. of Law].)

Second, Plaintiffs argue, they are likely to succeed on the merits of one or more of their claims for four independent reasons: (a) like the "proper cause" standard that was rejected by the Supreme Court in *NYSRPA*, the "good moral character" standard impermissibly grants licensing officers the discretion to deny a license based on a perceived lack of something (here, the "essential character, temperament and judgment necessary . . . to use [the weapon entrusted to the applicant] only in a manner that does not endanger oneself or others," which is a vague and subjective term); (b) its requirements of an in-person interview, four "character references," the divulging of family and associates, and the disclosure of social-media accounts are impermissible for numerous reasons, including the fact that they afford the licensing officer too much discretion under the Second Amendment and infringe on the applicant's First (and possibly Fifth) Amendment rights; (c) its long list of "sensitive locations" impermissibly includes

4

numerous locations that are nonsensitive, and its definition of "a restricted location" impermissibly encompasses *all* private property in the state unless the property owner expressly permits the carrying of firearms; and (d) its four-and-a-half times increase in required training hours will cost hundreds of additional dollars in course fees (and possibly lost wages), which will impermissibly extinguish the right to bear arms of those responsible New Yorkers who cannot afford those costs, and it is precisely what the Supreme Court in *NYSRPA* warned against when it stated that it would "not rule out constitutional challenges to shall-issue regimes where, for example, . . . exorbitant fees deny ordinary citizens their right to public carry." (*Id*. at 8-25 [pages "5" through "23"].)

Third, Plaintiffs argue, they are likely to suffer irreparable harm absent preliminary relief because (a) a strong showing of a constitutional deprivation (even if the deprivation is for only a minimal period of time) constitutes irreparable harm, and (b) here, the above-discussed aspects of the CCIA either deprives Plaintiffs of their Second Amendment rights or forces them to waive various of their First Amendment rights to exercise their Second Amendment rights. (*Id*. at 25 [page "23"].)

Fourth, Plaintiffs argue, the balance of equities tips overwhelmingly in Plaintiffs' favor because the New York State legislature intentionally tramples the clearly enumerated Second Amendment right to bear arms outside of the home (in addition to well-established First Amendment rights). (*Id*. at 26 [page "24"].)

Fifth and finally, Plaintiffs argue, an injunction is in the public interest because (a) the public has an interest not only in vindicating Second (and First Amendment) rights, but also in the prevention of the egregious curtailment of those rights, (b) the Supreme Court's new ban on means-end scrutiny now prevents Defendant from relying on public safety as an automatic form

of public interest, and (c) the CCIA consists of unprecedented restrictions on constitutional rights

that have no historical analog. (*Id*. at 25-26 [pages "24" and "25"].)

### 2.    Defendant's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Defendant asserts eleven arguments.

(Dkt. No. 19 [Def.'s Opp'n Memo. of Law].)

First, Defendant argues, with regard to the issue of standing, under controlling Second

Circuit precedent, the three organizational Plaintiffs have not alleged facts plausibly suggesting

standing to sue in their own right because they must do so without relying on their members'

injuries (much less their supporters' injuries). (*Id*. at 24-26 [pages "10" through "12"].)

Second, Defendant argues, he is not a proper defendant because any alleged injury from

the licensing laws is not fairly traceable to him, and the Eleventh Amendment separately bars

suit against him (given that New York State has not consented to be sued and he has no specific

connection with the enforcement of the CCIA). (*Id*. at 26-29 [pages "12" through "15"].)

Third, Defendant argues, Plaintiff Antonyuk has not alleged an injury-in-fact because he

will never be subject to the requirements he is challenging (given that his license was not issued

in New York City or the counties of Nassau, Suffolk, or Westchester, and thus will never need to

be renewed), he has not yet filed for a new license under the CCIA, and his pre-enforcement

challenge is not supported by factual allegations plausibly suggesting that he intends to engage in

conduct proscribed by the CCIA (e.g., by taking his gun into a university or onto private

property) or will face a credible threat of prosecution. (*Id*. at 29-34 [pages "15" through "20"].)

Fourth, Defendant argues, in any event, with regard to the issue of clear likelihood of

success on the merits, Plaintiffs can bring only a facial challenge (which is generally disfavored

by courts) because the CCIA has never been applied to him, and such a facial challenge is

premature until New York State courts have been given the opportunity to narrow the provisions of the CCIA. (*Id*. at 34-35 [pages "20" and "21"].)

Fifth, Defendant argues, New York State's good-moral-character requirement is constitutional because (a) it is patterned after laws endorsed by the *NYSRPA* majority such as a Connecticut statute quoted in *NYSRPA* and the analogous statutes of other states (such as Rhode Island, Pennsylvania, Virginia, Colorado, and Illinois), and (b) the requirement is relevantly similar to a long tradition of Anglo-American history and doctrine. (*Id*. at 35-47 [pages "21" through "33"].)

Sixth, Defendant argues, New York State's licensing procedures are constitutional because (a) its interview and reference requirements are permissible both under *Heller* and *NYSRPA* and as part of the longstanding tradition regarding in-person inspections of those carrying firearms, and (b) its social-media-disclosure requirement does not violate either the Second Amendment (in that it ensures that the applicants are "law abiding, responsible citizens," and it has a strong historical pedigree and a strong modern justification) or the First Amendment (in that it is content neutral and thus subject to only intermediate scrutiny, which it easily survives). (*Id*. at 47-61 [pages "33" through "47"].)

Seventh, Defendant argues, New York State's protections for "sensitive locations" are constitutional, because Plaintiffs do not specify which categories of "sensitive locations" they are challenging (other than all of them), *Heller* presumptively permits prohibitions on carrying guns in vulnerable places, and *NYSRPA* recognizes the fact that such prohibitions are deeply rooted in the Nation's historical tradition of firearm regulation. (*Id*. at 61-65 [pages "47" through "51"].)

Eighth, Defendant argues, New York State's law preventing armed persons from entering other people's property without consent is constitutional (in that the Second Amendment does

7

not guarantee the right to bear arms on someone else's property) and deeply rooted in Anglo-American property law and tradition (prohibiting persons from carrying guns onto another person's land or plantation without permission). (*Id*. at 65-70 [pages "51" through "56"].)

Ninth, Defendant argues, New York State's training requirements are constitutional, because (a) in-person firearms training requirements are provided for in the Constitution itself and are deeply rooted in American tradition, and (b) Plaintiffs' alleged training costs are entirely hypothetical and entirely consistent with this Nation's historical tradition of firearms regulation. (*Id*. at 70-76 [pages "56" through "62"].)

Tenth, Defendant argues, in any event, with regard to the issue of a strong showing of irreparable harm, the presumption of irreparable harm arising from a constitutional deprivation is not automatic, and Plaintiffs have not alleged facts plausibly suggesting what adverse factual consequences they will experience if an injunction is not issued. (*Id*. at 76-77 [pages "62" and "63"].)

Eleventh, Defendant argues, in any event, the equities and public interest favor allowing the CCIA to protect the public from gun violence, because any prejudice to Plaintiffs is entirely theoretical, while the prejudice to the public is potentially catastrophic. (*Id*. at 77-79 [pages "63" through "65"].)

### 3. Plaintiffs' Reply Memorandum of Law

Generally, in their reply memorandum of law, Plaintiffs assert thirteen arguments. (Dkt. No. 40 [Plfs.' Reply Memo. of Law].)

First, Plaintiffs argue, with regard to the issue of standing, the organizational Plaintiffs have standing because (a) the Supreme Court did not have an issue with the representational standing of the organizational plaintiff in *NYSRPA* or similar cases, (b) the cases relied on by

Defendant are distinguishable because they involve claims asserted under Section 1983, and here, Plaintiffs are also asserting claims not asserted under Section 1983, and (c) if the Court is concerned that Plaintiffs lack standing, it should permit them to amend their Complaint. (*Id*. at 4-5 [attaching pages "2" and "3" of Plfs.' Reply Memo. of Law].)

Second, Plaintiffs argue, Plaintiff Antonyuk has standing because (a) "[r]eportedly, New York (and Defendant specifically) has given conflicting information about whether someone who already has a license will be subject to these provisions," (b) New York State's new "good moral character" requirement is an ongoing standard to which every license is held (a fact evidenced from the provision that a license may be suspended or revoked at any time if a person becomes "ineligible" or "engag[es] in conduct that would have resulted in the denial of a license . . ."), and (c) at the very least, he is subject to the sensitive-location provision and restricted-location provision, the violation of which he has alleged a credible threat of prosecution (and he need not first expose himself to actual arrest or prosecution to be entitled to challenge the statute). (*Id*. at 6-9 [pages "4" through "7"].)

Third, Plaintiffs argue, Defendant is the proper party because (a) none of the cases Defendant cited actually foreclose him from being a proper party, (b) other courts have not taken issue with him as a party on multiple occasions, and (c) for a constitutional challenge of this nature, Bruen may be the only proper party available, given his CCIA-enforcement duties as Superintendent, his authority over all New York State Police officers, and his authority to order them to "stand down." (*Id*. at 10-11 [pages "8" and "9"].)

Fourth, Plaintiffs argue, the Eleventh Amendment does not bar suit because it does not bar a plaintiff from suing a state official acting in his official capacity for prospective injunctive relief from violations of federal law. (*Id*. at 11 [page "9"].)

9

Fifth, Plaintiffs argue, with regard to the issue of likelihood of success on the merits, the Supreme Court in *NYSRPA* did not "specifically endorse" the CCIA's "good moral character" requirement because (a) it expressly did not "rule out constitutional challenges to shall-issue regimes," (b) the Connecticut statute on which Defendant relies is distinguishable from the CCIA and in any event was treated by the Supreme Court as an outlier, and (c) the concurring opinion on which Defendant relies did not sanction New York State's "discretion" to license based on its "open ended" inquiry into "good moral character." (*Id*. at 11-14 [pages "9" through "12"].)

Sixth, Plaintiffs argue, New York State has failed to meet its burden of showing that its "good moral character" requirement is consistent with the Nation's historical tradition of firearm regulation, because (a) it fails to identify a single historical illustration before the mid-19th century to early 20th century (except for licensing in the fourteenth century, which of course is too distant from 1789), and (b) it instead focuses on authority to deprive a person of firearms when the individual has demonstrated by his actions that he presents a danger or he belongs to a class of people disfavored by government officials (such as Roman Catholics). (*Id*. at 14-17 [pages "12" through "15"].)

Seventh, Plaintiffs argue, the "good moral character" requirement has a racist pedigree because (a) historically the requirement has been used as a threshold for naturalized immigrants in order to favor white persons, or for professional licenses to discriminate against Black persons, and (b) the CCIA's "good moral character" requirement is so vague that in practice it empowers officials to apply whatever standard they subjectively choose to favor some (thus constituting the sort of discretionary licensing scheme that was disfavored by the Supreme Court in *NYSRPA*). (*Id*. at 18-24 [pages "16" through "22"].)

Eighth, Plaintiffs argue, the requirements of an in-person interview, four character

10

references and the divulging of family and associates are impermissible, because (a) the only qualifications found permissible by the Supreme Court in *NYSRPA* were fingerprinting, a background check, a mental health records check, and a firearms safety course, and (b) the purported historical analogues cited by Defendant involve restrictions against only disfavored groups (often based on race) or a requirement in one city (New York City). (*Id*. at 24-27 [pages "22" through "25"].)

Ninth, Plaintiffs argue, Defendant's justification for access to social media is unpersuasive because (a) the unconstitutionality of this demand does not depend on what "disturbing" statements the state might find in a person's social media accounts, but on lack of good cause to impose this demand on presumptively law-abiding, responsible citizens, (b) none of the purported historical analogues cited by Defendant required a person to provide information about himself to authorities, and (c) the requirement of social-media disclosure is not content neutral for purposes of the First Amendment (in that it applies only to "pro-gun" persons, it is made directly to licensing officials who have shown themselves to be disinclined to favor "pro-gun" statements, and it will require applicants to "self-censor" their online presence before applying). (*Id*. at 27-32 [pages "25" through "30"].)

Tenth, Plaintiffs argue, the provision regarding "sensitive locations" is unconstitutional, because (a) the myriad of sensitive locations listed in the CCIA is almost limitless (including, for example, public sidewalks, restaurants that serve alcohol, healthcare services, public transportation, and gatherings of individuals to express their constitutional rights), (b) the Supreme Court in *NYSRPA* effectively barred the expansion of sensitive locations beyond schools, government buildings, legislative assemblies, polling places and courthouses, and (c) the aforementioned expansion is unsupported by any historical examples that are actual

analogues. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order. (*Id*. at 32-38 [pages "30" through "36"].)

Eleventh, Plaintiffs argue, the provision defining "restricted locations" is unconstitutional, because (a) by declaring a policy governing all property owners, New York State is usurping (not protecting) the rights of property owners to decide things for themselves, effectively seizing people's private property and declaring it to be a gun-free zone, (b) Defendant's historical support for this restriction relies on only a handful of statutes that mostly either were anti-poaching laws or applied only to trespassers, and (c) Defendant's heavy reliance on *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), is misplaced because that case involved a license holder seeking to force a private property holder to permit him to carry his weapon there, and in any event, it merely upheld a state statute prohibiting such carrying in places of worship unless the places of worship "permitted" such carrying (not unless they posted "clear and conspicuous signage" or gave "express consent," as is required by the CCIA). (*Id*. at 38-40 [pages "36" through "38"].)

Twelfth, Plaintiffs argue, the CCIA's onerous training requirements violate the Second Amendment because (a) the Second Amendment's language of "a well regulated militia" requires "the imposition of discipline and training" by only someone, not the state, (b) the purported historical analogues relied on by Defendant are merely founding-era militia statutes, which apply to members of an organized militia, not "the people" referenced in the Second Amendment, and (c) the CCIA requiring many times the number of hours of training as 45 other states (and doing so at many times the cost), impermissibly imposes a wealth-based requirement that   makes New York State an outlier (surpassed in onerousness by only California). (*Id*. at 40-42 [pages "38" through "40"].)

12

Thirteenth, Plaintiffs argue, they meet the remaining elements for injunctive relief because (a) they have demonstrated irreparable harm (e.g., though experiencing a constitutional violation if Plaintiff Antonyuk were to carry a concealed handgun into a gas station or store), and (b) the public harm claimed by Defendant is framed as the CCIA were already in effect. (*Id*. at 42 [page "40"].)

### 4.    Hearing and Oral Argument

At the preliminary-injunction hearing on August 23, 2022, Plaintiffs adduced the testimony of the following three witnesses, who relied on their supplemental declarations in support of Plaintiffs' reply memorandum of law and then were cross-examined by Defendant: (1) Plaintiff Antonyuk; (2) Erich M. Pratt, Senior Vice President of both Plaintiff Gun Owners of America, Inc., and Plaintiff Gun Owners Foundation; and (3) William Robinson, Director of Communications for Plaintiff Gun Owners of America New York, Inc. (Text Minute Entry dated Aug. 23, 2022; Dkt. No. 46 [Hrg. Tr.].) Defendant chose not to personally attend the hearing, and Plaintiffs chose not to subpoena him; as a result, he did not testify at the hearing. (Dkt. No. 44, at 1; Hrg. Tr. at 32-33, 75.)[1] Following the presentation of evidence, counsel submitted oral

---

[1]       The Court notes that, on August 22, 2022, Plaintiffs filed a Witness List that included Defendant. (Dkt. No. 42, at 2.) Later that day, Defendant filed a letter stating that "[t]his is the first time that Plaintiffs indicated that they wished to have Superintendent Bruen testify at the hearing tomorrow," and that "[pursuant to the conversation that the undersigned had with the Court's Courtroom Deputy on July 21, 2022], Superintendent Bruen was not planning to be present to testify at the hearing that is scheduled for tomorrow, August 23, 2022." (Dkt. No. 44.) In fact, Defendant's decision to not personally attend the hearing cannot fairly be characterized as having been "pursuant" to the conversation defense counsel had with the undersigned's Courtroom Deputy on July 21, 2022, because the Courtroom Deputy in no way directed or even recommended Defendant's personal absence from the hearing; rather, she merely explained that the Court's directive of July 21, 2022, for Defendant to "mak[e] available for an in-person hearing at any point between TUESDAY, AUGUST 23, 2022, and the end of FRIDAY, AUGUST 26, 2022" meant only that, at the very least, Defendant must appear *through counsel* at that hearing so that the hearing may take place before the CCIA took effect on September 1,

argument, in which they largely repeated arguments made in their memoranda of law. (*Compare* Dkt. No. 46, at 33-75 *with* Dkt. Nos. 9, 19, and 40.)

## II.   GOVERNING LEGAL STANDARDS

### A.   Procedural Legal Standard

"A preliminary injunction is an 'extraordinary and drastic remedy' . . . ; it is never awarded as of right . . . ." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations omitted). Generally, in the Second Circuit, a party seeking a preliminary injunction must establish the following three elements: (1) that there is either (a) a likelihood of success on the merits and a balance of equities tipping in the party's favor or (b) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in the party's favor; (2) that the party will likely experience irreparable harm if the preliminary injunction is not issued; and (3) that the public interest would not be disserved by the relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (reciting standard limited to first part of second above-stated element and using word "equities" without the word "decidedly"); *accord, Glossip v. Gross*, 135 S. Ct. 2726, 2736-37 (2015); *see also Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (reciting standard including second part of second above-stated element and using words "hardships" and "decidedly"); *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010) (holding that "our venerable standard for assessing a movant's probability of success on the merits remains valid [after the Supreme Court's decision in *Winter*]").

---

2022. His lack of personal attendance at that hearing (and any resulting adverse evidentiary consequences to him resulting from that absence) were entirely his decision. (Dkt. No. 12; Hrg. Tr. at 32.)

With regard to the first part of the first element, a "likelihood of success" requires a demonstration of a "better than fifty percent" probability of success. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *disapproved on other grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, n.2 (1987). "A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits. *See, e.g., Ligon v. City of New York,* 925 F. Supp.2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing "hardship imposed on one party" and "benefit to the other" as a "balanc[ing] [of] the equities"); *Jones v. Nat'l Conference of Bar Examiners,* 801 F. Supp. 2d 270, 291 (D. Vt. 2011) (considering the harm to plaintiff and any "countervailing benefit" to plaintiff in balancing the equities); *Smithkline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* 99-CV-9214, 1999 WL 34981557, at \*4-5 (S.D.N.Y. Sept. 13, 1999) (considering the harm to defendant and the "benefit" to consumers in balancing the equities); *Arthur v. Assoc. Musicians of Greater New York*, 278 F. Supp. 400, 404 (S.D.N.Y. 1968) (characterizing "balancing the equities" as "requiring plaintiffs to show that the benefit to them if an injunction issues will outweigh the harm to other parties"); *Rosenstiel v. Rosenstiel*, 278 F. Supp. 794, 801-02 (S.D.N.Y. 1967) (explaining that, in order to "balance the equities," the court "will consider the hardship to the plaintiff . . . , the benefit to [the] plaintiff . . . , and the relative hardship to which a defendant will be subjected") [internal quotation marks omitted].[2]

With regard to the second part of the first element, "[a] sufficiently serious question as to the merits of the case to make it a fair ground for litigation" means a question that is so

---

[2]        *See also Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12, n.2 ( 7th Cir. 1992) ("Weighing the equities as a whole favors X, making preliminary relief appropriate, even though the *undiscounted* balance of harms favors Y.") [emphasis added].

"substantial, difficult and doubtful" as to require "a more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953); *accord, Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205-06 (2d Cir. 1970).[3]   "A balance of hardships tipping decidedly toward the party requesting a preliminary injunction" means that, as compared to the hardship suffered by other party if the preliminary injunction is granted, the hardship suffered by the moving party if the preliminary injunction is denied will be so much greater that it may be characterized as a "real hardship," such as being "driven out of business . . . before a trial could be held." *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979); *Int'l Bus. Mach. v. Johnson*, 629 F. Supp.2d 321, 333-34 (S.D.N.Y. 2009); *see also Semmes Motors, Inc.,* 429 F.2d at 1205 (concluding that the balance of hardships tipped decidedly in favor of the movant where it had demonstrated that, without an injunctive order, it would have been forced out of business as a Ford distributor).[4]

---

[3]     *See also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997); *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988);   *City of Chanute v. Kansas Gas and Elec. Co.,* 754 F.2d 310, 314 (10th Cir. 1985); *R.R. Yardmasters of Am. v. Penn. R.R. Co.*, 224 F.2d 226, 229 (3d Cir. 1955).

[4]     The Court notes that, under the Second Circuit's formulation of this standard, the requirement of a balance of *hardships* tipping *decidedly* in the movant's favor is apparently added only to the second part of the first element (i.e., the existence of a sufficiently serious question as to the merits of the case to make it a fair ground for litigation), and not also to the first part of the first element (i.e., the existence of a likelihood of success on the merits), which (again) requires merely a balance of *equities* (i.e., hardships and benefits) tipping in the movant's favor. *See Citigroup Global Markets, Inc.*, 598 F.3d at 36 ("Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips decidedly' in its favor . . . , its overall burden is no lighter than the one it bears under the 'likelihood of success' standard.") (internal citation omitted); *cf. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp.2d 186, 192 (E.D.N.Y. 2013) ("[T]he *Winter* standard . . . requires the balance of equities to tip in the movant's favor, though not necessarily 'decidedly' so, even where the movant is found likely to succeed on the merits.").

With regard to the second element, "irreparable harm" is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

With regard to the third element, the "public interest" is defined as "[t]he general welfare of the public that warrants recognition and protection," and/or "[s]omething in which the public as a whole has a stake[,] esp[ecially], an interest that justifies governmental regulation." *Black's Law Dictionary* at 1350 (9th ed. 2009).

The Second Circuit recognizes three limited exceptions to the above-stated general standard. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4.

First, where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less-rigorous "serious questions" standard but should grant the injunction only if the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim. *Id*. (citing *Able v. United States*, 44 F.3d 128, 131 [2d Cir. 1995]); *see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) ("A plaintiff cannot rely on the 'fair-ground-for-litigation' alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme.") (internal quotation marks omitted). This is because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able,* 44 F.3d at 131.

17

Second, a heightened standard–requiring both a "clear or substantial" likelihood of success and a "strong" showing of irreparable harm"–is required when the requested injunction (1) would provide the movant with all the relief that is sought and (2) could not be undone by a judgment favorable to the non-movant on the merits at trial. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 [2d Cir. 2006]); *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("When either condition is met, the movant must show [both] a 'clear' or 'substantial' likelihood of success on the merits . . . *and* make a 'strong showing" of irreparable harm' . . . .") (emphasis added).

Third, the above-described heightened standard may also be required when the preliminary injunction is "mandatory" in that it would "alter the status quo by commanding some positive act," as opposed to being "prohibitory" by seeking only to maintain the *status quo*. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).[5]  As for the point in time that serves as the *status quo*, the Second Circuit has defined this point in time as "the last actual, peaceable uncontested status which preceded the pending controversy." *LaRouche v. Kezer*, 20 F.3d 68, 74, n.7 (2d Cir. 1994); *accord, Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014); *Actavis PLC*, 787 F.3d at 650.

Because the parties have demonstrated in the memoranda of law an adequate understanding of this legal standard, the Court need not, and does not, further elaborate on this

---

[5]     Alternatively, in such a circumstance, the "clear or substantial likelihood of success" requirement may be dispensed with if the movant shows that "extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).

legal standard in this Decision and Order, which is intended primarily for the review of the parties.

B.     **Substantive Legal Standard**

The Second and Fourteenth Amendments protect an individual's right to "keep and bear arms" for self-defense. *NYSRPA v. Bruen*, 142 S. Ct. 2111, 2125 (2022) (citing *D.C. v. Heller*, 128 S. Ct. 2783 [2008] and *McDonald v. City of Chicago*, 130 S. Ct. 3020 [2010]). "[The] definition of 'bear' naturally encompasses public carry." *NYSRPA*, 142 S. Ct. at 2134.

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126, 2129-30. "To justify its [firearm] regulation, the government may not simply posit that the regulation promotes an important interest." *Id*. at 2126. Rather, the government must demonstrate that the firearm "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126, 2130-31.

"[T]his historical inquiry . . . will often involve reasoning by analogy . . . ." *NYSRPA*, 142 S. Ct. at 2132. Such "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. at 2133. On the other hand, "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted.'" *Id*. at 2133 (internal quotation marks omitted).

To "enabl[e] [courts] to assess which similarities are important and which are not" during this analogical inquiry, they must use at least "two metrics," which are "central" considerations to that inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *NYSRPA*, 142 S. Ct. at 2132-33. More specifically, courts must consider the following:

19

(1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense"; and (2) "whether that [regulatory] burden is comparably justified." *Id.* at 2133.

Granted, in some cases, this inquiry "will be fairly straightforward." *NYSRPA*, 142 S. Ct. at 2131. For example, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* "And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

However, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *NYSRPA*, 142 S. Ct. at 2132. This is because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* Nonetheless, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

## III.   ANALYSIS

Because standing is a threshold issue, the Court will address that issue before considering the issues of substantial likelihood of success on the merits, a strong showing of irreparable harm, the balancing of the equities, and the service of the public interest.

### A.   Whether Plaintiffs Have Standing

20

A "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008) (internal quotation marks omitted); *Wang v. Bethlehem Cent. Sch. Dist.*, 21-CV-1023, 2022 WL 3154142, at *4 (N.D.N.Y. Aug. 8, 2022) (Kahn, S.J.) ("[S]tanding is not dispensed in gross, and, accordingly, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."). However, only "one plaintiff must have standing to seek each form of relief requested in the complaint." *Davis*, 554 U.S. at 734. Dismissals for lack of standing must be without prejudice. *See Liu v. United States Cong.*, No. 19-3054, 2020 U.S. App. LEXIS 33950, at *14 (2d Cir. 2020) (explaining that dismissals for lack of standing must be without prejudice).

Because of the importance of the issue of standing in this case, the Court will separately consider the following three questions: (1) whether Bruen is a proper defendant; (2) whether Plaintiff Antonyuk has standing; and (3) whether each of the three organizational Plaintiffs has standing.

### 1.    Whether Superintendent Bruen Is a Proper Defendant

Based on a liberal construction of Plaintiffs' submissions, argument, and hearing testimony, the Court finds that Plaintiffs have asserted three possible bases for a finding that Bruen is a proper defendant: (1) the fact that he allegedly prescribes the form of concealed carry license applications; (2) the fact that he has personal and direct involvement in seven specified provisions (or groups of provisions) of the CCIA; and (3) the fact that he supervises state police members' enforcement of the CCIA's sensitive-locations provision and restricted-locations provision.

<ol type="a">
<li><b>Superintendent Bruen's Prescription of the Concealed-Carry License Application Form</b></li>
</ol>

Plaintiffs' Complaint alleges that, "[a]s Superintendent, [Defendant Kevin P. Bruen] exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public, *including prescribing the form for Handgun Carry License applications*." (Dkt. No. 1, at ¶ 7 [emphasis added].) This allegation appears to have a factual basis in that the italicized language appears to be based on the provision contained in N.Y. Penal Law § 400.00(3). *See* N.Y. Penal Law § 400.00(3) ("Blank applications [for a license to carry or possess a pistol or revolver] shall, except in the city of New York, be approved as to form by the superintendent of state police.").[6]

As for whether this italicized language has previously been successful in conferring proper-party status on Superintendent Bruen, it appears to mirror language that was in the complaint and amended complaint in *NYSRPA*. *See NYSRPA v. Bruen*, 18-CV-0134, Complaint, ¶ 12 (N.D.N.Y. filed Feb. 1, 2018); *NYSRPA v. Bruen*, 18-CV-0134, Amended Complaint, ¶ 13 (N.D.N.Y. filed May 16, 2018).[7] However, as Defendant correctly argues, the propriety of

---

[6]     The Court notes that, after September 4, 2022, this language will effectively read as follows: "Blank applications [for a license to carry or possess a pistol or revolver] shall, except in the city of New York, be approved as to form by the superintendent of state police." N.Y. Penal Law § 400.00(3).

[7]     The Court notes that presumably this language was used in *NYSRPA* in response to the Western District of New York's decision in *Libertarian Party of Erie Cnty. v. Cuomo*, 300 F. Supp.3d 424, 436 (W.D.N.Y. Jan. 10, 2018)*, aff'd Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122 (2d Cir. 2020). In that case, the Western District of New York had dismissed the claims against Superintendent D'Amico without explanation after defendants had argued that he had no "direct connection to, or responsibility for, the alleged illegal action here, i.e., the denial or revocation of any Plaintiff's firearms license." *See Libertarian Party of Erie Cnty. v. Cuomo*, 15-CV-0654, Memorandum of Law in Support of Defendants' Motion to Dismiss, at 19

himself being a defendant was never litigated or expressly decided by either the Northern District of New York or Second Circuit in *NYSRPA*, where the plaintiffs had also sued the New York Supreme Court justice, who oversees the process of licensing applications in the county in question, and who had in fact ruled on the license applications submitted by the plaintiffs. *See NYSRPA v. Beach*, 18-CV-0134, Complaint (N.D.N.Y. filed Feb. 1, 2018); *NYSRPA v. Beach*, 18-CV-0134, Amended Complaint (N.D.N.Y. filed May 16, 2018); *NYSRPA v. Beach*, 18-CV-0134, Memorandum of Law in Support of Motion to Dismiss (N.D.N.Y. filed March 26, 2018); *NYSRPA v. Bruen*, 345 F. Supp.3d 143 (N.D.N.Y. Dec. 17, 2018), *aff'd*, 818 F. App'x 99 (2d Cir. 2020). Nor was it expressly decided by the Supreme Court, although the Supreme Court did observe that Bruen was the "superintendent of the New York State Police, who oversees the enforcement of the State's licensing laws." *NYSRPA v. Bruen*, 142 S. Ct. 2111, 2125 (2022).

As a result, the Court is required to take a fresh look at the italicized language. The Court begins by observing what the Supreme Court said about the subject of proper-defendant status nearly a half-century ago: "[T]he 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976). In other words, the question the Court must ask itself is whether (and, if so, the extent to which), if ordered to do so by the Court, Superintendent Bruen could provide Plaintiffs with the relief they seek.

---

(W.D.N.Y. filed Apr. 29, 2016). Of course, the alleged illegal action in this case goes beyond the mere denial or revocation of a firearms license.

Granted, the Complaint does not appear to challenge the way Superintendent Bruen "prescrib[es] the form for Handgun Carry License applications." (*See generally* Dkt. No. 1, at ¶¶ 10-150 [asserting factual allegations and claims].) Rather, the Complaint challenges the following seven aspects of the CCIA: (1) its allegedly subjective definition of "good moral character"; (2) its allegedly onerous requirement of an in-person interview by the licensing officer; (3) its allegedly onerous requirement that the applicant disclose a list of his or her current and past social media accounts for the past three years; (4) its allegedly onerous requirement of at least four "character references" who can attest to the applicant's "good moral character and that such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others"; (5) its allegedly onerous requirement of a minimum of 16-hours of in-person training (plus a minimum of two hours of live-fire training) and accompanying fees; (6) its expansive list of "sensitive locations"; and (7) its expansive definition of "restricted locations." (*Id.*)

Furthermore, it seems unreasonable to infer that Superintendent Bruen might somehow use the application form to facilitate or further certain of these aspects (specifically, the first, second, sixth, and seventh aspects). However, while it may seem conceivable that Bruen could use the application form to further the third, fourth, and fifth challenged aspects of the CCIA (requiring [1] the list of four character references, [2] a certification of completion of the required training, and [3] a list of current and former social-media accounts), it seems implausible based on the allegations of the Complaint and the evidence submitted for two reasons.

First, these three pieces of information are not expressly required to be contained in the application form, pursuant to N.Y. Penal Law § 400.00(3), which provides as follows, in pertinent part:

> An application shall state the full name, date of birth, residence, present occupation of each person or individual signing the same, whether or not he or she is a citizen of the United States, whether or not he or she complies with each requirement for eligibility specified in subdivision one of this section and such other facts as may be required to show the good character, competency and integrity of each person or individual signing the application.

N.Y. Penal Law § 400.00(3).

Second, these three pieces of information are expressly required to be provided *to the licensing officer*, pursuant to N.Y. Penal Law § 400.00(1), which provides as follows, in pertinent part:

> [F]or a license issued under paragraph (f) of subdivision two of this section, *the applicant shall* meet in person with the licensing officer for an interview and shall, *in addition to any other information or forms required by the license application*[,] *submit to the licensing officer* the following information: . . . (ii) names and contact information of no less than four character references who can attest to the applicant's good moral character and that such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others; (iii) certification of completion of the training required in subdivision nineteen of this section; (iv) a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicants character and conduct as required in subparagraph (ii) of this paragraph . . . .

N.Y. Penal Law § 400.00(1) (emphasis added). Granted, while this language does not expressly preclude Defendant from also requesting the information on the form (for example, to help ensure that the licensing officer has the information before him or her before the required in-person interview), it renders it useless to direct him to not include the information in the

concealed-carry license application form: the licensing officer would obtain it anyway pursuant

to the statute.

As a result, the Court finds that Superintendent Bruen is not a proper defendant to

Plaintiffs' claims to the extent they arise from his use of the concealed-carry license application

form to facilitate or further any of the seven challenged aspects of the CCIA.

### b.      Superintendent Bruen's Express Involvement in Specified Provisions of the CCIA

In support of their standing argument in their reply memorandum of law, Plaintiffs cite

(in addition to N.Y. Exec. Law § 223, which is discussed below in Part III.A.1.c. of this Decision

and Order) seven provisions (or groups of provisions) of the CCIA. (Dkt. No. 40, at 10, n.17

[attaching page "8" of Plfs.' Reply Memo. of Law, citing provisions found at Dkt. No. 1, Attach.

1, at 9, 12, 15, 22, 31, 33, 39].) Those seven provisions are as follows: (1) a provision that the

Superintendent shall promulgate rules and regulations governing appeals from the denial of an

application, renewal, recertification, or license revocation (Dkt. No. 1, Attach. 1, at 9); (2) a

provision that the Superintendent shall approve the form for recertification, which shall request

the license holder's name, date of birth, gender, race, residential address, Social Security

number, firearms possessed by such license holder, e-mail address at the option of the license

holder, and an affirmation that the license holder is not prohibited from possessing firearms (*id*.

at 12); (3) provisions that the Superintendent shall promulgate policies and procedures with

regard to standardization of the newly required 18 hours of firearms safety training (including the

approval of course materials and promulgation of proficiency standards for live fire training) and

create an appeals board for the purpose of hearing appeals (*id*. at 15); (4) a provision that the

Superintendent shall certify within 30 days that a statewide license and record database specific

for ammunition sales has been created and is operational (*id*. at 22); (5) a provision that the Superintendent shall promulgate a plan to coordinate background checks for firearm and ammunition purchases (*id.* at 31); (6) a provision that the Superintendent shall within 60 days notify each licensed dealer holding a permit to sell firearms of the requirement to submit a request to the Division of State Police to initiate a background check (*id*. at 33); and (7) a provision that the Superintendent shall approve the curriculum for the 18-hour firearm training course that must be completed by an applicant prior to the issuance or renewal of a license application and promulgate rules and regulations determining the proficiency level for the live-fire range training (*id*. at 39).

Only the third and seventh provisions (or groups of provisions) appear to involve a challenge asserted in this litigation: specifically, a challenge to the new 18-hour training requirement. None of the provisions appear to regard the requirement of an in-person interview, a disclosure of current and past social-media accounts, or four character references.

Moreover, while the second provision regards something that Plaintiff Antonyuk will undergo in the future (i.e., recertification), the Complaint does not appear to challenge as onerous the procedure for applying for recertifications, which at the hearing Plaintiff Antonyuk admitted involved only "go[ing] to the website and put[ting] in any new firearms on my license and tak[ing] [out] any firearms that are no longer possessed or owned." (*See generally* Dkt. No. 1; Dkt. No. 46, at 30 [Hrg. Tr.].)

As a result, the Court finds that Superintendent Bruen is a proper defendant to Plaintiffs' claims challenging the new 18-hour firearm training requirement for newly issued or renewed

licenses (to extent that Plaintiffs have standing to assert those claims, a subject discussed below in Parts III.A.2. through III.A.4. of this Decision and Order).[8]

> **c.      Superintendent Bruen's Supervision of State Police Members' Enforcement of the CCIA's Sensitive-Locations Provision and Restricted-Locations Provision**

Although Plaintiffs argue that the CCIA expressly involves the Superintendent of the State Police in seven of its provisions (or groups of provisions), Plaintiffs do not argue that the CCIA expressly charges him with enforcement of the provisions listing sensitive locations and defining restricted locations. (Dkt. No. 40, at 10, n.17 [attaching page "8" of Plfs.' Reply Memo. of Law]; *see generally* Dkt. No. 1, Attach. 1.) This makes sense because the CCIA does not appear to expressly charge him with that enforcement. *See, e.g.,* N.Y. Penal Law § 265.01-d (not specifically charging the Superintendent of the New York State Police with duty of such enforcement); *accord*, N.Y. Penal Law § 265.01-e; N.Y. Penal Law §400.00(19). Rather, Plaintiffs rely on N.Y. Exec. Law § 223 to involve Superintendent Bruen in enforcement of the CCIA. (Dkt. No. 40, at 10, n.17.) As a result, the question is whether N.Y. Exec. Law § 223 is sufficient to involve Superintendent Bruen in that enforcement (and, if so, the extent to which it is sufficient).

Granted, to the extent that enforcement of the CCIA is performed by state police officers, the Court can discern Superintendent Bruen's fairly traceable involvement in the investigation,

---

[8]      The Court notes, because Plaintiff Antonyuk has already applied for a license, he does not appear to need go through either the application process or the renewal process, which appear to be the only processes that require the 18-hour firearm training process (in addition to an in-person interview, social media disclosure, four character references, and "good moral character"). *See* N.Y. Penal Law § 400.00(1) (applying the requirements only when a license is "issued or renewed"). Instead, it appears that he need only go through the recertification process.

arrest, and charging of Plaintiffs (and their members) by state police officers. *See, e.g.,* N.Y. Exec. Law § 223(1) ("It shall be the duty of the superintendent of the state police and of members of the state police to prevent and detect crime and apprehend criminals."). However, to the extent that such enforcement is performed by county sheriffs and city, town, and village police officers (which seems just as likely as it being performed by state police members), the Court has trouble discerning Bruen's involvement in that enforcement. *Cf.* N.Y. Exec. Law § 223(2) (conferring authority over local police officers only "by written order").

Of course, Defendant opposes the Court's first finding (of his involvement in the enforcement of the CCIA by state police officers), citing four cases in support of his argument that the Superintendent of the State Police is the wrong defendant and that the relevant licensing officer is the proper defendant. (Dkt. No. 19, at 27 [attaching page "13" of Defs.' Opp'n Memo. of Law].) The problem is that, because the fact-specific rulings in those cases were rendered before the enactment of the CCIA (and often resulted from vague allegations by the plaintiffs), none of the cases involved (as this case involves) a pointed challenge to the enforcement of the state licensing laws' list of "sensitive locations" and definition of "restricted locations," which can fairly be described as sweeping in scope.[9] Moreover, Defendant has not even attempted to

---

[9]      *See generally Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106 (2d Cir. 2020) (deciding challenge to state's firearm licensing laws on the grounds that [a] they violate the plaintiffs' Second Amendment rights to possess firearms in their homes, [b] they violate the plaintiffs' Second Amendment rights to possess firearms in public, and [c] their licensing criteria of "good moral character," "good cause," and "proper cause" are unconstitutionally vague); *Sibley v. Watches*, 501 F. Supp. 3d 210 (W.D.N.Y. 2020) (deciding challenge to state's firearm licensing laws on the grounds that [a] they violate the plaintiff's Second Amendment right to possess a firearm in his home without a license, [b] they violate his Second Amendment right to possess a cane sword in public, and [c] their licensing criterion of "good moral character" is unconstitutionally overbroad and vague); *Aron v. Becker*, 48 F. Supp. 3d 347 (N.D.N.Y. 2014) (McAvoy, J.) (deciding challenge to state's firearm licensing laws on the grounds that [a] the permit application process violates the ADA, [b] the defendants had failed to train and supervise

show how a licensing officer alone would have the authority to prevent an investigation, arrest, and charging of Plaintiffs (or their members) for violating the CCIA's "sensitive-locations" provision and "restricted-locations" provision. (*See generally* Dkt. No. 19, at 26-28 [attaching pages "12" through "14" of Def.'s Opp'n Memo. of Law].)

As a result, the Court is not persuaded by Defendant's argument that the Superintendent of the State Police is not in any way a proper defendant in this action and that a licensing officer is the sole proper defendant in this action. This leads the Court to ask to whom the investigation, arrest, and charging of Plaintiffs (or their members) for violating the CCIA's "sensitive-locations" provision and "restricted-locations" provision could fairly be traced. In other words, who are the defendants who, if ordered to do so by the Court, could provide Plaintiffs with the injunctive relief they seek?

Authority exists for the point of law that the Governor and Attorney General might *not* be proper defendants (regardless of whether they were named solely in his or her official capacity). *See, e.g., Sibley v. Watches*, 501 F. Supp. 3d 210, 234 (W.D.N.Y. 2020) (dismissing Governor as defendant in challenge to New York State handgun licensing statute); *Aron v. Becker*, 48 F. Supp. 3d 347, 368-69 (N.D.N.Y. 2014) (dismissing Governor as defendant in challenge to New York State handgun licensing statute); *Maloney v. Cuomo*, 470 F. Supp.2d 205, 211 (E.D.N.Y.

---

its licensing officers, [c] their licensing criterion of "good moral character" is unconstitutionally overbroad and vague, [d] their differing appeals procedures based on county violate the Equal Protection Clause of the Fourteenth Amendment, and [e] their permit application process violated the plaintiff's due process rights under the Fifth and Fourteenth Amendments); *Osterweil v. Bartlett*, 09-CV-0825, 2010 WL 11465268 (N.D.N.Y. Feb. 24, 2010) (deciding challenge to state's firearm licensing laws on the grounds that [a] they violate the plaintiff's Second Amendment right to possess a firearm in his home and [b] they violate the plaintiff's right to possess arms in two homes under the Equal Protection Clause of the Fourteenth Amendment) (Sharpe, J.).

2007) ("[T]he Court sees no basis for the plaintiff to assert his claims against the Governor. As with the Attorney General, the Governor is not involved in the enforcement of the statutes that the plaintiff is challenging [prohibiting the in-home possession of nunchaku]."), *vacated on other grounds, Maloney v. Cuomo*, 390 F. App'x 29 (2d Cir. 2010); *cf. Osterweil v. Bartlett*, 09-CV-0825, 2010 WL 11465268, at *2 (N.D.N.Y. Feb. 24, 2010) (Sharpe, J.) (dismissing claims against Governor and Attorney General where plaintiff did not oppose that dismissal). However, the Court questions the applicability of these cases to proper-defendant determinations under the CCIA, given that (1) the CCIA has introduced a "sensitive-location" restriction and "restricted-location" restriction across the state, (2) the Attorney General is responsible for prosecuting charges filed by the State Police, and (3) the Governor could simply replace a Superintendent who refuses to enforce the CCIA.[10]

Moreover, authority exists for the point of law that the relevant county district attorney and/or the relevant local county sheriff or city, town, or village police chief might be a proper defendant (in his or her official capacity). *See, e.g., Maloney v. Cuomo*, 470 F. Supp.2d 205, 211 (E.D.N.Y. 2007) (finding district attorney to be proper defendant to statute prohibiting the in-home possession of nunchaku) (citing *Baez v. Hennessy*, 853 F.2d 73, 76 [2d Cir.1988] for the

---

[10]    The Court notes that, currently pending in the S.D.N.Y., is a complaint challenging the CCIA's social-media-disclosure requirement, references requirement, and training requirement, and naming as the sole defendant Governor Hochul. *See Corbett v. Hochul*, 22-CV-05867, Complaint (S.D.N.Y. filed July 11, 2022) (naming as the sole defendant Governor Hochul in a challenge to the CCIA's social-media-disclosure requirement, references requirement, and training requirement). In addition, at least one district court from outside the Second Circuit has treated a state attorney general as a proper defendant to an analogous challenge. *See, e.g., Miller v. Smith*, 18-CV-3085, 2022 WL 782735, at *5 (C.D. Ill. March 14, 2022) (finding that state attorney general was a proper defendant to a challenge to a restriction on carrying handguns in child care facilities).

point of law that "[i]t is well established in New York that the district attorney, and the district attorney alone, should decide when and in what manner to prosecute a suspected offender"), *vacated on other grounds, Maloney v. Cuomo*, 390 F. App'x 29 (2d Cir. 2010); *cf. NYSRPA v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) (reviewing disposition of claims under the Secure Ammunition and Firearms Enforcement Act against, *inter alia*, the Chief of Police for the Town of Lancaster, New York, without discussing the impropriety of him being a defendant).[11]

Indeed, depending on the location of the violation and the identity of the investigating, arresting, charging, and prosecuting authorities, it appears the list of proper defendants could conceivably include not simply the licensing officer, but the Governor, the Attorney General, the Superintendent of State Police, the Sherriff, the County District Attorney, the local chief of police, and the Mayor or Supervisor of that locality (to the extent that he or she can replace that local chief of police). However, further analysis of this issue by the Court is hampered by the fact that Plaintiffs (and their members) have not yet actually been investigated, arrested, and charged (or even declared an intent to violate the law or a desire to do so at a specific place and time), thus obscuring the identity of the relevant law enforcement authority and prosecutor

---

[11]   The Court notes that the sole district court case on which Plaintiffs rely for the point of law that "federal courts have taken no issue with the Superintendent as a party on multiple occasions" (*Avitabile v. Beach*) not only did not involve a challenge to the propriety of the Superintendent's status as a defendant but named as a second defendant the district attorney (a fact that Plaintiffs' counsel knows, given that he was the plaintiff's counsel in that case). *See generally Avitabile v. Beach*, 277 F. Supp.3d 326 (N.D.N.Y. 2017) (Hurd, J.). The Court notes also that, currently pending in the W.D.N.Y., is a complaint challenging the CCIA's restricted-locations provision and naming as defendants Superintendent Bruen, the Erie County Sheriff, and the City of Buffalo Police Commissioner. *See Paladino v. Bruen*, 22-CV-0541, Complaint (W.D.N.Y. filed July 11, 2022) (naming as defendants Bruen, the Erie County Sheriff, and the City of Buffalo Police Commissioner in a challenge to the CCIA's restricted-locations provision codified at N.Y. Penal Law § 265.01-d).

against whom redress may be sought.

As a result, the Court finds that Superintendent Bruen is a proper defendant to Plaintiffs' claims challenging the enforcement of the CCIA's sensitive-location provision and restricted-location provision by state police members, as opposed to by local law enforcement (to extent that Plaintiffs have standing to assert those claims, a subject again discussed below in Parts III.A.2. and III.A.3. of this Decision and Order).

### c.    Summary of Claims to Which Superintendent Bruen Is Properly a Defendant

In sum, the Court finds that Superintendent Bruen is a proper defendant to only the following claims: (1) Plaintiffs' claims challenging the new 18-hour firearm training requirement for newly issued or renewed licenses; and (2) Plaintiffs' claims challenging the enforcement of the CCIA's sensitive-location provision and restricted-location provision by state police members, as opposed to by local law enforcement. The extent to which Plaintiff Antonyuk and the organizational Plaintiffs have standing to assert these claims are issues the Court will now discuss.

### 2.    Whether Plaintiff Antonyuk Has Standing

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) 'a likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "[T]he injury-in-fact requirement . . . helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Accordingly, "[a]n injury sufficient to

satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not "conjectural" or "hypothetical."'" *Id.* (quoting *Lujan*, 504 U.S. at 560). The party invoking federal jurisdiction has the burden of establishing standing. *Id.*

Where, as here, plaintiffs challenge a law not yet in effect, they need not show that they are "subject to . . . an actual arrest, prosecution, or other enforcement action" as a "prerequisite to challenging the law." *Id.* Rather, "pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent" is permitted. *Id.* at 159. More specifically, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

To show that Plaintiffs "inten[d] to engage in a course of conduct arguably affected with a constitutional interest," plaintiffs are not required "to confess that [they] will in fact violate the law." *Susan B. Anthony List*, 573 U.S. at 163 (citing *Babbitt*, 442 U.S. at 301). However, "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564 (emphasis in original); *Frey v. Bruen*, 21-CV-5334, 2022 WL 522478, at *5 (S.D.N.Y. Feb. 22, 2022).[12]

---

[12]     For example, the Supreme Court in *Susan B. Anthony List* found that the petitioners adequately alleged standing where two petitioners "pleaded specific statements they intend[ed] to make in future election cycles . . ." and another petitioner "alleged that it previously intended to disseminate materials criticizing a vote for the ACA as a vote 'to fund abortions with tax dollars,' and that it 'desire[d] to make the same or similar statements about other federal candidates who voted for [the ACA].'" 573 U.S. at 161. On the other hand, the Supreme Court in *Lujan v. Defenders of Wildlife* found that the plaintiffs "profession of an 'inten[t]' to return to the places they had visited before—where they w[ould] presumably, this time, be deprived of the

Furthermore, "'[t]he identification of a credible threat sufficient to satisfy the imminence requirement . . . necessarily depends on the particular circumstances at issue," and "will not be found where plaintiffs do not claim that they have ever been threatened with prosecution, that prosecution is likely, or even that a prosecution is remotely possible.'" *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (quoting *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016)). Although this standard "sets a low threshold" and is "quite forgiving to plaintiffs seeking such pre-enforcement review," *Picard*, 42 F.4th at 98, "[a] credible threat of prosecution . . . cannot rest on fears that are imaginary or speculative." *Knife Rights v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (internal quotation marks omitted); *Adam v. Barr*, 792 F. App'x 20, 22 (2d Cir. 2019) (summary order).

For example, in *Does 1-10 v. Suffolk Cnty., N.Y.*, No. 21-1658, 2022 WL 2678876, at *3 (2d Cir. 2022), the Second Circuit recently held that the plaintiffs failed to establish standing where they did not allege a "credible threat sufficient to satisfy the imminence requirement . . . ." In that case, the plaintiffs brought a pre-enforcement "challenge to Suffolk County's alleged policy criminalizing possession of the Delta Level Defense CT4-2A[.]" *Does 1-10*, 2022 WL 2678876, at *2. The Second Circuit found that the plaintiffs failed to show a credible threat of prosecution, despite the fact that they had received a notification from the Suffolk County Police Department that "the Delta Level Defense CT4-2A [was] 'not in compliance with the New York State Penal Law' and that Does 'may be subject to arrest and criminal charges' if they 'fail[ed] to present the weapon to the Suffolk County Police Department'" upon receipt of the letter. *Id.* at

_____

opportunity to observe animals of the endangered species—[was] simply not enough." 504 U.S. at 564.

*3. Because the plaintiffs did not allege that "any individual ha[d] been arrested or had their firearm forcibly confiscated for failing to comply with the Suffolk County Police Department's request . . . , or even that *any* purchaser of the [firearm] ha[d] been arrested or had their firearms forcibly confiscated by the Suffolk County Police Department," they failed to allege "that the threatened injury [wa]s certainly impending or that there [wa]s a substantial risk that they w[ould] be harmed[.]" *Id.*[13]

Here, Plaintiff Antonyuk has alleged and/or sworn that he "desires," "wants," "wishes" or "would like," after September 1, 2022, to continue carry a concealed handgun in all the places in which he currently carries it, which would violate the CCIA. (*See, e.g.,* Dkt. No. 1, at ¶¶ 61, 102, 109, 111, 128 [Compl.]; Dkt. No. 1, Attach. 6, at ¶¶ 12-13, 19 [Antonyuk Decl.]; Dkt. No. 41, Attach. 3, at ¶¶ 3, 6-8, 12-14 [Antonyuk Supp. Decl.].)[14]

---

[13]     *See also Cayuga Nation*, 824 F.3d at 331 (finding plaintiffs had adequately established standing where they alleged "that they intend[ed] to conduct bingo games, which [wa]s clearly prohibited by the [challenged] Ordinance, and the Village ha[d] announced its intention to enforce the Ordinance *against the Nation and 'Mr. Halftown's group'*") (emphasis added); *Adam,* 792 F. App'x at 22 (finding the plaintiff failed to allege facts sufficient to demonstrate a credible threat of prosecution under the CSA where he "[did] not claim that the CSA ha[d] been enforced against him in the past, nor that he ha[d] ever been threatened with prosecution," "[n]or ha[d] he made any allegations concerning the past or present enforcement of the CSA in general from which a credible threat could be inferred").

[14]     For example, for Plaintiff Antonyuk, these places include (or appear to include) the following: (1) the doctor's office (Dkt. No. 41, Attach. 3, at ¶ 5 [Antonyuk Supp. Decl.] Dkt. No. 46, at 27-30 [Hrg. Tr.]); (2) the gas station (Dkt. No. 46, at 26-27 [Hrg. Tr.]; Dkt. No. 1, at ¶ 112; Dkt. No. 41, Attach. 3, at ¶ 5 [Antonyuk Supp. Decl.]); (3) Walmart (Dkt. No. 56, at 28-29 [Hrg. Tr.]; Dkt. No. 41, Attach. 3, at ¶ 8 [Antonyuk Supp. Decl.]); (4) movie theaters (Dkt. No. 56, at 29-30 [Hrg. Tr.]; Dkt. No. 41, Attach. 3, at ¶ 10 [Antonyuk Supp. Decl.]); (5) parks and playgrounds (Dkt. No. 41, Attach. 3, at ¶¶ 7, 12 [Antonyuk Supp. Decl.]); and (6) pistol competitions (Dkt. No. 56, at 26 [Hrg. Tr.]; Dkt. No. 41, Attach. 3, at ¶ 9 [Antonyuk Supp. Decl.].) Plaintiff Antonyuk does not appear to currently carry his handgun in church, although he wants to do so. (Dkt. No. 46, at 28 [Hrg. Tr.]; Dkt. No. 41, Attach. 3, at ¶ 6 [Antonyuk Supp. Decl.].) Other places that he wants to be able to carry his handgun (although it is not entirely clear from the record that he currently does) include (1) restaurants serving alcohol, (2) bars, (3)

He has not alleged or sworn, however, that he *intends* to do so. Intent is what is almost universally required.[15] Granted, Plaintiff Antonyuk does not have to "confess" to this future violation, by, say, calling the relevant local authorities and declaring his intent to violate the new gun law's sensitive-location provision and restricted-location provision X times the following week, complete with dates, times and addresses (although the addresses certainly would help the Court to determine whether the defendants are the proper ones, *see, supra,* Part III.A.1.of this Decision and Order). But he must indicate his *intent* to violate the law. Here, he has not.

Granted, ordinarily, it would seem plausible that a plaintiff such as Mr. Antonyuk--a Ukrainian immigrant who has a deep mistrust of totalitarian regimes offering its citizens little in the way of crime control (Dkt. No. 1, Attach. 6, at ¶¶ 4-8 [Antonyuk Decl.]), who seems to carry his gun nearly everywhere he goes in in Schenectady County, and who seems to sincerely want to continue to do so (based on his demeanor while testifying at the hearing)--is, while resuming his daily life in the coming weeks, going to both violate the CCIA's sensitive-location provision or restricted-location provision.[16]

---

shopping malls, (4) museums, (5) libraries, (6) hotels, (7) car dealerships, (8) hospitals, (9) pharmacies, (10) public transportation facilities (such as airports), and (11) gatherings at which Second Amendment rights are discussed. (Dkt. No. 41, Attach. 3, at ¶¶ 11-15 [Antonyuk Supp. Decl.].)

[15]    *But see Avitabile v. Beach*, 277 F. Supp.3d 326, 331-32 (N.D.N.Y. 2017) (Hurd, J.) ("But Avitabile has publicly announced his own desire to purchase and possess such a weapon for self-defense purposes in his own home . . . , conduct that would be likely to result in his prosecution under § 265.01. . . . Indeed, it is hard to imagine what, if any, additional conduct Avitabile might be required to engage in to trigger a more 'credible' threat of prosecution short of actually committing the proscribed act. Accordingly, plaintiff may pursue his claim at this time.").

[16]    This discovery might be as obvious as a passerby catching sight of a glimmer of steel as a permit holder is transferring his or her handgun to his trunk in a parking lot of a gas station (*see, e.g.,* Dkt. No. 46, at 35-36), or it might be as subtle as noticing a bulge under the coat of a permit holder, whether it be under the permit holder's arm, on his or her hip, or at the small of his or her back. One can already hear the assistants at a doctor's office whisper: "There goes the one with

But Mr. Antontuk is not an ordinary plaintiff. To his credit, he appears to have taken his citizenship oath as seriously as native citizens would probably want him to. He is law abiding and respectful. For example, at the hearing Plaintiff Antonyuk testified to the following facts (in a calm, soft-spoken voice): (1) he always carries his handgun according to "the law" and is "law-abiding" (Dkt. No. 46, at 26; Dkt. No. 1, Attach. 6, at ¶ 3 [Antonyuk Decl.]; Dkt. No. 1, at ¶ 1 [Compl.]); (2) he would not go anywhere he was "not welcome" (Dkt. No. 46, at 27); (3) if he were told not to be present on a premises carrying his handgun, he would "leave the premise[s]" (*id*. at 29); (4) if another man or woman does not want him to be armed on their private property, that is something that he must "honor" (*id*. at 27); (5) there is "really" no harm to asking individuals if they want him carrying on their property (*id*. at 30); and (6) it was not "arduous" for him to give four character references when he applied for a license in 2009 (*id*. at 25-26). Indeed, when he speaks of his life after the law takes effect, he speaks of himself feeling the repercussions of *complying* with it. For example, he testified as follows: (1) "if [he's] somewhere and [his] wife call[s] [him], ask[s] [him] to pick up some groceries or if [he's] on the way to somewhere and [has] to do quick shopping, [he] would have to go home and disarm or leave [his] firearm in the car" (Dkt. No. 46, at 29); and (2) he will experience a "diminished feeling of safety" by "going to a movie theater without being able to protect [him]self." (*id*. at 29).

Simply stated, the Court does not find that Plaintiff Antonyuk intends to "engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the CCIA] . . . ." *Susan B. Anthony List*, 573 U.S. at 159..

---

the gun. Why does the doc put up with it? I don't feel safer. I'm going to call the police and give them an anonymous tip."

In any event, even if Plaintiffs' allegations and testimony could be liberally construed as sufficiently stating an intent by Plaintiff Antonyuk to engage in conduct proscribed by the CCIA, that intent is merely a "some-day intention[]," not the concrete intention necessary to establish standing. *Picard*, 42 F.4th at 97. Furthermore, Plaintiff Antonyuk has failed to provide sufficient allegations and/or evidence regarding an imminent threat of arrest and prosecution by law enforcement. Granted, the fact that, up until now, state and local law enforcement have not in recent months reached out to him personally to inform him of the extent to which they will be enforcing this new complicated law (Dkt. No. 46, at 31 [Hrg. Tr.]) is of little surprise (given the law's complicated nature), and even less significance (given the near-universal application of the sensitive-location provision and restricted-location provision, geographically). However, he still must adduce factual allegations or admissible evidence of a credible threat of prosecution under the CCIA.

In *Picard*, the Second Circuit stated that "'[t]he identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the particular circumstances at issue, and *will not be found where plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible*.'" 42 F.4th at 98 (emphasis added). Although this standard is "forgiving," because "courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund," *Picard*, 42 F.4th at 98 (internal quotation marks omitted), Plaintiffs have adduced no factual allegations or admissible evidence that Plaintiff Antonyuk has ever been threatened with arrest and prosecution by law enforcement. (Dkt. No. 46, at 31 [Hrg. Tr.].) *See, e.g., Does 1-10*, 2022 WL 2678876, at *3.

For each of these alternative reasons, the Court finds that Plaintiff Antonyuk does not

have standing.

### 3.      Whether the Organizational Plaintiffs Have Standing

Generally, an advocacy group of a non-profit organization suing in federal court may establish standing in one of two ways: (1) associational or representational standing; and (2) organizational standing. *Informed Consent Action Network v. Becerra*, 21-CV-4134, 2022 WL 992814, at *5 (S.D.N.Y. Mar. 31, 2022). Regarding the first method of standing, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock,* 477 U.S. 274, 281 (1986) (collecting cases). Regarding the second method of standing, organizations can "have standing in [their] own right to seek judicial relief from injury to [themselves] and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

### a.      Associational or Representational Standing

Plaintiffs' Complaint alleges that "[m]any of the irreparable harms to GOA, GOF, and GOA-NY's members and supports, which will be caused by implementation of the CCIA, are alleged herein by GOA, GOF, and GOA-NY in a representational capacity on behalf of the interests of their members and supports." (Dkt. No. 1, at ¶ 5 [Pls.' Compl.].) Based on these allegations, the Court finds that one of the grounds on which the organizational Plaintiffs seek to establish standing is through associational or representational standing.

The Supreme Court has articulated a three-part test to determine whether a litigant has established associational or representational standing:

> [A]n association has standing to bring suit on behalf of its members when:
> (a) its members would otherwise have standing to sue in their own right;
> (b) the interests it seeks to protect are germane to the organization's

purpose; and (c) neither the claim asserted nor the relief requested requires
the participation of individual members in the lawsuit.

*Int'l Union*, 477 U.S. at 282 (quoting *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S.

333, 343 [1977]).

The Second Circuit has held, however, "that an organization does not have standing to

assert the rights of its members in a case brought under 42 U.S.C. § 1983," because the Second

Circuit has "'interpret[ed] the rights [§ 1983] secures to be personal to those purportedly

injured.'" *Nnebe*, 644 F.3d at 156 (quoting *League of Women's Voters of Nassau Cnty. v. Nassau*

*Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 [2d Cir. 1984]); *see also Christa McAuliffe*

*Intermediate Sch. PTO, Inc. v. de Blasio*, 788 F. App'x 85, 85 (2d Cir. 2019) (""[T]he

organizational plaintiffs bringing this appeal do not have standing to assert claims under 42

U.S.C. 1983 on behalf of their members"); *N.Y. State Citizens Coal. for Child. v. Poole*, 922 F.3d

69, 74-75 (2d Cir. 2019) ("In a string of opinions, this Court has held that organizations suing

under Section 1983 must, without relying on their members' injuries, assert that their own

injuries are sufficient to satisfy Article III's standing requirements"); *Nat'l Rifle Assoc. of Am. v.*

*Cuomo*, 480 F. Supp.3d 404, 411 (N.D.N.Y. 2020) (D'Agostino, J.) (finding that the plaintiff did

not adequately plead associational standing because "an association cannot bring an action as the

representative of its members").

Granted, Plaintiffs argue that they are asserting claims not only under Section 1983 but

directly under the Constitution (i.e., without relying on Section 1983). However, they cite no

binding or persuasive authority for the point of law that those direct claims are actionable. Under

the circumstances, the Court finds such direct claims not actionable for the reason stated by

Defendant during oral argument at the hearing. (Dkt. No. 46, at 51 [Hrg. Tr., arguing that

"Section 1983 is the exclusive constitutional remedy for a claim that a state actor has violated the

41

Constitution"].) *See also Pauk v. Bd. of Tr. of City Univ. of New York*, 654 F.2d 856, 865 (2d Cir.1981) ("[W]hen § 1983 provides a remedy, an implied cause of action grounded on the Constitution is not available."); *Lehman v. Doe*, 66 F. App'x 253, 254-55 (2d Cir.2003) ("The only difference between the seventh and the prior causes of action is that in the seventh Lehman includes the Fourteenth Amendment as a basis for his action. However, when § 1983 provides a remedy, an implied cause of action grounded directly in the Constitution is not available."); *Marino v. CUNY*, 18 F. Supp.3d 320, 341 (E.D.N.Y. 2014) ("As § 1983 provides a remedy for Plaintiff's alleged constitutional violations, an implied cause of action grounded directly in the Constitution is not available. . . . Accordingly, Plaintiff's First Cause of Action against the Individual Defendants directly alleging violations of the Fourteenth Amendment is dismissed.").

Accordingly, the Court finds that organizational Plaintiffs have not adequately pled associational standing because the Second Circuit clearly prohibits an association from bringing an action, under 42 U.S.C. § 1983, as the representative of its members.

In any event, the Court alternatively finds that the organizational Plaintiffs lack "prudential standing." *Poole*, 922 F.3d at 75. As the Second Circuit has stated, "When any plaintiff asserts the rights of others, it has traditionally also faced, in our court, a rule of prudential standing: the so-called third-party standing bar." *Id.* However, the Second Circuit has "developed an exception to it where a plaintiff can show '(1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests.'" *Id.* (quoting *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 41 [2d Cir. 2015]). Even if the Court were to assume that the organizational Plaintiffs have shown a sufficiently close relationship between themselves and their members/supporters to satisfy the first prong of this test, the organizational Plaintiffs have "not shown, or even alleged, that [their members or supporters] would have any

difficulty asserting their own interests." *Keepers, Inc.*, 807 F.3d at 41.

For each of these alternative reasons, the Court finds that the three organizational Plaintiffs do not have associational or representational standing.

### b.      Organizational Standing

Turning to an analysis of organizational standing, "[t]o bring a Section 1983 suit on behalf of its members, an organization must clear two hurdles." *Poole*, 922 F.3d at 74. First, the organization must show that the violation of its members' rights has caused the organization to suffer an injury independent of that suffered by its members. *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). Second, the organization must "demonstat[e] a close relation to the injured third part[ies]," and "a hindrance" to those parties' "abilities to protect [their] own interests." *Mid-Hudson Catskill Rural Migrant Ministry v. Fine Host Corp.*, 418 F.3d 168, 174 (2d Cir. 2005). In the Second Circuit, courts "recognize[] that only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.'" *Nnebe*, 644 F.3d at 157 (quoting *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 [2d Cir. 1993]).

Here, based on a liberal construction of Plaintiffs' submissions, argument, and hearing testimony, the Court finds that they have asserted two possible bases for a finding that Plaintiffs GOA and GOF have standing: (1) a perceptible impairment of those organizations' activities through the increased time spent answering phone calls and e-mail message; and (2) a perceptible impairment of those organizations' finances through both a loss of financial supporters and an increase in litigation costs. Similarly, based on a liberal construction of Plaintiffs' submissions, argument and hearing testimony, the Court finds that Plaintiffs have asserted two possible bases for a finding that Plaintiff GOA-NY has standing: (1) a perceptible impairment of that organization's activities through the increased time spent answering phone

calls and e-mail messages, and traveling across the state to meet with concerned members and supporters; and (2) a perceptible impairment of that organization's finances through a loss of financial supporters, an increase in travel-related costs, and an increase in litigation costs.

### i.      Increased Time Answering Phone Calls and E-mail Messages

All three organizational Plaintiffs have adduced declarations stating that they have received communications from members and supporters who are deeply concerned about the CCIA. (Dkt. No. 1, Attach. 4, at ¶¶ 7-8 [Pratt Decl.]; Dkt. No. 1, Attach. 5, at ¶¶ 8-9 [Robinson Decl.].) For example, the Director of Communications of the GOA-NY (William Robinson) has personally "handled multiple telephone calls with many of GOA-NY's members and supporters in New York asking about the impact of the CCIA on them[.]" (Dkt. No. 1, Attach. 5, at ¶¶ 5, 9, 12 [Robinson Decl.].)

More specifically, at the hearing, the Senior Vice President of Plaintiffs GOA and GOF (Erich Pratt) testified that the GOA and GOF received 28 phone calls and e-mails since the enactment of the CCIA. (Dkt. No. 46, at 9 [Hrg. Tr.].) Mr. Pratt also testified that this represented an increased volume of communications from its members and supporters (the prior volume being "like a dozen to 15 [e-mails] a day"). (*Id.*) Finally, according to Mr. Pratt's Supplemental Declaration, Plaintiffs GOA and GOF have spent a "substantial" amount of time "dealing with the passage and implementation of the CCIA[,]" and Pratt had also learned from one of the organizations' attorneys "that [the attorney] has fielded numerous phone calls and received numerous messages about the new CCIA legislation." (Dkt. No. 41, Attach. 1, at 2-4 [Pratt. Suppl. Decl.].)

However, Mr. Pratt did not, or was unable to, provide the Court with the following facts:

(1) the number of phone calls and e-mails that Plaintiffs GOA and GOF received specifically between the period of July 1, 2022, and July 11, 2022, i.e., the period relevant to the Court's standing analysis (as opposed to simply after July 1, 2022); (2) the number of phone calls and e-mails that Plaintiffs GOA and GOF had received between June 23, 2022, and June 30, 2022, i.e., the week that preceded the period relevant to the Court's standing analysis; and (3) in receiving and responding to the 28 phone calls and e-mail regarding the CCIA, the amount of time that Plaintiffs GOA and GOF employees spent communicating with their members and supporters. (*Id.* at 9-13.) Indeed, even assuming that the receipt of up to 28 phone calls and e-mails occurred during the above-referenced eleven-day period, the receipt would not appear to be much of an increase (if any) in communication, given that Mr. Pratt testified that, on average, Plaintiffs GOA and GOF ordinarily receive a "dozen to 15 [e-mails] a day." (*Id.* at 9.)

Also at the hearing, Mr. Robinson testified that, after July 1, 2022, Plaintiff GO-ANY received phone calls numbering "in the 20s" (plus three or four additional phone calls since he filed his supplemental declaration) regarding the CCIA and "quite a few" e-mails (equaling approximately 24) regarding the CCIA. (Dkt. No. 46, at 16-18 [Hrg. Tr.].) According to Mr. Robinson, this number of phone calls represented an increase from Plaintiff GO-ANY's usual "three to four [phone calls] a week," and this number of e-mails represented an increase from its usual "two or three [e-mails] a day." (*Id.*) According to Mr. Robinson's Supplemental Declaration, he has had "to spend additional significant hours of time to deal with this new law, including speaking with various individuals (including sheriffs, county counsel, other attorneys) to try to understand the way the law is written so that [he] could help [GO-ANY's] members comply with something that makes a felony to carry in places we could previously carry." (Dkt. No. 41, Attach. 2, at 2 [Robinson Suppl. Decl.].) Finally, Mr. Robinson estimated that, as it

45

specifically relates to the CCIA, he has spent approximately "60 hours . . . driving, 30 hours . . . [in] meetings, and about 6 hours . . . [answering] phone calls and emails." (*Id.*)

Like Mr. Pratt, however, Mr. Robinson did not, or was unable to, provide the Court with the following key facts: (1) the number of phone calls and e-mails that Plaintiff GO-ANY received regarding the CCIA specifically between the period of July 1, 2022, and July 11, 2022, i.e., the period relevant to the Court's standing analysis (as opposed to simply after July 1, 2022);[17] and (2) the number of hours that he spent communicating with members and supporters regarding the CCIA during the period of July 1, 2022, to July 11, 2022, compared to the number of hours that spent on average communicating with members and supporters regarding other matters during a similar time period before July 1, 2022. (Dkt. No. 46, at 16-18 [Hrg. Tr.]; see generally Dkt. No. 41, Attach. 2 [Robinson Suppl. Decl.].)

This evidence appears to be a far cry from the evidence of a loss of hundreds of hours in *N.Y.S. Citizens' Coal. for Child. v. Poole*. *See Poole*, 922 F.3d at 74-75 (finding that the Coalition had standing to pursue its Section 1983 action because the Coalition had asserted that the State's alleged violations of the Act cost it hundreds of hours in the form of phone calls from aggrieved foster families). Furthermore, the complained-of impairment (i.e., answering a greater number of phone calls and e-mails than usual) does not appear to "constitute[] far more than . . . a setback to [an organizational plaintiff's] abstract social interests." *Nnebe*, 644 F.3d at 157 (citing *Havens Realty Corp.*, 455 U.S. 363, 379 [1982]). None of the three organizational

---

[17]     The Court notes that, according to Mr. Robinson, although GO-ANY "ha[s] a 24-hour answering service, [a] machine type of thing[, all of the incoming phone calls] flip over right to [Robinson's] cell phone after a few . . . rings." (Dkt. No. 46, at 17 [Hrg. Tr.].)

Plaintiffs (one of which had contributions last year that were "certainly in the millions")[18]

adduced evidence of the extent to which this increase in communication with their members has

caused a diversion in resources from the organizational Plaintiffs' primary or core missions.[19]

       In any event, the Court further finds that the organizational Plaintiffs have not sufficiently

established a risk of future harm for purposes of standing. A plaintiff seeking injunctive relief

"cannot rely [only] on past injury to satisfy the injury requirement [to establish standing] but

must [also] show a likelihood that he . . . will be injured in the future." *Deshawn E. by Charlotte*

*E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998); *Access 4 All, Inc. v. Trump Int'l Hotel & Tower*

*Condo*, 458 F. Supp.2d 160, 167 (S.D.N.Y. 2006) ("To establish standing for an injunction, a

plaintiff must not merely allege past injury, but also a risk of future harm."). Here, because the

organizational Plaintiffs have alleged facts regarding only previous instances of increased phone

call and e-mail traffic, and not also alleged facts regarding a projection of future call and e-mail

traffic, the organizational Plaintiffs have not alleged a future injury to confer standing.

### ii.    Loss of Financial Supporters

       In their Complaint, Plaintiffs repeatedly allege an injury to each of the three

organizational Plaintiffs' aggrieved "supporters." (Dkt. No. 1, at ¶¶ 4, 5, 6, 117, 118, 119, 120,

121, 122, 125, 128, 139, 142, 143, 148, 150.) The Court has some difficulty concluding what sort

---

[18]     (Dkt. No. 46, at 7 [Hrg. Tr.].)

[19]     Mr. Robinson testified that Plaintiff GO-ANY's "primary mission is to educate the public on gun laws, gun rights, and Second Amendment issues[,]" such that if Plaintiff GO-ANY "see[s] something [it is] interested in or that's [sic] going to violate our constitutional rights, yeah, we will pursue that." (Dkt. No. 46, at 16 [Hrg. Tr.].) Mr. Pratt testified that Plaintiff GOA is "an advocacy group . . . [that] lobbies as part of its main core mission." (Dkt. No. 46, at 6 [Hrg. Tr.].) In doing so, Mr. Pratt testified that a portion of Plaintiff GOA's purpose is to listen to its members and to advocate on their behalf to legislatures and courts. (*Id.*)

of "support" is being alleged other than *financial* support, and how the CCIA's alleged negative impact on those supporters does not also plausibly suggest the loss of financial support to the organizational Plaintiffs. Generally, such loss of financial support may suffice to establish the standing of organizational plaintiff.[20]

However, in neither their declarations nor hearing testimony did Plaintiffs provide the details of this lost financial support. (Dkt. No. 1, Attach. 4-6 [Decls.]; Dkt. No. 41, Attach. 1-3 [Suppl. Decls.]; Dkt. No. 46 at 5-33 [Hrg. Tr.].) Indeed, to the contrary, Mr. Robinson testified that Plaintiff GO-ANY has experienced an increase of approximately $6,000 in donations since the CCIA was passed. (Dkt. No. 46, at 19-20 [Hrg. Tr.].) Granted, apparently most if not all of these donations appear to have been ear-marked to cover the organizations' future legal fees (an item discussed separately below), but they certainly do not establish a decrease in donations.

As a result, the Court finds that Plaintiffs have not established organizational standing through the loss of financial supporters.

### iii.     Increased Travel-Related Costs

With respect to the financial expenses incurred by Plaintiff GO-ANY (as asserted in Mr. Robinson's Supplemental Declaration and hearing testimony), the Court begins by noting that such financial expenses may not be what the law refers to as self "manufactured." In other

---

[20]     *See Richards v. N.Y.S. Dep't of Corr. Servs.*, 572 F. Supp. 1168, 1179 (S.D.N.Y. 1983) (finding that allegation of minority correction officers association that it had suffered reductions in its financial support through loss of dues from its members, resulting from alleged unlawful employment practices of New York Department of Correctional Services, Commissioner of Department, Director of Bureau of Labor Relations of Department, and Director of Office of Employment Relations, and that that direct loss impeded association's ability to function as organization was sufficient to establish association's individual standing to bring action against defendants under federal civil rights statutes).

words, plaintiffs are not permitted to "manufacture [Article III] standing merely by inflicting

harm on themselves. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *Moya v. Dep't of*

*Homeland Sec.*, 975 F.3d 120, 148 (2d Cir. 2020) (Carney, J., concurring in part).

Here, given Mr. Robinson's admission that he has communicated with Plaintiff GO-

ANY's members and supporters through phone and e-mail, the Court is hard-pressed to

understand why he needed to traverse the state numerous times, and in doing so, accrue expenses

(i.e., $700 for hotels, $400 on gas, and approximately $400 on food) to complete tasks that

apparently could have been completed more expeditiously and efficiently over the phone or by e-

mail. (Dkt. No. 41, Attach. 2, at 2 [Robinson Suppl. Decl.].) Although Mr. Robinson explained

that he ordinarily educates Plaintiff GO-ANY's members and supporters that are located

throughout the "Monroe County area," he did not explain the need for the "unusual" practice of

"running all over the state of New York." (Dkt. No. 46, at 21 [Hrg. Tr.].)

### iv.    Increased Legal Fees

In their declarations and hearing testimony, Plaintiffs have adduced evidence that they have

incurred, or will incur, significant litigation costs. For example, in his Supplemental Declaration,

Mr. Pratt stated that Plaintiffs GOA and GOF have "incurred significant expenses in litigation

that [the organizations] would not have had to otherwise in New York, but for this new law."

(Dkt. No. 41, Attach. 1, at ¶ 15 [Pratt Suppl. Decl.].)

However, the Court must reject Plaintiffs' arguments regarding legal fees or other

litigation-related expenses as serving as a basis for standing, because "the burdens of bringing a

lawsuit cannot be the sole basis for standing." *Pollak v. Portfolio Recovery Assocs., LLC*, 21-

CV-6738, 2022 WL 580946, at *1 (E.D.N.Y. Feb. 24, 2022) (citing *Steel Co. v. Citizens for a*

*Better Env't*, 523 U.S. 83, 108 [1998] ["Reimbursement of the costs of litigation cannot alone

support standing."]).

For each of these alternative reasons, the Court finds that the three organizational

Plaintiffs do not have organizational standing.[21]

### 4.   Requirement of Immediate Dismissal (Instead of Amendment) in the Event of a Lack of Standing

Both the Supreme Court and Second Circuit have held that a lack of standing deprives the

Court of subject-matter jurisdiction (requiring an immediate dismissal without prejudice).[22]

---

[21]   The Court notes that it agrees with Plaintiffs' argument the Eleventh Amendment does not bar suit because it does not bar a plaintiff from suing a state official acting in his official capacity for prospective injunctive relief from violations of federal law, which is what Plaintiffs are doing here.

[22]   *See, e.g., Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732 (2008) ("Article III restricts federal courts to the resolution of cases and controversies. . . . That restriction requires that the party invoking federal jurisdiction have standing—the personal interest that must exist at the commencement of the litigation."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("One of th[e] landmarks [setting the constitutional limits on the powers of federal courts] . . . is the doctrine of standing. Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."); *Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990) ("The . . . litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements. A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."); *Faculty v. New York Univ.*, 11 F.4th 68, 78 (2d Cir. 2021) ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice rather than with prejudice. After all, such a dismissal is one for lack of subject matter jurisdiction, and without jurisdiction the district court lacks the power to adjudicate the merits of the case.") (internal quotation marks and citations omitted); *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021) ("A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when the plaintiff lacks constitutional standing to bring the action.") (internal quotation marks omitted); *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54 (2d Cir. 2016) ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice. Such a dismissal is one for lack of subject matter jurisdiction . . . .") (citations omitted); *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l*, 790 F.3d 411, 416-17 (2d Cir. 2015) ("A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, . . . such as when (as in the case at bar) the plaintiff lacks constitutional

Granted, some cases seem to suggest that, in such a case, a district court may permit an amendment of a complaint to permit the plaintiff to establish standing. However, a close reading of those cases reveals they did not squarely address the issue of the immediate and mandatory consequences of a lack of subject-matter jurisdiction.[23]

Granted also, the Court could alternatively apply the relevant factors under *Foman v. Davis*, 371 U.S. 178, 182 (1962) (i.e., the existence of bad faith or undue delay on the part of the

---

standing to bring the action.") (internal quotation marks and citation omitted); *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) ("[T]o survive SWIFT's and the federal defendant's Rule 12(b)(1) motion to dismiss, Amidax must allege facts that affirmatively and plausibly suggest that it has standing to sue."); *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) ("In order to ensure that this bedrock case-or-controversy requirement is met, courts require that plaintiffs establish their standing as the proper parties to bring suit.") (internal quotation marks omitted); *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n. 6 (2d Cir. 2006) ("[T]he proper procedural route [for standing challenges at the pleadings stage] is a motion under Rule 12(b)(1)."); *Shain v. Ellison*, 356 F.3d 211, 214, 216 (2d Cir. 2004) ("[S]ince Shain has not met his burden of demonstrating standing to seek injunctive relief, the federal courts lack subject matter jurisdiction over his claim for such relief. . . . For these reasons, we vacate the injunction and remand to the District Court with instructions to dismiss for lack of subject-matter jurisdiction.") (emphasis added).

[23]      *See, e.g., Manson v. Stacescu*, 11 F.3d 1127, 1133 (2d Cir. 1993) (affirming district court's dismissal of an action for lack of standing on the defendants' motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12[b][6], and finding that the district court did not abuse its discretion in denying the plaintiffs' motion for leave to file a fourth amended complaint to establish standing because doing so would be futile); *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 158-59 (2d Cir. 1992) (directing the district court on remand to afford the plaintiff an opportunity to amend his complaint with regard to his claim of associational standing only because the Circuit had found that the plaintiff separately had "standing to challenge the New York procedures for the selection of hearing officers"); *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 389 (2d Cir. 2015) (discussing whether the district court abused its discretion in denying the organizational plaintiffs' request to file a second amended complaint to demonstrate standing only because the individual plaintiffs already had demonstrated standing); *Does 1-10 v. Suffolk Cnty., N.Y.*, No. 21-1658, 2022 WL 2678876, at *1-2 (2d Cir. 2022) (affirming district court's decision that had "sua sponte dismissed [the plaintiffs'] complaint [due to a lack of standing] and granted them leave to replead within 30 days" in a gun-rights case, where the plaintiffs "declined to amend, and instead appealed the district court's order").

movant, undue prejudice to the opposing party, or futility of the amendment) out of an abundance of caution.[24] However, the Court need not do so, given its finding that it lacks-subject matter jurisdiction. Moreover, it is cognizant of the possibility that Plaintiffs, perhaps joining with other individual plaintiffs, may well file a new action (asserting as-applied claims) against not just Superintendent Bruen by other defendants; and the Court is reluctant to find that evidence adduced a hearing precludes an alleged change of intention on behalf of Plaintiff Antonyuk.

For all of these reasons, the Court finds an immediate dismissal without prejudice is required under Fed. R. Civ. P. 12(h)(3). Although Plaintiffs might object that this ground for dismissal is one asserted in Defendant's pending motion to dismiss, to which their opposition is not due until September 6, 2022 (Dkt. No. 21), they are respectfully reminded that they were given notice of this ground for dismissal in Defendant's opposition to their motion for

---

[24]       The Court notes that, if it were to do so, it would be tempted to find that such an amendment would be futile given the evidence referenced above in Parts III.A.1. through III.A.3. of this Decision and Order, including the following: (1) Plaintiff Antonyuk's hearing testimony that he always carries his gun according to "the law" (Dkt. No. 46. at 26); (2) his declared aversion to going anywhere he is "not welcome" (*id*. at 27); (3) his admission that, if he was told not to be present on a premises carrying his firearm, he would "leave the premise[s]" (*id*. at 29); (4) his admission that, if another man or woman does not want him to be armed on their private property, that is something that he must "honor" (*id*. at 27); (5) his admission that there is "really" no harm to asking individuals if they want him carrying on their property (*id*. at 30); (6) his admission that it was not "arduous" for him to give four character references when he applied for a license in 2009 (*id*. at 25-26); (7) his admission that currently he does not bring his gun to church (*id*. at 28); (8) his admission that, "if [he's] somewhere and [his] wife call[s] [him], ask[s] [him] to pick up some groceries or if [he's] on the way to somewhere and [has] to do quick shopping, [he] would have to go home and disarm or leave [his] firearm in the car" (*id*. at 29); (9) his admission that he has not had any interactions with the New York State Police over the past three months, nor ever been threatened with arrest or prosecution by the New York State Police (*id*. at 31); and (10) the organizational Plaintiffs' inability to recall the necessary facts from between July 1 and July 11, 2022 (*see, e.g., id.* at 10, 17, 18).

preliminary injunction (Dkt. No. 19), and they were given an opportunity to be heard on the issue

before the hearing in their reply (Dkt. Nos. 34, 38, 39), and at the hearing (Dkt. No. 46).

Nonetheless, they have failed to demonstrate standing.

   B.   **Substantial Likelihood of Success on the Merits**[25]

   What follows in this Decision and Order is "judicial dictum,"[26] because (although it is

the product of briefing and argument) it not essential to the Court's decision of Plaintiffs' motion

for a preliminary injunction (which must be denied without prejudice because the Court lack's

subject-matter jurisdiction over Plaintiffs' Complaint). However, the Court includes it out of an

abundance of caution, because at least a conceivable chance exists that Plaintiffs may take an

immediate appeal of this Decision and Order to the Second Circuit and be found to, in fact,

possess standing, in which case what follows would constitute the Court's holding.

   As an initial matter, the Court finds that the Second Amendment's plain text covers the

conduct in question: carrying a handgun in public for self-defense. More specifically, the Court

finds that (1) Plaintiff Antonyuk (and the members of the other two Plaintiffs) are part of "the

People" protected by the amendment, (2) the weapons in question are in fact "arms" protected by

---

[25]    Although the parties disagree regarding whether the requested preliminary injunction is prohibitory or mandatory in nature, they do not cite any on-point cases (and the Court has not yet found any cases) involving motions for a preliminary injunction challenging a statute that has been enacted but not yet taken effect. Granted, the status quo at the time of this Decision and Order is a State of New York in which the challenged restrictions are not yet in effect. However, the status quo is also a state in which the restrictions are scheduled to take effect on September 1, 20202, pursuant to a statute that was duly enacted. For this reason, and out of an abundance of caution, the Court will treat the requested preliminary injunction is prohibitory or mandatory in nature (requiring a substantial likelihood of success and a strong showing of irreparable harm, as set forth above in Part II.A. of this Decision and Order).

[26]    *See Black's Law Dictionary* at 519 (9th ed. 2009) (defining "judicial dictum" as "[a]n opinion by a court on a question that is directly involved, briefed, and argued by counsel, and even passed on by the court, but that is not essential to the decision").

the amendment, and (3) the regulated conduct falls under the phrase "keep and bear." *NYSRPA*, 142 S. Ct. at 2134-35; *see also D.C. v. Heller*, 554 U.S. 570, at 583-92 (2008) (analyzing meaning of "bear arms" at time of both 1791 and 1868).

Thus, the Government must rebut the presumption of protection against New York State's firearm regulation by demonstrating that the challenged portions of the statute are consistent with this Nation's historical tradition of firearm regulation. To do so, Defendant relies on a variety of historical sources.

As the Supreme Court has observed, some history is more relevant than others. *See NYSRPA*, 142 S. Ct. at 2136 ("[W]hen it comes to interpreting the Constitution, not all history is created equal."). Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634-35, the two relevant times are around 1791 and around 1868, *see NYSRPA*, 142 S. Ct. at 2138 ("We need not address this issue today [of whether courts, when defining the scope of this individual right, should primarily rely on the prevailing understanding of the right when the Fourteenth Amendment was ratified in 1868 or when the Second Amendment was ratified in 1791] because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry.").[27] "Historical evidence that

---

[27]     Of course, the reason that the latter time period is also relevant (and indeed, according to some scholars, even more relevant) is that it was the Fourteenth Amendment that conferred Second Amendment protection against the states. Moreover, although the Supreme Court observed that there is a "general[] assum[ption]" that the prior period is more important, *NYSRPA*, 142 S. Ct. at 2111, it did speak of only an "assumption" that was "general," and it did analyze and discuss the latter period approximately as much as it did the prior period. *See NYSRPA*, 142 S. Ct. at 2136-56 (analyzing both time periods, albeit lessening reliance on the latter period when that period contradicted the earlier period).

long predates or postdates either [1791 or 1868] may not illuminate the scope of the right." *NYSRPA*, 142 S. Ct. at 2136.

Finally, the Court repeats the observation of the Supreme Court that "we are not obliged to sift the historical materials for evidence to sustain New York State's statute. That is respondents' burden." *NYSRPA*, 142 S. Ct. at 2150.

      **1.**      **Challenge to Requirement of "Good Moral Character"**

As indicated above in Part I.A. of this Decision and Order, in response to the Supreme Court's Decision in *NYSRPA*, New York State replaced the requirement of a showing "proper cause" with, among other things, a definition of "good moral character." Specifically, the relevant portion of the statute reads as follows: "No license shall be issued or renewed except for an applicant . . . of good moral character, which . . . shall mean having the essential character, temperament and judgment necessary . . . to use [the weapon entrusted to the applicant] only in a manner that does not endanger oneself or others." N.Y. Penal Law § 400.00(1)(b). Liberally construed, Plaintiffs' Complaint and motion papers challenge two features of the newly defined "good moral character" requirement: (1) the fact that the definition of "good moral character" fails to expressly contain the qualifying phrase "other than in self-defense";[28] and (2) the fact

---

[28]    Specifically, in their Complaint, Plaintiffs challenge the CCIA's requirement of character references who will attest to the applicant's "good moral character" (and the fact that the applicant has not engaged in any acts, or made any statements that "suggest they are likely to engage in conduct that would result in harm to themselves or others") because the definition of "good moral character" lacks an express exception for self-defense:

> [T]he requirement that [four character references attest to the fact that the applicant has said] nothing [that would] 'suggest [an applicant is] likely to engage in conduct that would result in harm [justified or not] to themselves or others' is an open-ended and vague standard, as one hundred percent of those applying for a permit to carry a handgun in public, by definition, could be said to be 'likely' to 'harm' a carjacker

55

that, like the "proper cause" standard that was rejected by the Supreme Court in *NYSRPA*, the revised "good moral character" standard impermissibly grants licensing officers the discretion to deny a license based on a perceived lack of a characteristic that is vague and subjective.

### a. Conspicuous Omission of Qualifying Phrase "Other than in Self-Defense"

While pursuing the laudable goal of public safety, and in an attempt to curb ever-increasing mass shootings, the New York State Legislature has generated an unconstitutional statute in the CCIA. In its eight-day haste to pass a legislative response to the Supreme Court's Decision in *NYSRPA* (which reads less like such a measured response than a wish list of exercise-inhibiting restrictions glued together by a severability clause in case some of the more fanciful restrictions were struck down),[29] the New York State Legislature forgot four important words--"other than in self-defense." The Court has difficulty imagining how any law-abiding, responsible citizen could ever "use"[30] a concealed handgun to defend himself or herself in public against another person in a manner that does not "endanger" that other person: the very act of using a firearm in self-defense against another person necessarily involves threatening, if not

---

through the morally legitimate and entirely lawful act of self-defense.

(Dkt. No. 1, at ¶ 65 [Compl.].)

[29]     *See* 2022 N.Y. Sess. Laws ch. 371, § 25 ("If any clause, sentence, paragraph or section of this act shall be adjudged by any court of competent jurisdiction to be invalid, the judgment shall not affect, impair or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph or section thereof directly involved in the controversy in which the judgment shall have been rendered.").

[30]     The Court notes that the revised language uses the word "use" instead of the words "bear," "carry," "possess" or "own."

actually causing, danger to that other person.[31]

To the extent that one argues that the Court should simply read into the end of this definition the qualifying phrase "other than in self-defense," one is reminded that the phrase could easily have been included in, but is conspicuously missing from, the definition, reasonably suggesting that this sort of omission[32] was intentional.[33] Moreover, the Court finds that such a heavy reliance on licensing officials to honor this implied construction of unequivocal language would not suffice to correct such an unreasonable restriction of a constitutional right.[34]

Thus, the statute is conditioned on a logical impossibility, and is thus doomed to the fate of the statute in *Heller* (which similarly, by requiring that firearms in the home be rendered and kept inoperable at all times, made it "*impossible* for or citizens to use them for the core lawful purpose of self-defense"). *Heller*, 554 U.S. at 630 (emphasis added).

Defendant argues that "[t]his language wasn't pulled out of thin air–it came from a

---

[31]    *See, e.g.,* 18 U.S.C. § 921(a)(3) (defining "firearm" as "any weapon (including a starter gun) which will or is *designed* to or may readily be converted to *expel a projectile by the action of an explosive*") (emphasis added); N.Y. Exec. Law § 296(6) (characterizing "guns" and "firearms" as "deadly weapons").

[32]    Similarly missing are the words "illegally" or "unlawfully," and the more-archaic constructions such as "offensively," "to the terror of the people," or "to make war against" the government.

[33]    *See, e.g., Heller,* 554 U.S. at 630 ("The District argues that we should interpret this element of the statute to contain an exception for self-defense. . . . But we think that is precluded by the unequivocal text . . . .").

[34]    *See Parker v. D.C.*, 478 F.3d 370, 401 (D.C. Cir. 2007) ("The District responds that, notwithstanding the broad language of the Code, a judge would likely give the statute a narrowing construction when confronted with a self-defense justification. That might be so, but judicial lenity cannot make up for the unreasonable restriction of a constitutional right."), *aff'd*, *D.C. v. Heller*, 554 U.S. 570 (2008).

Connecticut statute quoted in the *NYSRPA* opinion and declared constitutional." (Dkt. No. 19, at

37.) The portion of *NYSRPA* relied upon is a footnote, in which Justice Thomas stated,

"Although Connecticut officials have discretion to deny a concealed-carry permit to anyone who

is not 'suitable person,' see Conn. Gen. Stat. § 29-28(b), the 'suitable person' standard precludes

permits only to those 'individuals whose conduct has shown them to be lacking the essential

character of temperament necessary to be entrusted with a weapon.'" *NYSRPA*, 142 S. Ct. at

2123, n.1 (quoting *Dwyer v. Farrell*, 193 Conn. 7, 12, 475 A.2d 257, 260 [Conn. 1984], which in

turn had obtained the quoted language from *Rabbit v. Leonard*, 36 Conn.Sup. 108, 115-16

[Conn. 1979]). Of course, the language requiring the possession of "the essential character of

temperament necessary to be entrusted with a weapon" comes not from Conn. Gen. Stat. § 29-

28(b)[35] but from *Dwyer* and *Rabbin*, which predate *Heller* by some 24 years. In any event, N.Y.

Penal Law § 400.00(1)(b) does not define "good moral character" as "having the essential

character of temperament necessary to be entrusted with a weapon" (a requirement that permits

one to use a firearm in self-defense) but (again) as "having the essential character, temperament

and judgment necessary . . . to use [the weapon entrusted to the applicant] only in a manner that

---

[35]    The relevant portion of the Connecticut statute reads, in pertinent part, as follows:

> Upon the application of any person having a bona fide permanent
> residence within the jurisdiction of any such authority, such chief of police
> or, where there is no chief of police, such chief executive officer or
> designated resident state trooper or state police officer, as applicable, may
> issue a temporary state permit to such person to carry a pistol or revolver
> within the state, provided such authority shall find that such applicant
> intends to make no use of any pistol or revolver which such applicant may
> be permitted to carry under such permit other than a lawful use and that
> such person is a *suitable* person to receive such permit.

Conn. Gen. Stat. § 29-28(b) (emphasis added).

does not endanger oneself or others" (a requirement that literally does not permit one to use a firearm in self-defense). As a result, the Court has difficulty understanding how one could argue that the language in question from the new statute "c[o]me[s] from" or "mirrors" the Connecticut statute. It does not. It certainly was not endorsed in any way by the *NYSRPA* majority.

Nor does the language in question come from or mirror any of the other state statutes cited by Defendant. *See* R.I. Gen. Laws § 11-47-11 (required that a permit be issued to an applicant "if it appears . . . that he or she is a suitable person to be so licensed"); Pa. Cons. Stat. § 6109(d)(3) (requiring an investigating sheriff to determine "whether the applicant's character and reputation are such that the applicant will not be likely to act in a manner dangerous to public safety"); Va. Code. § 18.2-308.09(13) (allowing a judge to reject a licensing request if "the court finds, by a preponderance of the evidence" that the applicant "is likely to use a weapon unlawfully or negligently to endanger others"); Colo. Rev. Stat. § 18-12-203(2) (allowing a sheriff to reject a permit application "if the sheriff has a reasonable belief that documented previous behavior by the applicant makes it likely the applicant will present a danger to self or others"); 430 Ill. Comp. Stat. Ann. 66/10(a)(4) (allowing permits only for an applicant who "does not pose a danger to himself, herself, or others, or a threat to public safety as determined by the Concealed Carry Licensing Review Board"). The Rhode Island statute merely requires "suitab[ilty]"; the Illinois statute speaks only of "pos[ing] a danger"; and the remaining three statues speak only of "likel[ihood]" of danger. None require a condition that is literally impossible to achieve: the use of a firearm in a manner that does not endanger oneself or others.

Nor is the phrase in question somehow saved by defense counsel's reference to a similar phrase in New York State's Mental Hygiene Law, which "is understood to mean [a danger to oneself or others] 'outside the self-defense situation'" and is a "standard that's well known in the

law." (Dkt. No. 46, at 43-44 [Hrg. Tr.].) Defense counsel never provided any citations to New York State's Mental Hygiene Law or other New York State laws. (*Id*. at 43-45.)

To the extent defense counsel was referencing N.Y. Mental Hygiene Law §§ 9.40, 9.41 and 9.46, he is respectfully reminded that those sections need not be construed as implicitly containing the phrase "other than in self-defense" because they expressly require the appearance of mental illness.[36] Moreover, comparing the CCIA's requirement of usage "in a manner that does not endanger oneself or others" to the N.Y. Mental Hygiene Law essentially compares a law-abiding responsible citizen who wishes to carry a concealed handgun in public for self-defense (for which he or she has duly received a license) to a mentally ill person. This is not a belief countenanced by the Second Amendment to the United States Constitution.

Nor is the phrase in question somehow saved by defense counsel's argument (which is again unsupported by any citations) that, "[w]hen we talk about being a danger to oneself or others, [we] talk about being an affirmative danger, not a reactive danger to someone else who is a danger to you." (Dkt. No. 46, at 45 [Hrg. Tr.].) Of course, as indicated above in note 32 of this Decisions and Order, relevant historical statutes sometimes draw such a distinction between carrying a firearm defensively (which might be akin to acting "reactively") and offensively (or

---

[36]     *See*, *e.g.*, N.Y. Mental Hygiene Law § 9.40(a) (authorizing director of a comprehensive psychiatric emergency program to temporarily receive and retain "any person alleged to have a mental illness for which immediate observation, care and treatment in such program is appropriate and which is likely to result in serious harm to the person or others"); N.Y. Mental Hygiene Law § 9.41 (authorizing law enforcement officers to "take into custody any person who appears to be mentally ill and is conducting himself in a manner which is likely to result in serious harm to himself or others"); N.Y. Mental Hygiene Law § 9.46 (requiring report of person who has been determined to be "likely to engage in conduct that would result in serious harm to self or others" when that "determination is made by a mental health professional currently providing treatment services to [the] person").

which might be akin to acting "affirmatively") when they speak about carrying firearms "offensively," "to the terror of the people," or "to make war against" the government. However, those statutes do so expressly, while the CCIA does not.

Not surprisingly, Defendant cites no examples from this Nation's historical tradition of firearm regulation requiring an analogous logical impossibility as a condition precedent to carrying a firearm (concealed or not). (*See generally* Dkt. No. 19, at 39-47.) Rather, the few relevant statutes cited by Defendant from the relevant time periods (i.e., those that do not "long predate[] or postdate[]" either 1791 or 1868) made firearm possession impossible for only a *segment* of the population (e.g., Native Americans, disloyalty Catholics, persons found to be dangerous, etc.). (*Id.*) Even if these statutes represent this Nation's historical tradition of firearm regulation instead of deviations therefrom, none of them made it a logical impossibility for the *entire* population of new license applicants to carry a firearm, as New York State has done. (*Id.*)

What the law-abiding, responsible citizens of New York State are left with is a statute that is, in the words of defense counsel, plagued by "a profound Second Amendment problem." (Dkt. No. 46, at 56 [Hrg. Tr., arguing "I think, and obviously if we had a standard that prohibited lawful self-defense, you know, we would have a profound Second Amendment problem"].)

For all of these reasons, the Court finds that Defendant has failed to rebut the presumption of protection against this "good moral character" requirement, and Plaintiffs have therefore shown a strong likelihood of success on their claims challenging the omission of an exception for usage in self-defense from the definition of "good moral character."

> **b.    Impermissible Granting to Licensing Officers the Sort of Open-Ended Discretion Prohibited by *NYSRPA*[37]**

---

[37]    For purposes of the Court's analysis of this issue, the Court will assume that the above-described omission (of the words "other than in self-defense" or similar language) has been

Although this open-ended-discretion issue presents a closer call than does the impossibility-of-performance issue discussed in the prior section of this Decision and Order, the Court must ultimately agree with Plaintiffs that a majority of Justices on the Supreme Court would find that New York State's new definition of "good moral character" does not in fact remove the open-ended discretion previously conferred by New York State's licensing regime on licensing officials and condemned by those Justices.[38] Instead, New York State's new definition merely changes the *nature* of that open-ended discretion. More specifically, it changes the nature from (1) the discretion to give licenses only to those applicants who can show that they possess some special need for self-protection distinguishable from that of the general community to (2) the discretion to give licenses only to those applicants who can show (based on, among other things, unspecified statements in their social media postings) that they possess the "essential character, temperament and judgment" to rarely, if ever, actually use a handgun in public.

The Court emphasizes that the Second Amendment right of which it is speaking is a right

---

rectified.

[38]     *See, e.g., NYSRPA*, 142 S. Ct. at 2123 (Thomas, J.) ("[T]he vast majority of States–43 by our count–are 'shall issue' jurisdictions, where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials *discretion* to deny licenses based on a *perceived* lack of need or *suitability*.") (emphasis added); *NYSRPA*, 142 S. Ct. at 2161-62 (Kavanaugh, J., concurring) ("As the Court explains, New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense. Those features of New York's regime–the unchanneled discretion for licensing officials and the special-need requirement–in effect deny the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens.' . . . By contrast, 43 States employ objective shall-issue licensing regimes. . . . Unlike New York's may-issue regime, those shall-issue regimes do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense.").

of self-defense, not a right of confrontation. (Readers will find no endorsement in this Decision

and Order of licensed New York State citizens who feel compelled to attend protests carrying a

handgun.) But the Second Amendment right in question is still one of self-defense, and licensing

officials may not arbitrarily abridge it based on vague, subjective criteria. Rather, the purpose of

the open-ended discretion is more objectively achieved through the requirement of

fingerprinting, a background check, a mental health records check, and training in firearms

handling and in laws regarding the use of force.

Finally, for the reasons stated by Plaintiffs in their memoranda of law, the Court does not

agree that New York State's revised good-moral-character requirement is patterned after laws

endorsed by the *NYSRPA*, or is consistent with the Nation's historical tradition of firearm

regulation.[39] *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order.

For all of these alternative reasons, the Court finds that Defendant has failed to rebut the

presumption of protection against the "good moral character" requirement, and Plaintiffs have

therefore shown a strong likelihood of success on their claims challenging the open-ended

discretion contained in this requirement.

### 2. Challenge to Requirements of In-Person Meeting, Social Media Disclosure, and Four Character References

Based on the current briefing and record, Plaintiffs have not made a persuasive case to

---

[39] However, the Court must reject as mere *argumentum ad populum* Plaintiffs' suggestion that the historical analogs of firearm regulation required by *NYSRPA* may not include any historical analogs that are currently viewed as racist (as much as the undersigned may personally agree that such historical analogs are both racist and abhorrent). *See Kanter v. Barr*, 919 F.3d 437, 457-48 (7th Cur. 2019) (Barrett, J., dissenting) (considering historical analogs of categorically disarming "Slaves," "Native Americans," and "Catholics," before distinguishing those analogs as not supporting "a legislative power to categorically disarm felons because of their status as felons").

the Court regarding the burdensomeness of either an in-person-meeting requirement or the four-character-references requirement (as long as it does not require that the references provide an impossible assurance to the licensing officer).[40]  Indeed, during examination at the hearing, Plaintiff Antonyuk testified that it was not "arduous" for him to give four character references when he applied for a license in 2009. (Dkt. No. 46, at 25-26 [Hrg. Tr.].) However, the Court reaches a different conclusion regarding the social-media disclosure requirement.

The CCIA requires those seeking a license or renewal to disclose to the licensing officer, among other things, "a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicants [sic] character and conduct as required in subparagraph (ii) of this paragraph," which includes the fact that "such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct [sic] that would result in harm to themselves or others." N.Y. Penal Law § 400.00(1)(o)(iv),(ii).

Setting aside the typographical error resulting from the lack of a comma between the words "conduct" and "that" (which, as a matter of grammar, literally disqualifies any applicant who has "engaged in any acts" whatsoever), this new requirement poses four independent problems: (1) requiring a condition that is impossible to satisfy (by requiring that the social-media accounts assure the licensing officer that the applicant will not likely "engage in conduct [which presumably includes carrying and using a handgun in public for self-defense] that would

---

[40]     Of course, the Court retains its disapproval of the four-character-references requirement to the extent it requires that the references provide an impossible assurance to the licensing officer that the applicant will not likely "engage in conduct [which presumably includes carrying and using a handgun in public for self-defense] that would result in harm to . . . others" for reasons discussed above in Part III.B.1.a. of this Decision and Order.

result in harm to . . . others") for reasons discussed above in Part III.B.1.a. of this Decision and Order; (2) granting open-ended discretion to licensing officers (by not employing objective criteria to determine when social media postings "suggest" that it is "likely" the applicant would cause harm to others, whether or not outside of self-defense) for reasons discussed above in Part III.B.1.b. of this Decision and Order; (3) First Amendment concerns stemming from the applicant having to disclose, and being punished for, political speech; and (4) Fifth Amendment concerns stemming from the applicant having to incriminate himself.

For the sake of brevity, the Court will not elaborate on the first and second problems by repeating its analysis set forth above in Part III.B.1.a. and Parts III.B.1.b. of this Decision and Order. Nor will the Court elaborate on the third problem other than to state that it agrees with all of the First Amendment arguments asserted by Plaintiffs in their memoranda of law. *See, supra*, Parts I.B.1. and I.B.3. of this Decision and Order. Nor will the Court linger on the extent to which the danger in question appears to be addressed by New York State's recently expanded Extreme Risk Protection Act ("ERPA"), N.Y. C.P.L.R. §§ 6340-47, which prevents individuals who presents a risk of danger to themselves or others from acquiring and possessing firearms, or by New York State's enactment of a law criminalizing the making of a threat (including on social media) with the intent to intimidate a group of people or cause public harm.

Instead, the Court will elaborate somewhat on the fourth problem, specifically the Fifth Amendment concerns expressed by the Court at the hearing regarding self-incrimination. (Dkt. No. 46, at 60, 63-64 [Hrg. Tr.]; *see also* Dkt. No. 9, Attach. 1, at 11-12 [attaching pages "9" and "10" of Plfs.' Memo. of Law].) In addition to enjoying a Second Amendment right to "keep and bear arms," citizens of course enjoy a Fifth Amendment right to remain silent. U.S. Const. amend V ("No person . . . shall be compelled in any criminal action to be a witness against

himself . . . ."). The Supreme Court has found it "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 393-394 (1968) (rejecting a situation where a defendant was forced to forfeit his Fifth Amendment right to keep silent in order to assert his Fourth Amendment guarantee of freedom from unreasonable searches, calling that requirement a "condition of a kind to which this Court has always been peculiarly sensitive"); *cf. Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (finding that the government may not deny a person a benefit "on a basis that infringes his constitutionally protected interests"). However, a citizen's Fifth Amendment right would be surrendered if he or she were compelled to disclose self-incriminating statements on a social-media posting in order to exercise his or her Second Amendment right in New York State. For those readers quick to point out it is only *law-abiding* citizens who enjoy this Second Amendment right to armed self-defense (and that citizens who post self-incriminating statements on social media are not law-abiding), they are respectfully reminded of how question-begging that argument is. As Plaintiffs' counsel argues in their reply, "[T]he legality of a vehicle search does not depend on whether the police ultimately find cocaine in the trunk." (Dkt. No. 40, at 29 [attaching page "27" of Plfs.' Reply Memo. of Law].) Finally, Defendant has adduced no historical analogs requiring persons to disclose their published political pamphlets (which might be considered to be akin to a social-media posting), or their personal correspondence (which might be akin to a private message, or a message to a restricted group, on social media).

### 3.  Challenge to Increased Firearm Training and Fees

This challenge too is not a ground for a preliminary injunction. Although Plaintiffs could certainly prevail on their excessive-training-hours claim at trial, they have not persuaded the Court that they possess a strong likelihood of success on it based on (1) the sparse evidence

adduced on the subject, (2) the fact that Plaintiff Antonyuk repeatedly testified that he participates in pistol competitions,[41] (3) the level of basic firearm familiarity assumed during the enactments of the historical analogs, and (4) the relative number of hours required to obtain a driver's license in New York State (although the Court concedes that obtaining a driver's license is not a constitutional right). The same is true with regard to Plaintiffs' excessive-fees claim, although that is a closer call given (1) the rising cost of services and the modest average income in the state, especially upstate, and (2) the Supreme Court's anticipation of the issue.[42]

### 4.    Challenge to the List of "Sensitive Locations" and the Definition of "Restricted Locations"

In *NYSRPA*, the Supreme Court found that, because it was "aware of no disputes regarding the lawfulness of . . . prohibitions" on weapons in "sensitive places" such as "legislative assemblies, polling places, and courthouses," it could "therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *NYSRPA*, 142 S. Ct. at 2133. As for any other "sensitive places," the Supreme Court found that "courts can use analogies to those historical regulations of 'sensitive places' to determine [if] modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.*

However, the Supreme Court found that "sensitive places" may *not* include "all 'places where people typically congregate and where law-enforcement and other public-safety

---

[41]     (Dkt. No. 41, Attach. 3, at ¶ 9 [Antonyuk Suppl. Decl.]; Dkt. No. 46, at 26 [Hrg. Tr.].)

[42]     *See NYSRPA*, 142 S. Ct. at 2138, n. 9 ("That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.").

professionals are presumptively available.'" *Id*. at 2133-34. This is because, while it "[i]t is true

that people sometimes congregate in 'sensitive places,' and it is likewise true that law

enforcement professionals are usually presumptively available in those locations," "expanding

the category of 'sensitive places' simply to all places of public congregation that are not isolated

from law enforcement defines the category of 'sensitive places' far too broadly." *Id*. at 2134. For

example, "there is no historical basis for New York to effectively declare the island of Manhattan

a 'sensitive place' simply because it is crowded and protected generally by the New York City

Police Department." *Id*.

### a.      List of "Sensitive Locations"

After carefully considering the matter, the Court agrees with Plaintiffs that the CCIA's

long list of "sensitive locations" impermissibly includes numerous locations that are nonsensitive

in nature for each of the three reasons stated in their memoranda of law and during oral

argument: (1) the myriad of sensitive locations listed in the CCIA is almost limitless (including,

for example, public sidewalks, restaurants that serve alcohol, healthcare services, public

transportation, and gatherings of individuals to express their constitutional rights), (2) the

Supreme Court in *NYSRPA* effectively barred the expansion of sensitive locations beyond

schools, government buildings, legislative assemblies, polling places and courthouses, and (3)

the aforementioned expansion is unsupported by any historical examples that are actual

analogues. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order. (*See also* Dkt. No. 46,

at 33-41, 68-73 [Hrg. Tr.].) To those reasons the Court would add only the following analysis

(which is intended to supplement and not supplant those reasons).

The CCIA's list of "sensitive locations" is indeed almost limitless:

> (a) any place owned or under the control of federal, state or local

government, for the purpose of government administration, including courts;

(b) any location providing health, behavioral health, or chemical dependance care or services;

(c) any place of worship or religious observation;

(d) libraries, public playgrounds, public parks, and zoos;

(e) the location of any program licensed, regulated, certified, funded, or approved by the office of children and family services that provides services to children, youth, or young adults, any legally exempt childcare provider; a childcare program for which a permit to operate such program has been issued by the department of health and mental hygiene pursuant to the health code of the city of New York;

(f) nursery schools, preschools, and summer camps;

(g) the location of any program licensed, regulated, certified, operated, or funded by the office for people with developmental disabilities;

(h) the location of any program licensed, regulated, certified, operated, or funded by office of addiction services and supports;

(i) the location of any program licensed, regulated, certified, operated, or funded by the office of mental health;

(j) the location of any program licensed, regulated, certified, operated, or funded by the office of temporary and disability assistance;

(k) homeless shelters, runaway homeless youth shelters, family shelters, shelters for adults, domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence;

(l) residential settings licensed, certified, regulated, funded, or operated by the department of health;

(m) in or upon any building or grounds, owned or leased, of any educational institutions, colleges and universities, licensed private career schools, school districts, public schools, private schools licensed under article one hundred one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools;

(n) any place, conveyance, or vehicle used for public transportation or public transit, subway cars, train cars, buses, ferries, railroad, omnibus, marine or aviation transportation; or any facility used for or in connection with service in the transportation of passengers, airports, train stations, subway and rail stations, and bus terminals;

(o) any establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage control law where alcohol is consumed and any establishment licensed under article four of the cannabis law for on-premise consumption;

(p) any place used for the performance, art entertainment, gaming,

or sporting events such as theaters, stadiums, racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission;

(q) any location being used as a polling place;

(r) any public sidewalk or other public area restricted from general public access for a limited time or special event that has been issued a permit for such time or event by a governmental entity, or subject to specific, heightened law enforcement protection, or has otherwise had such access restricted by a governmental entity, provided such location is identified as such by clear and conspicuous signage;

(s) any gathering of individuals to collectively express their constitutional rights to protest or assemble;

(t) the area commonly known as Times Square, as such area is determined and identified by the city of New York; provided such area shall be clearly and conspicuously identified with signage.

2022 N.Y. Sess. Laws ch. 371, § 4 (codified at N.Y. Penal Law § 265.01-e[2]).

But more important than the length of the list, in the Court's view, is the fact that the common thread tying together its items is the fact that they are all locations where (1) people typically congregate or visit and (2) law-enforcement or other security professionals are--presumably--readily available. This is precisely the definition of "sensitive locations" that the Supreme Court in *NYSRPA* considered and rejected:

In [Respondents'] view, 'sensitive places' where the government may lawfully disarm law-abiding citizens include all 'places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available.' . . . It is true that people sometimes congregate in 'sensitive places,' and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense.

*NSYRPA*, 142 S. Ct. at 2133-34.

Furthermore, Defendant does not successfully rebut the presumption of protection against

70

the CCIA's long list of "sensitive locations" by demonstrating that it is consistent with this

Nation's historical tradition of firearm regulation. Although Defendant cites some historical

analogs for restricting firearms at some of the above-listed locations, he often ignores the fact

that vast majority of the other states (of which there were 14 in 1791 and 37 in 1868) did not

have statutes restricting firearms at those very locations (suggesting that Defendant's "historical

analogs" might represent exceptions to a tradition more than a tradition), and that some of the

states even had contrary statutes (for example, statutes regarding carrying in places of worship[43]

and educational institutions[44]). In any event, and more importantly, he does not cite any

---

[43]     *Compare* 1869-70 Tenn. Pub. Acts 23-24 ("[I]t shall not be lawful . . . for any person attending any . . . public assembly of the people, to carry about his person, concealed or otherwise, any pistol . . . .") *and* 1870 Ga. Laws 421 ("[N]o person in said State of Georgia be permitted or allowed to carry about his or her person any . . . pistol, or revolver . . . to . . . any place of public worship . . . .") *and* 1870 Tex. Laws 63 ("That if any person shall go into any church or religious assembly, . . . and shall have about his person . . . fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars . . . .") *and* 1883 Mo. Laws 76 ("If any person shall . . . go into any church or place where people have assembled for religious worship, . . . having upon or about his person any kind of fire-arms, . . . he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than five days or more six months, or by both such fine and imprisonment.") *with* 1 William Waller Hening, *The Statutes at Large: Being a Collection of all the Laws of Virginia, from the First Session of the Legislature* 126, 173, 263 (1808) (citing 1632 Virginia statute providing that "ALL men that are fittinge to beare armes, shall bringe their pieces to the church," 1632 Virginia statute providing that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott," 1643 Virginia statute requiring that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott," and similar 1676 Virginia law) *and* 1 *Records of the Colony of Rhode Island and Providence Plantations, in New England* 94 (John Russell Bartlett ed., 1856) ("[N]oe man shall goe two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon.").

[44]     *Compare* Univ. of Va. Bd. of Visitors Minutes (Oct. 4-5, 1824) ("No student shall, within the precincts of the university . . . keep or use weapons or arms of any kind, or gunpowder.") *and* 1870 Tex. Laws 63 ("That if any person shall go into . . . any school room or other place where persons are assembled for educational, literary or scientific purposes, . . . and shall have about

historical analogs for restricting firearms at *all* of the above-listed locations. In short, the CCIA's list of "sensitive locations" is not deeply rooted in the Nation's historical tradition of firearm regulation.

### b.    Definition of "Restricted Locations"

After carefully considering the matter, the Court agrees with Plaintiffs that the CCIA's definition of "restricted locations" impermissibly encompasses *all* private property in the state unless the property owner expressly permits the carrying of firearms for each of the three reasons stated in their memoranda of law and during oral argument: (1) by declaring a policy governing all property owners, New York State is usurping (not protecting) the rights of property owners to decide things for themselves, effectively seizing people's private property and declaring it to be a gun-free zone; (2) Defendant's historical support for this restriction relies on only a handful of statutes that mostly either were anti-poaching laws or applied only to trespassers; and (3)

---

his person . . . fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars . . . .") *and* 1883 Mo. Laws 76 ("If any person shall . . . go . . . into any school-room or place where people are assembled for educational, literary or social purposes, . . . having upon or about his person any kind of fire-arms, . . . he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than five days or more than six months, or by both such fine and imprisonment.") *with A Digest of the Laws of New Jersey: containing all the laws of general application, now in force, from 1709 to 1855, inclusive, with the rules and decisions of the courts* 316 (2d ed. 1855) ("The opening or keeping of any room or place . . . for pistol-shooting, either for money or without money, within three miles of the main building of the College of New Jersey, shall be and hereby are declared to be offences against this state . . . .") (permitting students to carry on campus) *and* 1878 Miss. Laws 176 ("That any student of any university, college or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the first section of this Act described, or any teacher, instructor, or professor who shall, knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars . . . .") (permitting open carry).

72

Defendant's heavy reliance on *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir.

2012), is misplaced because that case is both factually and legally distinguishable from the

current case (and was decided before *NYSRPA*). *See, supra,* Parts I.B.1. and I.B.3. of this

Decision and Order. (*See also* Dkt. No. 46, at 33-41, 68-73 [Hrg. Tr.].) To those reasons the

Court would add only the following analysis (which is intended to supplement and not supplant

those reasons).

The CCIA provides, in pertinent part, as follows:

> A person is guilty of criminal possession of a weapon in a
> restricted location when such person possesses a firearm, rifle, or shotgun
> and enters into or remains on or in private property where such person
> knows or reasonably should know that the owner or lessee of such
> property has not permitted such possession by clear and conspicuous
> signage indicating that the carrying of firearms, rifles, or shotguns on their
> property is permitted or has otherwise given express consent.

2022 N.Y. Sess. Laws ch. 371, § 5 (codified at N.Y. Penal Law § 265.01-d[1]).   The Court will

assume that the omission of the word "not" between "has" and "otherwise" is another

typographical error (which, as a matter of grammar, literally means that a "restricted location" is

"any private property where such person knows or reasonably should know that the owner or

lessee of such property . . . has . . . given express consent [to possess the firearm there]"). Setting

aside this error, Plaintiffs are correct that the CCIA effectively defines "restricted location" as

"any private property" in which the firearm possessor "knows or reasonably should know" that

the property owner or lessee has not (1) permitted such possession by clear and conspicuous

signage or (2) otherwise given express consent.

In support of his argument that the CCIA's definition of "restricted location" is consistent

with this Nation's historical tradition of firearm regulation, Defendant cites only four statutes that

might temporally be characterized as "historical analogs" (specifically, a 1715 statute from

Maryland, a 1721 statute from Pennsylvania, a 1741 statute from New Jersey, and an 1866 statute from Texas).[45] However, the 1715 Maryland statute does not expressly apply to any enclosures whatsoever (whether they be fenced-in lands or buildings); and, in any event, it expressly applies only to persons who were previously convicted of poaching. Moreover, the 1721 Pennsylvania statute and 1741 New Jersey statute expressly apply only to "inclosed lands," which clearly refers to fenced-in lands;[46]and, in any event, the 1741 New Jersey statute appears to have been replaced by a 1771 New Jersey statute that eliminated the restriction regarding

---

[45]     *See* 1715 Md. Laws 90 ("[I]f any person or persons whatsoever, that have been convicted of any of the crimes aforesaid [regarding hunting on another's land without permission], . . . shall . . . be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave . . . [he] shall forfeit and pay one thousand pounds of tobacco, one half to our sovereign lord the king, his heirs and successors, the other half to the party grieved, or those who shall sue for the same, to be recovered in any county court of this province."); James T. Mitchell et al., *Statutes at Large of Pennsylvania from 1682 to 1801* vol III, p. 254 (Clarence M. Busch, Printer, 1896) (reprinting 1721 Pennsylvania statute reading, "[I]f any person or persons shall presume, . . . to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation . . . he shall for every such offense forfeit the sum of ten shillings"); 1741 N.J. Laws 101 ("[I] any Person or Persons shall presume, at any Time after the Publication hereof, to carry any Gun, or hunt on the improved or inclosed Lands in any Plantation, other than his own, unless he have License or Permission from the Owner of such Lands or Plantation . . . he shall, for every such Offence, forfeit the Sum of Fifteen Shillings, with Costs attending such Conviction."); 4 *Digest of the Laws of Texas Containing the Laws in Force, and the Repealed Laws on Which Rights Rest, from 1754 to 1875* (reprinting 1866 Texas statute reading, "[I]t shall not be lawful for any person or persons to carry firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor").

[46]     *See, e.g., Hall v. Powel*, 4 Serg, & Rawle 456, 460 (Pa. 1818) (distinguishing between "the defendant's houses" and his "enclosed lands"); *Worrall v. Rhoads*, 2 Whart. 427, 428 (Pa. 1837) ("[T]his presumption would be strong indeed if the enjoyment of the easement or way were over the improved or valuable fields, meadows, gardens, or other enclosed lands of another."); *Henry v. Richardson*, 7 Watts 557, 557 (Pa. 1838) (distinguishing between "improved" lands and "enclosed lands"); *Sinnickson v. Dungan*, 8 N.J.L. 226, 226 (N.J. 1825) ("In an action against a defendant (who has killed swine trespassing on his enclosed lands) for neglecting or refusing to comply with the provisions of the act concerning swine, . . . the state of demand must contain such substantial averments, as will exhibit a case within the act.").

"inclosed lands."[47] Finally, although the 1866 Texas statute applies to "inclosed premises," that

term also apparently refers to fenced-in lands, not buildings (unless railways were able to pass

through, and crops able to grow in, buildings).[48] Thus these statutes are far from analogs, except

to the extent that the CCIA's "restricted location" definition applies to farmland. In any event,

even to that limited extent, the Court is not persuaded that these few examples are part of a

tradition as opposed to an exception to a tradition (given that, as stated earlier, there were 14

states in 1791 and 37 states in 1868). As a result, the Court finds that the CCIA's expansive

definition of "restricted locations" is not deeply rooted in the Nation's historical tradition of

firearm regulation.

### D.    Strong Showing of Irreparable Harm

After carefully considering the matter, the Court finds that Plaintiffs have made a strong

---

[47]    *See* 1771 N.J. Laws 344 ("[I]f any Person or Persons shall presume, at any Time after the Publication hereof, to carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessor, every such Person so offending, and convicted thereof . . . shall, for every such Offence, forfeit and pay to the Owner of the Soil, or his Tenant in Possession, the Sum of Forty Shillings, with Costs of Suit.").

[48]    *See, e.g., Houston, E. & W. T. Ry. Co. v. Adams*, 63 Tex. 200, 206 (Tex. 1885) ("It was alleged that . . . , by the negligent construction of the road, and failure to erect cattle-guards, and keep them in order where the railway entered and left the inclosed premises of appellees, his field had been left open to stock, whereby he was prevented from using it."); *Gulf, C. & S. F. Ry. Co. v. Simonton*, 22 S.W. 285, 285 (Tex. App. 1893) (discussing the plaintiff's allegation "that the company was operating its railroad through the inclosed premises of plaintiff, consisting of about 200 acres of land . . ."); *Frazer v. Bedford*, 66 S.W.573, 573 (Tex. App. 1902) ("Some cattle belonging to the appellees escaped from a pen in which they were confined, and broke into the inclosed premises of appellant, and damaged his crop."); *Missouri, K. & T. Ry. Co. of Texas v. Wetz*, 87 S.W. 373, 374 (Tex. App. 1905) ("Appellee's petition alleges 'that the defendant's said line of railroad passes through and over and across the inclosed premises of plaintiff at a point about two miles north of Landa's Station, in said Comal county, Texas."); *Posey v. Coleman*, 133 S.W. 937, 938 (Tex. App. 1911) ("This suit was instituted by the appellant against the appellee to recover damages resulting from the depredations of stock on growing crops situated on appellant's inclosed premises.").

showing that they will experience irreparable harm if the preliminary injunction is not issued for the reasons stated in their memoranda of law. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order. To those reasons the Court would add only that, even setting aside the unrebutted presumption of irreparable harm arising from the above-described constitutional violations, Plaintiffs have shown the adverse factual consequences that they—and especially Plaintiff Antonyuk—will suffer if an injunction is not issued: his diminished safety in all the locations that he currently carries his concealed handgun that he will not be able to carry it. (*See, e.g.,* Dkt. No. 46, at 29 [Hrg. Tr.]; Dkt. No. 1, Attach. 6, at ¶¶ 12, 14-18 [Antonyuk Decl.]; Dkt. No. 41, Attach. 3, at ¶¶ 3-5, 7, 9-10, 12.)

### E.      The Balance of Equities and the Service of the Public Interest

After carefully considering the matter, the Court finds that Plaintiffs have made a strong showing that balance of equities tips in their favor and that the public interest would not be disserved by the Court's granting of their requested relief for the reasons stated in their memoranda of law. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order. To those reasons, the Court would add only four brief points.

First, the Court finds that it is permissible to consider modern social-science studies when evaluating these two factors despite *NYSRPA*'s focus on historical analogs, because at the moment the Court is not analyzing the constitutionality of the CCIA based on historical analogs but deciding a motion for a preliminary injunction under Fed. R. Civ. P. 65, and two factors contained in the legal standard governing such a motion are the balance of the equities and the service of the public interest.[49]

---

[49]      The Court acknowledges that authority exists for the point of law that a balance of equities factor need not be considered where (as here) a preliminary injunction seeks mandatory

Second, two of Defendant's supporting amicus briefs cite studies to support Defendant's argument that making it more difficult for law-abiding responsible citizens in New York State to obtain a license to carry a handgun concealed will help reduce the state's problem of gun violence (Dkt. Nos. 27 and 30), while Plaintiffs' supporting amicus brief cites studies to oppose that argument (Dkt. No. 24). Generally, to the extent that their underlying statistics can be discerned from the briefs, Defendant's studies seem to establish, at most, an associational relationship between some lenient right-to-carry laws and violent crime, not a causal relationship; and in any event, they seem to all fail to measure the effect of deterrence.

Third, at the end of the day, however, the undersigned is left with a strong sense of the safety that a licensed concealed handgun regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves in public without a handgun (in no small part to the doubt cast into the would-be perpetrator's mind about whether this one, in this concealed-carry state, might be armed). These include senior citizens, disabled people, and those who work late at night, especially in a city. In the words of Justice Alito,

> [I]t might be somebody who cleans offices, it might be a doorman at an apartment, it might be a nurse or an orderly, it might be somebody who washes dishes. None of these people has a criminal record. They're all law-abiding citizens. They get off work around midnight, maybe even after midnight. They have to commute home by subway, maybe by bus. When they arrive at the subway station or the bus stop, they have to walk some distance through a high-crime area . . . .

---

relief. *See New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("When [an injunction is 'mandator'], the movant must show a 'clear' or 'substantial' likelihood of success on the merits, . . . and make a 'strong showing' of irreparable harm, . . . in addition to showing that the preliminary injunction is in the public interest."). However, here, the Court considers that factor in the interest of thoroughness.

Transcript of Oral Argument at 67, *NYSRPA v. Bruen*, 142 S. Ct. 2111 (2022) (No. 20-843).[50] It is this consideration, the Court finds, that would tip the scales in favor of granting Plaintiffs' motion, if they had standing.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs' Complaint (Dkt. No. 1) is *sua sponte* **DISMISSED** **without prejudice** for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3); and it is further

**ORDERED** that Plaintiffs' motion for a preliminary injunction (Dkt. No. 9) is **DENIED without prejudice** as **moot**; and it is further

**ORDERED** that Defendant's motion to dismiss for lack of subject-matter jurisdiction (Dkt. No. 21) **DENIED without prejudice** as **moot**; and it is further

**ORDERED** that the Clerk of Court is directed to close this action.

Dated: August 31, 2022
       Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge

---

[50]    This is the case regardless of whether the number of these individuals is in the millions or merely hundreds of thousands. As the Sixth Circuit has observed of a different statute, "[i]t is in the public interest not to perpetrate the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).